IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KARL L. ELDERS,           *
                             *
           Plaintiff     *
                             *
    v.                  *   CIVIL ACTION NO. MJG-02-3892
                             *
MARIA C. DIAZ,          *
                             *
           Defendant     *

     *    *    *    *    ***    *    *    *    *

MEMORANDUM IN SUPPORT OF DEFENDANT
MARIA C. DIAZ'S MOTION FOR SUMMARY JUDGMENT

In accord with Rules 56(b) and (c) of the Federal Rules of Civil Procedure and Local Rule 105.1, the Defendant, Lieutenant Colonel Maria C. Diaz, (hereinafter "Diaz"), by her attorneys, Thomas M. DiBiagio, United States Attorney for the District of Maryland, and undersigned counsel, submits the following memorandum in support of the motion for summary judgment, in rejoinder to the Plaintiff's, Lieutenant Colonel Karl Elders (hereinafter "Elders"), Amended Complaint.

## I.   INTRODUCTION

Identifying, eradicating and preventing sexual harassment is an overriding interest of our Nation's Armed Forces. Not only is sexual harassment within the military contrary to good order and discipline, it is also counterproductive to combat readiness and mission accomplishment. Whether aired formally or informally, reportage of sexual harassment is officially encouraged and is considered by the National Guard to be in the line of duty and within the scope of employment. *See* Exhibit 1, Declaration of Felton Page, Chief, National Guard Bureau, directorate for Equal

Opportunity.

Regarding the present posture of the instant case and the genesis of the Amended Complaint, Elders initially filed a defamation suit in the Circuit Court for Baltimore County, Maryland maintaining specifically that Diaz libeled and slandered him, (Count One), and invaded his privacy, (Count Two), when Diaz reported to other military personnel that Elders had harassed her sexually in the course of her military duties. *See* Original Complaint at 1-4, ¶¶ 1-24. The case was subsequently removed to federal court and a motion seeking to substitute the United States as the party-defendant was filed simultaneously with the Notice of Removal. *See* Notice of Removal and Motion for Substitution in *Elders v. Diaz*, Civ. No. MJG-02-3892. The United States, possessed of the United States Attorney's certification that Lt. Col. Diaz was acting within the scope of employment when she made the allegations at issue, moved to substitute itself as the sole party-defendant pursuant to Section 2679(d)(1) of Title 28 of the United States Code and moved to dismiss the Original Complaint. *See* Substitution Motion of the United States and Certification, which is herein incorporated by reference, *and* Diaz's Motion to Dismiss in *Elders v. Diaz*, Civ. No. MJG-02-3892 *and* Exhibit 2, Scope-of-Employment Certification. Discontented, Elders contested the removal, argued that intramilitary immunity did not apply and pressed for discovery relative to the propriety of the scope of employment certification. *See* Elders's Opposition To Removal in *Elders v. Diaz*, Civ. No. MJG-02-3892.

By letter Order dated February 12, 2003, this Court directed Elders to file an Amended Complaint setting forth specifically the facts supportive of his argument that his claim is not one incident to military service and that Diaz's allegations were not made within the scope of her employment as a National Guard officer. *See* 2/12/03 Letter of the Court in *Elders v. Diaz*, Civ. No. MJG-02-3892. Though afforded anew the opportunity to meet the pleading requirements of Rule 8(a)(2), and heedless of the Court's directive, Elders has failed to assert with particularity any facts supporting his defamation claim, content instead to rely upon vague and general allegations.

The allegations made in Elders's Amended Complaint can be divided into three categories. First, and without supplying specific dates, Elders alleges that Diaz made statements accusing him of sexual harassment to fellow National Guard officers including Lt. Col. James M. Mentges, Lt. Col. Raul Q. Willem, Lt. Col. Warren Thomas, Lt. Col. David Rein and Officer Debbie Gregory. Amd. Compl. at 2, ¶ 8. Elders attempts to remove these statements from the context of military service by alleging that they were not made within the course of formal sexual harassment complaints or investigations.

Secondly, Elders alleges "upon information and belief" that Diaz made defamatory statements concerning him to her medical colleagues at Franklin Square Hospital "possibly including" some fifty named doctors. *Id*. at 3, ¶ 9. Elders does not deign to identify when the allegedly defamatory statements were made and

3

indeed does not specify what was purportedly said.  Moreover, the roster of names of Franklin Square Hospital employees set forth in paragraph 9 of the Amended Complaint is simply a list of *every* doctor in the General Surgery department of the hospital, an alphabetized list that can be obtained easily from the Franklin Square Internet website or telephone directory.  *See* Exhibit 6, Franklin Square Hospital Website Listing of General Surgeons. Finally, Elders alleges that Diaz made unspecified defamatory statements on unspecified dates to her husband and unnamed nanny. Amd. Compl. at 4, ¶ 10.

Lieutenant Colonel Elders seeks to impose personal liability on Diaz, a flight surgeon formerly under his command, because she accused him of sexually harassing her in the course of their military duties.  Try as he might, he cannot divorce the present suit from his military service by making vague allegations of unspecified defamatory statements by Lt. Col. Diaz to unnamed civilians outside of the National Guard.  *See* Amd. Compl. at 4, ¶¶ 9, 10.  Elders and Diaz have no relationship or contact apart from their military service in the MDANG.  Elders is an airline pilot who lives in Montgomery County, Amd. Compl. at 1, ¶ 4; Lt. Col. Diaz is a surgeon who lives and practices in Baltimore County. Amd. Compl. at 2, ¶ 5.

The statements made by Diaz reporting Lt. Col. Elders's alleged sexual harassment were made exclusively to fellow National Guard officers both informally and during the course of the ensuing formal military investigations.  *See* Exhibit 3, Declaration of Lt.

