*FOR OFFICIAL USE ONLY*

# COMMANDER DIRECTED

# REPORT OF INVESTIGATION

# PREPARED BY

# COLONEL ARTHUR N. WERTS

# INVESTIGATING OFFICER

# AIR NATIONAL GUARD

# CONCERNING ALLEGATIONS OF

# MISCONDUCT OF

# LT COL KARL ELDERS

# 7 JUNE 2002

*FOR OFFICIAL USE ONLY*

# TABLE OF CONTENTS

**SECTION I**
    **TAB A**
        SCOPE AND AUTHORITY..............................................1
        BACKGROUND AND ALLEGATIONS .............................1
    **TAB B**
        CHRONOLOGY OF EVENTS.........................................3

**SECTION II**
    **TAB C**
        FINDINGS, ANALYSIS AND CONCLUSIONS....................4
    **TAB D**
        LT COL ELDERS CONCERNS .......................................9
    **TAB E**
        RECOMMENDATIONS ................................................14

**SECTION III**
    **TAB F**
        INDEX OF WITNESSES................................................17
    **TAB G**
        INDEX OF EXHIBITS...................................................19

*FOR OFFICIAL USE ONLY*

## Section I: Tab A

1. **SCOPE AND AUTHORITY:** Major General Bruce F. Tuxill, Assistant Adjutant General for Air appointed Colonel Arthur N. Werts on 2 April 2002 to conduct the investigation into allegations concerning inappropriate conduct committed by Lieutenant Colonel Karl Elders. These allegations concern certain conduct against Lieutenant Colonel Maria Diaz, a flight surgeon assigned to the 135 Airlift Group. The investigation was conducted from 18 April 2002 to 10 May 2002, and was administratively supported by the Headquarters, Maryland Air National Guard, Fifth Regiment Armory, Baltimore, Maryland.

2. **BACKGROUND AND ALLEGATIONS:**

    2.1. **BACKGROUND:** The allegations in question came to light in late February 2002 when the Commander of the 175th Security Forces Squadron, Major Raul Willem, was in a conversation with Lt Col Maria Diaz and she related that she was "having a problem with another officer"; that she was "nervous and upset"; and, in Major Willem's view, "was crying as she told me the story." Lt Col Diaz identified the officer she was having problems with as her commander, Lt Col Karl Elders. Summarized, Lt Col Diaz's description of the issues were unwanted and repeated sexual advances, physical contact, and harassment.

Major Willem submitted his observations in a Memorandum for the Record to the 175 WG/CC, Brig Gen Beasley, on 7 March 2002. On 8 March 2002, Major Michael Mentges, 135 Airlift Squadron Training Officer, prepared a memorandum citing similar concerns based on conversations he had with Lt Col Diaz from the late Fall of 2001 through early March 2002. Maj Willem reported that Lt Col Diaz stated she was afraid to come forward because she was concerned that "no one would believe her" and that Lt Col Elders would reprise against her.

On 9 March 2002, Brig Gen Beasley appointed Colonel John C. Inglis, MDANG, to conduct a commander directed inquiry.

Lt Col Diaz, 135th AG, SME, is a traditional guardsman who serves as a board certified surgeon in the Baltimore medical community. During the course of the investigation, another female officer, Major Doris Maurer, the full time 135th Airlift Group Deputy for Maintenance, testified to having experienced a similar, though less aggressive, physical contact with Lt Col Elders.

Lt Col Elders has served as the Commander of the 135th Airlift Squadron for two years. He has been a traditional guardsman in the Maryland Air National Guard for over 11 years. He is a commercial airline pilot in his civilian occupation. Lt Col Elders was interviewed by Col Inglis on 15 March 2002. After being informed of the nature of the allegations, he declined to provide any verbal testimony, citing his right to legal counsel. On 17 March 2002, he submitted a letter stating that allegations of "sexual harassment, battery, and maltreatment against a female subordinate…are totally false." Lt Col Elders did not provide any further testimony.

