# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

KARL L. ELDERS                              *
                                            *
      Plaintiff,                          *
                                            *
      v.                                  *    Case No. MJG-02-3892
                                            *
MARIA C. DIAZ                               *
                                            *
      Defendant.                          *
                                            *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## OPPOSITION TO MOTION OF DEFENDANT MARIA DIAZ TO DISMISS

### (ORAL ARGUMENTS REQUESTED)

Were this case to reach the merits, it presents nothing but a garden variety defamation lawsuit. But for now, this Court is unfortunately being intentionally sidetracked by the uninvited intervention of the United States of America in an effort to extinguish the individual state common law claims of one private citizen against another.

Plaintiff Karl L. Elders ("Elders"), in his private capacity, brought defamation and false light claims under the laws of the State of Maryland against defendant Maria C. Diaz ("Diaz"), who was named in her private capacity. Rather than respond to these claims, Diaz instead sought the protection of the government, not to truthfully defend her actions against what she might perceive as false allegations but simply to run and hide behind a cloak of immunity.

The United States is not an appropriate party to this action. Although both Elders and Diaz were officers within the Maryland Air National Guard during the relevant period[1], there are no activities challenged in this litigation that are incidental to military service, and the tortious acts Diaz committed fell outside of her scope of employment. Elders

---

[1] Elders has recently left the Maryland Air National Guard. See Declaration of Karl L. Elders at ¶3 (dated May 18, 2003)("Elders Decl."), attached at Exhibit "1". This fact, however, is not determinative of any of the legal claims he has brought against Diaz.

does not seek damages against or from any governmental entity. Nor does he seek to challenge improper military personnel actions, decisions or the conduct of a superior officer. In the end, as it was in the beginning, this remains nothing but a garden variety defamation lawsuit that the law dictates must be allowed to proceed forward.

## FACTUAL BACKGROUND

Both Diaz and Elders are traditional guardsmen (i.e., weekend warriors) with the Maryland Air National Guard ("MD ANG").[2] At the time the defamatory comments presumably began to be spread by Diaz, Elders was serving as the Squadron Commander of the 135th Tactical Airlift Squadron, and Diaz was the flight surgeon. Since at least Fall 2001, Diaz has been falsely telling third parties, only some of whom have been identified thus far, that Elders sexually harassed and assaulted her. See First Amended Complaint at ¶¶6-7 (filed March 3, 2003)("FAC"). Her false statements have been made to fellow National Guardsmen, id. at ¶8, to family members and friends, id. at ¶9, and to her personal family and business employees and medical co-workers, id. at ¶10.

However, although Diaz was intentionally spreading these false rumors, she never complained to superior officers, Equal Employment Opportunity representatives ("EEO") or anyone with the authority to resolve her alleged problems with Elders. Nor did ever she seek to file a sexual harassment complaint, whether informal or formal, concerning

---

[2] The National Guard is the original military of the United States. The Constitution empowers Congress "to provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of Training the Militia according to the discipline prescribed by Congress." U.S. Const. art. 1, 8, cl. 15,16. The National Defense Act of 1916 materially altered the status of the militias by creating the National Guard. Essentially, it "federalized" the state militias in certain respects. "The Guard is thus the successor to the State militias, but it is now a hybrid state-federal organization, for the Governor remains in charge of the National Guard in each state except when the Guard is called into active federal service." Holdiness v. Stroud, 808 F.2d 417, 420 (5th Cir. 1987). For a history of the National Guard and the Maryland National Guard, see Estate of Burris v. State, 360 Md. 721, 759 A.2d 802 (Md. 2000).

Elders' alleged conduct until others conveniently did so on her behalf. <u>Id</u>. at ¶12. On or about March 15, 2002, Elders was relieved of command of his Squadron, removed from flying status, and restricted from classified information and full participation in an organization that he had served faithfully for the preceding 12 years. This action was primarily taken on the basis of two hearsay memorandums signed by Major James M. Mentges ("Mentges") and Major Raul Q. Willem ("Willem"), which were based on false statements made to them by Diaz over a period of months.[3] <u>See</u> Exhibit "2". Both Mentges and Willem were subordinate in rank to Diaz and have never fallen within her military chain of command. <u>Id</u>. at ¶8.

The stories provided to Mentges and Willem by Diaz were never intended to serve as any type of complaint of sexual harassment. In the best light available to Diaz, the conversations were nothing more that discussions among friends and buddies. <u>Id</u>. At no time did she ever request either Mentges or Willem to act upon her allegations. Indeed, it appears she directed them not to do anything. <u>See</u> Rule 56(f) Declaration of Mark S. Zaid, Esq. at ¶9 (dated May 17, 2003)("Zaid 56(f) Decl."), attached at Exhibit "3".

Following the actions of Mentges and Willem, the MD ANG launched a Command Directed Inquiry into the allegations. Colonel John Inglis ("Inglis"), who was Elders' immediate superior, was assigned to handle the investigation in violation of regulation. <u>See</u> FAC at ¶15. Inglis, however, did little more than undertake a sham investigation involving a select few people who intentionally and knowingly repeated the false allegations in order to harm Elders. <u>See</u> Def's Memo, Exhibit "4". Inglis would not even inform Elders of the specific allegations against him. Based on nothing more than a few statements, Inglis concluded the allegations were substantiated. <u>Id</u>. However, before his report was finalized, the MD ANG assigned an independent investigator, Colonel Arthur

---

[3]Apparently, Mentges and Willem have since been promoted to Lieutenant Colonels. <u>See</u> Defendant Maria C. Diaz's Motion for Summary Judgment at 6 fn.2 (filed April 10, 2003) ("Def's Memo"). However, at all times relevant to this litigation, they were Majors and will be referred to in that vein.

Werts ("Werts") from the New Jersey National Guard, to conduct a full and unbiased investigation. <u>See</u> FAC at ¶15.

Over the course of several weeks, Werts interviewed or took sworn statements from eighteen witnesses (including those interviewed by Inglis), and obtained documentary and audio evidence. A final report was completed in June 2002, <u>see</u> Def's Memo, Exhibit "5", and in July 2002, Elders was notified that the investigation concluded that Diaz's sexual harassment claims were unsubstantiated. Yet, Elders was not returned to his former position of leadership, and was, instead, reassigned because of the "ill feelings" that the allegations had created. <u>See</u> Zaid 56(f) Decl. at ¶4, attached at Exhibit "3".

Although he was cleared of any wrongdoing, Elders continued to suffer the vindictive wrath of Diaz, particularly through her continued efforts to tell third parties about the fabricated events. <u>See</u> FAC at ¶¶8-10. Even worse, third parties repeated the allegations first made by Diaz and the rumors swelled to such a degree that it was being said by some that Elders committed rape and/or sodomy; a statement that is not only not true but was never even alleged. <u>Id</u>. at ¶17. Eventually, as a result of Diaz's actions, Elders recently left the MD ANG after more than a decade of service. <u>See</u> Elders Decl. at ¶3.

## PROCEDURAL BACKGROUND

This case was filed on October 25, 2002, before the Circuit Court for Baltimore County. Diaz was properly served with the Summons and Complaint on October 31, 2002. Pursuant to 28 U.S.C. § 2679, the United States government removed Elders' lawsuit from state court to this Court on November 29, 2002. Additionally, because the government alleged that Diaz was acting in the scope of employment, it simultaneously sought to substitute the United States for Diaz as the defendant. <u>See</u> Notice of Removal and Motion for Substitution (filed Nov. 29, 2002).

On December 9, 2002, Elders filed an Opposition to the government's Motion challenging the substitution. <u>See</u> Plaintiff's Opposition to Defendant's Notice of Removal and Motion for Substitution (dated Dec. 7, 2002). Elders noted that before this

4

Court should comply with the government's request, he was entitled to challenge the government's certification regarding scope of employment through discovery. In a further effort to shield unlawful conduct from the light of day, Diaz replied with a motion to dismiss Elders' claims altogether. <u>See</u> Motion of Defendant Maria Diaz to Dismiss (filed Dec. 16, 2002).

Following the briefing of these Motions, by Order dated February 12, 2003, this Court denied Diaz and the government's two pending Motions and instructed Elders to file an Amended Complaint. <u>See</u> Order (dated February 12, 2003). Additionally, the Court indicated that the plaintiff in his Amended Complaint:

> a. shall specify the "third parties" to whom, he alleges, Ms. Diaz made defamatory statements.
> b. consistent with the foregoing discussion, clarify the precise nature of the facts he is alleging by specifying the context of the alleged actual statements.
> c. shall clearly set forth those allegations based upon which he contends that Ms. Diaz's allegedly defamatory statements were made outside the course of her Guard employment.

<u>Id</u>. Furthermore, the Court instructed the government that any "certification as to the scope of employment must address the specific actions alleged by the Plaintiff to be tortious." <u>Id</u>.

Based on the information available to him, Elders filed a First Amended Complaint on March 3, 2003. In response, before any discovery had been undertaken, the government, on behalf of Diaz, filed a Motion for Summary Judgment on April 10, 2003.[4]

## <u>ARGUMENT</u>

The government inappropriately seeks to intervene in this litigation and dismiss Elders' actions on the basis of Rule 56 of the Federal Rules of Civil Procedure. To

---

[4] Although the government once again raises the issue of substitution, it technically has not filed any specific motion requesting that substitution be granted. Instead, it attempts to incorporate its earlier motion for substitution by reference. <u>See</u> Def's Memo at 2.

support a Motion for summary judgment, it must be demonstrated that there are no genuine issues existing as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c). A Court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The movants bear "the initial responsibility of informing the district court of the basis for their motion and identifying those portions of the record which show lack of a genuine issue." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In order to overcome a summary judgment motion, the nonmoving party must designate "specific facts showing that there is a genuine issue for trial." Id. at 324; Fed.R.Civ.P. 56(e). The necessary proof that must be produced is not precisely measurable, but must show "'sufficient evidence supporting the claimed factual dispute ... to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" First Nat'l Bank of Arizona v. Cities Service Co., Inc., 391 U.S. 253, 289 (1968). If the Court can conclude that a reasonable trier of fact could return a verdict for the nonmovant, then summary judgment must be denied. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Pulliam Investment Co. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir. 1987).

Additionally, it should be clear that Elders' First Amended Complaint satisfies Rule 8 of the Federal Rules of Civil Procedure. Diaz inappropriately seeks to impose a heightened burden on Elders at this early stage.[5] "[U]nder a notice pleading system, it is

---

[5] Diaz claims "Elders has failed to assert with particularity any facts supporting his defamation claim, content instead to rely upon vague and general allegations." See Def's Memo at 3. Yet, as a factual matter, Elders identified specific defamatory allegations that he challenges, see FAC at ¶7, and identified specific people (either by name or title because the name is unknown) to whom it is alleged Diaz uttered those - and likely other - defamatory statements, id. at ¶¶8-10. With respect to the legal burden sought to be imposed by Diaz, it simply does not exist.

6

not appropriate to require a plaintiff to plead facts establishing a prima facie case."
<u>Swierkiewcz v. Sorema, N.A.</u>, 534 U.S. 506 (2002). "This simplified notice pleading
standard relies on liberal discovery rules and summary judgment motions to define
disputed facts and issues and to dispose of unmeritorious claims." <u>Id</u>. at 512. Thus,
Elders' claims alleging defamation are to be tested under "Rule 8's liberal pleading
requirement of a short and plain statement showing that he is entitled to relief." <u>Id</u>. <u>See</u>
5 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE 2d Sec 1245 (1990).[6]

Even so, Elders' First Amended Complaint fully abided by the Court's Order of
February 12, 2003, based on information known at the time.[7] Elders specified the "third
parties" to whom he alleges Diaz made defamatory statements, and who is known to have
repeated them. <u>See</u> FAC at ¶¶8-11,17. He also clarified, to the extent he could without
the benefit of discovery, the precise nature of the facts he is alleging by specifying the
context of the alleged actual statements. <u>Id</u>. at ¶7. Finally, he clearly sets forth allegations
that show Diaz made defamatory statements outside the course of her Guard
employment. <u>Id</u>. at ¶¶7,9-10.

Therefore, before the Court should ever grant Diaz's Motion for Summary Judgment,
Elders must be permitted to conduct discovery and, if necessary, be subsequently allowed
to amend his Complaint pursuant to Rule 15(a) of the Federal Rules of Civil Procedure to
incorporate any newly developed evidence.

---

[6]In fact, although in an unpublished decision, the Fourth Circuit has specifically
recognized that "Rule 8 does not contain a special pleading requirement for defamation."
<u>Wuchenich v. Shenandoah Memorial Hospital</u>, 215 F.3d 1324,  2000 WL 665633 (4th
Cir. 2000).

