UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| KARL L. ELDERS | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Case No. MJG-02-3892 |
| | * | |
| MARIA C. DIAZ | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**DECLARATION OF KARL L. ELDERS**

The undersigned hereby declares as follows:

1. I am a person over eighteen (18) years of age and competent to testify. I make this Declaration as the Plaintiff in Opposition to Defendant Maria C. Diaz's Motion for Summary Judgment.

2. I wish to state outright that I absolutely and unequivocally deny each and every one of the allegations that the defendant Lt Col Maria C. Diaz has stated against me. The allegations have absolutely no foundation in truth and were fabricated with malicious intent.

3. I am currently serving as a Boeing 777 pilot for United Airlines. My aviation career spans almost 28 years which include 15 years of active military service in the United States Air Force, and 12 years service in the Maryland Air National Guard. I recently left the Guard and since March 2003 I have served as a staff officer for the Regional Plans and Issues Division, Headquarters Air Force, Pentagon. I have served as a professional pilot most of my military career, which is characterized by a deep sense of service and leadership in positions requiring great trust, integrity and responsibility. These include as a Nuclear Weapons Specialist and Air Traffic Controller. I have had the

distinct honor and privilege of commanding the first advance tactical airlift squadron for the USAF, the C-130J model aircraft.

    4.  On 8 July 2000, I became the squadron commander for the 135th Tactical Airlift Squadron, Martin State Airport, Baltimore (Maryland Air National Guard).  My leadership ability as squadron commander earned praise and favorable review/appraisals.  All aspects of my personal and professional relationships with members of my command as well as superior officers within the Maryland Air National Guard appeared normal until on or about 1 February 2002.  During the February 2002 Unit Training Assembly (UTA), the job announcement of a vacancy for the position of 135th Airlift Group Commander was published with limited circulation.  Although several potential officer candidates may have been eligible to compete for this position, the job description was written in a manner that matched the qualifications of only one officer.  I inquired about the manner in which the position vacancy was written, its timing and the brief period in which the announcement would remain open for public consumption before closing—15 Feb 2002 (two weeks). Colonel John C. Inglis informed me that Lt. Col. Warren Thomas was his personal choice for the position, even though no one had yet interviewed.  Selection for the position of 135th Airlift Group Commander would have resulted in promotion to the grade of 0-6 and career advancement for the successful candidate. My inquiry into the vacancy announcement resulted in several e-mails between the Maryland State staff, Col Inglis, and myself. The Maryland State Staff subsequently influenced Col Inglis to re-advertise the Airlift Group vacancy.

    5.  At that point, my relationship with some of the full time members of the 135th Airlift Group changed dramatically.  Specifically, I observed that the defendant, Lt Col Maria C. Diaz, who was a subordinate member of my command (135th Airlift Squadron), began to spend a great deal of time with Lt Col Warren Thomas, Major James Mentges, and Major Todd Wilkinson. Although Lt Col Diaz served the squadron as the 135th Airlift Squadron Staff Medical Examiner (SME), she and Lt Col Thomas, Majors

Mentges and Wilkinson went on a two-week Air National Guard flight to Alaska, 8 February through approximately 20 February 2002. She did not coordinate her travel request with the 135th Squadron chain of command. Lt Col Thomas had previously sought and gained approval for paid travel for Lt Col Diaz to accompany both he and Major Mentges to England for a one-week flight simulator refresher course during the summer of 2001--on or about June 2001. During the period immediately following my inquiry about the 1 Feb 2002 vacancy announcement, other members of my squadron observed Majors Mentges, Wilkinson, and Lt Cols Diaz and Thomas in meetings seemingly unrelated to our organizational mission (closed door sessions).

    6. On 3 March 2002, Col Inglis visited my office and pressured me for a decision on interviewing for the vacancy. I asked him for some specific guidance and he declined. Besides Lt Col Thomas, I was the only one expressing interest in the position. On 8 March 2002, I interviewed for the position of 135th Airlift Group Commander. On 15 March 2002, I was verbally relieved of command--based on allegations of sexual harassment, maltreatment and battery--brought forth by, as I was told, two third party Memos For Record from Majors Mentges and Willem--denied access to classified information, removed from flying status, restricted to UTA performance, and given written "No Contact" orders for Lt Col Maria C. Diaz and Major Doris Mauer. Additionally, I was placed under a "GAG" order not to discuss any aspect of what had happened to me with anyone except clergy and counsel. The two third party memos used against me related only to Lt Col Diaz' allegations and were, in fact, more detailed than Lt Col Diaz's own statements. The memos were the only documents Col Inglis referred to on 15 March 2002 as he relieved me of command, and the only documents cited in Brigadier General Beasley's 9 March 2002 letter appointing Col Inglis as the initial Investigating Officer.

