UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| KARL L. ELDERS | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Case No. MJG-02-3892 |
| | * | |
| MARIA C. DIAZ | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

### RULE 56(f) DECLARATION OF MARK S. ZAID, ESQ.

The undersigned hereby declares as follows:

1. I am a person over eighteen (18) years of age and competent to testify.

2. I am the attorney of record for the plaintiff Karl L. Elders ("Elders") and as such I am personally familiar with the facts of this case. I make this declaration pursuant to Rule 56(f) of the Federal Rules of Civil Procedure and in support of the Plaintiff's Opposition to Defendant Maria C. Diaz's Motion for Summary Judgment.

3. I am the managing partner of the law firm of Krieger & Zaid, PLLC, and admitted to practice law in the States of New York, Connecticut and the District of Columbia, as well as before the D.C. Circuit, Second Circuit and Fourth Circuit Court of Appeals, and the United States District Courts for the District of Columbia, Maryland, Eastern District of New York, Northern District of New York and the Southern District of New York.

4. On March 15, 2002, my client was removed from his position of Squadron Commander of the 135th Tactical Airlift Squadron of the Maryland Air National Guard on the basis of sexual harassment allegations that apparently originated with the defendant Lt. Colonel Maria Diaz. Two investigations into the allegations were initiated by the Maryland Air National Guard ("MD ANG"). I represented Elders throughout the process. On July 12, 2002, Elders and I appeared before Major General Bruce F. Tuxill, Assistant Adjutant General For Air (now The Adjutant General), 5th Regiment Armory,

MD ANG, at which time he informed Elders that Diaz's sexual harassment allegations were found to be unsubstantiated. This decision was also transmitted in writing. No punishment was imposed upon Elders arising from any allegation proffered by Diaz. However, Elders was not returned to his former position of leadership and was, instead, reassigned because of the alleged "ill feelings" that the allegations had created. Thus, Elders was essentially punished for acts for which he was never found guilty.

5. On October 25, 2002, Elders filed a two count Complaint against Diaz before the Circuit Court for Baltimore County asserting claims of defamation and false light. The United States Attorney's Office for the District of Maryland removed the case from state court to this court, and seeks to have the United States government substituted in her place as the defendant on the basis that she was acting in the scope of her employment. If successful, the government would then possess sovereign immunity against Elders' tort claims. Diaz and the government also argue that dismissal is required based on intramilitary immunity (otherwise known as the Feres doctrine).

6. In support of its arguments, the government - not Diaz - submitted to the Court redacted copies of reports prepared by Colonel John C. Inglis and Colonel Arthur N. Werts. Before the government filed its initial Motion, Elders had never seen either of these reports. He had requested a copy of the Inglis report through a Freedom of Information/Privacy Act ("FOIPA") request dated April 8, 2002. He reiterated that request by a FOIPA request dated July 12, 2002, which also specifically sought access to the Werts' report. Two additional related FOIPA requests dated August 1, 2002 and November 5, 2002, were filed as well and have never received responses.

7. Although the information was being arbitrarily withheld from Elders for months, in the immediate aftermath of his filing this lawsuit, the Department of Justice and the MD ANG determined on their own that the two Command Inquiry reports could be released. Yet, it is the National Guard Bureau, a separate federal entity, that possessed the

release authority over these documents and was still processing Elders' request at the time the government filed its Motion. Obviously, the fact that the government publicly released portions of the two investigative reports unequivocally demonstrates that the information could, and should, have been released to Elders long ago. It also calls into question the good faith of the MD ANG in handling Elders' FOIPA requests. At the very least, the government should be required to disclose the reports in their entirety before any scope of employment determination is reached. The reports contain numerous references to supplemental statements and exhibits that pertain to the defamatory allegations in question.

8. In fact, on the basis of legal grounds that neither intramilitary or sovereign immunity prohibits Elders' lawsuit, Diaz's Motion for Summary Judgment should be denied outright. However, alternatively, there are significant material facts that must be explored before the defendant is entitled to any relief. Because this is a defamation/false light lawsuit, Elders asserts the allegations made by Diaz surrounding certain events never occurred. Thus, the substance, i.e., what happened and where, underlying Diaz's allegations - from either her standpoint or the governments - cannot serve as the determination for application of the <u>Feres</u> doctrine or the scope of employment test due to the legal nature of Elders' lawsuit.

