## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **KARL L. ELDERS,** | * | |
| | * | |
| **Plaintiff** | * | |
| | * | |
| **v.** | * | **CIVIL ACTION NO. MJG-02-3892** |
| | * | |
| **MARIA C. DIAZ,** | * | |
| | * | |
| **Defendant.** | * | |

\*    \*    \*    \*    \*\*\*\*\*\*    \*    \*    \*    \*

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANT
## MARIA C. DIAZ'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiff, Karl Elders (hereinafter "Elders"), has utterly failed to produce any probative evidence supporting his claim that Lt. Col. Diaz (hereinafter "Diaz") made defamatory statements concerning him to anyone outside of the National Guard.  Rather, his own proffered evidence conclusively establishes that this lawsuit arises solely from his military service.  Accordingly, Elders's claim is barred by Westfall Act immunity and intramilitary immunity.  In addition, Diaz's statements to fellow military officers are privileged under the law of defamation.

### ARGUMENT

**I.    Elders Has Failed to Produce Any Evidence Showing
a Single Defamatory Statement by Lt. Col. Diaz to
Anyone Outside of the Maryland Air National Guard.**

**A.    Elders Has Produced No Evidence of
Defamatory Statements to Civilian Third Parties.**

Despite his 50-page brief and nineteen exhibits, Elders has utterly failed to produce any evidence supporting his claim that Lt. Col. Diaz published defamatory statements about him to

civilians outside of the National Guard.[1]  In his first amended complaint, Elders alleged that Lt. Col. Diaz made defamatory statements about him to her medical colleagues and co-workers at Franklin Square Hospital "possibly including" a list of some fifty named doctors.  Amd. Compl. ¶ 9.  He also alleged that Lt. Col. Diaz made defamatory statements about him to her close personal friends and nanny.  Amd. Compl. ¶ 10.

In response to these baseless allegations, Lt. Col. Diaz submitted a sworn declaration stating that she "had no discussions accusing Lt. Col. Elders of sexual harassment with anyone at Franklin Square Hospital, [her] personal friends, or employees."  Ex. 3 in Support of Def.'s Mot. for Summary Judgment, Decl. of Maria C. Diaz ¶ 5.  To survive Diaz's well-supported motion for summary judgment, Elders  must produce probative evidence supporting his claim that Lt. Col. Diaz defamed him to civilians outside of the National Guard.  Fed. R. Civ. P. 56 (e); *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49 (1986).  He has not done so.  Instead, he attempts to dismiss Lt. Col Diaz's evidence by arguing that "this self-serving statement is worthless at this stage of the litigation." Opp. at 36.  However, it is Elders's mere allegations, not Diaz's evidence, that are worthless at this stage of the litigation.  Fed. R. Civ. P. 56 (e); *Anderson,* 477 U.S. at 248-49.

None of Elders's  nineteen exhibits even purports to establish a defamatory statement by Lt. Col. Diaz to any person outside of the National Guard.[2]  In fact, in his statement of facts at pages 2-4

---

[1] In fact, it appears that the only publication in the civilian community concerning the sexual harassment allegations against Elders have come from Elders himself.  For example, in October 2002 he contacted the Daily Record to generate state-wide publicity concerning this matter.  *See*, Earl Kelly article, *The Daily Record* (Baltimore, MD), October 30, 2002, attached as Exhibit A.  *See also* Pl. Ex.8, Declaration of Major David M. Falter at ¶ 16.

[2] As is shown in sections II and III below, any claim arising from Lt. Col. Diaz's statements to her fellow National Guard officers are barred by Westfall Act immunity and intramilitary immunity.  In addition, such statements are privileged under Maryland law.  See Sec. IV below.

of his Opposition, Elders cites only the allegations in his amended complaint to support his claim that Diaz defamed him to civilian third parties outside of the National Guard. Opp. at 2. Of course, Elders cannot rest upon these mere allegations in opposition to a motion for summary judgment. Rule 56 (e). Accordingly, Diaz is entitled to summary judgment. *Id.*

### B.   Elders is Not Entitled to Discovery.

Moreover, Elders is not entitled, as he argues, to conduct a discovery fishing expedition in the vague hope of finding some evidence to support his conclusory allegations of defamatory statements to civilian third parties. *See* Opp. at 7. Rule 56 (f) requires a party opposing a motion for summary judgment who claims to be unable to produce evidence in opposition to the motion to file an affidavit explaining: (1) the precise nature of the necessary discovery, *i.e.*, what facts are sought and how they are to be obtained; (2) how those facts are reasonably expected to create a genuine issue of material fact; (3) what efforts the affiant has made to obtain those facts to date; and (4) why affiant's efforts to obtain those facts have been unsuccessful. *Burlington Coat Factory v. Esprit De Corp.*, 769 F.2d 919, 926 (2nd Cir. 1985). *See also Price v. Western Resources, Inc.*, 232 F.3d 779, 783 (10th Cir. 2000)(holding same).

Elders's vague Rule 56 (f) affidavit utterly fails to meet this standard. *See* Rule 56 (f) declaration of Mark S. Zaid, Esq. (the "Zaid Affidavit"). The fifteen-paragraph Zaid affidavit fails to show any efforts made to date to obtain evidence in support of his allegations that Lt. Col Diaz defamed Elders at Franklin Square Hospital, or for that matter, to anyone outside of the National Guard. *Id.* In addition, he does not explain why his efforts, if any, to gather this evidence have been unsuccessful, or precisely what discovery he thinks is necessary to obtain this evidence. *Id.* These defects are fatal to his Rule 56 (f) request for discovery.

Elders has had more than sufficient time to investigate and gather evidence in support of his

claim.  In both his initial complaint, filed on October 1, 2002, and his first amended complaint, Elders alleges that Diaz has been defaming him to civilian third parties since the fall of 2001.  Compl. ¶ 6; Amd. Compl. ¶¶ 6, 9, 10.  Now, over nine months after filing this lawsuit and almost two years after the alleged defamation to third parties supposedly began, Elders argues that he requires formal discovery in order to obtain any evidence to support his factual allegations.  This demand is absurd.