4

Col. Maria C. Diaz at 1, ¶ 4. Diaz has made no unprivileged statements accusing Elder's of sexual harassment to anyone outside of the MDANG. *Id*. at 1, ¶ 5. Accordingly, Elders's defamation claim arises out of or is incident to military service and maintenance of the instant suit is thus barred by the doctrine of intramilitary immunity.

Moreover, as referenced above, the National Guard officially encourages its members to informally report sexual harassment to fellow National Guard members prior to the lodging of formal complaints. *See* Exhibit 1, Page Declaration at 3, ¶¶ 12-14. Such informal reports are considered to be within the scope of a National Guard member's federal employment and in the line of duty. *Id*. at 5, ¶ 17. Diaz's statements reporting Elders's alleged harassment were made within the scope of her federal employment as a National Guard officer. *Id*. Consequently, pursuant to the Westfall Act, 28 U.S.C. § 2679(d)(2), the United States must be substituted as the party-defendant in place of Lt. Col. Diaz and this suit should thus proceed as one under the Federal Tort Claims Act (FTCA). 28 U.S.C. §§ 1346(b), 2671-80 (2003). *See also* 28 U.S.C. § 2679(d)(4). If the suit is treated as one filed under the FTCA, the Court lacks subject matter jurisdiction to entertain Elders's claim of defamation (libel and slander) because this type of intentional tort is not cognizable under the FTCA. 28 U.S.C. § 2680(h). Even if the contrary were true, Elders has not exhausted his administrative remedy by first presenting his claim to the appropriate federal agency for resolution; thus the claim is not

ripe for adjudication.  Such deficiencies compel dismissal of the Amended Complaint and the grant of summary judgment in Diaz's favor.

## II.  <u>STATEMENT OF FACTS</u>[1]

Although the facts giving rise to the instant action were set forth originally in Diaz's Motion to Dismiss, which is herein incorporated by reference, it bears repeating that in March 2002, both Majors Raul Willem and Michael Mentges,[2] in separate written Memorandums for the Record, notified Brigadier General David A. Beasley that Diaz had advised them individually that Elders, her commanding officer, was harassing her by repeatedly making unwanted sexual advances and subjecting her to inappropriate physical contact.  Exhibit 4, Inglis Investigation at 3, 9; Exhibit 5, Werts Investigation at 1.  The Air National Guard officially encourages its members to informally discuss incidents of sexual harassment with fellow Guard members prior to filing a formal complaint.  *See* Exhibit 1 at 3, ¶¶ 12-13.  The alleged victim of sexual harassment is in no way restricted to utilizing the formal complaint system and may freely discuss perceived sexual harassment with fellow Guard officers.  *Id.*

---

[1]  Reference herein to Exhibits 5 and 6 are to the two Inglis and Werts "Reports of Investigation" filed with Diaz's original Motion to Dismiss and designated therein as Exhibits A and B, respectively, which exhibits are incorporated herein by reference.

[2]  Willem was the Commander of the 175th Security Forces Squadron and Mentges was the 135th Airlift Squadron Training Officer.  Exhibit A, Inglis Investigation at 3; Exhibit B, Werts Investigation at 1.  Both were subsequently promoted to Lt. Col.

At the time of her informal complaints accusing Elders of sexual harassment, Diaz was assigned to the 135th Airlift Squadron as a Flight Surgeon; Elders was the Commander of that squadron and her commanding officer.  On March 9, 2002, Brig. Gen. Beasley appointed Colonel John C. Inglis as Investigating Officer to conduct a Wing-level command inquiry into Diaz's allegations. Exhibit 4 at 1; Exhibit 5 at 1.

Colonel Inglis interviewed and took sworn statements from Diaz and several other military witnesses.  His investigation focused on Diaz's specific allegations that: (1) on a May 2000 military training flight, Elders unexpectedly kissed her on the lips in the cargo compartment of the military aircraft; (2) at the Air Base in the summer of 2000, Elders invited her to travel with him to Amsterdam on a "buddy pass" where he would "show her a good time" and they could "window shop"; (3) Elders kissed her lips and attempted to push his tongue in her mouth in the summer of 2001 in the course of summonsing her to his office at the Warfield Air National Guard Base to discuss her application for a MDANG State Air Surgeon position; and (4) Elders, in December 2001 at the 175th Wing Christmas party, grabbed her wrist, twisted her arm and said, "What the hell did you say to him," Exhibit 4 at 12.

During the course of the investigation, Major Doris Maurer, another officer in Diaz's squadron, testified that she too had been subjected to Elders's unwanted sexual advances.  Elders refused to be interviewed, submitting instead an unsworn letter characterizing the sexual harassment and battery accusations as "totally false."

Exhibit 4 at 3.

Finding that Diaz's testimony was credible, Colonel Inglis wrote that Diaz "provided clear and compelling testimony that Lt. Col. Elders sexually harassed her for a period dating from at least mid-2000 to the present.  These include an unwanted kiss aboard a local training flight on probably 25 May 2000, an offer to travel alone with him to Amsterdam . . . and an unwanted kiss with an attempt to insert his tongue in her mouth in the Fall of 2001." Exhibit 4 at 8.  Colonel Inglis dismissed the notion that the allegations were entirely fabricated.  *Id.*

Due to the gravity of the findings made and conclusions reached in Inglis's investigation, Major General Bruce Tuxill, then the Assistant Adjutant General for Air and the highest ranking officer in the MDANG[3], appointed Colonel Arthur Werts of the New Jersey Air National Guard (NJANG) to conduct an independent headquarters-level investigation.  Exhibit 5 at 1.  Possessed of the record compiled in the Inglis Investigation, Colonel Werts commenced his inquiry, submitting a formal Report of Investigation to General Tuxill on June 7, 2002.  *See* Exhibit 5.  After taking the sworn testimony of both Diaz and Elders, along with the statements of fifteen other military witnesses, and citing the lack of corroborative evidence, Exhibit 5, Index of Witnesses at 17-18, Colonel Werts determined that Diaz's allegations regarding Elders's