The Wing directed inquiry was completed on 19 March 2002. The various memoranda and statements collected during that inquiry provided a basis for the Headquarters, MDANG investigation. On 2 April 2002, Major General Tuxill appointed Colonel Arthur N. Werts,

*FOR OFFICIAL USE ONLY*

Headquarters NJANG to conduct a command directed investigation into the allegations against Lt Col Elders, as well as concerns raised by Lt Col Elders.

2.2 ALLEGATIONS: The allegations investigated were framed from the sworn statements dated 9 March 2002 and 14 March 2002 provided by Lt Col Diaz during the inquiry conducted by Col Inglis.

2.2.1 ALLEGATION NUMBER 1. Lt Col Diaz alleged Lt Col Elders made an inappropriate sexual advance towards her with a kiss on the lips in the cargo compartment during a C-130J local training flight in Summer 2000. If established this would be a violation of ANGI 36-3, Paragraph 1-7b.

2.2.2 ALLEGATION NUMBER 2. Lt Col Diaz alleged that during Summer 2001 Lt Col Elders made her an inappropriate offer by inviting her to accompany him to Amsterdam for free with a "buddy pass" and that they would have a wonderful time "window shopping." If established this would be a violation of ANGI 36-3, Paragraph 1-7b.

2.2.3 ALLEGATION NUMBER 3. Lt Col Diaz alleged that during Summer 2001 Lt Col Elders invited her to his office where he kissed her in a sexually aggressive manner. If established this would be a violation of ANGI 36-3, Paragraph 1-7b.

2.2.4 ALLEGATION NUMBER 4. Lt Col Diaz alleged that at the December 2001 Wing Christmas party Lt Col Elders grabbed her wrist, twisting her arm and said "what the hell did you say to him." If established, this would be a violation of ANGI 36-3, Paragraph 1-7b as well as provisions of the Annotated Code of Maryland Article 65, Section 47.



**DEPARTMENT OF THE AIR FORCE**
**HEADQUARTERS MARYLAND AIR NATIONAL GUARD (ANG)**
**BALTIMORE MARYLAND**

2 Apr 02

MEMORANDUM FOR COLONEL ARTHUR N. WERTS

FROM: MDNG/AGAIR

SUBJECT: Appointment as Investigating Officer

1. Pursuant to my authority as Assistant Adjutant General (Air) for the State of Maryland, I hereby appoint you as Investigating Officer into the matters and circumstances arising from or related to certain allegations made against and by Lt Col Karl Elders, Commander, 135th Airlift Squadron, Maryland Air National Guard.

2. Pursuant to the above, you are hereby directed to conduct an inquiry into these allegations, seeking to obtain and collect all evidence that you deem to be reasonably available and relevant to your investigation. You are further directed to prepare a report aggregating the evidence and information you collect and/or otherwise gather. This report will, at a minimum, summarize the evidence relevant to this matter, provide findings, and conclude with recommendations. Statements and other evidence relevant to your inquiry will be attached to your report.

3. If you have any questions or need assistance, please contact Lt Col Allyson Solomon at 800-847-7549 extension 6493 or (410) 918-6493.

BRUCE F. TUXILL, Maj Gen, MDANG
Assistant Adjutant General for Air

*FOR OFFICIAL USE ONLY*

## Section I:  Tab B

3. **CHRONOLOGY OF EVENTS**:

| DATE | Event |
|---|---|
| 25 May 2000 | Lt Cols Diaz and Lt Col Elders serve on crew 135 Airlift Squadron local flight when he allegedly kissed her |
| Summer 2001 | Lt Col Elders allegedly offers Lt Col Diaz free "buddy pass" to Amsterdam |
| Summer 2001 | Lt Col Elders called Lt Col Diaz to office where he allegedly kissed her |
| Sep 2001 | Lt Col Elders called Lt Col Diaz at home on an Monday (non-work day) regarding OPR; she refused to meet him |
| 14 Dec 2001 | Christmas party Lt Col Diaz approached by Lt Col Elders and allegedly said "You picked the wrong team" |
| 21 Dec 2001 | Christmas party Lt Col Elders allegedly grabbed and twisted Lt Col Diaz's arm |
| Late Feb 2002 | Lt Col Diaz has conversation with Maj Willem, Commander 175 Security Forces Squadron regarding conduct of Lt Col Elders |
| 7 Mar 2002 | Following his conversation with Brig Gen Beasley, Commander 175 Wing, Maj Willem documented conversation with Lt Col Diaz in a MFR per General's request |
| 8 Mar 2002 | At the request of Brig Gen Beasley, Maj Mentges, 135 Airlift Squadron Training Officer, documents conversation with Lt Col Diaz in a MFR |
| 9 Mar 2002 | Brig Gen Beasley appoints Col John C. Inglis to conduct inquiry |
| 9-19 Mar 2002 | Col Inglis conducts inquiry |
| 15 Mar 2002 | Lt Col Elders presented "No Contact Order" with regard to Lt Col Diaz and Maj Maurer; temporarily removed from flight status; security clearance temporarily suspended and temporarily suspended from command. |
| 16 Mar 2002 | Lt Col Elders submitted letter refuting all allegations |
| 17 Mar 2002 | Lt Col Elders sent letter to MG James F. Fretterd, the Adjutant General, with copy to Maj Gen Tuxill requesting assistance |
| 20 & 21 Mar 2002 | Mr. Mark Zaid, Attorney at law, notified Col Inglis and Brig Gen Beasley he was retained by Lt Col Elders on 18 Mar 02 |
| 2 Apr 2002 | Col Arthur N. Werts, Headquarters NJANG appointed by Major General Tuxill, Assistant Adjutant General for Air, to conduct a command directed investigation |
| 18-19 Apr 2002 | Col Werts conducted interviews |
| 20 Apr-2 May 2002 | Col Werts unavailable due to other commitments |
| 3-4 May 2002 | Col Werts conducted interviews |
| 6-10 May 2002 | Col Werts continued with investigation to include interviews |
| 11-31 May 2002 | Col Werts concluded report writing |

*FOR OFFICIAL USE ONLY*

## Section II: Tab C

4   FINDINGS, ANALYSIS AND CONCLUSIONS

   4.1 ALLEGATION NUMBER 1. Lt Col Diaz alleged Lt Col Elders made an inappropriate sexual advance towards her with a kiss on the lips in the cargo compartment during a C-130J local training flight in Summer 2000. If established, this would be a violation of ANGI 36-3, Paragraph 1-7b.

      4.1.1   Findings: Not Substantiated.

      4.1.2   Analysis: Lt Col Elders denied this allegation as "totally false" stating "he never kissed Lt Col Diaz" and further disagreed saying, in his capacity as an instructor, his responsibilities were in the front of the aircraft and therefore he had no reason to go to the rear.

Lt Col Diaz's testimony/sworn statement confirms that during this flight Lt Col Elders was training two other pilots in the front of the aircraft. She stated there were no witnesses since all aircrew including the loadmaster was on the flight deck at the time of the alleged incident. Lt Col Diaz alleges she said "no" to Lt Col Elders after he made this advance.

Lt Col Diaz was aware of the EO complaint process. Lt Col Diaz did not document the incident, did not tell anyone of the incident and per her testimony was not sure if the alleged offender had heard her say "no," due to the noise level in the aircraft.

Witnesses testified that they had never observed any inappropriate behavior between Lt Col Elders and Lt Col Diaz. They testified both individuals carried themselves in a professional manner in both the workplace and unit social events.

Lt Col Thomas, Maj Mentges, and Maj _____ testified that they basically thought Lt Col Elders was an excellent pilot and good squadron commander but had problems with Lt Col Elders getting involved in matters concerning technician issues and not supporting agreed upon leadership decisions. All testified that, based upon their observations, Lt Col Elders' relationship with Lt Col Diaz was professional.