[7]As this case continues, and Elders and his attorney conduct further investigation,
additional relevant information is coming to light, including the identification of new
third party witnesses to whom Diaz discussed her defamatory sexual harassment
allegations. <u>See e.g.</u>, Declaration of Ted Whiteley at ¶¶3-5 (dated May 8, 2003)
("Whiteley Decl."), attached at Exhibit "4".

I.  **THE LEGAL CLAIMS BROUGHT BY ELDERS AGAINST DIAZ IN HER INDIVIDUAL CAPACITY DO NOT INVOLVE MATTERS INCIDENT TO MILITARY SERVICE THAT JUSTIFY APPLICATION OF INTRAMILITARY IMMUNITY**

Diaz argues that "Elders's [sic] defamation claim arises out of or is incident to military service and maintenance of the instant suit is thus barred by the doctrine of intramilitary immunity." See Def's Memo at 5. This position is based on an expansive reading of the law that simply does not exist, particularly given the factual circumstances underlying this case.

**A.  Intramilitary Immunity Does Not Preclude This Action As The Torts In Question Were Not Incidental To Military Service**

The Federal Tort Claims Act ("FTCA") sets forth the specific parameters of the scope of the government's waiver of sovereign immunity under circumstances where claims are asserted against the United States, a specific federal agency or a federal employee acting within the scope of employment. Although permitting some suits, Congress withheld the government's consent to be sued for "[a]ny claim arising out of the combatant activities of the military or naval forces, or the Court Guard, during time of war." 28 U.S.C. § 2680(j). Of course, none of the claims at issue in this litigation arose out of "combatant activities" or occurred "during time of war." However, in 1950, the Supreme Court broadly expanded the scope of immunity when it ruled that "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." Feres v. United States, 340 U.S. 135, 146 (1950). This became known as "the Feres doctrine."[8]

Three rationales have been promoted to support the Feres exception to the broad waiver of sovereign immunity contained in the FTCA. See United States v. Johnson, 481 U.S. 681, 688 (1987); Bradley v. United States, 161 F.3d 777 (4th Cir. 1998).

---

[8] Elders does not question that the Feres doctrine could, under the appropriate circumstances, be applied to members of the National Guard. "It is beyond question that the Feres doctrine generally applies to claims brought by National Guard members." Stauber v. Cline, 837 F.2d 395, 399 (9th Cir. 1988).

"First,`[t]he relationship between the Government and members of its armed forces is "distinctively federal in character."'" Johnson, 481 U.S. at 689 (alteration in original), quoting Feres, 340 U.S. at 143. "Second, the existence of ... generous statutory disability and death benefits is an independent reason why the Feres doctrine bars suit for service-related injuries." Id. And, third, "suits brought by service members against the Government for injuries incurred incident to service are barred by the Feres doctrine because they are the `type[s] of claims that, if generally permitted, would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness.'" Id. at 690, quoting United States v. Shearer, 473 U.S. 52, 59 (1985).[9]

This third rationale, which is at issue here, is the most controversial. The Supreme Court has stated that intramilitary immunity generally applies to bar claims brought by service members directly under the Constitution pursuant to Bivens v. Six Unknown Named Agents of the Federal Bureau of Investigation, 403 U.S. 388 (1971), against military personnel supervising the claimants, Chappell v. Wallace, 462 U.S. 296 (1983), as well as to others exercising military responsibility. United States v. Stanley, 483 U.S. 669 (1987).

"[P]ractically any suit that 'implicates the military judgments and decisions,' ... runs the risk of colliding with Feres." Persons v. United States, 925 F.2d 292, 295 (9th Cir. 1991), quoting Johnson, 481 U.S. at 691. In determining whether the "incident to service" test is met, a key inquiry is "whether the suit requires the civilian court to second-guess military decisions ... and whether the suit might impair essential military discipline."

[9]As the years have past, the Feres doctrine has increasingly come under attack, including by Justices of the Supreme Court. See Johnson, 481 U.S. at 694-700 (Scalia, J., Dissenting). One reason is that intrusions by courts to grant equitable relief in military matters have become more familiar in recent years. Id. at 700. Indeed, it is relevant that this case also seeks equitable, in addition to monetary, relief. Elders has specifically requested that Diaz make a public retraction and apology, and that an injunction be issued prohibiting her from further disseminating defamatory comments. See FAC at 7. The D.C. Circuit recently ruled that equitable claims are not precluded by the Feres doctrine. Brannum v. Lake, 311 F.3d 1127 (D.C.Cir. 2002).

Shearer, 473 U.S. at 57."[T]he focus of Feres is not upon when the injury occurs or when the claim becomes actionable, rather it is concerned with when and under what circumstances the negligent act occurs." Kendrick v. United States, 877 F.2d 1201, 1203 (4th Cir. 1989). The Fourth Circuit has further clarified that "[i]f a suit requires *deep inquiry* into military decisions or would *strongly impact* military discipline, the Feres doctrine will bar it." Minns v. United States, 155 F.3d 445, 449 (4th Cir. 1998), cert. denied, 525 U.S. 1106 (1999)(emphasis added).[10] Otherwise, the case can go forward.

Of significant importance, and neglected to be mentioned by Diaz, whether an injury arises out of or is incident to service is a question of fact. Woodside v. United States, 606 F.2d 134, 141 (6th Cir. 1979), cert. denied, 445 U.S. 904 (1980); Hass v. United States, 518 F.2d 1138, 1141 (4th Cir. 1975); Deckinger v. Castro-Reyes, 689 F.Supp. 531, 534 (D.Md. 1988); Kenneally v. Bayer, 760 F.Supp. 503, 506 (D.Md. 1990). Thus, as is explained throughout this pleading, Elders has sufficiently demonstrated the existence of material facts that reveal Diaz's motion is premature and cannot be granted without the taking of discovery.

In any event, Diaz's Motion can be denied outright because it seeks to improperly expand the impact of Feres, Chappell and Stanley to encompass all state claims against individual military defendants. Such an attempt was explicitly rejected by the Fourth Circuit Court of Appeals in Scott v. Rice, 7 F.3d 226 (4th Cir. 1993), 1993 WL 375664. Though unpublished, the Scott decision is directly on point. Scott was an officer and pilot on active duty in the District of Columbia Air National Guard's Air Guard Reserve. Her unit commander, initiated an action pursuant to Air National Guard regulations to

---

[10]The Fourth Circuit was also persuaded that "Feres seems best explained by the peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty." Minns, 155 F.3d at 448. None of these factors are confronted by Elders' claims. Diaz was not Elders' superior, military discipline was not involved, and because Diaz was not acting in the scope of her employment, there is no FTCA issue.

terminate Scott's Air Guard Reserve status. He did so on the basis that she was, in part, soliciting support from female members of the unit for a sex discrimination suit against him. Id. at *1. Scott then filed a complaint alleging sexual discrimination, the investigation of which concluded that Scott had not presented any specific evidence of verbal or physical conduct of a sexual nature against her. The termination proceedings then commenced against her and she brought an action pursuant to 42 U.S.C. § 1983. Based on the exact same argument now espoused by the Diaz, the district court ruled Scott was barred from suing the defendants in federal court by the intramilitary immunity doctrine announced in Chappell and extended in Stanley. Id.

Although the Fourth Circuit Court of Appeals affirmed the dismissal, it importantly confined Chappell and Stanley to their proper province and rejected the broad proposition Diaz now invokes.

> With respect to the application of the intramilitary immunity doctrine to actions brought pursuant to 42 U.S.C.§ 1983, we reject the district court's conclusion that Chappell and Stanley compel dismissal in this case. Chappell and Stanley were damages actions brought directly under the Federal Constitution, see Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 338, 406 (1971), in which the Supreme Court held that the unique disciplinary structure of the military was a "special factor counseling hesitation," Chappell, 462 U.S. at 300; Stanley, 483 U.S. at 681, in the judicial creation of a damages cause of action for service persons deprived of constitutional rights. Although some circuits have extended the reasoning of Chappell and Stanley to cases brought against state officers (or against federal officers acting under color of state law) pursuant to 42 U.S.C. § 1983, see Crawford v. Texas Army Nat'l Guard, 794 F.2d 1034, 1035-36 (5th Cir. 1986)(citing cases), we need not do so.[11]  In Williams v. Wilson, 762 F.2d 357, 359-

---

[11] Of course, there can be no question that Elders' claims are based solely on state law. He has alleged claims for defamation and false light. These are neither federal or constitutional in nature. "Under Maryland law, to present a prima facie case for defamation, a plaintiff must ordinarily establish that the defendant made a defamatory statement to a third person; that the statement was false; that the defendant was legally at fault in making the statement; and that the plaintiff thereby suffered harm." Gohari v. Darvish, 767 A.2d 321, 327 (Md. 2001).  Diaz has acknowledged that false light is an actionable state offense under Maryland law. See Memorandum in Support of Defendant

60 (4th Cir. 1985), we adopted the four-part test first propounded in
Mindes v. Seaman, 453 F.2d 197, 201-02 (5th Cir. 1971)[affirmed on
appeal after remand, 501 F.2d 175 (5th Cir. 1974)], for determining
whether particular actions of military authorities are properly reviewable
by the civilian courts outside the Bivens context. Having endorsed the
Mindes test, we must apply it-not Chappell or Stanley-to determine the
reviewability of non-Bivens actions against military defendants. See
Guerra v. Scruggs, 942 F.2d 270, 276 (4th Cir. 1991).

Id. at *2.[12]

The Mindes Court determined that a court should not review internal military affairs

in the absence of (a) an allegation of the deprivation of a constitutional right or an

allegation that the military has acted in violation of applicable statutes or its own

regulations, and (b) exhaustion of available intra-service corrective measures. Mindes,

453 F.2d at 201. If a plaintiff seeking review of a military decision sufficiently alleges

the appropriate violation, and exhaustion of administrative remedies, or if no such

remedies are available, the court must then examine the substance of the allegations in

light of the policy reasons that militate in favor of not reviewing military decisions. Id.

The Fifth Circuit articulated four factors for a court to analyze:

(1) The nature and strength of the plaintiff's challenge to the military
    determination. An obviously tenuous claim of any sort must be
    weighted in favor of declining review;
(2) The potential injury to the plaintiff if review is refused;

---

Maria Diaz's Motion to Dismiss and Reply to Plaintiff's Opposition to the Defendant's
Removal Notice and Motion to Substitute the United States as the Sole Party Defendant
in the Above-Captioned Matter at 2 fn.1 (filed Dec. 16, 2002)("Def's Initial Memo").

[12]Moreover, Diaz's bold pronouncement that no claim against the National Guard has
ever been permitted, which is not true as the cases cited herein illustrate, does not reflect
the current state of law. Even the Supreme Court in Stanley did not preclude all claims
involving "military decisions". "The circuits that have extended Feres's incident to
service test beyond claims brought by plaintiffs in the federal armed services have done
so in limited and analogous circumstances." Meister, 233 F.3d at 338. In Elders' case,
since there are no military decisions being challenged, there were obviously no events
that were "incident to [Elders] military service." In fact, the Fourth Circuit has previously
permitted libel actions against the military to proceed until the existence of immunity
could be established, which of course required discovery to first take place. Berndtson v.
Lewis, 465 F.2d 706, 707 (4th Cir. 1972).

(3) The type and degree of anticipated interference with the military function. Interference that would "seriously impede the military in the performance of vital duties" militates strongly against relief;

(4) The extent to which the exercise of military expertise or discretion is involved. Courts should defer to superior knowledge and experience of professionals in matters such as military personnel decisions or other areas that relate to specific military functions.

Id. Application of the Mindes factors demonstrates the inapplicability of Feres to these circumstances. First, and most clearly, there is not one military determination at issue or being challenged in this litigation. There were no disciplinary proceedings instituted. The litigation will not require "deep inquiry into military decisions" nor will it "strongly impact military discipline." Minns, 155 F.3d at 449. Adjudication would not "impede a commanding officer in performing the "vital duty," ... of exercising his own discretion and military expertise with respect to personnel matters." Scott, 7 F.3d 226, 1993 WL 375664 at *2.[13]

Second, the potential injury to Elders if review is refused is undeniable. He has absolutely no other recourse to pursue for the actions committed by Diaz. Third, not only will this lawsuit not "seriously impede the military in the performance of vital duties," but there are no military functions that will be interfered with even in the slightest. The sexual harassment charges against Elders were found to be unsubstantiated. Thus, there will be no need for this Court to "second-guess" any military decisions. Shearer, 473 U.S. at 57. Nor does there exist any concerns surrounding the officer-subordinate relationship. It is very significant that the MD ANG considered Diaz to be Elders' subordinate. Courts

---

[13]The Fourth Circuit ultimately agreed that Scott litigation should be dismissed since, unlike in the instant matter, reviewing Scott's equitable-relief action would "interfere with the military function to precisely the degree forbidden by Mindes, because the potential for civilian judicial review would impede a commanding officer in performing the 'vital duty,' id., of exercising his own discretion and military expertise with respect to personnel matters. 'Courts should defer to the superior knowledge and expertise of [military] professionals in matters ... directly related to specific military functions.' Id. Our review of the record satisfies us that Colonel Wherley's decision to terminate Scott from active-duty status was directly related to the military function of maintaining discipline within his unit." Scott, 7 F.3d 226, 1993 WL 375664 at *2.

have cautioned against "entertaining a suit which asks the court to tamper with the established relationship between enlisted military personnel and their superior officers", Trerice v. Summons, 755 F.2d 1081 (4th Cir. 1985), but this concern primarily exists solely from bottom-up, not top-down.