    7. I believe that Lt Col Diaz acted in concert with Lt Col Thomas and Majors Mentges, Mauer, and Wilkinson to discredit me by fabricating her allegations so that I

would not be selected for the position of 135th Airlift Group Commander. Some of my beliefs are based on the following reasons:

(a) Lt Col Thomas, Lt Col Diaz, Major Mauer and Major Mentges are close friends and wanted Lt Col Thomas to have the position of 135th Airlift Group Commander. Lt Col Diaz stated under oath (independent investigation:Werts Apr-Jun 2002), that she is friends with Major Mentges and close to his family;

(b) Major Mentges stated under oath (independent investigation:Werts Apr-Jun 2002) that he has an adversarial relationship with me;

(c) Notwithstanding the aforementioned, Lt Col Diaz and Major Mentges are under investigation for plagiarism related to a paper submitted to Air University by Lt Col Diaz. It is likely that one or both believed that I was the one who reported them to the Inspector General. This happened before the allegations of sexual harassment came to light;

(d) Before the 135th Airlift Group vacancy was formally announced, Major Todd Wilkinson, on January 17, 2002, asked me to leave the organization because I was undermining the Command Authority and stated that I could do better elsewhere. Lt Col Diaz witnessed the event and also stated that I was undermining Lt Col Thomas' authority. Not long after, Col John C. Inglis specifically told me that he had pre-selected Lt Col Warren Thomas for the Airlift Group Commander position;

(e) I am aware that MSgt Diane Krienbrink has told my attorney and others that Major Mauer personally solicited her to support a sexual harassment complaint against me --before I was relieved of command. Major Mauer apparently actively campaigned for support to build a case for sexual harassment. Major Mauer is also close to Major Mentges and Lt Col Thomas;

(f) I personally observed Lt Col Diaz engaging in what appeared to be a serious conversation with Major Mauer on or about 6 March 2002 (two days before I interviewed for the position of Airlift Group Commander);

4

(g)  It is unbelievable that two third party memos (Mentges and Willem: dated 7 and 8 March 2002) from different organizations on base could be presented simultaneously to Brigadier David Beasley, 175th Wing Commander—for use on the exact day (8 March 2002) that I interviewed for the position of 135th Group Commander without close pre-coordination;

(h) Lt Col Diaz, Lt Col Thomas, Major Mentges, Major Wilkinson and Major Mauer conferred with others to the extent that from late February through early March 2002, members of my squadron reported to me that they had been asked to choose sides/did not like what was about to happen;

(i)  Lt Col Diaz consistently took public and private actions after I allegedly sexually harassed her that completely contradicts her allegations. For example, although she allegedly stated to others that she had resigned herself during by Summer 2001 to not be anywhere around me, we were often in close proximity to each other, and even alone on several occasions. At no time did she ever say anything to me or appear uncomfortable in any way. Furthermore, she made a public apology during our UTA in February 2002 and stated that she had been too touchy-feely and publicly requested that I assist her by closely monitoring her behavior. The last time I had any real "contact" with her before she made her allegations was when she left me an unsolicited and lengthy voice message at 12:01 am on 8 Feb 2002. She personally thanked me for all of the help that I have given her in her capacity at the 135th Airlift Squadron, stated that she wanted to visit my office and thank me personally and called me a "renaissance man". I saved this voicemail for weeks and tape recorded it as a precaution. I also transcribed the message. I provided a copy to my attorney to use in this proceeding. Although the message was saved in my voicemail system and had no automatic date for eraser, someone entered my system and erased it without my permission just before Colonel Werts started to conduct his independent investigation of Lt Col Diaz's allegations against me.

5

8. All officers of the Maryland Air National Guard were required to be familiar with the sexual harassment policies. We were usually required to attend trainings and provided with manuals about what constituted sexual harassment, how to prevent sexual harassment and how to properly file sexual harassment complaints, both informal and formal. Based on my understanding of the regulations, should Lt Col Diaz wanted to properly pursue a sexual harassment complaint against me she should have taken her concerns through her chain of command, or to an EEO representative. Lt Col Diaz unit chain of command would have been in the following order:

> The 135th Squadron Operations Officer:  Lt Col Cory Lunt
> The 135th Squadron Commander:  Lt Col Karl Elders
> The 135th Deputy Commander for Operations:  Lt Col Warren Thomas*
> The 135th Airlift Group Commander:  Col Chris Inglis
> The 175th Wing Commander:  BG David Beasley.
> (*)  Only if Col Inglis was not available/on duty.

Neither Major Mentges, Willem or Mauer are anywhere near Lt Col Diaz's chain of command. Of course, each of them are subordinate to me and even if I had actually been causing Lt Col Diaz any concerns, none of them had any authority to resolve it or intervene.

9. I have carefully reviewed the statements by Majors Mentges, Willem and Mauer, as well as those by Lt Col Diaz, wherein they indicate - usually in vague terms - when Lt Col Diaz allegedly falsely told them that I had sexually harassed her. From what I can tell, neither myself or Lt Col Diaz were in active duty or any official military status on those days that she made her defamatory statements and caused me injury. I am aware that Lt Col Diaz would often be on the Base when she was not working or needed for military duties. Indeed, at times she was on Base in her civilian clothes. Thus, just because she might have been on Base speaking with other members of the National Guard by no means is proof that she was acting in the line of duty or within her scope of employment.

10. The allegations asserted by Lt Col Diaz are unfounded.  Her chronologies of events and witness statements are inconsistent across the board.  Her actions defamed my professional career as a military officer and Commander, and have resulted in several comments from my peers and superiors in my professional capacity as a United Airlines pilot. The actions of Lt Col Diaz clearly show malice and have irreparably damaged my reputation and career.

I do solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the forgoing paper are true to the best of my knowledge.

Date:   May 18, 2003

/s/
_____
Karl L. Elders