9. What is most important and relevant is ascertaining the exact dates and places where each and every defamatory statement made by Diaz occurred, what was said, to whom were they said, why were they said (i.e., did Diaz intend for the statements to constitute informal complaints of sexual harassment; her testimony to the MD ANG indicates she did not), to whom were the statements repeated by third parties (and who were the third parties), and what military status Diaz and Elders were in at the time of the defamatory statements. These are just some of the very basic questions that relate not only to the government's intramilitary argument, but strike at the heart of whether Diaz

was acting in the scope of her employment when she made the defamatory comments at issue in this litigation. The supporting declarations submitted by Elders, Ted Whiteley, David M. Falter, Charles Robinson, David L. McGinnis, David Gessouroun and Gary Bernard, the contents of which are hereby incorporated into this declaration, sufficiently contradict the factual statements asserted by Diaz and the government concerning the questions I have indicated above (given that these declarations are being filed electronically, I am maintaining the originals bearing the individual's signature in my files). This is particularly so with respect to whether Diaz was acting in her scope of employment when she made the statements. Indeed, as the exhibits reveal, the several statements of Diaz and her supporters not only contradict each other, but are inconsistent with the factual/legal arguments proffered by the government. These questions can certainly be answered through discovery, particularly by taking the depositions of Diaz, Mentges, Willem, Doris Maurer and Thomas. Of course, if Diaz made statements outside the scope of her employment with the MD ANG, none of the asserted immunities exist. Her deposition, and that of those who work with her in her civilian capacity (such as her secretary) would lead to discoverable evidence.

10. In the course of representing Elders, I have interviewed witnesses formerly or currently associated with the Maryland Air National Guard. Many possess information directly relevant to this case, which they have repeated to me directly. However, most are unwilling to come forward on a voluntary basis for fear of reprisals. For example, one witness whom I interviewed has knowledge of Diaz telling third parties about her sexual harassment allegations, believes that Diaz was conspiring with Major Michael Mentges, Lt. Colonel Thomas and others to ruin Elders' chances of getting the Group Commander's position; knows of rampant rumors spreading throughout the Maryland Air National Guard that Elders allegedly committed sodomy and rape, overheard Diaz imploring Lt. Colonel Thomas to take the final steps to get rid of Elders, knows of

pressure placed on individuals by Lt. Colonel Thomas to allege sexual harassment claims against Elders, is aware that Majors Mentges and Todd Wilkinson have used racial slurs, and that Lt. Colonel Thomas has undertaken racially motivated acts against African-Americans who are in the MD ANG. Of course, it is no coincidence Elders was one of the few, and the highest-ranking, African-Americans within the Maryland Air National Guard, and there exists ample evidence that Major Mentges and Lt. Colonel Thomas openly did not like him.

11. Another witness is MSgt Diane Krienbrink, who would testify that she was approached by Major Doris Maurer before the allegations against Elders became known and asked whether she would be willing to participate in going after Elders. She declined and fears retaliation. I am also aware, having spoken to individuals who are close to Diaz and/or her friends, of a great deal of information that would impute Diaz's credibility, particularly with respect to allegations of sexual harassment. Some have heard Dr. Diaz state that she uses code words in the operating room --in her civilian capacity-- to alert other nurses (who are not in the operating room at the time) of a sedated male patient's penis size. This is to apparently allow the female operating room staff to alert other nurses if it warrants entering the operating room to take a look. While this might be salacious information, under the circumstances, the context may be quite relevant.

12. I am also aware that one or more official government investigations have been undertaken, or may even still be ongoing, involving allegations that Diaz plagiarized a paper while attending the Air War College. The allegations were brought to the attention of the United States Air Force by an anonymous tip. It is my understanding that the paper she allegedly plagiarized was one written by Major Mentges. While I do not know whether the investigation was completed or the conclusions that might have been reached, the matter of plagiarism is one that directly calls into question the issue of Diaz's credibility.

5

13. From the evidence that is available to me, it appears that Diaz may suspect that Elders was responsible for the anonymous tip, and the timeline suggests this may have occurred in or around late February 2002. If true, this would lend further credence that Diaz's allegations of sexual harassment may have been fabricated to retaliate against Elders on the suspicion he had caused Diaz angst or harm by reporting her alleged plagiarism.

14. Several witnesses have reported being asked to "take sides", meaning either choose to be with Elders or be against him and stand with Diaz, Lt. Colonel Thomas, Major Mentges and Major Wilkinson.

15. With respect to Exhibits "10" (May 3, 2002) and "11" (April 18, 2002), these are portions of the sworn testimony the defendant delivered before Colonel Arthur Werts as part of the investigation into her allegations against Elders. Exhibit "13" is a sworn statement executed by the defendant on March 9, 2002, and Exhibit "14" is a portion of the April 19, 2002, testimony of Lt. Colonel Michael C. Lunt. Although the names are redacted, I can tell from the contents of the testimony who the individuals are, but more precisely by the fact the National Guard Bureau provided me with an unredacted list of witnesses, which is attached as Exhibit "A" to this declaration, which corresponds the dates of the documents with the identity of the individual.

I do solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true to the best of my knowledge.

Date: May 19, 2003

/s/
_____
Mark S. Zaid