At a bare minimum, Elders has known since at least December 16, 2002, when Diaz filed her initial motion to dismiss, that evidence of defamatory statements to people outside of the National Guard would be necessary in order to overcome the defenses of Westfall Act immunity and intramilitary immunity.  Indeed, Elders argued in his opposition to Diaz's initial motion to dismiss that he filed on January 21, 2003, that Diaz had made defamatory statements to civilian third parties.  It was because of these vague and conclusory allegations that the Court initially denied Diaz's motion to dismiss and ordered Elders to file an amended complaint specifying the civilian third parties to whom he alleges Diaz made defamatory statements.  Order dated February 12, 2003, at ¶ 3.  Elders filed his first amended complaint on March 3, 2003.

Elders's first amended complaint made detailed factual allegations that Diaz has been defaming him to her medical colleagues and co-workers at Franklin Square Hospital since the fall of 2001 and specifically listed fifty named doctors in the General Surgery Department.  Amd. Compl. ¶ 9.  He also alleged that she has been defaming him to her close personal friends and nanny since the fall of 2001.  Amd. Compl. ¶ 10.  It is now abundantly clear that Elders has absolutely no evidence to support these allegations.  Rather, he simply made allegations based upon nothing more than wishful thinking in a baseless effort to circumvent the defenses of Westfall Act immunity and

intramilitary immunity.[3]

When considering Elders's Rule 56 (f) discovery request, the Court should bear in mind that this is a defamation action.  Amd. Compl. Count One.  Under Maryland law, a "defamatory statement is one that tends to expose a person to ***public scorn***, hatred, contempt or ridicule, thereby discouraging ***others in the community*** from having a good opinion of, or from associating or dealing with, that person."  *Batson v. Shiflett*, 325 Md. 684, 72-23 (1992)(emphasis added).[4]  Defamation arises from false *public* statements that seriously affect one's reputation in the community at large. *Id.*  Defamation, by its very nature, cannot be a secret.  If Lt. Col Diaz has in fact been defaming Elders in the civilian community since fall 2001, Elders has had ample time to investigate and gather evidence to support his defamation claim.  Such evidence, if any exists, is certainly not under Diaz's sole or exclusive control.  Accordingly, there is absolutely no reason why Elders requires formal discovery to obtain evidence to support his claim that he has been defamed in the civilian community.  The fact that he has been unable to gather one shred of evidence in support of his claim in the ten months since he initiated this action or the nearly two years since he alleges that the defamation began shows that summary judgment is clearly warranted.

Moreover, the Zaid affidavit fails to detail the precise discovery that Elders claims is necessary as is required by Rule 56 (f).  *Burlington Coat Factory*, 769 F.2d at 926; *Price*, 232 F.3d at 783.  Paragraph nine of the Zaid affidavit states that Elders proposes taking depositions of Lt. Col. Diaz, Lt. Col. James Mentges, Lt. Col. Raul Willem, Lt. Col. Warren Thomas, and Maj. Doris

---

[3]Of course, Rule 11 (b)(3) requires an attorney to have evidentiary support for the factual allegations in a complaint that he/she signs.

[4]The statements Elders alleges Lt. Col. Diaz made about him are thus not even defamatory under Maryland law.

Maurer. Zaid Affidavit ¶ 9. These proposed depositions of military officers are not reasonably calculated to lead to evidence of defamatory statements to third parties outside of the National Guard. Rather, they confirm that Elders's lawsuit arises from his military service in the National Guard and has nothing to do with the civilian community. *See* Intramilitary Immunity argument at III below. In fact, the Zaid affidavit stresses that in the course of representing Elders since March 2002 he has "interviewed witnesses formerly or currently associated with the Maryland Air National Guard." Zaid Affidavit ¶¶ 4,10. A striking defect in the Rule 56 (f) affidavit is the total absence of any showing of any investigation or interviews to date outside of the National Guard. Elders cannot now use his lack of diligence in investigating his claim of defamatory statements to civilian third parties as a sword to avert Diaz's well-supported motion for summary judgment. His failure to diligently investigate his claim is fatal to his Rule 56 (f) request.

Finally, Elders confuses the liberal notice pleading requirements of Rule 8 with Rule 56's standard for summary judgment. Opp. at 6-7. Elders cannot, as he argues at pp. 6-7, file an amended complaint that is not well-grounded in fact, avoid summary judgment by demanding a discovery fishing expedition under Rule 56 (f) in the futile hope of finding some fact to support his claim, and then propose to amend his complaint yet again. *See, e.g., Oreman Sales v. Matsushita Electric*, 768 F. Supp. 1174, 1180 (E.D. La. 1991). This is a summary judgment motion, not a motion to dismiss. Elders must produce some probative evidence that supports his claim now. *Anderson*, 477 U.S. at 252. He cannot avoid summary judgment at this stage by simply invoking Rule 8's liberal notice pleading requirement and demanding an unwarranted discovery fishing expedition under Rule 56 (f). Accordingly, because Elders has utterly failed to satisfy Rule 56 (f), his vague request for discovery concerning supposed defamatory statements to civilian third parties should be denied, and summary judgment should be entered in favor of Diaz.

**II.    Diaz is Entitled to Substitution of the United States
as Party Defendant Under the Westfall Act.**

The evidence before the Court shows that Lt. Col. Diaz was acting within the scope of her federal employment when she told two fellow officers that her commanding officer was making unwanted sexual advances toward her. Elders's challenge to the Attorney General's certification (the "scope certification") is not governed by Rule 56. Rather, under the Westfall Act, 28 U.S.C. § 2679, when the Attorney General's scope certification is disputed, the Court must weigh the competing evidence and resolve any material factual disputes when determining whether the employee was acting in scope. *Borneman v. United States*, 213 F.3d 819, 827-28 (4th Cir. 2000). The Court cannot accept Elders's factual allegations as true, and need not view Elders's evidence in the light most favorable to him. *Id*. A plaintiff always bears the burden of proof to overcome the scope certification. *Id*. The Court "should remain cognizant of the considerations weighing against protracted litigation under the Westfall Act" and resolve the scope issue at the earliest possible stage. *Id*. at 827.