---

[3] General Tuxill was recently appointed Adjutant General of the Maryland National Guard.

two attempts to kiss her and his comments relative to inviting her to accompany him to Amsterdam could not be substantiated by a preponderance of the evidence. *Id*. at 4-8. Noting that Diaz had reported the 2001 Christmas-party-wrist-grabbing incident to other squadron officers shortly after its occurrence and that several witnesses affirmed that Diaz looked scared at the time of the incident, Colonel Werts found that Elders had indeed grabbed and twisted Diaz's wrist. *Id*. at 7-8. Diaz has had no unprivileged discussions of her allegations with anyone outside of the National Guard. Exhibit 3, Diaz Declaration at 2, ¶ 5. She has never discussed her allegations with anyone at Franklin Square Hospital. *Id*. Additional facts will be added, where necessary, in the Argument that follows.

### III.  ARGUMENT

#### Motions For Summary Judgment--The Legal Standard

It is settled that summary judgment shall be granted when

the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Stated another way, when a party fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which the party will bear the burden at trial, summary adjudication is in order. *Celotex*, 477 U.S. at 322. A fact is material for purposes of summary judgment when, if applied in light of the pertinent substantive law, it affects the

outcome of the litigation. *Reece v. Martin Marietta Technologies, Inc.*, 914 F. Supp. 1236, 1239 (D. Md. 1995).

Clearly, the movant for summary judgment need not support its motion with evidence negating the opponent's case; rather, the movant may satisfy its burden by showing that there is an absence of evidence to support the nonmovant's case. *Latimer v. Smithkline & French Lab.*, 919 F.2d 301, 303 (5th Cir. 1990). If that showing is made, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *Celotex*, 477 U.S. at 325. "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' ... by 'conclusory allegations,' ... by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (same). As explained below, fidelity to these principles in the instant case impels summary adjudication.

## A. **Intramilitary Immunity Bars Elders's Claim**

Born largely of the concern that judicial intervention in matters military would deleteriously affect military discipline, the Supreme Court has created the doctrine of intramilitary immunity, a firm rule barring soldiers from suing their fellow-soldiers or the Government for injuries incurred incident to military service. *Minns v. United States*, 155 F.3d 445, 448-49 (4th Cir. 1998). This doctrine of intramilitary immunity was first articulated by the Supreme Court in *Feres v. United States,* 340

10

U.S. 135, 146 (1950), and is therefore frequently referred to as the *Feres* doctrine.

In *Feres*, the Supreme Court considered whether Congress, by enacting the FTCA, had waived the United States' sovereign immunity for tort suits by soldiers injured in the course of military service. Although the FTCA did not facially exempt suits arising from military service, the Court established a rule that "the Government is not liable . . .for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." *Id.* at 146. The Court's holding in *Feres* was based upon three factors.

First, no American law had ever permitted a soldier, whether regular or Militia, to recover for damages against his superiors or the Government. *Id.* at 141-42. Second, Congress had established a comprehensive administrative scheme to compensate soldiers injured or killed in the line of duty. Finally, and most importantly, the Court considered the unique relationship between the Nation and its soldiers. *Id.* at 143. The Court later explained that "in the last analysis, *Feres* seems best explained by the peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits . . . were allowed for negligent orders given or negligent acts committed in the course of military duty." *United States v. Shearer*, 473 U.S. 52, 57 (1985)(internal quotation marks and citations omitted). *See also Minns*, 155 F.3d at 448-49 (explaining

rationale for the doctrine of intramilitary immunity).

In *Chappell v. Wallace*, 462 U.S. 296 (1983), the Supreme Court extended the doctrine of intramilitary immunity to *Bivens* claims brought by soldiers against their fellow soldiers.[4]  The Court explicitly acknowledged that its analysis in *Chappell* was guided by *Feres* although *Bivens* claims are not suits against the Government under the FTCA, but rather damages claims against individual defendants in their personal capacities.  *Chappell*, 462 U.S. at 299.  *See generally F.D.I.C. v. Myer*, 510 U.S. 471, 478 (1994) (holding that *Bivens* claims may not be brought against the United States or its agencies).

The Court's holding in *Chappell* recognized that "no military organization can function without strict discipline and regulation that would be unacceptable in a civilian setting," and that "[t]he inescapable demands of military discipline and obedience to orders cannot be taught on battlefields[.]"  *Chappell*, 462 U.S. at 300.  Accordingly, the Court barred *Bivens* suits within the military because "[t]he special nature of military life – the need for unhesitating and decisive action by military officers and equally disciplined responses by enlisted personnel – would be undermined by [lawsuits among soldiers]."  *Id.* at 304.  *See also Shearer*, 473 U.S. at 52, 57 (holding that the hallmarks of the intramilitary immunity doctrine are "whether the suit requires the civilian court to second-guess military decisions and whether the suit might

---

[4] *Bivens v. Six Unknown Named Federal Narcotics Agents*, 403 U.S. 388 (1971).

impair essential military discipline.")