CMSgt _____ provided testimony concerning general inappropriate behavior among the officers and enlisted within the airlift squadron involving touching and hugging but did not observe that behavior between Lt Col Elders and Lt Col Diaz. He considered Lt Col Diaz "too friendly" and brought his concerns to Lt Col _____ attention as he thought that her conduct at times was inappropriate. Lt Col Diaz confirmed Lt Col _____ mentioned to her Chief _____'s concerns (and those of others not specifically named). Lt Col Diaz subsequently publicly apologized during a morning stand up meeting. Chief Robinson viewed Lt Col Diaz as more of a mediator between parties, specifically between Lt Col _____ and Lt Col Elders.

      4.1.3   Conclusion: The testimony did not identify any witnesses to corroborate the alleged incident occurred. There was no physical evidence produced and the witnesses questioned were consistent in characterizing the relationship between Lt Col Elders and Lt Col

*FOR OFFICIAL USE ONLY*

Diaz as professional. Lt Col Diaz provided consistent testimony throughout. Based upon the totality of the available evidence and weighing the amount of time that has passed since the alleged misconduct occurred, the preponderance of evidence does not support a finding that this alleged misconduct occurred.

    4.2. ALLEGATION NUMBER 2. Lt Col Diaz alleged that, during Summer 2001, Lt Col Elders made her an inappropriate offer by inviting her to accompany him to Amsterdam for free with a "buddy pass" and that they would have a wonderful time "window shopping." If established, this would be a violation of ANGI 36-3, Paragraph 1-7b.

        4.2.1   <u>Findings</u>: Not Substantiated.

        4.2.2   <u>Analysis</u>: Lt Col Elders categorically denied this allegation as "totally false" stating "I did not make a request of Colonel Diaz to accompany me on any trip abroad as that would be inappropriate." He asserted it is widely known within the unit that he flies European routes for United, suggesting that anyone could make up such a story.

Lt Col Diaz testified that she never told Lt Col Elders' she was not interested and that she was married as indicated in Maj Willem's 7 Mar 02 statement. But rather told him "I just said I was not interested, I said no." Lt Col Diaz testified she did not initially realize what "window shopping" in Amsterdam really meant. Following a conversation with "the guys," she was informed what Amsterdam was about in that "you can go out there and buy sex." Her initial perception of Lt Col Elders' trying to be nice changed to being uncomfortable when the concept of "window shopping" was clarified. At the time the incident allegedly occurred, she did not report it to anyone in or outside the chain of command.

Lt Col Diaz did not document the incident. Maj Willem's statement noted the Lt Col Diaz mentioned the alleged incident approximately two weeks prior to the date of his statement of 7 March 2002, (approximately 20 Feb 02).

Maj Mentges stated that had not observed the alleged incident but testified his statement dated 8 March 2002 was based on comments Lt Col Diaz made to him in the Fall of 2001. In his testimony, it was between November 2001 to end of January 2002, which is not typically referred to as Fall. He candidly commented on the difficulties and tension between him and Lt Col Elders. Maj Mentges stated, "he did not trust Lt Col Elders." He testified that, until recently, anyone observing Lt Col Elders and Lt Col Diaz would consider their relationship as normal.

Lt Col Diaz described her relationship with Maj Mentges as, we "are friends, I know the family, I took care of Mike. Mike had an abnormal EKG…" She went with him to Brooks AFB in her official capacity as a flight surgeon, because she stated pilots dread going there. It turned out Maj Mentges' EKG was fine. When asked by the IO "do you know any incident or any reason…that would cause him, meaning Col Elders, to even ask you to go to Amsterdam? She responded "No"…."even Mike won't ask me to go to Amsterdam, and we're friends….I am doctor and then I am friend." Lt Col Diaz testified, " I had also talked to Mike Mentges because

*FOR OFFICIAL USE ONLY*

Mike was my buddy. Mike and I are good friends." She also stated "I think what I needed (was) what I always give people.... just (for him) to listen."