Finally, this is a defamation lawsuit, plain and simple. There are no military personnel decisions or other areas that relate to specific military functions that are involved. The military has no special expertise or discretion in handling defamation cases or even sexual harassment matters. This defamatory tort action is no different from circumstances that would have existed if Diaz and Elders had been in an automobile accident with each other at a stop sign, and other members of the MD ANG either were caught in a collision chain reaction or had witnessed the incident. See Ross v. Bryan, 309 F.3d 830 (4th Cir. 2002)(Feres did not prevent claims arising from automobile accident that occurred on military base between military servicemembers).

Thus, the government's attempt to apply the intramilitary immunity doctrine to this case demonstrates a fundamental misunderstanding of the legal and factual claims involved. It claims that the plaintiff "cannot separate the alleged defamatory statements made by Lt. Col. Diaz accusing him of sexual harassment from his military service." See Def's Memo at 17. The basis for the government's position is that Diaz informally reported Elders' actions to other members of the MD ANG "while performing military duty in uniform", that such informal reporting is "officially encouraged" and considered to be "in the line of duty and within the scope of employment", that the statements were privileged and that each of "these allegations directly concerns Elders's military service and status as a commanding officer." Id. at 17-18.[14]

---

[14]The arguments underlying the government's attempt to inject intramilitary immunity into this case have changed from its last Motion to Dismiss. Initially, the government sought to significantly rely upon the location of the alleged acts as asserted by Diaz as the genesis for the application of the Feres doctrine (i.e., unwanted kisses occurred on military property and implicated the officer-subordinate relationship). See Def's Initial

First, as explained further below, Diaz never filed or verbalized an "informal report" of sexual harassment to anyone concerning Elders. This is a complete after-the-fact manipulation of the events that occurred. Nor is there any evidence in the record that Diaz was performing military duty in uniform when she made these so-called "informal reports". Although this assertion is contained in Diaz's brief, the cited source is Diaz's submitted declaration, id. at 17 (citing Diaz Decl. at 2, ¶4). However, there is no such claim in her declaration that even references her duty status on the days she uttered the defamatory remarks, much less that she was in uniform. This is undoubtedly for good reason, because Diaz's duty status on the days in question remains an open question. The available evidence reveals that, in fact, Diaz frequently showed up on base to have secret, closed door meetings with Lt. Col. Warren Thomas ("Thomas"), Mentges and Major Doris Maurer ("Maurer") while she was not officially on duty and sometimes in civilian clothes. See Elders Decl. at ¶9, attached at Exhibit "1"; Declaration of David M. Falter at ¶¶5,13 (dated May 18, 2003)("Falter Decl."), attached at Exhibit "5"; Declaration of Charles Robinson at ¶¶18-20 (dated May 18, 2003)("Robinson Decl."), attached at Exhibit "6". Indeed, based on the documentary evidence, it does not appear Diaz was on official duty the days she made her statements to Mentges, Willem and likely others. See Exhibit "7".[15]

---

Memo at 15. Though it appears that the government has backed away from such an argument, to the extent it still invokes it, the fact that the "activity" underlying Diaz's allegation took place on base or in military aircraft is not itself controlling. See Johnson v. United States, 704 F.2d 1431, 1437 (9th Cir. 1983)(rejecting as myopic the view "that if a serviceman is injured while on-base, he cannot recover under the FTCA, whatever the cause of the injury," in favor of broader exploration of the totality of the circumstances). Nor does the Fourth Circuit adopt the government's view. See Ross, 309 F.3d 830.

[15] Willem believed that his conversation with Diaz occurred around February 20, 2002. See Def's Memo, Exhibit "5", at 5. Diaz's records do not indicate she was in military status between February 19, 2002 and March 14, 2002. See Exhibit "7". Although apparently she attended her UTA drill on March 2-3, 2002, Willem indicated in his statement of March 7, 2002, that the meeting was two weeks earlier, not four days.

Second, as noted herein, the governing policy for the National Guard does not officially encourage military officers to file an informal report of sexual harassment to any other Guard member. See Exhibit "8. Nor were the steps that Diaz took to supposedly informally report Elders' actions even constitute "informal reports" of sexual harassment under Guard policy. Thus, her actions were neither "in the line of duty" or within her "scope of employment". See Robinson Decl. at ¶¶6-15,21; Declaration of David L. McGinnis at ¶¶15-21 (dated May 17, 2003)("McGinnis Decl."), attached at Exhibit 9.

Third, as explained further below, the defamatory statements that Diaz made were not privileged. Nor is the issue of privilege relevant to the question of intramilitary immunity.

Finally, the government continues to claim that each of Diaz's allegations "directly concerns Elders's [sic] military service and status as a commanding officer." See Def's Memo at 18. This argument necessarily requires that the allegations Diaz made are actually true.[16] However, this is a defamation/false light lawsuit based entirely on state common law. Thus, Elders asserts these events never occurred. See FAC at *passim*. Of course, his version of events must be accepted as true for purposes of this Motion. GE Inv. Private Placement Partners II v. Parker, 247 F.3d 543, 548 (4th Cir. 2001). Thus, the

---

[16]Though exaggerated as it might be, the following example demonstrates why the government's argument must fail. Had Diaz told others that Elders was a coward because she witnessed that at the Revolutionary War Battle of Bunker Hill in 1775, he ran from the British without firing a shot, the subsequent defamation claim against her would not be viewed in the context of Boston, Massachusetts 226 years ago. Instead, where Diaz was when she made the defamatory comments, what her duty status was, to whom did she make the comments (and were they repeated) and why, and what damages did Elders suffer would be some of the requisite factual issues. Some courts have also held that it is relevant where the plaintiff was, and what duty status they were in, at the time of the injury. See Meister, 233 F.3d at 338. Diaz has submitted no evidence to demonstrate Elders was on active duty or on official status when she was spreading her defamatory statements about him. In fact, using the vague dates Diaz and the others have provided, Elders believes he was not acting in any military capacity when Diaz was spreading her defamatory allegations. See Elders Decl. at ¶9, attached at Exhibit "1".

substance, i.e., what happened and where, underlying Diaz's allegations - from either her standpoint or the governments - cannot serve as the determination for application of the Feres doctrine due to the legal nature of Elders' lawsuit.[17]

Due to the nature of Elders' legal claims, what is more important are the dates and places where each and every defamatory statement made by Diaz occurred, what was said, to whom was it said, to whom was it repeated by third parties (and who were all the third parties), and what damages did Elders suffer. See Zaid 56(f) Decl. at ¶¶8-9, attached as Exhibit "3". While Elders possesses some of this information, as set forth in his First Amended Complaint, clearly he does not know the full extent of Diaz's damaging actions. Moreover, as explained throughout this brief and the supporting declarations, there is ample proof that Diaz is withholding information from this Court regarding the number of people she spoke with and when the conversations occurred. Whether the government's Motion is denied outright or without prejudice, discovery is required to further expose the relevant facts.[18]

---

[17]As a matter of law, were the roles reversed and it was Diaz filing a sexual harassment lawsuit against Elders, or the government, the result would be quite different. In such a case, her allegations of misconduct would be asserted as being true, which would subject them to dismissal under Feres. In Becker v. Pena, 107 F.3d 877 (9th Cir. 1997), a female military service member brought suit alleging such claims as sexual harassment. However, the Court found that "[w]hile the acts of sexual harassment served no military purpose, they were incident to Becker's military service. Virtually all of the harassing conduct occurred during working hours on the Coast Guard base. Becker's harassers were predominantly superior in rank and were subject to military discipline for harassing her." Id. Thus, the Feres doctrine applied and the case was dismissed. See also Smith v. United States, 196 F.3d 774, 776-77 (7th Cir.1999)(sexual harassment claim would require court pass judgment on military's proper conduct, failure to supervise and readiness); Corey v. United States, 124 F.3d 216 (10th Cir. 1997)(plaintiff alleged sexual harassment and discrimination occurred "[d]uring the course of her employment" thereby prompting application of Feres doctrine).

[18]The deposition of Diaz would be an excellent place to start to try and resolve many of the unanswered questions that would impact an analysis of whether the Feres doctrine or the FTCA applies. Other important witnesses would be, but not limited to, Mentges, Thomas, Willem, Maurer and Diaz's medical secretary. See Zaid 56(f) Decl. at ¶9. As this Court suggested in its Order dated February 12, 2003, intramilitary immunity does

1. Elders' State Law Claims Are No Different From Those Similar Claims That Overcame A Defense Of Intramilitary Immunity And Were Permitted To Proceed By Several Circuit Courts Of Appeals And District Courts

The government claims that "federal courts have consistently applied the doctrine of intramilitary immunity to bar *all* lawsuits within the military, including the National Guard, by soldiers seeking damages from their fellow-soldiers or the Government for injuries in any way related to their military duties." See Def's Memo at 16.[19] Therein lies the penultimate dispute. Were the injuries related to Elders or Diaz's "military duties"? If they were not, as Elders argues, or if there still remains a factual question surrounding this issue, then intramilitary immunity cannot apply at this time.

Although the Fourth Circuit's decision in Scott provides ample reason to deny Diaz' Motion., three cases from three different Courts of Appeals presenting similar facts to the instant matter should further persuade this Court that intramilitary immunity does not apply and the government's Motion should be denied outright.[20]

---

not apply to any defamatory statements Diaz made to non-Guard members. Moreover, with respect to the prospect of discovery, given the nature of the National Guard being quasi-military, many of the individuals who possess discoverable information are, such as Diaz, traditional Guardsmen. That is, taking their depositions would not even interfere with their military duties, much of which takes place only on the weekends.

[19]The Fourth Circuit, however, has expressly declined to apply the Feres doctrine to all claims simply because somehow the military is involved, particularly when the claims are "based upon a truly independent or post-service tort." Kendrick, 877 F.2d at 1204 n.2. See also Blakey v. U.S.S. Iowa, 991 F.2d 148 (4th Cir. 1993)(Feres doctrine does not preclude recovery for independent negligent acts by military if acts occur post-service and are not incident to military activities)(citations omitted).

[20]In the government's reply brief in support of its earlier Motion to Dismiss, it commented upon the plaintiff's citation to these three cases. However, it merely noted that none of these cases undermine the "proposition that all claims for injuries suffered by military personnel that are even remotely related to the individual's status as a member of the military are barred by the intramilitary immunity doctrine." See Reply Memorandum in Support of Defendant Maria Diaz's Response to the Plaintiff's Opposition to Diaz's Motion to Dismiss and Opposition to Plaintiff's Discovery Requests at 13-14 (filed February 10, 2003)("Def's Reply Memo"). These three Circuit Courts of Appeal decisions unequivocally reject the expansive proposition of intramilitary immunity espoused by the government in this case. Most importantly, these three Courts

First, this case is very similar to that addressed by a very respected panel of the

Seventh Circuit in <u>Cross v. Fiscus</u>, 830 F.2d 755 (7th Cir. 1987), where a commanding

officer filed a state law defamation claim against three enlisted men who had complained

about his conduct. As the Court explained:

> Enlisted men often say nasty things about officers behind their backs.
> Military discipline forbids many kinds of challenges to the authority of
> officers, and even the permitted challenges have their risks. The military
> services allow people to go over the heads of their commanding officers
> to complain of wrongdoing, real or imagined. Roger Fiscus, Donald
> Rathburger, and Jesse Hicks, three gunnery sergeants of the 4th Marine
> Division (Reserve) stationed in Chicago, complained about the conduct
> of Lt. Colonel Charles Cross, the commanding officer of its 2d
> Battalion, 24th Regiment. They took the risk that Cross's superiors
> would absolve him of wrongdoing and think ill of them for making
> unfounded complaints. Instead the superior officers removed Cross from
> his command, although they declined to impose other discipline. Cross
> retaliated with a suit accusing the sergeants of defamation.

<u>Id</u>. at 755. This fact pattern is analogous to the instant matter. Yet, the Seventh Circuit

expressly ruled that the <u>Feres</u> doctrine was inapplicable to the situation of a state law

defamation claim.[21] It distinguished between FTCA claims against the United States,

which is the umbrella for <u>Feres</u>, and claims against federal employees under <u>Bivens</u>.