The Court currently has more than sufficient evidence before it to determine that Lt. Col. Diaz was acting within the scope of her employment when she told Majors Willem and Mentges that her commander was sexually harassing her. The facts that are material to the scope of employment issue are quite straightforward and are essentially undisputed. The only material facts are the following: (1) in February 2002, Lt. Col. Diaz orally informed Major Willem and Major Mentges that Lt. Col. Elders, her squadron commander, had made unwanted sexual advances towards her, Pl. Ex. 3, Willem Memo.; Pl. Ex. 4, Mentges Memo.; Def. Ex. 3, Diaz Decl. ¶ 4; Def. Ex 4, Inglis Investigation at 3, 6; Def. Ex. 5, Werts Investigation at 1, 3; (2) Majors Willem and Mentges reported this information to the Commander of the 175th Wing, Brigadier General David A. Beasly,

*Id.*; (3) as a result of these reports, the Air National Guard conducted two formal military investigations, Def. Ex. 4, Inglis Investigation; Def. Ex. 5, Werts Investigation; and (4) Lt. Col. Diaz gave sworn testimony in both investigations in which she detailed the unwanted sexual advances that Lt. Col. Elders had made toward her.[5]  Def. Ex. 3, Diaz Decl. ¶ 4;  Def. Ex 4, Inglis Investigation at 3, 6; Def. Ex. 5, Werts Investigation at 1, 3.

Elders concedes, as he must, that Lt. Col. Diaz's statements in the two military investigations were made within the scope of her employment as a military officer.  His challenge to the scope certification is based entirely on the irrational legal proposition that Lt. Col. Diaz was acting in the scope of her employment when she accused Lt. Col. Elders of sexually harassing her in the two formal investigations, but that she acted outside of the scope of her employment when she made the very same accusations informally to Majors Willem and Mentges. Opp. at 29-34.  Yet it was Lt. Col. Diaz's oral statements to Majors Willem and Mentges that caused the military to conduct the two formal investigations.  Maryland's scope-of-employment law is hardly so narrow.

Under Maryland law, an employee's acts are within the scope of his/her employment "if they were in furtherance of the employer's business[.]" *Sawyer v. Humphries*, 322 Md. 247, 255 (1991).  *See* Opp. at 29.  An act is in scope as long as it "'was such as was incident to the performance of the duties entrusted to him by the master, **even though in opposition to his express and positive orders**.'" *Id.*, *quoting*, *Hopkins C. Co. v. Read Drug*, 124 Md. 210 (1914)(emphasis added).

The evidence establishes that the military has an overriding interest in preventing, identifying, and eliminating sexual harassment. *See, e.g.*, Def. Ex. 1, Page Decl. ¶¶ 7-17; Pl. Ex. 10, 11 (Exhibits A-1 and A-2 to Robinson Decl.) 1987 and 1988 Sexual Harassment Policies.

---

[5]Lt. Col. Diaz's specific allegations are detailed in her moving papers at 7-8 and her initial Motion to Dismiss at 5-6.

Accordingly, Lt. Col. Diaz's actions in reporting what she perceived to be sexual harassment by her commander to fellow officers were in furtherance of the employer's business. *Sawyer*, 322 Md. at 255. Elders argues that Lt. Col. Diaz's statements to Majors Willem and Mentges were not in scope because she did not follow the precise procedures for making an informal or formal sexual harassment report contained in National Guard Regulation 600-22/Air National Guard Instruction 36-3. Pl. Ex. 9, Robinson Decl; Pl. Ex.14, McGinnis Decl.; Pl. Ex.13, NGB 600-22/ANGI 36-3.

Diaz's evidence shows that National Guard policy allows free and open discussion among officers of alleged incidents of sexual harassment. Def. Ex. 1, Page Decl. ¶¶ 15-17. Nothing in the regulation cited by Elders prohibits an officer from discussing perceived sexual harassment with a fellow officer. However, under Maryland law, this is not a material dispute. Lt. Col. Diaz's statements to Majors Willem and Mentges would be in scope even if they were made **in opposition to express and positive orders** from her employer. *Sawyer*, 322 Md. at 255.

The military certainly believed that Lt. Col. Diaz's statements were a matter of utmost military concern. It was on the basis of Lt. Col. Diaz's statements to Majors Willem and Mentges that the military initiated its two formal investigations. Under Maryland law and the clear weight of evidence, these statements were made within the scope of her employment as an officer, and she is entitled to have the United States substituted as party defendant. The Sixth Circuit recently approved certification in a strikingly similar case against an Air National Guard officer where plaintiff alleged that "Defendant made false and defamatory statements in regards to Plaintiff's military service, his personality, his lifestyle, his mental condition, his job performance and other like areas of concern[.]" *Singleton v. United States*, 277 F.3d 864, 868 (6th Cir. 2002). *See also Johnson v. Carter*, 983 F.2d 1316, 1322-23 (4th Cir. 1993)(holding that Navy admiral was acting in scope when he allegedly defamed base security officer), *rev'd. on other grounds*, by *Gutierrez de*

*Martinez v. Lamango*, 515 U.S. 417 (1995). This Court should follow suit. As Elders concedes, substitution mandates dismissal of this action because the United States has not waived its sovereign immunity for defamation actions. 28 U.S.C. § 2680 (h).

### III.    Lt. Col. Elders's Defamation Claim is Barred by Intramilitary Immunity.

Stripped of his unsupported allegations of defamatory statements to civilian third parties, it is clear that Lt. Col. Elders's defamation claim against Lt. Col. Diaz arises from or is incident to military service and is therefore barred by intramilitary immunity. *Feres v. United States*, 340 U.S. 135, 146 (1950); *United States v. Stanley*, 483 U.S. 669, 679-84 (1987).