The Court later explained in *United States v. Stanley,* 483 U.S. 669, 679-84 (1987), that its ruling in *Chappell* must be interpreted broadly to bar *all* tort claims within the military, not simply claims by enlisted soldiers against their superiors. *Id.* at 684. The Court explicitly rejected a proposed restriction of intramilitary immunity to lawsuits in which "it affirmatively appears that military discipline would be affected." *Id.* at 681. Instead, the Court established a bright-line test barring all claims that "'arise out of or are in the course of activity incident to [military] service.'" *Id.* at 684, *quoting Feres*, 340 U.S. at 146. The Court explained that

> [a] test for liability that depends upon the extent to which particular suits would call into question military discipline and decision-making would itself require judicial inquiry into, and hence intrusion upon, military matters. **Whether a case implicates those concerns would often be problematic, raising the prospect of compelled depositions and trial testimony by military officers concerning the details of their military command**. Even putting aside the risk of erroneous judicial conclusions (which would becloud military decision making), the mere process of arriving at correct conclusions would disrupt the military regime. **The "incident to service" test, by contrast, provides a line that is relatively clear and that can be discerned with less extensive inquiry into military matters.**

*Stanley*, 483 U.S. at 682-83 (emphasis added).

Of no moment relative to the application of the *Feres* doctrine is the type of military service implicated by the lawsuit. Whether involving regular or reserve components of the military, lawsuits arising incident to such service are uniformly barred. Moreover, intramilitary immunity has been applied to preclude all service-

13

connected claims brought against National Guard soldiers.   Those courts having occasion to consider the issue have so held.   *See, e.g., Jones v. New York State Division of Military and Naval Affairs*, 166 F.3d 45, 51 (2nd Cir. 1999)(collecting cases).   *See also Bowen v. Oistead*, 125 F.3d 800, 804-05 (9th Cir. 1997), *cert. denied*, 524 U.S. 938 (1998); *Uhl v. Swanstrom*, 79 F.3d 751, 755-56 (8th Cir. 1996); *Wright v. Park*, 5 F.3d 586, 591 (1st Cir. 1993)(all cases applying intramilitary immunity to bar suits incident to service of any component of military).

In *Bowen*, it was argued that the doctrine was only applicable where federal military personnel committed some tort.  125 F.3d at 804.   The Court of Appeals for the Ninth Circuit rejected the contention, opining that the "military apparatus of the United States cannot be divided into strictly state and federal components." *Id*. at 804-05.   The court went on to hold that "*Feres* applies to the state National Guards and their members due to the integral role they play as part of the nation's defense force and the substantial degree to which the state National Guards are financed, regulated, and controlled by the federal government even when not called into active federal service." *Id. See also Jones*, 166 F.3d at 51-52 (holding that justiciability of constitutional tort actions incident to state and federal military service co-extensive in light of central role National Guard plays in the national defense).

Even for suits bottomed upon state law, the intramilitary

14

immunity doctrine still applies and federal courts, in the exercise of their pendent or supplemental jurisdiction, have so concluded. *See* 28 U.S.C. § 1367. For example, the Court of Appeals for the Fifth Circuit explained in a case involving the National Guard that "[j]udicial review of a claim for damages asserted on the basis of state law would constitute no less an unwarranted intrusion into the military . . . structure than the entertainment of claims founded in § 1985[5], § 1983[6], and *Bivens*. Absent express Congressional provision for such judicial intervention, the rationale of *Chappell* . . . bars state law tort claims." *Holdiness v. Stroud*, 808 F.2d 417, 426 (5th Cir. 1987). *See also Jorden v. National Guard Bureau*, 799 F.2d 99, 101, 108 (3rd Cir. 1986), *cert. denied*, 484 U.S. 815 (1987)(holding that intramilitary immunity bars pendent state common law claims for defamation against National Guard officers); *Bowen*, 125 F.3d at 805 (pendent state law breach of contract claim by National Guard soldier nonjusticiable because it involved inherently military issues).

In *Jaffe v. United States*, 663 F.2d 1226, 1239 (3rd Cir. 1979), *cert. denied,* 456 U.S. 972 (1982), the Court of Appeals for the Third Circuit analyzed pendent state law claims brought by former active-duty soldiers who alleged that they were ordered to

---

[5]  42 U.S.C. § 1985.

[6]  42 U.S.C. § 1983.

stand in a field without any protection from radiation while a nuclear weapon was detonated a short distance away. *Id*. at 1229. The Third Circuit held that the soldiers' state law claims were barred by intramilitary immunity and explained that "the rationale for precluding FTCA suits applies equally to suits brought directly under state law. Suits founded on state law have the same potential for undermining military discipline as federal tort claims." *Id*. at 1239.

Importantly, whether a lawsuit arises from or is incident to military service is not synonymous with state law concepts of scope-of employment. The incident to service test is a much broader concept. The federal courts have consistently applied the doctrine of intramilitary immunity to bar *all* lawsuits within the military, including the National Guard, by soldiers seeking damages from their fellow-soldiers or the Government for injuries in any way related to their military service. The Court of Appeals explains that "[i]n the broadest sense, the *Feres* [intramilitary immunity] doctrine removes military governance from the rubric of civilian tort law." *Stewart v. United States*, 90 F.3d 102, 105 (4th Cir. 1996). "[A]t a minimum, *all* injuries suffered by military personnel that are even remotely related to the individual's *status* as a member of the military" are barred by intramilitary immunity. *Id., quoting Major v. United States*, 835 F.2d 641, 644 (6th cir. 1987), *cert. denied* 487 U.S. 1218 (1988)(emphasis in original).

This Court recently expounded on the critical need for this sweeping intramilitary immunity in a case involving the alleged rape of a female soldier by her drill sergeant. *Shiver v. United States*, 34 F.Supp. 2d 321, 322 (D.Md. 1999). Holding that the alleged rape victim's claims were barred, this Court eloquently explained that

> [t]he military services of this country cannot effectively be managed or deployed
> if subject to litigative hindsight by...judges[.]. . .[M]ilitary discipline would be adversely affected by allowing tort litigation [within the Armed Forces]... as officers' and noncommissioned officers' authority and credibility would both be open to attack outside military channels thus undermining their authority. **The resulting fear of litigation would paralyze decision-making in the one segment of our society that remains free of such paralysis, and that must remain free of it, if it is to fulfill its mission.**

*Shiver*, 34 F.Supp. 2d at 322 (emphasis added).