    4.2.3  <u>Conclusions:</u> There is no physical evidence or documentation concerning the alleged incident. There was no testimony that established the exact date of the alleged incident. Maj Mentges statement of 8 Mar 2002 was that, in the Fall 2001, Lt Col Diaz shared the alleged incident with him, and her testimony has been generally consistent throughout. However, in his testimony, Major Mentges stated he was not clear on the dates by stating "his brain was scrambled up on times but I would say it would be between ... November (2001) and the end of January (2002)." Maj Mentges did not conceal the tension between him and Lt Col Elders but candidly acknowledged it. There was no conflicting testimony that would cause one to believe that Maj Mentges was untruthful in his testimony or statements. Further, given that they were friends, it is reasonable that Lt Col Diaz would confide in him. However, based on the totality of available information and weighing the passage of time since the alleged incident occurred, the preponderance of evidence does not support a finding that this alleged misconduct occurred.

    4.3. ALLEGATION NUMBER 3. Lt Col Diaz alleged, that during Summer 2001 Lt Col Elders invited her to his office where he kissed her in a sexual manner. If established, this would be a violation of ANGI 36-3, Paragraph 1-7b.

    4.3.1.  <u>Findings</u>: Not Substantiated.

    4.3.2.  <u>Analysis</u>: Lt Col Elders response to the allegation that he tried to kiss Lt Col Diaz in a sexually aggressive manner was that it was "totally false." Lt Col Elders further challenged the portion of the Lt Col Diaz' statement that referred to the time frame of the alleged incident as being in the summer. He stated he was unaware of the State Air Surgeon position becoming vacant until November, thus bolstering his assertion that allegation is false.

Lt Col Diaz stated while in Lt Col Elders office, "he offered me a seat on a small red sofa that he had in his office. He sat in a chair directly across from me. He said that he understood that I wanted to put in for the State Air Surgeon's position." He further stated that he felt that I should be a "shoe-in" for the position because I was female and of Puerto Rican heritage. I had "both" minority issues in my favor. Lt Col Elders finished by telling me that he and I had to "stick together" because of our minority status and that he would put in a good word for me when he got to his new position as 135 AG/CC. At that point, Lt Col Elders stood and approached the sofa. I thought he was coming over to pick up some personal items that were on the sofa next to me. To my astonishment, he leaned over, put his right hand on my shoulder and kissed me. He attempted to put his tongue into my mouth. I pulled away, and again told him "No.'"

Witnesses testified that they had never observed any inappropriate behavior between Lt Col Elders and Lt Col Diaz. They testified both individuals carried themselves in a professional manner in both the workplace and unit social events.

Maj Mentges testified that he had observed Lt Col Elders brush up against Lt Diaz but "not in a fashion any differently than someone else might for people who work together, know each other I'd say as well as we do, given the environment that we are in."

*FOR OFFICIAL USE ONLY*

CMSgt Robinson testified an environment existed where "too much hugging, too much touchy-touchy things were going on and I (Chief Robinson) thought it was inappropriate."

Lt Col Thomas, Maj Mentges, and Maj Wilkinson testified that they basically thought he was an excellent pilot and good squadron commander but had problems with Lt Col Elders getting involved in matters concerning technician issues and not supporting agreed upon leadership decisions. All testified that Lt Col Elders' relationship with Lt Col Diaz was professional.

4.3.3 Conclusions: The testimony did not provide any witnesses to corroborate that the alleged event occurred. This is consistent with Lt Col Diaz's description of the events. There was no physical evidence produced and the witnesses questioned were consistent in characterizing the relationship between Lt Col Elders and Lt Col Diaz as professional. It is reasonable given that, as Maj Mentges was a friend to Lt Col Diaz, she would have shared this incident with him, but elected not to do so. Based on the totality of available information and weighing the passage of time since the alleged incident occurred, the preponderance of evidence does not support a finding that the alleged misconduct occurred.

4.4 ALLEGATION NUMBER 4. Lt Col Diaz alleged that at the December 2001 Wing Christmas party Lt Col Elders grabbed her wrist, twisting her arm and said "what the hell did you say to him." If established, this would be a violation of ANGI 36-3, Paragraph 1-7b as well as provisions of the Annotated Code of Maryland Article 65, Section 47.

4.4.1 Findings: Substantiated.

4.4.2 Analysis: Lt Col Elders denied this allegation by stating "I've never put my hand on anybody in the unit in a forceful way....I did not in this case either. ... This statement that I grabbed her and twisted her arm and said anything cruel like is indicated here is untrue."