Although the Seventh Circuit did rule that immunity nonetheless applied, this was

because the individual defendants had acted within their "outer perimeters" of duty, i.e.,

---

of Appeals decisions, as does the <u>Scott</u> decision, *postdate* the Supreme Court's
pronouncement in <u>Stanley</u> (indeed, the Seventh Circuit decision was issued just three
months later) and therefore had the benefit of the analysis contained therein that Diaz
asserts merits dismissal of Elders' claims. It will speak volumes if in her next pleading
Diaz cannot offer anything more than a couple of sentences simply saying the cases are
distinguishable instead of specifically articulating how the legal and factual components
do not undermine her position.

[21]The Sixth Circuit recently permitted a National Guard member to sue another National
Guard member for defamation without interference by the <u>Feres</u> doctrine, although
because of certification that the defendant had acted within the scope of their
employment, thereby substituting the United States, the lawsuit was eventually dismissed
under the FTCA. <u>See  Singleton v. United States of America</u>, 277 F.3d 864 (6th Cir.
2002).

were within their scope of employment when they filed official complaints through their chain of command. <u>Cross</u>, 830 F.2d at 757. Notably, the Court opined:

> The sergeants are not policy-making employees of the Marines, and gunnery sergeants do not regularly evaluate the conduct of their superior officers; nonetheless, providing such evaluations within the chain of command is among the privileges of enlisted personnel. U.S. Navy Regulations Art. 1139 (1973). Higher officers are entitled to know -- if it is true -- that an officer is not behaving properly. That enlisted personnel may provide misinformation rather than the truth does not contract the scope of their duties, under the approach of Gregoire. On the sole ground of absolute immunity, the judgment is AFFIRMED.

<u>Id</u>. at 758. As with the sergeants, Diaz was not a policy-making employee of the MD ANG. She was considered by the MD ANG to be Elders' subordinate, not superior. <u>See</u> Def's Memo at 7. And the defamatory statements that are at issue did not take place in the course of filing either a formal or informal complaint through her chain of command or to an EEO representative. <u>See</u> Robinson Decl. at ¶¶6-15,21, attached at Exhibit "6"; McGinnis Decl. at ¶¶15-21 at Exhibit "9"; FAC at ¶12. Whether Diaz was acting in the scope of her employment, which would permit the United States to be substituted as the defendant, is a legal issue distinct from the applicability of the <u>Feres</u> doctrine.

Second, in <u>Lutz v. Secretary of Air Force</u>, 944 F.2d 1477 (9th Cir. 1991), a former major in the United States Air Force filed state law claims against three Technical Sergeants who had broken into her office, took personal papers and disseminated the information in order to injure her reputation and career. <u>Id</u>. at 1478. The documents implied she was involved in a lesbian relationship. <u>Id</u>. at 1479. Quite importantly, the United States certified that the defendants had acted within the scope of their employment. <u>Id</u>. Notwithstanding the certification, both the district court and the Ninth Circuit ruled that the <u>Feres</u> doctrine did not apply because the defendants' actions were not "activities incident to service."

> [N]ot every action by one member of the armed services against another implicates military decision making, relates to the military mission, or is

20

> incident to service. Here three subordinates had a personal vendetta
> against a superior. They broke into her office after hours, opened her
> private mail, and disseminated it in an attempt to ruin her reputation. It
> seems hardly possible that this conduct or the resulting injury to the
> victim "arises out of or is incident to service."

Lutz, 944 F.2d at 1484.

The Court rejected each and every one of the government's arguments, all of which

have also been asserted as grounds for dismissal in the instant matter:

> Appellants focus on Major Lutz's status as an active duty military
> officer, on the fact that Lutz and the sergeants were all "subject to
> military discipline," and on the fact that the damage she alleges was to
> her career in the military. These criteria are overbroad, however, and
> violate Stanley's express rejection of a rule which would "disallow
> [claims] by servicemen entirely." 483 U.S. at 681. That is, every lawsuit
> by one active-duty member of the military against another would clearly
> implicate the first two factors, and any suit involving an injury impairing
> the plaintiff's ability to continue working would involve damage to his
> or her "military" career. For example, had the sergeants physically
> assaulted Lutz to get back at her, causing injuries which prevented her
> from continuing in her occupation, the same factors would apply. We
> find it inconceivable that Feres would be read to preclude a suit against
> the individual defendants in such a situation. While the absence of
> active-duty status or subjection to military discipline may defeat the
> application of Feres, see McGowan [v. Scoggins], 890 F.2d 128 [9th Cir.
> 1989], their presence is insufficient, standing alone, to invoke Feres.

Lutz, 944 F.2d at 1485-86.[22] This Court, as did the Ninth Circuit, should finally declare

that "even Feres concatenations must come to an end." Id. at 1487.

Finally, the First Circuit recently analyzed the "incident to service test" in the context

---

[22]The Ninth Circuit also found unpersuasive the government's argument that the
individual defendants' actions were "incident to service" because it was "their duty to
report any violations of Air Force regulations by their superior officers to the appropriate
authorities. While the existence of such a duty would likely immunize them from liability
for making colorable reports of violations to superiors, we echo the district court's
conclusion that 'it is not conceivable that this duty required defendants to remove
personal documents from their commander's desk after working hours and distribute them
to other Air Force personnel.'" Lutz, 944 F.2d at 1486. Thus, any claim in this case that
Diaz's reporting of the alleged incidents were incident to service because of a duty to
report instances of sexual harassment to military personnel should be rejected, at least to
the extent her comments were not part of a formal/official investigative process.

of state tort claims and the interplay of the Feres doctrine in Day v. Massachusetts Air National Guard, 167 F.3d 678 (1st Cir. 1999). Day was an airman in the Massachusetts Air National Guard who was subjected to a hazing incident on the military base by other Guard members. He filed both federal and state claims against the Guard, the Department of the Air Force and named and unnamed individuals. Id. at 680. As in the instant matter, the United States Attorney certified that three of the individuals were acting within their scope of employment. Id. at 681. The First Circuit determined that the Feres doctrine does bar the federal claims against all defendants, as well as the state claims against the United States and its components, but not the state claims against any individual who acted outside their scope of employment (which was a reversal of the district court's decision). Id. The Court ruled that:

> The incident to service test itself has become a talisman, although perhaps not so intended (Justice Jackson spoke also of "service connected" injuries, Feres, 340 U.S. at 142). Courts have sought to determine whether an injury was incident to service by asking whether it occurred on a military facility, whether it arose out of military activities or at least military life, whether the alleged perpetrators were superiors or at least acting in cooperation with the military, and--often stressed as particularly important, see Johnson, 481 U.S. at 686 & n.7--whether the injured party was himself in some fashion on military service at the time of the incident. No single element in the equation, the Supreme Court has said, is decisive. See Shearer, 473 U.S. at 57.

The First Circuit seemingly echoed the Fourth Circuit's wisdom in Scott and took careful notice that "the Supreme Court has not yet taken this step of converting Feres into an immunity for individuals against state law claims. To do so would mean that military service personnel who were the victims of serious intentional torts inflicted by other service personnel on base would effectively be denied any civil remedy against a wrongdoer who was not acting within the scope of his military employment--a result that has caused more than one court to blanch." Day, 167 F.3d at 684.

The Feres doctrine already protects the federal treasury, and the "core concerns of Feres about military discipline are largely--although not entirely--assuaged by the ability

of the United States to certify under the Westfall Act those state-law claims against military personnel which it believes are sufficiently related to the defendant's duties to fall within the scope of defendant's employment." Id.[23]

In addition to these three Circuit Courts of Appeals cases, decisions within this very district also support Elders' position. Consider, for example, Kenneally, 760 F.Supp. 503, which also dealt with defamation claims filed by one National Guard member against another.[24] The defendant - a Lieutenant Colonel in the D.C. National Guard - allegedly placed a telephone call to the Office of Presidential Personnel (OPP) and allegedly made a defamatory statement about the plaintiff - a Colonel in the D.C. National Guard who was his Commander - to the effect that plaintiff used illegal drugs. Id. at 504.

The defendant claimed that intramilitary immunity required dismissal of the lawsuit. Interestingly, the Lieutenant Colonel was not being represented by the government because the "Justice Department has in fact claimed that *matters arising in the context of*

---

[23]The Court concluded that "[t]he issue is very close and the Supreme Court may yet take the step of converting Feres into a formal immunity barring state law claims against individuals for conduct, however unauthorized and deliberate, that causes injury to the plaintiff incident to military service. But the risk of some injustice is manifest, the policy arguments for the extension are at the margin, and the Supreme Court has been increasingly loath to override state law in areas of traditional state responsibility without a clear Congressional mandate. See Wisconsin Pub. Intervenor v. Mortier, 501 U.S. 597, 605 (1991). If the step is to be taken, it should be taken by the Supreme Court or upon more evidence that without it military autonomy will be seriously threatened." Day, 167 F.3d at 685. See also Durant v. Tassin, 884 F.2d 1350, 1351 (10th Cir. 1989) ("intra-military immunity should not be applied to shield military personnel from common-law actions based on their nonmilitary conduct"), cert. denied, 110 S.Ct. 728 (1990).

[24]In what appears to be one of the only Maryland state court decisions that touched upon the Feres doctrine, which in fact occurred in litigation involving the Maryland Army National Guard, the Court of Appeals noted that the "Feres doctrine has been applied almost exclusively in the context of claims alleging specific negligence or other wrongful conduct on the part of named or ascertainable individuals, the liability of the Government in those instances being vicarious." Estate of Burris, 360 Md. at 744 fn.6, 759 A.2d at 815 fn.6. There is no vicarious liability on the part of the Government in this case.

*the Guard involve no federal interest.*" Id. at 505 (emphasis added).[25] The Court declined

to apply intramilitary immunity because the defendant must first establish that he was

performing a military act by making the alleged call to OPP. Id. citing Durant, 884 F.2d

at  1354; Brown v. United States, 739 F.2d 362 (8th Cir. 1984), cert. denied, 473 U.S.

904 (1985). As explained further below, Diaz was not performing official military acts on

the numerous occasions when she defamed Elders, particularly when she initially spoke

to National Guard members such as Mentges and Willem.[26]

    In addition to showing the defendant was performing a military act, it must also be

established that the incident to service test is met. This was a question of fact that

precluded summary judgment because "a factual determination must be made regarding

the status of plaintiff and the OPP at the time of the alleged defamatory statement before

the Court will be able to determine whether the alleged evaluation directed to the OPP

was an incident of plaintiff's service." Kenneally, 760 F.Supp. at 506. From the facts in

possession of Elders at this time, he was not in military status on many (or any) of the

occasions that Diaz made her defamatory statements. See Elders Decl. at ¶9, attached at

Exhibit "1". Nor does it appear Diaz was always in military status at the time either. See

Exhibit "7". Of course, Diaz presumably knows when and where she made her comments

to third parties, as do the third parties (i.e., Mentges, Willem, Maurer and others), and

discovery will reveal such facts as the relevant duty status of the parties at the time of the

_____

[25]The Court thus noted that the "Justice Department's position clearly indicates that there
is a factual issue as to whether defendant was federal military personnel." Kenneally,
760 F.Supp. at 505. Before this Court adjudicates the Feres question, the U.S. Attorney's
Office for the District of Maryland should be required to articulate what circumstances
exist for it to unilaterally modify a policy position of the Department of Justice.

[26]Diaz's reliance on the more recent decision from this district of Shiver v. United States,
34 F.Supp.2d 321 (D.Md 1999), neither supports her premise nor contradicts Elders'
position. See Def's Memo at 17. Shiver, which involved claims arising from an alleged
rape of a servicewoman committed by her drill sergeant while on active duty, dealt solely
with intramilitary immunity as it applied to FTCA claims against the government and the
Attorney General. Id. at 322. The plaintiff's claims against the individual military
members were not dismissed on the basis of intramilitary immunity. Id. at 323.

defamatory allegations.[27]

Thus, Diaz's actions cannot be deemed to have been "incident to service". Therefore, Feres and the doctrine of intramilitary immunity do not apply. At the very least, such a determination cannot conclusively be reached at this time without the taking of discovery.

## II.  ELDERS' CLAIMS ARE COGNIZABLE BECAUSE DIAZ ACTED OUTSIDE OF HER SCOPE OF EMPLOYMENT THEREBY RENDERING HER, AND NOT THE UNITED STATES, AS THE PROPER DEFENDANT SUBJECT TO LIABILITY

Because it knows that the Feres doctrine does not preclude Elders' claims, the government tosses in two additional kitchen sink arguments that are premature: (1) that Elders cannot maintain an action against the United States for libel and (2) that Elders cannot seek damages against the United States for acts upon which he did not file an administrative claim. See Def's Memo at 24-28. These arguments apply only if the United States is substituted as the party-defendant rendering the instant action one governed by the FTCA. No decision of this nature has yet been made by the Court. Frankly, Elders agrees that if the United States is properly substituted as the defendant in place of Diaz, his lawsuit stops there. The United States is immune from his state tort claims. That outcome has not yet materialized though.