#### A.    Elders's Evidence Establishes That His Claim Arises From Military Service.

As is shown in Section I above, Diaz has pierced the pleadings and Elders can no longer rely upon the vague allegations in his amended complaint. Fed. R. Civ. P. 56 (e); *Anderson,* 477 U.S. at 248-49. It is Elders's evidence, not his unsupported allegations, that matters now. *Id.*

All of Elders's proffered evidence is decidedly military in nature and firmly establishes that his claim arises from military service. Elders has submitted his own declaration and the declarations of six other witnesses in support of his claim. His witnesses are all present or former officers or senior NCO's in the National Guard: Lt. Col. Karl L. Elders, Master Sergeant Ted Whiteley, Major David M. Falter, Chief Master Sergeant Charles Robinson, Brigadier General (N.Y.) David L. McGinnis, Major David Gessouroun, and Capt. Gary Bernard. Pl's. Exs. 2, 7, 8, 9, 14, 17, 20. He has also submitted two official military memoranda from Major Raul Q. Willem and Major James M. Mentges, (Pl's. Exs. 3, 4), certain testimony of Lt. Col. Diaz and Lt. Col. Michael Lunt from the Inglis and Werts military investigations, (Pl's Exs. 15, 16, 18, 19), and certain military policy documents and regulations, (Pl's. Exs. 10, 11, 13). Simply cataloguing the evidence that Elders

believes supports his claim shows that his claim arises from military service. However, the tale he tells in his declaration puts the issue beyond any doubt.

Elders claims that in February 2002, Lt. Col. Warren Thomas, 135th Air Operations Officer; Major Mentges, 135th Operations Support Flight Commander; Major Willem, 175th Security Forces Squadron Commander; Major Todd Wilkinson, 135th Navigator Instructor; and Major Doris E. Maurer, 135th Deputy Commander for Logistics, enlisted Lt. Col. Diaz in a conspiracy to discredit him.[6] Elders Decl. ¶ 7. Lt. Col. Thomas and Majors Mentges, Wilkinson, and Maurer are all full-time personnel at the Air Base. Elders Decl. ¶5. Elders claims that the object of this conspiracy was to prevent him from being selected for promotion to 135th Airlift Group Commander in order to ensure that Lt. Col. Thomas was selected for the promotion. *Id.* Elders claims that Lt. Col. Diaz's statements to Majors Willem and Mentges alleging sexual harassment, and presumably her sworn testimony in the Inglis and Werts investigations, were made in furtherance of this conspiracy. *Id.*

Elders speculates that Lt. Col. Diaz and Major Mentges were motivated to participate in this conspiracy because they believed that he had reported them to the Inspector General for allegedly plagiarizing an official military paper submitted to the Air War College. *Id.* at ¶ 7 (c). Elders claims that he was relieved of command, denied access to classified information, removed from military flying status, and otherwise restricted in the performance of his military duties as a result of this conspiracy. *Id.* at ¶ 6. Elders states unequivocally that he believes Lt. Col. Diaz's "actions defamed [his] professional career as a military officer and Commander[.]" *Id.* at 10.

The declarations of Major Falter, Chief Master Sergeant Robinson, and Major Gessouroun

---

[6]Elders has not proffered any probative evidence supporting such a conspiracy that would allow a jury to return a verdict in his favor. *Anderson*, 477 U.S. at 249-50. His "evidence" is nothing but rank conjecture and speculation. Elders's "evidence" does, however, clearly demonstrate his theory of this case.

all purport to buttress Elders's conspiracy theory.  For example, Major Falter claims that he warned

General Tuxill "of an upcoming plot to destroy the command and career of Lt. Col. Elders." Falter

Decl. at ¶ 11.  *See also,* ¶ 3.  He further states that "I did not know how Lt. Col. Elders would be

removed, but I began to suspect it would likely be perpetrated by Lt. Col.'s (then Majors) Mentges

and Wilkinson."  *Id.* at ¶ 3.  Major Falter claims that "[i]f Lt. Col. Elders were to obtain the Group

Commander position, it would effectively 'freeze' Lt. Cols. Thomas, Mentges, and Wilkinson in

their positions for years to come and upset the order or succession."  *Id.* at ¶ 10.  *See also* ¶ 11.

Major Falter concludes that he "believe[s] Lt. Col. Diaz fabricated the stories in an effort to conspire

with Lt. Cols. Thomas, Mentges and Wilkinson, and Major Maurer to ensure Lt. Col. Elders did not

obtain the Group Commander's position."  *Id.* at ¶ 17.

     In the same vein, Chief Master Sergeant Robinson, 135th Chief of Flight Services, declares

that, "I believe the allegations were fabricated in order to discredit Lt. Col. Elders so that he would

not be chosen for the position of Group Commander of the 135th Airlift Squadron." Robinson Decl.

¶ 17.  He further states that "[i]t is my understanding that before Lt. Col. Elders sought the position,

Lt. Col. Thomas had already been told by the Group Commander, Col. Inglis, that he was the choice

to succeed him.  Lt. Col. Elders was threatening that succession."  *Id.* at 18.  Similarly, Major

Gessouroun states that he had a conversation with Lt. Col. Mike Vichich who told him that "Karl

[Elders] made a mistake by not playing the game right.  He said that Karl had been offered the DCO

[Deputy Chief Operations] position, but instead of being satisfied with the normal progression in the

unit he wanted to interview for Group Commander. . . . he went on to say that Karl shouldn't have

tried to jump two positions."  Gessouroun Decl. ¶ 3.

     This case is nowhere near the outer margins of the intramilitary immunity doctrine.  Elders

own proffered evidence conclusively establishes that his claim arises from his military service.