Plaintiff cannot separate the allegedly defamatory statements made by Lt. Col. Diaz accusing him of sexual harassment from his military service. Lieutenant Colonel Diaz had informal discussions with fellow National Guard officers reporting that her commanding officer, Lt. Col. Elders, was sexually harassing her in the course of her military duties. *See* Diaz Decl. at 2, ¶ 4. Lieutenant Colonel Diaz made these informal reports at the Air National Guard Base while performing military duty in uniform. *Id*. Such informal reports of sexual harassment are officially encouraged by the National Guard and are considered to be in the line of duty and

within the scope of employment for a member of the National Guard. *See* Exhibit 1, Page Decl. at 3, 5, ¶¶ 12-13, 17.

The military certainly considered Lt. Col. Diaz's allegations to be a matter of utmost military concern. As a result of Lt. Col. Diaz's informal reports, the National Guard conducted two formal military investigations of Lt. Col. Elders. Exhibits 4; 5. Lieutenant Colonel Diaz participated as a witness in both investigations and gave sworn statements accusing Lt. Col. Elders of sexual harassment. *Id*. Specifically, she testified that Lt. Col. Elders unexpectedly kissed her on the lips in the cargo bay of a military aircraft while they were on a training mission, Exhibit 4, Inglis investigation at 5-6, 8; Exhibit 5, Werts Investigation at 2; that he forcibly kissed her on the lips and attempted to push his tongue into her mouth during a meeting in his office at Squadron Headquarters, *id.;* that he invited her to travel to Amsterdam alone with him, *id.;* and that he grabbed and twisted her wrist in a threatening manner at a Wing Christmas party. *Id.* Each of these allegations directly concerns Elders's military service and status as a commanding officer. Lieutenant Colonel Diaz has never made an unprivileged statement accusing Lt. Col. Elders of sexual harassment to anyone outside of the National Guard. Exhibit 3, Diaz Decl. at 2, ¶ 5. In fact, Lt. Col. Elders and Lt. Col. Diaz have no relationship or contact outside of their military service in the National Guard. Diaz Decl. at 1, ¶ 3. Essentially,

18

Lt. Col. Elders alleges that his military reputation and military career have been adversely affected by a subordinate officer's allegations of sexual harassment. Elders's defamation claim is squarely barred by the doctrine of intramilitary immunity. *See, e.g., Murphy v. Marcum*, 946 F.2d 886, 1991 WL 209035 (4th Cir. 1991)(unpublished)(holding that soldier's defamation claims were barred by intramilitary immunity); *Deckinger v. Castro-Reyes*, 689 F.Supp. 531 (D. Md. 1988)(holding that Reserve officer's defamation claims were barred by intramilitary immunity). Summary judgment is therefore in order.

### B. Elders's Claims Are Not Cognizable Under The FTCA

In addition to being barred by intramilitary immunity, there is yet another reason why Elders cannot proceed with his suit. As explained more fully below, the United States must be substituted as the party-defendant in this matter thus rendering the instant action one governed by the FTCA. In the Federal Employee Liability Reform and Tort Compensation Act of 1988 (FELRTCA), 28 U.S.C. § 2679, Congress amended the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-80, to provide absolute immunity to federal employees for state-law torts committed within the scope of their employment. *Jamison v. Wiley*, 14 F.3d 222, 227 (4th Cir. 1994). The FELRTCA overruled the Supreme Court's decision in *Westfall v. Erwin*, 484 U.S. 292, 297 (1998), which significantly narrowed the absolute immunity that federal employees had traditionally enjoyed

19

from state-law torts.  *Jamison*, 14 F.3d at 226.  For that reason, the FELRTCA is commonly known as the Westfall Act.

The purpose of the Westfall Act "was to give federal employees an absolute immunity from common law tort actions that was functionally equivalent to . . . the immunity that they had enjoyed under the common law doctrine of *Barr v. Matteo* before the *Westfall* decision."  *Jamison*, 14 F.3d at 227.  The Westfall Act's absolute immunity is codified at 28 U.S.C. § 2679(b)(1).  That provision establishes that an action against the United States under the Federal Tort Claims Act shall be "exclusive of any other civil action or proceeding for money damages" against a federal employee or their estate for negligent or wrongful acts committed "while acting within the scope of his office or employment."  *Id.; see, e.g., Maron*, 126 F.3d at 321; *Barry v. Stevenson*, 965 F. Supp. 1220, 1222-24 (E.D. Wisc. 1997) (holding that FTCA provides the exclusive remedy for Wisconsin National Guard soldier injured due to negligence of fellow National Guard soldier).

In the Westfall Act, Congress established a procedure whereby the United States is substituted as party-defendant in place of any federal employee sued in his/her individual capacity upon certification by the Attorney General that the employee was acting within the scope of his/her office or employment at the time of the incident out of which the claim arose.  28 U.S.C. § 2679(d)(1); (d)(2); *Maron*, 126 F.3d at 321-22.  Thereafter, the action proceeds

as a claim against the United States under the FTCA. 28 U.S.C. §
2679 (d)(4). The Westfall Act further provides that any action
filed in State court is removed by operation of law to federal
court upon the Attorney General's certification. 28 U.S.C. § 2679
(d)(2). The Attorney General's scope-of-employment certification
is conclusive for purposes of removal. *Id.*; *Borneman v. United
States*, 213 F.3d 819, 825-26, 829 (4th Cir. 2000), *cert. denied* 531
U.S. 1070 (2001).