Maj Mentges stated Lt Col Diaz called him the day of the alleged incident on his cell phone and said "Lt Col Elders grabbed her by the wrist very firmly and twisted her arm in an uncomfortable manner behind her back."... Lt Col Diaz told me that she was scared by Lt Col Elders' action and was afraid to be around him." Maj Wilkinson stated Lt Col Diaz told him about the alleged grabbing the week following the alleged incident.

Lt Col Diaz was asked by the IO to demonstrate how Lt Col Elders grabbed her. In this demonstration, Lt Col Diaz grabbed her wrist, pulled the arm forward and down as if to say something in a person's ear while exerting additional pressure. She did not show that Lt Col Elder's twisted her arm behind her back. On 9 March 2002, Lt Col Diaz met with Brig Gen Beasley and Lt Col Miller to discuss the content of Maj Mentges' and Maj Willem's memorandums. In her testimony to the IO, Lt Col Miller stated "Lt Col Diaz struck me (Lt Col Miller) as being afraid... She did not ask and was not happy frankly that these two officers had raised her concerns expressed to them to General Beasley." She also commented Lt Col Diaz was "very, very reluctant" to come forth with any details. Following her initial interview with Col Inglis, Lt Col Diaz signed a statement verifying Maj Willem and Maj Mentges memorandum

*FOR OFFICIAL USE ONLY*

to be true with the exception that she was not crying. Subsequently, Lt Col Diaz provided a detailed statement to Col Inglis.

The statements of Maj Mentges and Maj Willem characterized Lt Col Diaz as either scared or afraid.

Testimony is consistent that the relationship between Lt Col Elders and Lt Col Diaz was professional. CMSgt Robinson characterized Lt Col Diaz as a "mediator" between Lt Col Elders and Lt Col Thomas. Chief Robinson stated Lt Col Diaz and Lt Col Elders had a good relationship until a certain point. He describes that point as being when it became known Col Inglis' position would become vacant and that news of the pending vacancy seemed to increase the stress and tension between Lt Col Thomas, Lt Col Diaz and Lt Col Elders.

There was no evidence to support the Lt Col Diaz was influenced or coerced by any members of the unit leadership to file a complaint against subject. In fact, no such complaint has been filed. While Lt Col Diaz has provided a statement, her reluctance to do so adds to her credibility under the facts and circumstances of this matter. In addition, several witnesses described Lt Col Diaz as being emotionally concerned about further contact with Lt Col Elders.

    4.4.3. <u>Conclusions:</u> The testimony provided by Lt Col Elders and Lt Col Diaz are in direct conflict. There are no independent witnesses to the alleged incident, and no physical evidence of the alleged incident. Corroborated testimony was obtained that Lt Col Diaz appeared afraid following the alleged grabbing. Lt Col Diaz immediately notified Maj Mentges about the incident on the evening of its occurrence. Her general description of the events of that incident has remained consistent, and Lt Col Diaz has indicated that she was "scared". Several witness confirmed her state of fear. As noted above, Lt Col Diaz did not officially file a complaint. Moreover, there is no evidence that suggests or infers that Lt Col Diaz had any ulterior or improper motivation to report the incident, and in fact was a reluctant witness throughout. Moreover, even though there was testimony that there was generally a "touch-feely" atmosphere which permeated the 135 AG, there was no testimony that physical roughness and aggressive physical hostility was acceptable. Even if Lt Col Elders mistakenly believed that his relationship with Lt Col Diaz was such that he was able to brush against her or that the general atmosphere within the 135 AG made some degree of physical conduct acceptable, Lt Col Elders could not have reasonably believed that he was entitled to physically restrain and inflict pain on another Air Guard member. These events, in addition to Lt Col Diaz's contemporaneous reporting of the incident, when evaluated on the totality of the surrounding circumstances and available evidence, weigh in favor of Lt Col Diaz's account of events rather than Lt Col Elders' denials of the conduct, based upon a preponderance of the available evidence.