The government's arguments, however, again speak directly to the question of whether Elders will be permitted to challenge the United States Attorney's certification that Diaz acted in the scope of employment. Given the arguments addressed with respect to the Feres doctrine, there is an interesting interplay. Although the Feres doctrine's "incident to military service" test would appear as a practical matter to encompass the scope of employment inquiry, the questions are legally distinct. See Valdiviez v. United

---

[27]By submitting a sworn declaration, Diaz had the opportunity to attempt to clarify many of these factual questions, particularly because Elders previously raised these same questions in response to her initial Motion to Dismiss. That Diaz chose to leave these factual questions lingering is enlightening.

States, 884 F.2d 196, 198-99 (5th Cir. 1989)(Feres doctrine's "incident to service" inquiry is distinct from the FTCA scope of employment inquiry); L. Jayson, Handling Federal Tort Claims § 216.01, at 9-162 (1990)("the fact that a serviceman's activities would be considered 'incident to service' for purposes of the application of the Feres doctrine ... does not necessarily make those same activities within the scope of employment for the purposes of determining the government's liability under respondeat superior doctrine").

When a federal employee[28] is sued for a wrongful or negligent act, the Federal Employees Liability Reform and Tort Compensation Act of 1988 (commonly known as the Westfall Act) provides that:

> [u]pon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

28 U.S.C. § 2679 (d)(1).[29] Upon a *successful* invocation of the certification, the individual employee is dismissed from the case and the United States is substituted as defendant. The case would then proceed under the FTCA, which confers immunity to the government for claims of libel and slander. See 28 U.S.C. § 2680(h). The government has not yet been substituted for Diaz as the defendant in this action. Indeed, the government is entitled to be substituted *only* if Diaz was acting within the scope of her employment. If she was not, the government has no role to play in this litigation.

---

[28]Elders is not conceding that Diaz was a federal employee during any or all of the occasions when she defamed him. There is no documentary evidence before this Court to suggest she was. Thus, this is a question of fact that requires discovery and precludes summary judgment at this time.

[29]Section 2679 (d)(2) provides for removal of cases from state to federal court and substitution of the United States as the party defendant in those cases.

### A. The United States Attorney's Certification Is Inadequate To Justify Substitution

The mere fact that the United States Attorney has certified Diaz was acting in the scope of her employment is not enough. In <u>Gutierrez de Martinez v. Lamagno</u>, 515 U.S. 417 (1995), the Supreme Court held that a certificate of scope of employment is conclusive for purposes of removal from state court only, not substitution. District courts are to review the certification attempt. Without such review, the Court held, the scope of employment issue "however contestable in fact, would receive no judicial audience," and federal courts would be reduced to "rubberstamp work." <u>Id</u>. at 429. In <u>Maron v. United States</u>, 126 F.3d 317 (4th Cir. 1997), the Fourth Circuit recognized that "the recent <u>Gutierrez</u> decision means we may no longer decline to judicially decide whether substitution is proper." <u>Id</u>. at 321. That meant discovery and an evidentiary hearing was in order. <u>Id</u>. Of course, neither has transpired in this case.

In his latest undated certification, Thomas M. DiBiago, United States Attorney, certified that Diaz was "acting within the scope of her employment as an employee of the Air National Guard, a reserve component of the United States Air Force, at the time of such incident." <u>See</u> Def's Memo at Exhibit "2".[30] In reaching his position, Mr. DiBiago relies solely upon his reading of the Complaint and "a November 26, 2002 memorandum from Assistant United States Attorney Tarra DeShields." <u>Id</u>. This Certification raises several significant concerns.

First, the lone "incident" to which Mr. DiBiago refers is neither known or identified. Elders has alleged multiple incidents have occurred during the period November 2001 to the present where Diaz has defamed him, which standing alone serves to undercut the certification. Because multiple incidents make up the claims against Diaz, the scope of employment test must be applied specifically to each of the acts or incidents contained in

---

[30]Under 28 C.F.R. § 15.3, the Attorney General has delegated to the United States Attorney the authority to provide § 2679(d) certification.

the complaint that make up each claim, rather than broadly to the claims or complaint as a whole. See Lyons v. Brown, 158 F.3d 605, 608-09 (1st Cir. 1998).

Second, according to the certification, Mr. DiBiago reached his determination by reviewing Elders' Complaint. Yet Elders filed a more detailed First Amended Complaint on March 3, 2003. Moreover, there is certainly no reasonable likelihood that information in either the Complaint or the First Amended Complaint significantly contributed to a decision that Diaz was acting in the scope of her employment. Thus, Mr. DiBiago presumably relied upon Ms. DeShield's memorandum, which also pre-dated the First Amended Complaint by nearly four months. What facts does Ms. DeShield possess that contradicts Elders' original assertions, much less his later more detailed ones? Not one fact is provided to this Court by Mr. DiBiago. Although the government's certification may have satisfied its prima facie burden, it carries no evidentiary weight because it neither contains any "details" or "explains the bases for its conclusion." Maron, 126 F.3d at 323.[31] See also Wood v. United States, 995 F.2d 1122, 1123 (1st Cir. 1993)(Westfall Act certificate cannot simply deny the basic "incident" charged); McHugh v. University of Vermont, 966 F.2d 67 (2d Cir. 1992)(same).[32]

Finally, what perhaps should be most troubling to this Court is that the government and Diaz have blatantly disregarded the Court's explicit instruction that following the

---

[31]The burden of proof to refute the certification of scope of employment admittedly falls on Elders to "prove by a preponderance of the evidence that the defendant[] [was] not acting within the scope of [her] employment." Maron, 126 F.3d at 323. If Elders can so demonstrate, then the government "must provide evidence and analysis to support its conclusion that the torts occurred within the scope of employment." Id. Elders has done so. The government has not.

[32]The First Circuit noted that the language of the Westfall Act "does not allow an immunity certificate simply to deny, say, an alleged killing, rape, assault, or some other 'egregious misconduct' that occurs during working hours. It suggests that the Act requires the certificate to explain, instead, why the alleged misconduct was not so 'egregious' as to place it outside the employee's 'scope of employment.'" Woods, 995 F.2d at 1126.

filing of Elders' First Amended Complaint any "certification as to the scope of employment must address the specific actions alleged by the Plaintiff to be tortious." <u>See</u> Order (dated February 12, 2003). The certification obviously does not.

### B. Diaz Has Not, And Cannot, Demonstrate She Was Acting In The Scope Of Her Employment When She Spread Her Defamatory Statements

The scope of employment inquiry of whether the employee was acting within the line of duty is defined by the applicable state law of respondeat superior. <u>Jamison v. Wiley</u>, 14 F.3d 222, 227 n.2 (4th Cir. 1994). In this case, Maryland law applies. Under Maryland law, an act is within the scope of employment if it is authorized. <u>Sawyer v. Humphries</u>, 322 Md. 247, 255, 587 A.2d 467, 470-71 (Md. 1991). An act is authorized if it "was incident to the performance of the duties entrusted to [the servant] by the master, even though in opposition to [the master's] express and positive orders." <u>Id</u>. at 255, 470, <u>quoting</u> <u>Hopkins Chem. Co. v. Read Drug & Chem. Co.</u>, 124 Md. 210, 214, 92 A. 478, 479-80 (Md. 1914). Intentionally spreading defamatory lies with malice is certainly not an authorized act within the MD ANG, nor incident to the performance of any legitimate duties entrusted to Diaz by the Guard.

Diaz relies upon the declaration of Felton Page ("Page"), Chief, National Guard Directorate for Equal Opportunity, in order to demonstrate she acted within the scope of her employment when spreading the defamatory allegations. Interestingly, Page never specifically refers to Diaz or her specific factual circumstances. Indeed, he does not indicate that he is even familiar with the facts as they have been alleged to exist either by Diaz or Elders. Instead, he merely generally describes for the Court the alleged policies of the National Guard Bureau - and thereby the MD ANG - pertaining to sexual harassment. <u>See</u> Declaration of Felton Page (dated April 8, 2003)("Page Decl."), attached to Def's Memo.[33] Though wide sweeping in application, the declaration conveniently

---

[33] In Diaz's Reply brief filed February 10, 2003, she included a declaration of Lieutenant Colonel Allyson Solomon to support her premise that her actions were military in nature.

omits any reference whatsoever to the policies the Guard says exists. One would imagine that if such policies actually existed, it would be in Diaz's best interests (and the governments) to specifically identify them for the Court so that they could be applied to this litigation. The absence, however, was for good reason. The pronouncements in the Page declaration do not accurately reflect existing policy, and appear to be reflective of his own beliefs rather than any official policy. See Robinson Decl. at ¶¶6-15,21, attached at Exhibit "6"; McGinnis Decl. at ¶¶15-21 at Exhibit "9".

National Guard Regulation (NGR) 600-22/ANGI 36-3, a copy of which is attached as Exhibit "8" and can also be found at *http://www.ngbpdc.ngb.army.mil/pubfiles/ 36/363I.pdf*, recognizes that "[a]ll National Guard personnel are entitled to serve in an environment free from sexual harassment." This document constitutes the complete sexual harassment policies of the National Guard, including the MD ANG.[34] If a policy or procedure is not reflected in this document or other writings, it likely does not exist.[35] See

Lt. Colonel Solomon asserted she had EEO experience and had reviewed the investigative reports in this case. See Def's Reply Memo, Exhibit "1". Facially, the declaration certainly appeared helpful to Diaz. It is indeed interesting that the more detailed Solomon declaration has been replaced by the generic Page declaration. This leads one to wonder whether something in Solomon's declaration perhaps misstated the laws and policies as they truly exist. Given the significant material facts that remain in dispute regarding the proper status of Diaz and Elders when the defamation acts took place, Lt. Colonel Solomon may be an appropriate witness to depose to explain the distinction between her position, that set forth by Page and that which is contained in National Guard Regulation (NGR) 600-22/ANGI 36-3, which governs Diaz's conduct.

[34]The allegations investigated by Colonel Werts were, in fact, framed as potential violations of this regulation. See Def's Memo, Exhibit "5", at 2.

[35]The MD ANG has adopted specific policies in line with those set forth by the National Guard Bureau. Two such policy announcements were adopted by Major General James F. Fretterd, then the Adjutant General of the Maryland National Guard, on November 9, 1987 and February 1, 1995. These two policies echo the filing profile set forth in NGR 600-22. See Robinson Decl. at Exhibit "A", attached at Exhibit "6". Two later memos were issued by Brigadier General David A. Beasley, 175th Wing Policy Letter 97-04 (April 8, 1997) and 97-09 (November 24, 1997). Nothing within these two documents supports Diaz's arguments or contradicts those espoused by Elders.

Robinson Decl. at ¶¶8,13, attached at Exhibit "6"; McGinnis Decl. at ¶17 at Exhibit "9".

The NGR created a Military Discrimination System which specifically:

> establishes policies and procedures for filing, processing, investigating, settling, and adjudicating discrimination complaints in the Army National Guard (ARNG) and Air National Guard (ANG). It implements Title VI of the Civil Rights Act of 1964, as amended, DoD Directives 1350.2, and 5500.11, Army Regulation 600-20, and Air Force Instruction 36-2706, prohibiting discrimination based on race, color, religion, gender, national origin, or reprisal.[36]

NGR 600-22 specifically addresses the filing of both formal and informal complaints.[37] "The chain of command will be the primary channel for resolving discrimination complaints. Individuals will be encouraged to use command channels for redress of grievances....The sole mechanism for appealing the disposition of an informal complaint shall be to file a formal complaint." NGR 600-22, 1.7(f).

The government and Diaz, however, assert that it is official Guard policy that informal complaints can be made to any member of the Guard. See Page Decl. at ¶¶14-16. And that doing so is an act that is within the line of duty and scope of employment. Id. at ¶17. Such assertions are simply not supported by the documentary evidence. NGR 600-22, 2-1, pertains to "Informal Complaints" and addresses to whom one should be brought:

> An informal complaint of discrimination, although it may be initially verbal, shall be put in writing on NGB Form 333 with only the "Informal" box checked and initialed by the complainant....An informal complaint may be brought to the attention of any member of the chain of command at the lowest level of command where a remedy or resolution

---

[36] Sexual harassment falls within the category of discrimination. NGR 600-22, 1.10(citing DoD Instruction 1350.3).

[37] An "Informal Complaint" is specifically defined by the governing regulations to be a "complaint of [sic] alleging illegal discrimination expressed verbally (or filed on NGB Form 333 with only the 'Informal' block checked and initialed) to a member of the complainant's chain of command at any level, EOA or MEO staff, or other state NG officials." NGR 600-22, Glossary, at 37.

is possible, or to the equal opportunity representative or equal
opportunity advisor at that level.