*Stanley*, 483 U.S. at 684. The Court of Appeals teaches that the arising from or incident to military service test for intramilitary immunity "'encompass[es], at a minimum, *all* injuries suffered by military personnel that are even remotely related to the individual's *status* as a member of the military.'" *Stewart v. United States*, 90 F.3d 102, 105 (4th Cir. 1996), *quoting Major v. United States*, 835 F.2d 641, 644 (6th Cir. 1987)(emphasis in original). Here, Elders's proffered evidence purports to show a conspiracy by at least six of his fellow military officers to discredit him so that he would not be selected for promotion to 135th Airlift Group Commander.   It would be hard to imagine a claim more directly related to Elders's status as a military officer, and Elders directly concedes the point when he declares that Lt Col. Diaz's "actions defamed my professional career as a military officer and Commander[.]" Elders Decl. ¶ 10.[7]

The Court of Appeals instructs that when a Court evaluates an assertion of intramilitary immunity, "the proper question is whether the plaintiff's claims 'are the *type* of claims that, if generally permitted, would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness.'" *Stewart v. United States*, 90 F.3d 102, 106 (4th Cir. 1996), *quoting United States v. Shearer*, 473 U.S. 52, 59 (1985)(emphasis in original). *See also Minns v. United States*, 155 F.3d 445, 450 (4th Cir. 1998). If a lawsuit has the potential to require members of the Armed Forces "'to testify in court as to each other's decisions and actions,'" it is barred by intramilitary immunity. *Stewart,* 90 F.3d at 106, *quoting Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666, 673 (1977). *See also Ricks v. Nickels*, 295 F.3d 1124, 1129 (10th Cir. 2002).

---

[7]Elders's concession is further buttressed by his argument that Lt. Col. Diaz's allegations of sexual harassment are defamatory *per se* because they impute that Lt. Col. Elders committed a criminal offense, impute unfitness to his performance of his office or duties of employment, or lack of integrity in the discharge of his duties, and prejudice him in his profession or trade. Opp. at 38. Elders's defamation *per se* argument rests exclusively upon his status as a military officer and squadron commander. *Id.*

The Supreme Court has continually stressed that "the prospect of compelled depositions and trial testimony by military officers concerning the details of their military commands . . . would disrupt the military regime," and cannot be permitted.  *United States v. Stanley*, 483 U.S. 669, 682-83 (1987).  *See generally, Orloff v. Willoughby*, 345 U.S. 83, 94 (1953)(holding that "[o]rderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters").

Elders's proffered evidence shows that if this lawsuit is permitted to proceed, he will endeavor to show a conspiracy against him by most of the senior full-time officers in the Maryland Air National Guard to deny him promotion to 135th Group Commander so that Lt. Col. Thomas would be selected.  *See, e.g.*, Elders Decl. ¶ 7, Falter Decl. ¶ 17, Robinson Decl. ¶ 17.  Therefore, the selection of an officer to fill one of the most senior command positions in the Maryland National Guard will be put at issue in this lawsuit.  In addition, Elders claims that Lt. Col. Diaz and Major Mentges joined the conspiracy because they believed that he reported them to the Inspector General for allegedly plagiarizing an official military paper.  Elders Decl. at ¶ 7 (c).  Any such Inspector General investigation will also presumably be put at issue.

In addition, Elders has submitted what can only be characterized as expert witness statements by Brigadier General (N.Y.) McGinnis and Chief Master Sergeant Robinson concerning the National Guard's sexual harassment policy.  Pl's. Exs. 14, 9.  These expert declarations are submitted in an attempt to dispute the declaration of the Chief of the National Guard Bureau's Directorate for Equal Opportunity, Felton Page, setting forth that sexual harassment policy.  While nothing in the McGinnis or Robinson declarations actually undermines Felton Page's declaration, Elders is clearly asking this Court to make a judicial determination announcing to the military what their sexual

harassment policy is. Opp. at 16, 29-32. To prevent such an unwarranted judicial intervention in military affairs, the Court of Appeals instructs that the "sort of claims that might involve an assessment of military . . . [policies and ] regulations" are barred by intramilitary immunity. *Stewart*, 90 F.3d at 106.

Elders's Rule 56 (f) affidavit further establishes that litigating this claim will necessarily involve the judiciary in sensitive military affairs. Elders demands to take the depositions of Lt. Col. Diaz, Lt. Col. Mentges, Lt. Col. Willem, Lt. Col. Thomas, and Major Maurer. Zaid Decl. ¶9. The Supreme Court specifically instructs that it is "the prospect of compelled depositions and trial testimony by military officers concerning the details of their military commands" that is the very harm sought to be avoided by intramilitary immunity. *Stanley*, 483 U.S. at 682-83.

Accordingly, Elders's proffered evidence demonstrates beyond any doubt that litigating his claim will necessarily require members of the Armed Forces to testify both in court and in compelled depositions as to each other's decisions and actions and will require a judicial assessment of military regulations and policies. *Stewart*, 90 F.3d at 106. In fact, Elders's proffered evidence shows that he has already enlisted several current or former members of the Armed Forces to testify against their fellow soldiers. *See* Decls. of Lt. Col. Elders, Master Sergeant Whiteley, Major Falter, Chief Master Sergeant Robinson, Brigadier General (N.Y.) McGinnis, Major Gessouroun, and Capt. Bernard. Therefore, litigation of this *type* of claim would necessarily involve the judicial branch in sensitive military affairs at the expense of military discipline and effectiveness. *See Stewart*, 90 F.3d at 106, *quoting Shearer*, 473 U.S. at 59. Accordingly, it is barred by intramilitary immunity.

Despite this, Elders argues that his lawsuit should be allowed to proceed because it is a state-law defamation claim, rather than a *Bivens* or 42 U.S.C. § 1983 claim, against Lt. Col. Diaz, or a

Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346 (b), 2671-2680, suit against the United States. *See* Opp. at 1, 10-14, 18-25. As is shown in Diaz's moving papers at 16-17, the rationale supporting the intramilitary immunity doctrine fully supports its application to this defamation claim. The key rationale supporting the intramilitary immunity doctrine has always been the recognition that lawsuits among soldiers have tremendous potential to utterly destroy the good order, discipline, and combat readiness of our Nation's Armed Forces.