Members of the National Guard are federal employees when
engaged in training or duty under Title 32 or Title 10 of the
United States Code. 28 U.S.C. § 2671; *Singleton v. United States*,
277 F.3d 864 (6th Cir. 2002)(affirming Westfall Act certification
of Air National Guard officer sued for defamation in state court by
fellow National Guard officer). The United States Attorney for the
District of Maryland, as the designee of the Attorney General, has
certified that Lt. Col. Diaz was acting within the scope of her
federal office or employment at the time of the incident out of
which this claim arose. *See* Exhibit 2, Scope-of-Employment
Certification. Accordingly, and by operation of law, the United
States has been substituted as the party-defendant in place of Lt.
Col. Diaz, and this is an action against the United States under
the FTCA. 28 U.S.C. § 2679(d)(4).

It is indisputable that Diaz was acting within the scope of
her federal employment as a National Guard officer when she made

21

statements accusing Elders of sexually harassing her. The determination of whether an employee was acting within the scope of her employment is made by reference to the principles of the respondeat superior law of the state in which the alleged tort occurred. *Maron*, 126 F.3d at 323-24. Under Maryland law, the law pertinent here, a number of variables inform the scope-of-employment determination, though the Maryland Court of Appeals in *Sawyer v. Humphries*, 322 Md. 247, 255, 587 A.2d 467, 470 (1991), made clear that no one factor is dispositive. Respecting what considerations may be pertinent, the *Sawyer* court observed that:

> [t]o be within the scope of the employment the conduct must be of the kind the servant is employed to perform and must occur during a period not unreasonably disconnected from the authorized period of employment in a locality not unreasonably distant from the authorized areas, and actuated at least in part by a purpose to serve the master.

*Id*. at 255, 587 A.2d at 470.

Amplifying this point, the court held that the general test for determining if an employee's tortious acts were within the scope of employment is whether the acts were in furtherance of the employer's business and were authorized by the employer. *Id*. The court went on to say that an important factor is whether the employee's conduct was "expectable" or "forseeable." *Id*. at 256, 587 A.2d at 471 (quoting *Cox v. Prince George's County*, 296 Md. 162, 171, 460 A.2d 1038, 1042 (1983)) (other citations omitted). Viewed in light of *Sawyer's* exposition of the principles relevant to the scope-of-employment determination, it is clear that Diaz was within such scope when she made the statements at issue.

Diaz's formal and informal statements reporting Lt. Col. Elders' sexual harassment were expressly authorized by National Guard policy. National Guard Bureau policy officially encourages Guard members to informally discuss perceived incidents of sexual harassment with fellow Guard members prior to filing formal complaints. *See* Exhibit 1, Page Decl. at 3, ¶¶ 12-13, 17. The National Guard considers such informal complaints to be within the scope of a Guard member's federal employment. *Id*.

Lt. Col. Diaz made informal reports accusing Lt. Col. Elders of sexual harassment to fellow National Guard officers while on duty at the Air Base. Exhibit 3, Diaz Decl. at 2, ¶ 4. The National Guard acted upon these informal reports and conducted two formal investigations. Exhibit 4, Inglis Investigation; Exhibit 5, Werts Investigation. Lt. Col. Diaz reiterated her allegations of sexual harassment in sworn testimony in the two formal investigations. *Id*. The National Guard could not have conducted its formal investigations without Lt. Col. Diaz's informal reports and cooperation as a witness.

Incontestably, Diaz's statements were made in furtherance of one of the National Guard's functions, that is, preserving military morale and discipline. Sexual harassment is recognized by the Armed Forces to be contrary to good order and discipline and counterproductive to combat readiness and mission accomplishment. Exhibit 1, Page Decl. at 3, ¶ 8. Preventing, identifying and

eliminating sexual harassment is a top command priority within the National Guard. *Id.* Diaz's statements to her fellow Guardsmen furthered this command priority and were authorized by National Guard policy. *Id*. at 3, ¶¶ 9-17. The National Guard considers statements reporting sexual harassment, whether formal or informal, to be in the line of duty and within the scope of a Guard members' employment. *Id*. at 5, ¶ 17.

In short, Diaz was acting within the scope of her employment at the time of the occurrence of the allegedly tortious conduct. The Amended Complaint and the exhibits attached herein clearly attest to such. The scope-of-employment certification is appropriate and substitution of the United States is entirely proper. As explained below, the limitations and exceptions set forth in the FTCA thus define this Court's subject matter jurisdiction and dictate dismissal of the Amended Complaint.

**1. Elders's Claim Is Not Cognizable**

Under the doctrine of sovereign immunity, the United States may not be sued without its consent. *United States v. Sherwood*, 312 U.S. 584, 586 (1941). Courts strictly construe limited waivers of sovereign immunity in favor of the sovereign. *Doe v. Chao*, 306 F.3d 170, 179 (4th Cir. 2002). Absent such a waiver, the court lacks subject matter jurisdiction over claims against the government. *United States v. Mitchell*, 463 U.S. 206, 212 (1983).

Though the FTCA constitutes a limited waiver of sovereign immunity, the FTCA exempts intentional torts of the sort at issue here from its immunity waiver. Subsection(h) of Section 2680 of

24

the FTCA expressly provides that:

> The provisions of this chapter and section 1346(b) of
> this title shall not apply to-
>
> (h) Any claim arising out of assault, battery, false
> imprisonment . . . libel, slander . . . .

28 U.S.C. § 2680(h) (2002).  Elders's Amended Complaint alleges

libel and slander.  Amd. Compl.  Under Maryland law, the gravamen

of such torts is injury to reputation through the communication of

false information. *Chinwuba v. Larsen*, 142 Md. App, 327, 359, 790

A.2d 83, 101 (2002).  However pled, when a claim involves the type

of damage described above, it is not cognizable under Section

2680(h)'s exception for claims having their genesis in libel and

slander. *Talbert v. United States*, 932 F.2d 1064, 1066-67 (4th Cir.