NGR 600-22, 2-1(a). In fact, the regulation specifically addresses the exact situation that

supposedly befell Diaz wherein it noted that "[i]f the complaint is brought against the

company or squadron commander, then the informal complaint will be brought to the

equal opportunity representative, or to a member of the chain of command at the next

higher level of command (battalion/group)." Id.[38]

Page has no known authority to unilaterally rewrite the governing regulations and

policies simply to serve or create a litigation advantage for the government. The

regulations quite clearly and specifically identify all categories of individuals to whom an

informal complaint is recommended to be made:

> Military members who believe they have been illegally discriminated
> against are encouraged to discuss their complaints with and to seek
> assistance from their Equal Opportunity Representative or Advisor
> (ARNG) or their Wing Military Equal Opportunity personnel (ANG), or
> any member of their unit chain of command.

Id. at 2-1(b). Nowhere does it identify "fellow National Guard members".[39] If that was

the intent of the policy, surely the governing document - which was recently issued on

March 30, 2001 and governs the very time period in question - would have included such

broad language. That it did not reveals that the policy relied upon by the government and

Diaz is not what they assert it to be.[40]

---

[38]NGR 600-22, 2-7(a), further states that "[w]hen a military member believes that his or
her commander was responsible for the alleged discrimination, the member will file the
formal complaint with the next higher commander in the chain of command."

[39]The formal complaint, NGB Form 333, states that a complainant is "encouraged to
discuss the complaints with and to seek assistance from your immediate supervisor, unit
commander, members of the chain of command or EOA/EOT staff." See Exhibit "8"
(reproduced as Figure 1-2). Diaz has never asserted that she filed a formal complaint.

[40]All the more reason that if this Court does not chose to simply reject the government's
intervention, which the evidence justifies, it should permit discovery on the scope of
employment issue to allow Elders the opportunity to challenge the government's
litigation contentions.

1. <u>Diaz Never Filed An Informal Complaint Regarding Her Allegations Of Sexual Harassment</u>

There is absolutely no information within the record supporting the government's claim that Diaz was acting in the scope of her employment amidst defamation and false light claims. Even if the Court were persuaded by the Page declaration that the filing of an informal complaint to any member of the National Guard is an act that falls within the scope of employment, there is no evidence Diaz ever filed an informal complaint.

She generically claims that in or about February 2002, she "had conversations with fellow Maryland Air National Guard officers in which I raised my concern that Lt. Col. Elders was sexually harassing me." <u>See</u> Declaration of Maria C. Diaz at ¶4 (dated April 8, 2003), attached at Def's Memo, Exhibit "3". Although Diaz conveniently fails to identify who these "fellow Maryland National Guard Air officers" are, Mentges and Willem are certainly among them (and the fact that others could be involved but are not identified again demonstrates why summary judgment is premature).[41] Neither Mentges or Willem fall within Diaz's chain of command. <u>See</u> Elders Decl. at ¶8, attached at Exhibit "1".

Diaz's testimony to Colonel Werts specifically confirms that her conversations with Mentges had nothing to do with filing an informal complaint or her scope of employment. She testified, "*I had also talked to Mike Mentges because Mike was my buddy. Mike and I are good friends.*" She also stated "I think what I needed (was) what I always give people ... just (for him) to listen." <u>See</u> Def's Memo, Exhibit "5", at 5-6 (changes original, emphasis added).[42]  Lt.Col. Tamara Miller, one of the attorneys for the

_____

[41] Inglis report indicates Diaz had conversations with Major (now Lt. Col.) Wilkinson. <u>See</u> Def's Memo, Exhibit "4", at 8 fn.14. These are conspicuously absent from Diaz's declaration.

[42] In discussing her conversations and relationship with Mentges, she added that "I am doctor and then I am friend." Def's Memo, Exhibit "5", at 5. It is noteworthy that Diaz did not refer to her military position in any way. This is evidence that she did not consider her discussions with Mentges to be related to her military scope of employment.

MD ANG, testified to Colonel Werts that Diaz did not ask either Mentges or Willem to do anything about her allegations. Id. at 7. This is confirmed in Diaz's testimony as well.

> Col. Werts: What did you expect them to do? I mean, what was your expectation?
> Diaz: I think what I needed what I always give people.
> Col. Werts: Somebody to listen.
> Diaz: Just to listen.
> Col. Werts: You didn't think they were going to take this any further?
> Diaz: I didn't think so.
> Col. Werts: Did you tell them not to take it any further?
> Diaz: RESPONSE MISSING
> Col. Werts: Oh so they just went around you.

See Exhibit "10" at 5.[43] Though Diaz's response is missing, it appears clear from the context of Colonel Wert's response that Diaz, in fact, specifically instructed Mentges and Willem to do nothing.

There is an intended purpose of filing a true informal complaint regarding sexual harassment. It is to seek a remedy or resolution of the problem, and not to simply pass gossip among friends who would listen. Diaz did not file an informal complaint of sexual harassment against Elders. Instead, as discussed more fully below, she merely set in motion a malicious plan designed to discredit Elders; a theory that Elders is entitled to pursue further.

### C. If This Court Determines A Factual Dispute Still Remains Regarding Scope Of Employment, Discovery And An Evidentiary Hearing Is Necessary

Beyond proving that the government's certification is completely inadequate, Elders believes he has presented sufficient facts based on his pleadings, documentary evidence and declarations to persuade this Court to outright deny the government's attempt to substitute itself in Diaz's place. However, if the Court believes factual questions remain, it is common practice - and indeed essential to ensure fairness and due process - for

---

[43]The issue arises again a few moments later and Colonel Werts clarified that Diaz had no intention of doing anything about her allegations, and that she knew if she did want something done, she should go through her chain of command. See Exhibit "10", at 6.

district courts to allow discovery in order to resolve factual disputes that bear on a scope-of-employment issue, including in cases alleging defamation. See e.g., Stokes v. Cross, __ F.3d __, 2003 WL 21005282 (D.C.Cir. May 6, 2003); Ross v. Bryan, 309 F.3d 830 (4th Cir. 2002); Borneman v. United States, 213 F.3d 819 (4th Cir. 2000); Aliota v. Graham, 984 F.2d 1350 (3d Cir. 1993), cert. denied, 126 L.Ed.2d 37 (1993); Schrob v. Catterson, 967 F. 929 (3d Cir. 1992); McHugh, 966 F.2d at 74; Brown v. Armstrong, 949 F.2d 1007 (8th Cir. 1991); Nasuti v. Scannell, 906 F.2d 802.[44]

In asserting her that her sexual harassment allegations were made in the scope of her employment, Diaz's own sparse declaration is riddled with factual holes. She omits just about every relevant fact that must be provided in order to support her argument. She neither identifies when exactly these statements took place, the individuals to whom she made these statements, where she was when she made these statements or what her military status was at the time she made these statements. These omissions directly call into question whether the statements were made in the scope of her employment. See Zaid Decl. at ¶¶8-9, attached at Exhibit "3". Moreover, even the sparse facts Diaz provides in her declaration are contradicted by the evidence, particularly with respect to the extent she spread the defamatory statements, which she still continues to do notwithstanding that her allegations were found to be unsubstantiated. See Exhibit "2"; Whiteley Decl. at ¶¶3-5, attached at Exhibit "4"; Exhibit "11", at 8.[45]

---

[44] As the D.C. Circuit ruled earlier this month, a plaintiff challenging the government's scope-of-employment certification "need only have alleged sufficient facts that, taken as true, would establish that the defendants' actions exceeded the scope of their employment." Stokes, 2003 WL 21005282 at *5. The Court also noted that the plaintiff was not "required to allege the existence of evidence he might obtain through discovery....He was merely required to plead sufficient facts that, if true, would rebut the certification." Id. at *6 (citation omitted).

[45] For example, in her sworn testimony to Colonel Werts, Diaz stated she revealed the second alleged kiss, which occurred in or around Summer 2001, to her husband (though his identity is redacted). See Exhibit "11" at 8. But she also added that "[b]efore I did that, I had shared it with [REDACTED] because I didn't know what to do, and I was

Additionally, nowhere within Diaz's declaration or her supporting arguments does she discuss why she should not be held liable for unauthorized third parties (such as Mentges and Thomas) repeating her allegations. How these repetitions would be considered within the scope of employment is unclear, but what is clear is that this district has expressly recognized that individuals are liable under Maryland law for the republication of defamatory information by third parties. Hickey v. St. Martin's Press, Inc., 978 F. Supp. 230 (D.Md. 1997). See also Blue Ridge Bank v. Veribanc, Inc., 866 F .2d 681, 689 (4th Cir.1989)(originator of defamation liable for republication or repetition by third persons, provided natural and probable consequence of act, or presumptively or actually authorized or directed republication).

Although she denies having any discussions "accusing Lt. Col. Elders of sexual harassment with anyone at Franklin Square Hospital, my personal friends, or employees", this self-serving statement is worthless at this stage of the litigation.[46] Even the government has not argued, as the Court itself suggested in its Order dated February 12, 2003, that such statements made by Diaz outside of the MD ANG to non-military personnel could be construed as falling within her scope of employment. Putting the

_____

scared." Id. To whom is Diaz referring to? Is this individual military or civilian? And why is this sworn admission of a disclosure of the sexual harassment allegations to a third party in 2001 omitted from her sworn declaration submitted in support of her Motion to dismiss this lawsuit? In addition to this reference, there are other indications of Diaz talking to third parties about Elders that she has not informed this Court about.

[46]One reason why Elders believes Diaz has discussed her allegations with non-military individuals with whom she works is derived from her testimony to Colonel Werts. Diaz stated that she believed she was being stalked at her office and that it was connected to Elders. See Exhibit "11" at 13-14. She revealed that she had reported her concerns to the authorities (whether military or civilian is not indicated), and that she had had discussions about this with her secretary and neighbor. Id. It is certainly reasonable to believe that she would have mentioned the alleged situation with Elders in the course of these conversations. Moreover, Maurer acknowledged to Colonel Werts that she was aware of Diaz's alleged stalking incident. How would she know unless Diaz was confiding in her? What else has Diaz said to her, and when and where did these conversations take place?

36

military issues aside, the fact that Diaz simply denies Elders' allegations does not entitle her to summary judgment without further proceedings and discovery.

Finally, the government - not Diaz (as she did not have access to these documents) - also submitted to this Court two incomplete versions of the purported investigations conducted into the allegations that Elders sexually harassed Diaz. See Def's Memo at Exhibits "4" and "5".[47] Although Elders sought access to these documents pursuant to the Freedom of Information/Privacy Acts for nearly one year without success, see Zaid 56(f) Decl. at ¶6-7, attached as Exhibit "3", the government unconscionably took the opportunity to use the information against Elders to serve its own interests.[48] These two reports contain references to numerous supplemental documents, particularly declarations and witness statements, that are legally and factually relevant to this action. Id. At the very least, the government should be required to disclose the reports in their entirety before any scope of employment determination is reached.

Given the evidence provided by Elders, this Court should deny the government's effort to substitute itself with prejudice. Alternatively, since such a huge gap exists surrounding Diaz's persistent history of disseminating defamatory statements concerning Elders, this Court should at least deny the government's motion to substitute until proper discovery occurs. Finally, until this Court rules on the scope of employment question, the government's kitchen sink arguments are premature.

## III. THERE IS NO ABSOLUTE OR CONDITIONAL PRIVILEGE THAT

---

[47]The public disclosure of these two documents may very well constitute an actionable violation of the Privacy Act of 1974, 5 U.S.C. § 552a. Elders never consented to the disclosure of these records, and it is not at all clear whether the routine use exception permitted the MD ANG to turn over copies to the Department of Justice, which in turn publicly filed them as part of these proceedings.

[48]Elders first requested a copy of the report prepared by Colonel Inglis on April 8, 2002. See Zaid 56(f) Decl. at ¶6. He requested the report prepared by Colonel Arthur N. Werts, on July 12, 2002. Id. Elders did not receive partial copies until January 2003. In the interim, the MD ANG filed the two reports as part of this lawsuit, although the National Guard Bureau, a separate federal entity that possessed the release authority was still processing Elders' request.

**APPLIES TO SHIELD DIAZ FROM LIABILITY FOR ALL HER DEFAMATORY STATEMENTS**

In her latest Motion, Diaz claims for the first time that her accusations of sexual harassment against Elders were privileged under Maryland law. See Def's Memo at 28-32. Under the circumstances, such a defense is completely inappropriate for the government to assert. These are affirmative defenses that belong to Diaz individually, and the United States Government should not be providing free legal assistance to a private citizen in a civil lawsuit. It is one thing to assert intramilitary immunity, a defense that seemingly belongs to the government, and a Westfall Certification regarding scope-of-employment, but whether or not privileges exist are defenses to be brought by Diaz after the government is out of the case. Nevertheless, in order to facilitate a resolution to these defenses so that this case can finally move forward, Elders will address the question of privilege and demonstrate that none exist to merit dismissal of his lawsuit.