The deleterious effect of litigation on military discipline is exactly the same whether the cause of action against a fellow soldier is a constitutional tort (*Bivens* or § 1983), or state-law tort. *See, e.g., Bowen v. Oistead*, 125 F.3d 800, 804(9th Cir. 1997)(holding that the overwhelming weight of authority indicates that both constitutional claims and claims sounding in tort are barred by intramilitary immunity); *Holdiness v. Stroud*, 808 F.2d 417, 426 (5th Cir. 1987)(holding that judicial review of a claim for damages asserted on the basis of state law wold constitute no less an unwarranted intrusion in to the military structure than the entertainment of constitutional claims founded in § 1985, § 1983, and *Bivens*); *Jaffe v.United States*, 663 F.2d 1226, 1239 (3rd Cir. 1979)(holding that suits founded on state law have the same potential for undermining military discipline as FTCA claims). In fact, the FTCA adopts state tort law as its substantive law, 28 U.S.C. § 1346 (b)(1), and it is the potentially harmful effect that litigating these common-law tort claims would have on military discipline that initially prompted the Supreme Court to articulate the doctrine of intramilitary immunity. *Feres*, 340 U.S. at 142-146. The prospect of compelled depositions and trial testimony by members of the Armed Forces about each other's decisions and actions is identical whether the suit is founded directly on state tort law, *Bivens,* § 1983, or is derivatively founded on state tort law pursuant to § 1346 (b)(1) of the FTCA. *See Stewart*, 90 F.3d at 106.

16

Elders does not even attempt to argue that a state-law defamation action arising from military service has any less potential to adversely affect military discipline than a *Bivens,* § 1983, or FTCA action.  Instead, he misreads the two-page, unpublished decision in *Scott v. Rice*, 7 F.3d 226, 1993 WL 375664 (4th Cir. 1993), to stand for the proposition that intramilitary immunity cannot bar a state-law tort claim.  Opp. at 10-14.  *Scott* was a 42 U.S.C. § 1983 action brought by a terminated National Guard officer.  *Id.* at **1.  The District Court dismissed the suit on intramilitary immunity grounds.  **2.  The Court of Appeals affirmed the dismissal, but held that it **need not reach** the issue of whether intramilitary immunity applied to § 1983 claims.  *Id.*  Therefore, the *Scott* panel explicitly **did not** reach the issue for which Elders claims the case stands.[8]   Instead, the *Scott* panel applied the test articulated in 1971 by the Fifth Circuit in *Mindes v. Seaman*, 453 F.2d 197, 201-02 (5th Cir. 1971), to determine whether a non-*Bivens* action by a soldier arising from military service could proceed in the civilian courts.  *Scott* at **2.  However, the Supreme Court's opinion in *Stanley*, 483 U.S. at 682-83, abrogates *Mindes* with respect to claims brought by soldiers.  The Fifth Circuit recently recognized that "*Stanley*, blocks claims brought by servicemen incident to their military service, which therefore preempts *Mindes* with respect to such claims."  *Meister v. Texas Adjutant General's Department*, 233 F.3d 332, 341 (5th Cir. 2000).  The Fifth Circuit explained that claims by soldiers, whether Regular or National Guard, are governed by the *Feres* arising from or incident

---

[8]As explained in Diaz's summary judgment motion at 15, all Circuits that have decided the issue have held that intramilitary immunity bars actions brought against National Guard officers under § 1983.  *See, e.g., Watson v. Arkansas National Guard*, 886 F.2d 1004, 1007 (8th Cir. 1989)(collecting cases).  "The concern for the disruption of military discipline on which *Feres, Chappell,* and *Stanley* are based applies equally when a court is asked to entertain an intra-military suit under § 1983."  *Id.*

to military service test, not the *Mindes* test.  *Id.* at 338.[9]  Similarly, in *Wright v. Park*, 5 F.3d 586, 590-91 (1st Cir. 1993), the First Circuit held that the bright-line rule articulated by the Supreme Court in *Stanley* controls claims brought by National Guard soldiers, not the *Mindes* test which the First Circuit adopted in *Penagaricano v. Llenza*, 747 F.2d 55, 60-61 (1st Cir. 1984).  The First Circuit held that the *Mindes* test "has outlived its usefulness as precedent," and explicitly overruled *Penagaricano* to "avoid leaving derelicts on the waters of the law."  *Wright*, 5 F.3d at 590-91, n. 7. (internal quotation marks and citation omitted).

The Court of Appeals' published precedents in *Stewart*, 90 F.3d at 106; *Minns*, 155 F.3d at 450; and *Kendrick v. United States*, 877 F.2 1201,1205 (1989), not the unpublished *Scott* opinion, control this action.  The overwhelming weight of authority holds that the bright-line arising from or incident to military service test reaffirmed by the Supreme Court in *Stanley*, 483 U.S. at 684, controls the justiciability of ***all*** lawsuits between soldiers.

However, even if the Court accepts Elders's invitation to turn the clock back to 1971 and apply the now-abrogated *Mindes* test, Elders's defamation claim is still nonjusticiable.  *Mindes* holds that "a court should not review internal military affairs in the absence of (a) an allegation of the deprivation of a constitutional right, or an allegation that the military has acted in violation of applicable statutes or its own regulations, and (b) exhaustion of available intraservice corrective measures."  *Mindes*, 453 F.2d at 201.  Opp. at 12.  Elders has not satisfied either prerequisite.  Elders does not allege that he has been deprived of a constitutional right, or that the military has violated any applicable statutes or regulations.  *See*, Amd. Compl.; Opp. at 14.  In addition, Elders concedes

---

[9]The Fifth Circuit held that *Mindes* still applies to claims brought by **civilians** that implicate military governance.  *Meister*, 233 F.3d at 341.