1991).  In short, the suit is jurisdictionally barred.

### 2. Elders's Has Not Exhausted His Administrative Remedy Thus Divesting The Court Of Subject Matter Jurisdiction

Even if Elders's claim is cognizable under the FTCA, this

Court still has no authority to adjudicate the claim.  Unless an

administrative claim is first presented to the appropriate federal

agency and subsequently denied, no civil action may be instituted

in federal court.  This is the command of the FTCA, which, in

pertinent part, provides in language that brooks no

misunderstanding:

> An action shall not be instituted upon a claim against
> the United States for money damages for injury or loss of
> property or personal injury or death caused by the
> negligent or wrongful act or omission of any employee of
> the Government while acting within the scope of his
> office or employment, *unless the claimant shall have
> first presented the claim to the appropriate federal
> agency and his claim shall have been finally denied by*

> *the agency in writing and sent by certified or registered*
> *mail.*

28 U.S.C. § 2675(a) (2001)(emphasis added).

Section 2401(b) of Title 28 of the United States Code reinforces when a tort claim against the Government may be filed in court, enjoining that

> [a] tort claim against the United States shall be forever
> barred unless it is presented in writing to the
> appropriate federal agency within two years after such
> claim accrues or unless action is begun within six months
> after the date of mailing, by certified or registered
> mail, of notice of final denial of the claim by the
> agency to which it was presented.

By their terms, these statutory provisions evince Congress' intent that satisfaction of the available administrative remedy conferred by the FTCA is a condition precedent to invocation of the judicial process. The failure to follow the requirements of the FTCA leaves a plaintiff without a forum in which suit may be entertained. This is so because the statutory command of Section 2675(a) is jurisdictional. The Supreme Court so held in *McNeil v. United States*, 508 U.S. 106 (1993).

There, four months after filing an FTCA action in federal court seeking damages derived from allegedly injurious human experimentation, McNeil submitted a similarly-based claim to the Department of Health and Human Services. *Id.* at 107. One month after its submission, the claim was denied by the federal agency. *Id.* at 108. Upon being served with McNeil's complaint, the United States moved successfully to dismiss the action, the district court concluding that the suit was filed prematurely, a ruling affirmed

26

by the Seventh Circuit Court of Appeals.  *Id*. at 109.

In taking up the question of whether McNeil could properly file suit in federal court without first having completed the procedural steps adumbrated in § 2675(a), the Supreme Court held that McNeil had filed his complaint too early.  Informed by that portion of the text of § 2675(a) proscribing the filing of a suit in the absence of presentment and denial of a claim at the administrative level, and noting that it could not rewrite the language of the statute, the High Court observed that "Congress intended to require complete exhaustion of Executive remedies before invocation of the judicial process." 508 U.S. at 112.  The Court went on to hold that dismissal of McNeil's complaint was proper and fully in accord with § 2675(a)'s exhaustion requirement. *Id*.

No different result should obtain here.  Elders has not presented an administrative claim to the appropriate federal agency.[7]  As discussed in subsection B of the Argument section of this Memorandum, the principle that the United States, as sovereign, has the right to define the conditions under which it will be sued is entrenched.  Courts are not free to extend or narrow the waiver of sovereign immunity beyond what Congress intended. *Houston v. U.S. Postal Service*, 823 F.2d 896, 898 (4th Cir. 1987), *cert. denied*, 485 U.S. 1006 (1988).  The language of §

---

[7]  The agency is drafting an affidavit to that effect and the Defendant will supplement its motion with the affidavit once it is completed.

2675(a) manifests Congress's intent that FTCA cases begin with the express or implicit denial of an administrative claim before subject matter jurisdiction over the claim vests in federal court. Allowing maintenance of Elders's premature suit would contravene the plain language of § 2675(a) and disserve the goals underlying the FTCA exhaustion requirement--the efficient settlement of claims and reduced congestion of court dockets. Elders's claim must therefore be dismissed.

## C. All Of Diaz's Statements Accusing Elders Of Sexual Harassment Are Privileged

In addition to intramilitary immunity and Westfall Act immunity, Elders's defamation claim fails as a matter of law because all statements made by Lt. Col. Diaz accusing Elders of sexual harassment are privileged. For reasons of public policy, certain communications are privileged and cannot give rise to a defamation claim. *Gohari v. Darvish*, 363 Md. 42, 55-59, 767 A.2d 321, 327-28 (2001). *See also* Restatement (Second) of Torts § 558 (1977)(elements of a cause of action for defamation include an *unprivileged* publication to a third party). Privileges may be absolute or qualified. *Gohari*, 363 Md. at 55, 767 A.2d at 327-28. An absolute privilege provides complete immunity regardless of Diaz's purpose or motive, or the reasonableness of her conduct. *Gohari*, 363 Md. at 42, n. 13, *quoting, DiBlasio v. Kolodner*, 233 Md. 512, 522, 197 A.2d 245, 250 (1964). Elders may only overcome a qualified privilege by proving malice, a showing that is not met

by simply asserting that such is obvious. *Id.*

Under Maryland law, publications between spouses are absolutely privileged and cannot give rise to a defamation claim under any circumstances. *Gohari*, 363 Md. at 42, n. 13, 767 A.2d at 321 *quoting* Dan B. Dobbs, *The Law of Torts* §§ 413-14. *See also* Restatement (Second) Torts § 592 (1977)("[a] husband or a wife is absolutely privileged to publish to the other spouse defamatory matter concerning a third person). Accordingly, Elders's allegation that Lt. Col. Diaz made defamatory statements concerning him to her husband, Amd. Compl. at 4, ¶ 10, cannot support Elders's defamation claim.