The allegations made by Diaz are very serious, not just facially but as a matter of law. They are defamatory *per se* given that they impute Elders committed a criminal offense involving moral turpitude, impute unfitness to his performance of the offices or duties of employment, or lack of his integrity in the discharge of those duties, and prejudice him in his or her profession or trade. Wells v. Liddy, 186 F.3d 505, 522 (4th Cir.1999), cert. denied, 120 S.Ct. 939 (2000).

Diaz, however, asserts that as a matter of law all statements to her spouse and her fellow National Guard Members are covered by an absolute privilege. Id. at 29-30. "For reasons of public policy, the law of defamation recognizes certain communications as privileged, and thereby affords those who publish such communications immunity from liability. The privilege, and the resultant immunity enjoyed by the publisher, may be either absolute or qualified." Miner v. Novotny, 304 Md. 164, 167, 498 A.2d 269, 270 (Md.App. 1985). "An absolute privilege is distinguished from a qualified privilege in that the former provides immunity regardless of the purpose or motive of the defendant, or the

reasonableness of the conduct, while the latter is conditioned upon the absence of malice and is forfeited if it is abused." Id. quoting DiBlasio v. Kolodner, 233 Md. 512, 522, 197 A.2d 245 (1964). Diaz has asserted both the existence of an absolute and qualified privilege in an effort to extricate herself from her legal predicament.

Elders does not contest that statements between Diaz and her spouse are protected by an absolute privilege. Gohari, 363 Md. at 55 fn.13, 767 A.2d at 328 fn.13.[49] However, Diaz argues that any statements made to Guard Members "should also be protected by absolute privilege" based on the reasoning set forth in Mangold v. Analytic Services, Inc., 77 F.3d 1442, 1447 (4th Cir. 1996). See Def's Memo at 31. Mangold, however, simply extended to private government contractors the protections afforded federal employees by Barr v. Matteo, 360 U.S. 564, 569-73 (1959) and Westfall v. Erwin, 484 U.S. 292, 295 (1988). In Barr and Westfall, "the Court recognized an absolute immunity from state law tort liability for federal officials exercising discretion while acting within the scope of their employment." Mangold, 77 F.3d at 1446.[50] Thus, statements provided by federal employees as part of official government investigations are accorded absolute immunity from liability. Id. Elders in no disputes that any statements that Diaz provided as part of an official investigation are protected (even if Diaz was not acting as a federal employee, and that is an issue in dispute, from a policy prospective Elders still believes there is a privilege). Indeed, Elders specifically carved such statements out of his First Amended Complaint. See FAC at ¶13.

---

[49] However, the privilege does not extend to any instances of repetition that her spouse might have made to other third parties or, for that matter, any statements Diaz might have made to members outside of the Guard, as this Court has already suggested. Diaz has chosen not to address this issue, and it should be considered conceded.

[50] Because absolute immunity has its costs "since illegal and even offensive conduct may go unredressed", "the common law immunity recognized in Barr and Westfall is afforded only to the extent that the public benefits obtained by granting immunity outweigh its costs." Mangold, 77 F.3d. at 1447 (citations omitted).

Of course, this absolute privilege applies only to "federal officials exercising discretion while acting within the scope of their employment." <u>Mangold</u>, 77 F.3d at 1446. Elders has continually asserted that Diaz was not acting within her scope of employment when she defamed him (and may not have even been a federal employee). Thus, the application of this privilege requires no different analysis than that with respect to the U.S. Attorney's certification. If Diaz is found by this Court to have acted within the scope of her federal employment, then the United States is substituted and this case is dismissed. A decision regarding the application of an absolute privilege is superfluous.

In any event, the privilege was certainly not designed to protect defamatory gossip, particularly spread for malicious purposes. And the facts as they exist now reveal that the statements made to Majors Mentges, Willem, Maurer, and undoubtedly countless others who still remain unidentified, were defamatory and outside of Diaz's scope of employment. Diaz has failed to articulate why this Court should expand the <u>Barr/Westfall</u> privilege beyond what any court has ever held.

If this Court is unwilling, as it should be, to unduly expand the existence of the absolute privilege to mere casual comments to friends, then Diaz suggests her comments are separately protected by a qualified privilege recognized by Maryland law "among people who share a common interest." <u>Id</u>. <u>citing</u> <u>Gohari</u>, 363 Md. at 57-59, 767 A.2d at 328-29. The "existence of a conditional privilege is a question of law for the Judge, and the burden of proof is on the defendant." <u>Woodruff v. Trepel</u>, 125 Md.App. 381, 402, 725 A.2d 612, 622 (Md.Spec.App.1999), <u>citing</u> <u>Simon v. Robinson</u>, 221 Md. 200, 205 (1959). Because Diaz has failed to meet the necessary burden of proof, any entitlement is lost.

Notwithstanding Diaz's failure to meet her burden, it might be helpful to explore what is required for the application of a common interest as it further demonstrates the need for this litigation to proceed forward. The standard for common interest is the following: "An occasion is conditionally privileged when the circumstances are such as to lead any one of several persons having a common interest in a particular subject matter

correctly or reasonably to believe that facts exist which another sharing such common interest is entitled to know." Gohari, 363 Md. at 57, 767 A.2d at 329, quoting Hanrahan v. Kelly, 269 Md. 21, 28 fn.2, 305 A.2d 151, 156 fn.2 (Md.App. 1973).

One scholar has elaborated upon the nature of common interests as being:

> usually found among members of identifiable groups in which members share similar goals or values or cooperate in a single endeavor....The idea is to promote free exchange of relevant information among those engaged in a common enterprise or activity and to permit them to make appropriate internal communications and share consultations without fear of suit....The privilege does not arise in the first place unless the communication relates in some degree to the common interest, and once the privilege arises it is lost if it is abused by malice or excessive publication.

Dan B. Dobbs, THE LAW OF TORTS, § 414, at 1160-61 (2000). Maryland has adopted the rule espoused by the Restatement (Second) of Torts regarding the protection of interest of the recipient or a third person.

> (1) An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that
> (a)  there is information that affects a sufficiently important interest of the recipient or a third person, and
> (b)  the recipient is one to whom the publisher is under a legal duty to publish the defamatory matter or is a person who whom its publication is otherwise within the generally accepted standards of decent conduct.[51]
> (2) In determining whether a publication is within generally accepted standards of decent conduct it is an important factor that
> (a)  the publication is made in response to a request rather than volunteered by the publisher or
> (b)  a family or other relationship exists between the parties.

Gohari, 363 Md. at 59, 767 A.2d at 330, quoting Restatement (Second) of Torts § 595, at 268. When considering whether Diaz acted within generally accepted standards of decent conduct, this Court must look at the circumstances surrounding this case and "[t]he social

---

[51]The comment regarding this subsection indicates that "a statement made for the protection of a lawful business, professional property or other pecuniary interest...comes within the rule stated in this Section." Restatement (Second) of Torts, § 595, at 270. Additionally, "[i]t is enough that the circumstances are such as to lead to the reasonable belief that the third person's interest is in danger." Id.

value of the particular interest of the third person that is believed to be imperiled, the value of the communication as a means of protection if the defamatory matter is true, the probable harm to the person defamed if the defamatory matter is false, and the fact that the publication is made in response to a request." Id.

The importance of the response/request qualification cannot be understated. The Maryland Court of Appeals has noted that "where the defamatory publication is ... in response to an inquiry and not volunteered, the defendant is afforded greater latitude in what he may say about the plaintiff without incurring liability." Gohari, 363 Md. at 60-61, 767 A.2d at 331, quoting Happy 40, Inc. v. Miller, 63 Md.App. 24, 25, 491 A.2d 1210, 1216 (1985)(citations omitted). There is no formal evidence in the record that Diaz - prior to Mentges and Willem repeating her story to the chain of command - ever responded to any inquiry for information.

In any event, the presence of malice will defeat any conditional privilege. Gohari, 363 Md. at 63, 767 A.2d at 332. Under the laws of Maryland "'knowledge of falsity or reckless disregard for truth' is the standard by which the malice required to defeat the conditional privilege defense is to be measured in cases of private defamation." Marchesi v. Franchino, 283 Md. 131, 139, 387 A.2d 1129, 1133 (Md.App. 1978).[52] Whether or not Diaz's statements were made by malice is a matter to be decided by a jury.[53] See Gohari, 363 Md. at 64, 767 A.2d at 332, General Motors Corp. v. Piskor, 277 Md. 165, 172, 352 A.2d 810 (1976); Hanrahan, 269 Md. at 29, 305 A.2d at 156; Simon, 221 Md. at 205-06.

---

[52]This definition also applies in determining whether punitive damages should be awarded. Marchesi, 283 Md. at 134 fn.3, 387 A.2d 1129, 1131.

[53]"It is equally well established that when a qualified privilege is asserted by the defendant as a defense, the publication of the libelous writing to one not within the scope of the qualified privilege, that privilege is lost and the ordinary rules in regard to libel per se apply. Hanrahan, 269 Md. at 40, 305 A.2d at 162 (citing cases). All relevant circumstances are admissible in determining the existence of actual malice sufficient to defeat the conditional privilege. Orrison v. Vance, 262 Md. 285, 295, 277 A.2d 573, 578 (1971).

As was stated more than a century ago:

> It is a question for the Court whether the statement if made in good faith
> and without malice is thus privilege. But the plaintiff has the right
> notwithstanding the privileged character of the communication to go to
> the jury, if there be evidence tending to show actual malice, as where the
> words unreasonably impute crime, or the occasion of their utterance is
> such to indicate, by its unnecessary publicity or otherwise, a purpose
> wrongfully to defame the plaintiff....Or, malice may be established by
> showing that the publication contained matter not relevant to the
> occasion....Expressions in excess of what the occasion warrants do not
> per se take away the privilege, but such excess may be evidence of
> malice....

Fresh v. Cutter, 73 Md. 87, 93-94, 20 A. 774, 775 (1890). See also McManus v.

McCarthy et al., 586 F.Supp. 302, 306 (S.D.N.Y. 1984)(libel action against Merchant

Marine midshipmen by Captain involves questions of fact precluding summary

judgment).

### A.  Because Diaz Was Fully Aware Of The Available Procedures To File Sexual Harassment Complaints And Intentionally Failed To Utilize Them, She Is Not Entitled To Any Protective Privileges

In order for Diaz to avail herself of any potential conditional privilege, she must have

followed the applicable regulations and procedures governing the filing - whether

informal or formal - of a complaint of sexual harassment.[54] The fact that she purposefully

chose not to do so with full knowledge of what protections were available, yet had no

qualms about spreading false statements of alleged past events to numerous other people,

destroys her ability to rely upon the immunity of a conditional privilege.

The situation presented here should be treated no differently than when a plaintiff

seeks to pursue sexual harassment claims against an employer under Title VII. The

unreasonable failure of a plaintiff to take advantage of an effective sexual harassment

policy can provide an employer an affirmative defense against a claim that a supervisor

---

[54]Thus, the reason why the individuals in Cross received absolute immunity was because
they properly filed their complaints, though misleading they might have been, through
the proper chain of command. Cross, 830 F.2d at 758.

violated the law. See Barrett v. Applied Radiant Energy Corp., 240 F.3d 262 (4th Cir. 2001).[55] Conversely, an individual who levies defamatory claims of sexual harassment against another individual should lose the ability to assert a conditional privilege if they similarly failed to take advantage of an effective sexual harassment policy.

The facts in Barrett offer essentially identical fact patterns. Barrett admitted that she received a copy of her company's sexual harassment policy. Id. at 267. Diaz admitted to being familiar with the MD ANG's sexual harassment policy. See Exhibit "11" at 7. She also admitted to knowing about the complaint process. Id. at 8. Barrett conceded that she never complained to any of her employer's managers. Barrett, 240 F.3d at 267. Diaz never complained to anyone within her unit chain of command or within the EEO structure. According to Barrett, she never told any of the managers because she feared retaliation and she doubted that her complaints would be taken seriously. Barrett, 240 F.3d at 267. Diaz likewise alleged she felt no one would believe her. See Exhibit "2".