18

that he has not pursued any intraservice remedies such as filing a complaint with the Inspector General, making a complaint for redress of a wrong under Article 138 of the Uniform Code of Military Justice, 10 U.S.C. § 938, and the Maryland Militia Code, Md. Code Ann. Art 65 § 43 (1957), or swearing out military charges.  Opp. at 13.  The Tenth Circuit recently held that "*Feres* is also supported by the notion that military discipline provides a separate means of penalizing and restraining those who injure their fellow military personnel."  *Pringle v. United States*, 208 F.3d 1220, 1227 (10th cir. 2000).  Accordingly, Elders's claim is nonjusticiable under *Mindes*.  453 F.2d at 201.

Moreover, even if Elders had satisfied *Mindes*'s prerequisites, his claim is still nonjusticiable.  *Mindes* precludes judicial review when "the type and degree of anticipated interference with the military function . . . would be such as to seriously impede the military in the performance of vital duties[.]" *Id.*  As is shown above, if Elders's claim is allowed to proceed, he will endeavor to prove a conspiracy against him by most of the senior full-time officers in the Maryland Air National Guard to prevent him from being promoted to 135th Airlift Group Commander.  Litigating such a claim can reasonably be expected to wreak havoc on military discipline in the Maryland Air National Guard and seriously impede the Air Guard's performance of its vital military duties.  Accordingly, in this case as in *Scott*, 1993 WL 375664 ** 2, *Mindes* dictates the same result as *Stanley*.

Elders also relies heavily on the Ninth Circuit's opinion in *Lutz v. Secretary of the Air Force*, 944 F.2d 1477 (9th Cir. 1991).  Opp. at 20-21.  *Lutz* specifically rejects Elders's argument that intramilitary immunity does not bar state-law claims and that a Court should instead consider the actual impact that a particular lawsuit will have on military discipline.  *Id.* at 1482, 1485-86.  *Lutz* makes it clear that intramilitary immunity bars **all** claims, both constitutional and state-law tort

claims, that arise from or are incident to military service. *Id.* at 1481. In fact, the Ninth Circuit has applied intramilitary immunity to bar National Guard soldiers' defamation and libel claims against fellow soldiers in at least two cases. *Bowen*, 125 F.3d at 802 (holding National Guard officer's defamation and other claims against fellow Guard officers barred by intramilitary immunity); *Stauber v. Cline*, 837 F.2d 395 (9th Cir 1988)(holding National Guard technician's libel and other claims against fellow National Guard technicians barred by intramilitary immunity despite allegations that they made statements to third parties that harmed his reputation). On the facts in *Lutz*, the Ninth Circuit held that defendants' actions in breaking into their commander's office after hours and stealing a sealed personal letter and notes that implied a lesbian relationship were not incident to military service. *Id.* at 1477, 1486. As is shown above, Elders's proffered evidence conclusively establishes that his claim arises from military service. Accordingly, even Ninth Circuit authority, though not controlling here, fully supports entry of summary judgment in this case.

This Court should reject Elders's request that it adopt the First Circuit's opinion in *Day v. Massachusetts Air National Guard*, 167 F.3d 678 (1999). Opp. at 21-23. *Day* represents an extreme minority view, presumably driven by the bad facts in that case. In *Day*, a Massachusetts National Guard airman alleged that he was sexually assaulted by his fellow airmen in a hazing incident. *Id.* at 680. The First Circuit held that plaintiff's claims against the United States and his § 1983 claims against his assailants were clearly barred by intramilitary immunity. *Id.* at 683-84. The *Day* panel, however, refused to apply Intramilitary immunity to bar plaintiff's state-law claims against his assailants. *Id.* at 684-85. The First Circuit reasoned that "the core concerns of *Feres* about military discipline are largely - - although not entirely - - assuaged by the ability of the United States to certify under the Westfall Act those state-law claims against military personnel which it believes are

20

sufficiently related to defendant's duties to fall within the scope of defendant's employment." *Id.*
at 684. This is faulty reasoning.

As is shown above, lawsuits between soldiers founded upon state law have the same potential
to undermine military discipline as § 1983 claims. Moreover, the scope-of-employment test for
Westfall Act immunity is certainly more narrow than the broad test for intramilitary immunity. The
Court of appeals has held that the arising from or incident to military service test reaffirmed in
*Stanley*, 483 U.S. at 680-84, encompasses, at a minimum, all injuries suffered by military personnel
that are even remotely related to the individual's status as a member of the Armed Forces. *Stewart*,
90 F.3d at 105. In addition, scope-of-employment under the Westfall Act is determined on a State-
by-State basis and the Attorney General's scope certification is itself subject to judicial review. *See*,
II above. The Supreme Court has consistently held that the uniform, federal arising from or incident
to military service test is the appropriate standard necessary to protect the good order and discipline
of our Nation's Armed Forces. *Stanley*, 483 U.S. at 680-84; *Ricks*, 295 F.3d at 1128-31.
Accordingly, the Westfall Act is not always an adequate substitute for intramilitary immunity and
this Court should not follow *Day*.

For these same reasons, Elders's reliance on the Seventh Circuit's opinion in *Cross v.
Fiscus*, 830 F.2d 755 (7th Cir.1987) is misplaced. *Cross* applied the absolute immunity that federal
officials traditionally enjoyed for torts committed within the outer perimeter of their duties to bar
State-law claims arising from military service. *Id.* at 757-58. In *Westfall v. Erwin*, 484 U.S. 292,
297 (1998), pending at the time of the *Cross* decision, the Supreme Court significantly narrowed
that absolute immunity. *Jamison v. Wiley*, 14 F.3d 222, 226-27 (4th Cir. 1994). As a result,
Congress passed the Westfall Act, legislatively overruling *Westfall*. *Id.* As is shown above, Westfall

Act immunity is not always an adequate substitute for intramilitary immunity.