Additionally, all statements made by Lt. Col. Diaz to fellow National Guard members reporting Lt. Col. Elder's sexual harassment are absolutely privileged. The Court of Appeals, in *Mangold v. Analytic Services Incorporated*, 77 F.3d 1442, 1447 (4th Cir. 1996), a case strikingly similar to the one at bar, held that all statements made during official military investigations are absolutely privileged. In *Mangold*, an Air Force Lt. Col. reported his superior officer, Col. Mangold, to Air Force authorities for improperly pressuring a contractor to hire a family friend. *Id.* at 1445. Prior to formally reporting Col. Mangold's misconduct, the Lt. Col. discussed the Col.'s misconduct with fellow Air Force officers. *Id.*

As a result of the Lt. Col.'s complaint, the Air Force

conducted an internal investigation and Col. Mangold was removed from his position. *Id.* Colonel Mangold then filed suit in Virginia state court against the Lt. Col., the contractor, and its executives alleging that they had defamed him by fabricating the charges of misconduct. *Id.* Pursuant to the Westfall Act, 28 U.S.C. 2679(d)(2), the Attorney General certified that the Lt. Col. was acting within the scope of his federal employment when he made the allegedly defamatory statements, removed the case to federal court, and substituted the United States for the Lt. Col. as the party-defendant. *Id.*

Relying on the Supreme Court's opinions in *Barr* and *Westfall, supra*, the Fourth Circuit recognized that under federal common law, government employees participating as witnesses in official investigations are shielded by absolute immunity. *Mangold*, 77 F.3d at 1447. The Court reasoned that "if government employees cooperating in such investigations are left exposed to lawsuits filed by those under investigation, they might be reluctant to cooperate, even if they are eyewitnesses to improper conduct." *Id.* The *Mangold* court then extended this absolute immunity to civilians cooperating with official investigations. *Id.* at 1448-49.

Applying *Mangold* to the instant case, it is apparent that all statements made by Lt. Col. Diaz during the two official Air National Guard investigations are absolutely privileged. *Id.* at 1447. Furthermore, Diaz's informal reports to fellow National

30

Guard members should also be protected by absolute privilege. Official National Guard policy encourages National Guard soldiers and airmen to make informal complaints reporting sexual harassment prior to filing formal complaints. Exhibit 1, Page Declaration at 3-4, ¶¶ 12-14. Such informal complaints advance the critical National Guard imperative of preventing, identifying, and eliminating sexual harassment. *Id.* at 4, ¶ 15.

Informal complaints are an important part of the Air National Guard's Equal Opportunity and Treatment (EOT) program. If a National Guard officer making an informal complaint of sexual harassment is not protected by the same absolute immunity enjoyed during a formal investigation, informal complaints cannot be an effective tool in eliminating sexual harassment within the Armed Forces. Accordingly, the absolute immunity recognized in *Mangold* should extend to Lt. Col. Diaz's informal complaints.

Even if Lt. Col. Diaz's informal complaints to fellow National Guard members are not absolutely privileged, they are protected by a qualified privilege. Maryland recognizes a qualified privilege among people who share a common interest. *Gohari*, 363 Md. 42, 57-59, 767 A.2d at 328-29. In *Gohari*, the Maryland Court of Appeals explained that "[a]n occasion is conditionally privileged when the circumstances are such as to lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that facts exists which another sharing such

common interest is entitled to know." *Id.* at 57, *quoting Hanrahan v. Kelly*, 269 Md. 21, 28, 305 A.2d 151, 156 (1973). *See also* Restatement (Second) of Torts § 596. "'The common law conditional privilege is broad and may apply to 'an infinite variety of factual circumstances.'" *Id.*

The members of a State's National Guard certainly share a common interest and duty in eliminating sexual harassment within the Guard. Therefore, communications by a Guard member to fellow Guard members concerning alleged incidents of sexual harassment by her commanding officer are protected by at least a qualified privilege. This is consistent with the federal courts' recognition of a broad application of the qualified privilege in the sexual harassment context because of the overriding common interest in eliminating sexual harassment in the workplace. *See, e.g., Garziano v. DuPont*, 818 F.2d 380, 387-89 (5th Cir. 1987); *Minns v. McDonnel Douglas*, 162 F. Supp. 2d 718, 740-42 (E.D. Mich 2001). Accordingly, all statements made by Lt. Col. Diaz accusing Lt. Col. Elders of sexual harassment are privileged under the law of defamation. Elders's case must be dismissed and summary judgment should be granted in favor of Lt. Col. Diaz.

## IV.  CONCLUSION

Based upon the foregoing, and the Defendant's original Motion to dismiss, which is incorporated herein by reference, the Defendant, Lieutenant Colonel Maria C. Diaz, requests that Elders's

Amended Complaint be dismissed and summary judgment be granted in

the Defendant's favor.

                              Respectfully submitted,

                              THOMAS M. DIBIAGIO
                              United States Attorney

                    By:    _____/s/_____
                              TARRA DeSHIELDS
                              Assistant United States Attorney
                              General Bar No. 07749

                              Office of the United States Attorney
                              6625 United States Courthouse
                              101 West Lombard Street
                              Baltimore, Maryland  21201
                              (410) 209-4800

                              Stephen M. Doyle
                              Lieutenant Colonel
                              Judge Advocate General's Corps
                              Maryland Army National Guard
                              1724 Sutton Avenue
                              Baltimore, Maryland 21227
                              (202) 353-8174

                              Counsel for Defendant Diaz

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on this 10th day of April, 2003, a copy

of the foregoing Motion For Summary Judgment was filed

electronically, and forwarded by regular mail, postage prepaid, to

Mark S. Zaid, Krieger & Zaid, PLLC, 1133 21st Street, N.W., Suite

800, Washington, D.C. 20036.

                         _____/s/_____

                         TARRA DeSHIELDS
                         Assistant United States Attorney