For Barrett, the Fourth Circuit Court of Appeals declined to accept that any of her explanations justified her failure to report the alleged sexual harassment. Indeed, the Court noted that these arguments:

> runs contrary to the case law of this circuit. In Lissau [v. Southern Food Service, Inc., 159 F.3d 177, 182 (4th Cir.1998)], we noted that any evidence that the plaintiff failed to utilize the company's complaint procedure "will normally suffice to satisfy [the company's] burden under the second element of the defense." ... A generalized fear of retaliation does not excuse a failure to report sexual harassment. Instead, the law is specifically designed to encourage harassed employees to turn in their harasser because doing so inures to everyone's benefit. Reporting the harasser benefits the victim by allowing the company to halt future harassment. It benefits others who might be harassed by the same individual, and it benefits the company by alerting it to the disruptive and unlawful misconduct of an employee. Thus, the reporting requirement serves the "primary objective" of Title VII which "is not to

---

[55]This has become known as the Faragher/Ellerth affirmative defense based on the Supreme Court's pronouncements in Faragher v. City of Boca Raton, 524 U.S. 775, 807-08 (1998) and Burlington Industries, Inc. v. Ellert, 524 U.S. 742, 764-65 (1998).

> provide redress but to avoid harm." ... By advancing a speculative "fear
> of retaliation" excuse for remaining silent, Barrett's argument would
> undermine the primary objective of Title VII and could result in more,
> not less, sexual harassment going undetected.

Barrett, 240 F.3d at 267 (citations omitted).

Indeed, both Title VII and NGB 600-22/ANG 36-3 expressly prohibit any retaliation against an individual reporting allegations of sexual harassment. See 42 U.S.C. § 2000e-3(a) and NGB 600-22, 1-7(d). It is for this reason that the courts have consistently refused to recognize a nebulous "fear of retaliation" as a basis for remaining silent. Madray v. Publix Super Mkts., Inc., 30 F. Supp.2d 1371, 1375 (S.D. Fla. 1998), aff'd 208 F.3d 1290 (11th Cir. 2000)("An employee's generalized fear of repercussions cannot form the basis for an employee's failure to complain to his or her employer."); Shaw v. AutoZone, Inc., 180 F.3d 806, 813 (7th Cir. 1999)(same); Hylton v. Norrell Health Care of New York, 53 F. Supp.2d 613, 618 (S.D.N.Y. 1999)(same); Jones v. USA Petroleum Corp., 20 F. Supp.2d 1379, 1386 (S.D. Ga. 1998)(same). "[T]he law against sexual harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists." Shaw, 180 F.3d at 813 (internal quotations omitted). An employee's subjective belief in the futility of reporting a harasser's behavior is not a reasonable basis for failing to take advantage of any preventive or corrective opportunities provided by the employer. See Lissau, 159 F.3d at 182.[56]

---

[56]The Fourth Circuit added that "[w]e cannot accept the argument that reporting sexual harassment is rendered futile merely because members of the management team happen to be friends. Crediting this view would impose an impermissible burden on any company, especially small businesses. People who start and manage small businesses together frequently do so in part because of their pre-existing friendships. Barrett claims that these friendships should relieve an employee of her reporting obligation and effectively impose automatic liability on the employer. Automatic liability, however, is precisely what the Supreme Court sought to avoid in fashioning the Faragher/Ellerth affirmative defense." Barrett, 240 F.3d at 268 (citation omitted).

If an individual seeking to pursue Title VII liability for claims arising out of alleged sexual harassment incidents loses the ability to do so because of a failure to exercise existing protections, then so too should an individual who falsely claims the existence of sexual harassment from gaining the protection of a privilege. The rationale espoused by Diaz and the government invites an open-door policy for fabricated allegations of sexual harassment or other misconduct in order to achieve personal objectives that might be based on hate, jealousy or retribution. If the Court adopts Diaz's position, then it will make a mockery, if not destroy, the very system that was designed to protect those who are truly victimized by sexual harassment. The system was designed to provide the necessary mechanisms and protection for the filing of sexual harassment complaints. If the system is not followed, particularly when the procedures are known to the alleged victim, then the invitation for abuse has been mailed to all those like Diaz who seek to maliciously benefit their own self-interests.

## B. Diaz's Malice Against Elders, The Evidence Of Which Is Overwhelming, Defeats Assertion Of Her Conditional Privilege

Though Elders is not required to prove Diaz acted with malice at this stage, many of the underlying facts that would contribute to such a finding are directly relevant to determining other aspects of this case, notably whether she acted incident to service or within her scope of employment. The overwhelming evidence is that Diaz's defamatory acts were motivated by individual malicious desires and served no purpose of her employer - the MD ANG.

There were three separate alleged acts of sexual harassment that occurred more than one year apart: an alleged attempted kiss in or around Spring 2000; more than one year later, in or around Summer 2001, there was another alleged attempted kiss; and then sometime around that same period, an alleged offer to go on a trip to Amsterdam for "window shopping" (which at a later date Diaz reflected to believe was an insinuation of desired sexual activity). There was never any allegation of an act of sexual harassment

46

after Summer 2001. Yet we are to believe that Diaz, according to her declaration (which is inconsistent with the sworn statements of others), suddenly decided to start talking about her fears in February 2002; eight months after the last incident took place and nearly two years since the first.

Diaz told Colonel Werts, who found her claims to be unsubstantiated, that "something had to be done" after the alleged second kiss in Summer 2001. <u>See</u> Exhibit "11" at 7. Her testimony clearly tries to persuade the listener to believe that these alleged incidents had a traumatic effect on her. As she stated, "People noticed that I started changing. I was getting a little bit more closed." <u>Id</u>. Willem swore that she "was scared", "very nervous" and "crying". <u>See</u> Exhibit "2".

Why then would Diaz at best purposefully exaggerate her contact with Elders (given her rampant proclivity for flirting with officers), and at worst lie about them? There is more than sufficient available evidence to demonstrate at least two reasons for Diaz's motivations being interpreted by a jury as malicious, retaliatory and intended to harm Elders' career. One possibility is that Diaz undertook her actions to punish Elders on the mistaken belief he had anonymously tipped off military authorities that Diaz had plagiarized a paper submitted to the Air War College. <u>See</u> Elders Decl. at ¶7(c), attached at Exhibit "1", Falter Decl. at ¶17, attached at Exhibit "5"; Zaid 56(f) Decl. at ¶¶12-13, attached at Exhibit "3".

Most likely, however, Diaz's allegations were made at the request of other members of the Maryland Air National Guard, notably Thomas, Mentges and Lt. Col. Todd Wilkinson, who wanted to ensure Elders was discredited so that he would not be chosen to be the next Group Commander of the 135th Airlift Squadron.[57] <u>See</u> Elders Decl. at ¶¶4-

---

[57]That Elders believes Diaz's malicious motivations were to sabotage his military career and impact military personnel decisions does not push his claims into the realm of the <u>Feres</u> doctrine. Elders is not challenging the MD ANG over his failure to obtain the Group Commander's position, or seeking damages from the government. These issues are only related to the question of whether Diaz acted with malice. Again, if Diaz did act

7, attached at Exhibit "1", Zaid 56(f) Decl. at ¶¶10-11,14, attached at Exhibit "3"; Falter

Decl. at ¶¶10-17, attached at Exhibit "5"; Robinson Decl. at ¶¶17-20, attached at Exhibit

"6"; Declaration of David Gessouroun at ¶¶3-5 (dated May 18, 2003) ("Gessouroun"),

attached at Exhibit "12".  Interestingly, Thomas and Mentges initially testified that Diaz

was experiencing difficulty with Elders long before the concerns surfaced in the first

official investigation. See Def's Memo, Exhibit "4", at 9 fn.22. Yet, once the

investigation went outside of the control of the MD ANG, their testimony suddenly

changed to Elders' relationship with Diaz being professional. Id. at Exhibit "5", at 4. In

fact, many of the witnesses who initially appeared firm in their belief of the wrongdoing

on the part of Elders, at least when it came to providing their comments internally to the

MD ANG, became vague and ambiguous once required to provide sworn testimony to an

independent outside investigator.

For example, Diaz provided a sworn statement on March 9, 2002, see Exhibit "13", in

which she described the alleged incident where Elders supposedly invited her to go

window shopping in Amsterdam. Her sworn statement provided to Colonel Inglis denotes

how the conversation made her feel "very uncomfortable" at the time it occurred. Id. Yet,

to Colonel Werts she simply described the incident as contemporaneously being a nice

invitation from Elders which she only later determined to be offensive after talking to

"the guys" (i.e., presumably Mentges and Thomas). See Exhibit "11" at 5-6.

In fact, the key players in this conspiracy rarely got their stories straight. Willem

swore that Diaz was crying at the time she allegedly told him of her fears and concerns.

See Exhibit "2". One would think Willem would be able to tell if she were crying or not,

but Diaz denied it, according to Colonel Inglis' Memorandum for the Record dated

March 9, 2002 (a copy is part of the investigative file and can be supplied, but was not

available for scanning at the time of this filing). Although Diaz told Colonel Inglis that

---

in this manner, such conduct would necessarily fall outside of her scope of employment
or any incident to service.

this point was the only inaccuracy within Willem's statement of March 7, 2002, she later testified to Colonel Werts that Willem was wrong on other points as well. See Def's Memo, Exhibit "5", at 5. Mentges testified that Diaz had repeated conversations with him concerning Elders during November 2001 to the end of January 2002. Id. Yet, these are conspicuously absent from Diaz's declaration. Although Mentges' initial written statement provided to the MD ANG was firm on the time period in which these alleged revelations occurred, he then testified to Colonel Werts that he was not clear on the dates because "his brain was scrambled up on times." Id. at 6. Another explanation is that these individuals were not expecting that their fabricated allegations would be thoroughly investigated by an independent outsider and did not timely arrange consistent stories.

Strangely enough, the last communication Elders had with Diaz before her allegations became known to him is illustrative of the true nature of how Diaz viewed Elders. In a unsolicited voicemail message left for Elders on February 7, 2002, Diaz stated:

> Hi Karl. This is me the doc. It's a little late and I just, trying to get care of all my loose ends tied. I wanted to thank you for getting me the, the desk. I haven't thanked you and that was really kind and over and beyond the call of duty of you. Ah, thank you ah I don't know what...Um, I'm just grateful, look um, I know I've been irritating you lately, I'm sorry. I'm sorry if I've been not so good, but you you're proving yourself very well and Karl you're going to get ahead just ah, you're a good person, so tomorrow, I'm leaving for Alaska and ah just thought I'd let you know that I wanted to thank you and to apologize if I've irritated you but I think I'm going to continue to irritate you because I have that way, I don't know why, but it's just, it's just Maria Diaz though. Take care and thanks again and thank you for this nice note.; You are a, you're the typical renaissance man the one who knows a little bit about everything, Just enough to let me realize that you are the boss. So, take it easy, I'm going to Alaska. I'm going to have fun because I need a break from surgeries etc.; I've got a good group.; I've got Mike and Duggie, Col Thomas. We're going to have a good time and when I come back, ah, I hope to thank you again in person. So, take it easy and thank you again. Thanks again, see you later. Bye bye.

See Elders Decl. at ¶7(i), attached at Exhibit "1". This message completely contradicts

everything Diaz allegedly later told Mentges, Willem and all other MD ANG personnel.[58]

Interestingly, Lt. Colonel Michael C. Lunt provided a sworn statement on March 10, 2002, wherein he commented that "[t]here are members of the unit who have been openly hostile to LtCol Elders' leadership tenure. I do not know if they have in any way influenced the reporting of these allegations." See Exhibit "14".[59] The fact that Lt. Colonel Lunt specifically included this concern in his voluntary statement lends credence to Elders' belief.

## CONCLUSION

Based on the foregoing, Elders respectfully requests that the government's Motion be denied and discovery permitted.

Date:   May 19, 2003

Respectfully submitted,

/s/

_____
Mark S. Zaid, Esq. (Federal Bar #023887)
Krieger & Zaid, PLLC
1133 21st Street, N.W., Suite 800
Washington, D.C.  20036
(202) 223-9050
ATTORNEY FOR PLAINTIFF

_____

[58]Elders is manually filing with the Clerk of the Court a tape cassette copy of the message Diaz left for him on his work voicemail, which he later personally retrieved and transcribed. See Elders' Decl. at ¶7(i), attached at Exhibit "1". See Notice of Filing of Bulky Exhibit in Support of Plaintiff's Opposition to Defendant Maria C. Diaz's Motion for Summary Judgment (dated May 19, 2003). Many people noticed inconsistent behaivor by Diaz that contradicts her allegations, and the statements of those who support her. See e.g., Declaration of Gary Bernard at ¶¶3-6 (dated May 17, 2003), attached at Exhibit "15"; Falter Decl. at ¶¶7-9, attached at Exhibit "5"; Robinson Decl. at ¶16, attached at Exhibit "6"; Gessouroun Decl. at ¶6, attached at Exhibit "12".

[59]In his April 19, 2002, sworn testimony, Lt. Colonel Lunts identified Mentges (who was the OSF Commander) as one of the individuals who was hostile to Elders. See Exhibit "14" at 4.