The Court of Appeals has held that the intramilitary immunity doctrine "removes military governance from the rubric of civilian tort law." *Stewart*, 90 F.3d at 106. Accordingly, this Court should reject Elders's demand that it intervene in military affairs through this state-law defamation action arising from Elders's military service.

**B.    Intramilitary Immunity Bars Elders's Request for Discovery.**

Elders cannot avoid summary judgment on intramilitary immunity grounds by simply demanding discovery. *See* Opp. at 7, 17, 25; Zaid Rule 56 (f) Affidavit. Like judicial immunity, Speech and Debate Clause immunity, and qualified immunity, intramilitary immunity is an immunity from the disruptive burdens of litigation, including discovery, and not simply a defense to liability. *See, e.g., Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)(holding that qualified immunity is meant to give government officials a right to avoid the burden of such pretrial matters as discovery). The Court of Appeals explains that "'it is the suit, not the recovery, that would be disruptive of discipline and the orderly conduct of military affairs.'" *Kendrick v. United States,* 877 F.2d 1201, 1205 (4th Cir. 1989)*, quoting, Henninger v. United States*, 473 F.2d 814, 815-16 (9th Cir. 1973). The Supreme Court emphasizes that the compelled depositions of military officers are one of the primary harms that intramilitary immunity seeks to prevent. *Stanley*, 483 U.S at 682. For these reasons, any denial of intramilitary immunity may be appealed on an interlocutory basis pursuant to the collateral order doctrine. *Jackson v. Brigle*, 17 F.3d 280, 281-82 (9th Cir. 1994); *Lutz*, 1480-1484.

Elders demands to take the depositions of Lt. Col. Thomas, Lt. Col. Diaz, Lt. Col. Mentges, Lt. Col. Willem, and Major Maurer. Zaid affidavit ¶ 9. This is precisely the harm that intramilitary immunity is intended to prevent. Moreover, this discovery cannot reasonably be expected to create

a genuine issue of material fact. *Burlington Coat Factory v. Esprit De Corp.*, 769 F.2d at 926. As is shown at III (A) above, the evidence Elders has submitted conclusively establishes that this lawsuit arises from military service. Elders's claimed injuries all relate to his status as a member of the military. *Stewart*, 90 F.3d at 104. In addition, the very discovery Elders requests shows that this is the **type of claim** that, if generally permitted, would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness. *Id.* Accordingly, Elders's request for discovery should be denied and summary judgment should be entered for Diaz.

## IV.  Diaz's Statements Are Privileged Under the Law of Defamation

As shown in her moving papers at 30–33, Diaz's informal reports to Majors Willem and Mentges of Lt. Col. Elders's unwanted sexual advances should be protected by the same absolute privilege as her testimony making the very same allegations in the two formal military investigations. *Mangold v. Analytic Services Inc.*, 77 F.3d 1442, 1447 (4th Cir. 1996). Elders argues that this absolute privilege should not apply because, he claims, Lt. Col. Diaz did not follow the precise procedures for making a sexual harassment report contained in NGB 600-22/ANGI 36-3. Opp. at 43-46. This lawsuit illustrates precisely why the absolute privilege should apply.

The military could not have conducted its investigations but for Lt. Col. Diaz's informal statements. Under Elders's argument, Diaz should be subject to the burden of protracted litigation and personal liability for these statements. Such an interpretation of the law would establish a regime whereby the victims of sexual harassment in the military could not even discuss incidents of sexual harassment with their fellow officers without being subject to defamation claims by their harassers. Such a reign of terror would thwart the military's overriding efforts to eliminate sexual harassment within the ranks and allow harassers to threaten and intimidate their victims with

23

defamation lawsuits.

In addition, Elders argues that Diaz should not be protected by the qualified privilege that allows people who share a common interest to share information.  Opp. at 46-50.  The evidence shows that as Maryland National Guard officers, Lt. Col. Diaz, and Majors Willem and Mentges share a strong common interest in eliminating sexual harassment by a senior officer in the Guard. They can share information on this subject.  Elders cannot defeat this qualified privilege with his bare and unsupported allegations of malice.  Elders must proffer enough probative evidence of malice to allow a jury to return a verdict in his favor on the issue.  *Anderson* 477 U.S. at 249.  He has not done so.  Elders's "evidence" of malice consists of nothing but statements that Lt. Col. Diaz was seen meeting with Lt. Col. Thomas and Major Mentges.  Pl. Ex. 2, Elders Decl. ¶ 5; Pl. Ex. 8, Falter Decl. ¶¶ 5, 13.  A jury could not return a finding in Elders's favor on the issue of malice based upon this evidence.  Accordingly, Diaz  is entitled to summary judgment on the basis of both absolute privilege and the common interest privilege.

## CONCLUSION

Based upon the foregoing, her moving papers, and original Motion to Dismiss, Defendant,

24

Lt. Col. Diaz, requests that summary judgment be granted in her favor.

Respectfully submitted,

THOMAS M. DIBIAGIO
United States Attorney

By:      /s/

TARRA DeSHIELDS
Assistant United States Attorney
General Bar No. 07749

Office of the United States Attorney
6625 United States Courthouse
101 West Lombard Street
Baltimore, Maryland  21201
(410) 209-4800

STEPHEN M. DOYLE
Lieutenant Colonel
Judge Advocate General's Corps
Maryland Army National Guard

1724 Sutton Avenue
Baltimore, MD 21227
(202) 353-8174

Counsel for Defendant Diaz

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 13th day of June, 2003, a copy of the foregoing Reply

Memorandum in Support of Defendant Lt. Col. Maria C. Diaz's Motion For Summary Judgment was

filed electronically this date, and forwarded by regular mail, postage prepaid, to Mark S. Zaid,

Krieger & Zaid, PLLC, due to the 1133 21st Street, N.W., Suite 800, Washington, D.C. 20036.

/s/

TARRA DeSHIELDS
Assistant United States Attorney