IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KARL L. ELDERS,                          *
                                         *
              Plaintiff                  *
                                         *
     v.                                  *    CIVIL ACTION NO. MJG-02-3892
                                         *
MARIA C. DIAZ,                           *
                                         *
              Defendant                  *

         *    *    *    *    ***    *    *    *    *

_____
MEMORANDUM IN SUPPORT OF
DEFENDANT MARIA C. DIAZ'S RENEWED MOTION
FOR SUMMARY JUDGMENT AND UNITED STATES'S MOTION TO QUASH

     In accord with Rules 45(c)(3)(A), 56(b) and (c) of the Federal
Rules of Civil Procedure and Local Rule 105.1, the United States
and the Defendant, Lieutenant Colonel Maria C. Diaz, (hereinafter
"Diaz"), by her attorneys, Allen F. Loucks, United States Attorney
for the District of Maryland, and undersigned counsel, submits the
following memorandum in support of both the United States's motion
to quash subpoenas for the production of witnesses and documents
and Maria Diaz's renewed motion for summary judgment, in rejoinder
to the Plaintiff's, Lieutenant Colonel Karl Elders (hereinafter
"Elders"), Amended Complaint.

## I.   INTRODUCTION

     Commencing on May 4, 2005, this Court will preside over a
Westfall Act, 28 U.S.C. § 2679, hearing convened for the purpose of
determining whether Diaz was acting within the scope of her
employment when she reported to certain members of the Maryland Air

National Guard ("MDANG")allegations of sexual harassment.  The United States urges that the Court should first determine whether this lawsuit is barred by the doctrine of intramilitary immunity before it reaches the more narrow scope of employment issue.  As this Court has recognized, to overcome intramilitary immunity, Elders must come forward with evidence of an allegedly defamatory statement by Lt. Col. Diaz to someone outside of the military.  It is now abundantly clear that Elders has no such evidence.  Instead, he continues to focus exclusively on matters arising within the National Guard.  Accordingly, this suit is clearly barred by intramilitary immunity.  At this stage, the Court should not require the testimony of National Guard officers concerning their military service to determine the scope issue.  Requiring such testimony would undermine one of the primary purpose of the intramilitary immunity doctrine which is to prevent "compelled depositions and trial testimony by military officers concerning the details of their commands. . . [which] would disrupt the military regime." *Unites States v. Stanley*, 483 U.S. 669, 682-83 (1987).

Elders, a Lieutenant Colonel in the MDANG filed a defamation suit in the Circuit Court for Baltimore County, Maryland, maintaining specifically that Diaz, also a Lieutenant Colonel in the MDANG, libeled and slandered him, (Count One), and invaded his privacy, (Count Two), when Diaz reported to other military personnel that Elders had harassed her sexually in the course of

her military duties. *See* Original Complaint at 1-4, ¶¶ 1-24. *See also* Statement of Facts in Diaz's 4/10/03 Motion for Summary Judgment, which motion and exhibits are incorporated herein, in full, by reference. The case was subsequently removed to federal court and a motion seeking to substitute the United States as the party-defendant was filed simultaneously with the Notice of Removal. *See* Notice of Removal and Motion for Substitution in *Elders v. Diaz*, Civ. No. MJG-02-3892.

The United States, possessed of the United States Attorney's certification that Lt. Col. Diaz was acting within the scope of employment when she made the allegations at issue, moved to substitute itself as the sole party-defendant pursuant to Section 2679(d)(1) of Title 28 of the United States Code and moved to dismiss the Original Complaint. *See* Substitution Motion of the United States and Certification, which is herein incorporated by reference, *and* Diaz's Motion to Dismiss in *Elders v. Diaz*, Civ. No. MJG-02-3892 *and* Exhibit 2, Scope-of-Employment Certification. The United States also asserted that Elders' claims were barred by intramilitary immunity because they arose incident to military service. *Id.*

Elders contested the removal, arguing that intramilitary immunity did not apply and pressed for discovery relative to the propriety of the scope of employment certification. *See* Elders's Opposition To Removal in *Elders v. Diaz*, Civ. No. MJG-02-3892. By

3

letter Order dated February 12, 2003, this Court directed Elders to file an Amended Complaint setting forth specifically the facts supportive of his argument that his claim was not one incident to military service and also that Diaz's allegations were not made within the scope of her employment as a National Guard officer. *See* 2/12/03 Letter of the Court in *Elders v. Diaz*, Civ. No. MJG-02-3892. Though afforded anew the opportunity to meet the pleading requirements of Rule 8(a)(2), and heedless of the Court's directive, Elders failed to assert with particularity any facts supporting his defamation claim, content instead to rely upon vague and general allegations. Specifically, in his Amended Complaint filed on March 3, 2003, Elders, without supplying specific dates, alleged that Diaz made statements accusing him of sexual harassment to fellow National Guard officers, including Lt. Col. James M. Mentges, Lt. Col. Raul Q. Willem, Lt. Col. Warren Thomas, Lt. Col. David Rein and Officer Debbie Gregory. Amd. Compl. at 2, ¶ 8. Elders attempted to remove the statements from the context of military service by alleging that they were not made within the course of *formal* sexual harassment complaints or investigations.

Secondly, Elders alleged "upon information and belief" that Diaz made defamatory statements concerning him to her medical colleagues at Franklin Square Hospital "possibly including" some fifty named doctors. *Id.* at 3, ¶ 9. Elders did not identify when the allegedly defamatory statements were made nor what was

purportedly said.  Moreover, he supplied the Court, in paragraph 9 of the Amended Complaint, with a roster of names of Franklin Square Hospital employees that was nothing more a list of *every* doctor in the General Surgery department of the hospital, an alphabetized list that could be obtained easily from the Franklin Square Internet website or telephone directory.  Finally, Elders alleged in his Amended Complaint that Diaz made unspecified defamatory statements on unspecified dates to her husband and unnamed nanny.  Amd. Compl. at 4, ¶ 10.

The Court, on December 12, 2003, permitted Elders the opportunity to take discovery in an effort to establish facts that would support his argument that the doctrine of intramilitary immunity did not apply and that Diaz made defamatory statements outside the scope of her government employment.  The Court allowed Elders to depose Diaz, directing that the deposition conclude within seven hours and be confined to identifying those persons to whom Diaz made allegedly defamatory statements, the context of such statements and the general subject matter of such statements.  *See* 12/12/03 Order in *Elders v. Diaz*, Civ. No. MJG-02-3892.  The deposition occurred on January 15, 2004.

Unearthing nothing from that deposition to aid his case, Elders instituted an action under the Freedom of Information Act ("FOIA") to garner the release of documents regarding any investigation undertaken by MDANG into a matter related to a

certain written submission to the Air War College. *See Elders v. MDANG, et al.*, Civ. No. MJG-03-3151. Some 375 pages of documentary material was fully, and where privileged, partially released to Elders. *Id.* Other material was held to be protected from disclosure by the Court. *See* 12/7/04 Order and Memorandum Opinion in *Elders v. MDANG, et al.*, Civ. No. MJG-03-3151.

In mid-March 2005, this Court scheduled a hearing, the focus of which is limited to determining whether Diaz was acting within the scope of her government employment when she made the allegedly defamatory statements about Elders. The hearing will commence on May 4, 2005. *See* 3/15/05 Order in *Elders v. Diaz*, Civ. No. MJG-02-3892. On April 26, 2005, by way of facsimile communication, the United States Attorney's Office received a letter from counsel for Elders and a subpoena seeking to have the United States secure the presence of five MDANG military members, along with Diaz, for attendance at the upcoming May 4, 2005 hearing. *See* Exhibit 1, A single subpoena was issued for Maria C. Diaz, Todd Wilkinson, MDANG, Diane Kreinbrink, MDANG, James M. Mentges, MDANG, Doris Maurer, MDANG, and Felton Page, Chief, National Guard Directorate for EEO.

Also on April 26, 2005, and by way of facsimile communication, the United States Attorney's Office received from counsel for Elders a subpoena addressed alternatively to Diaz and the MDANG seeking the provision of documents returnable to counsel for Elders

by May 2, 2005.  Exhibit 2, Subpoena addressed to Maria C. Diaz and

MDANG.  In that subpoena for the production of documents, Elders

seeks:

> 1. All documents that post-date February 2000, that are
> related or pertain to Dr. Diaz's allegations of
> retaliation filed against Generals Morgan and/or Tuxill;
>
> 2. Unredacted copies of Dr. Diaz's letters addressed to
> Governor Robert Erlich and Senator Barbara Mikulski
> (redacted copies were attached to the subpoena);
>
> 3. All documents, in addition to those set forth in item
> 2, that post-date February 2000, sent by Dr. Diaz to any
> elected official, federal, state or local, and any
> responses thereto, that are related or pertain to (a) the
> Maryland Air National Guard, or (b) Karl Elders or (c)
> Generals Morgan and/or Tuxill;
>
> 4. An unredacted copy of the May 21, 2003 letter sent by
> Dr. Diaz to Colonel Walsh;
>
> 5. Any documents sent by Dr. Diaz, or received from, the
> Air Force Office of Inspector General or the Maryland Air
> National Guard Inspector General that pertain or relate
> to (a) Karl Elders or (b) Generals Morgan or Tuxill;
>
> 6. An unredacted copy of the respective Reports of
> Investigation and all accompanying exhibits compiled by
> Colonel John C. Inglis dated 19 March 2002, and Colonel
> Arthur Werts in or around June 2002.

Elders's actions in this regard, along with his failure to

adduce any evidence during the deposition of Diaz that she made

non-privileged defamatory statements about him to anyone outside of

the military, serve only to confirm that his Amended Complaint must

be dismissed.  Elders seeks to impose personal liability on Diaz,

a flight surgeon formerly under his command, because she accused

him of sexually harassing her in the course of their military

7

duties.  He cannot divorce the present suit from his military service.  Elders and Diaz have no relationship or contact apart from their military service in the MDANG.  Elders is an airline pilot who lives in Montgomery County, Amd. Compl. at 1, ¶ 4; Lt. Col. Diaz is a surgeon who lives and practices in Baltimore County. Amd. Compl. at 2, ¶ 5.

The statements made by Diaz reporting Elders's alleged sexual harassment were made exclusively to fellow National Guard officers both informally and during the course of the ensuing formal military investigations.  *See* Diaz April 10, 2003 Summary Judgment Motion and Exhibit 3, Declaration of Lt. Col. Maria C. Diaz at 1, ¶ 4, incorporated herein by reference.  Diaz has made no unprivileged statements accusing Elders of sexual harassment to anyone outside of the MDANG.  *Id*. at 1, ¶ 5.  Accordingly, Elders's defamation claim arises out of or is incident to military service and maintenance of the instant suit is thus barred by the doctrine of intramilitary immunity, which Elders's most recent actions fully illustrate.

Moreover, the National Guard officially encourages its members to informally report sexual harassment to fellow National Guard members prior to the lodging of formal complaints.  *See* Diaz April 10, 2003 Summary Judgment Motion and Exhibit 1, Page Declaration at 3, ¶¶ 12-14.  Such informal reports are considered to be within the scope of a National Guard member's federal employment and in the

line of duty. *Id*. at 5, ¶ 17. Diaz's statements reporting Elders's alleged harassment were made within the scope of her federal employment as a National Guard officer. *Id*. Consequently, pursuant to the Westfall Act, 28 U.S.C. § 2679(d)(2), the United States must be substituted as the party-defendant in place of Lt. Col. Diaz and this suit should thus proceed as one under the Federal Tort Claims Act (FTCA). 28 U.S.C. §§ 1346(b), 2671-80 (2003). *See also* 28 U.S.C. § 2679(d)(4). If the suit is treated as one filed under the FTCA, the Court lacks subject matter jurisdiction to entertain Elders's claim of defamation (libel and slander) because this type of intentional tort is not cognizable under the FTCA. 28 U.S.C. § 2680(h). Even if the contrary were true, Elders has not exhausted his administrative remedy by first presenting his claim to the appropriate federal agency for resolution; thus the claim is not ripe for adjudication. Such deficiencies compel dismissal of the Amended Complaint and the grant of summary judgment in Diaz's favor.

Moreover, the Court should quash Elders's subpoenas for the appearance of witnesses on the ground of the failure to comply with the dictates of *United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 467 (1951). The subpoena for the production of documents presents the same infirmity. Additionally, the documents sought are not relevant to the purpose of the May 4, 2005 hearing and the subpoena for the production of documents fails to provide reasonable time

for compliance.

## II.   **STATEMENT OF FACTS**[1]

_____The facts giving rise to the instant action were set forth originally in Diaz's 12/16/02 Motion to Dismiss and the 4/10/03 Motion for Summary Judgment, which, along with their accompanying exhibits, are herein incorporated by reference.  It is necessary, however, to clarify the context in which the allegations at issue arose.  Specifically, in March 2002, both Majors Raul Willem and Michael Mentges,[2] in separate written Memorandums for the Record, notified Brigadier General David A. Beasley that Diaz had advised them individually that Elders, her commanding officer, was harassing her by repeatedly making unwanted sexual advances and subjecting her to inappropriate physical contact.  Exhibit 4, Inglis Investigation at 3, 9; Exhibit 5, Werts Investigation at 1.  The Air National Guard officially encourages its members to informally discuss incidents of sexual harassment with fellow Guard members prior to filing a formal complaint.  *See* Exhibit 1 at 3, ¶¶ 12-13.  The alleged victim of sexual harassment is in no way restricted to utilizing the formal complaint system and may freely

_____

[1]  Reference herein to Exhibits 5 and 6 are to the two Inglis and Werts "Reports of Investigation" filed with Diaz's original Motion to Dismiss and designated therein as Exhibits A and B, respectively, which exhibits are incorporated herein by reference.

[2]  Willem was the Commander of the 175th Security Forces Squadron and Mentges was the 135th Airlift Squadron Training Officer.  Exhibit A, Inglis Investigation at 3; Exhibit B, Werts Investigation at 1.  Both were subsequently promoted to Lt. Col.

discuss perceived sexual harassment with fellow Guard officers. *Id.*

At the time of her informal complaints accusing Elders of sexual harassment, Diaz was assigned to the 135th Airlift Squadron as a Flight Surgeon; Elders was the Commander of that squadron and her commanding officer.  On March 9, 2002, Brig. Gen. Beasley appointed Colonel John C. Inglis as Investigating Officer to conduct a Wing-level command inquiry into Diaz's allegations. Exhibit 4 at 1; Exhibit 5 at 1.

Colonel Inglis interviewed and took sworn statements from Diaz and several other military witnesses.  His investigation focused on Diaz's specific allegations that: (1) on a May 2000 military training flight, Elders unexpectedly kissed her on the lips in the cargo compartment of the military aircraft; (2) at the Air Base in the summer of 2000, Elders invited her to travel with him to Amsterdam on a "buddy pass" where he would "show her a good time" and they could "window shop"; (3) Elders kissed her lips and attempted to push his tongue in her mouth in the summer of 2001 in the course of summonsing her to his office at the Warfield Air National Guard Base to discuss her application for a MDANG State Air Surgeon position; and (4) Elders, in December 2001 at the 175th Wing Christmas party, grabbed her wrist, twisted her arm and said, "What the hell did you say to him," Exhibit 4 at 12.

During the course of the investigation, Major Doris Maurer,

another officer in Diaz's squadron, testified that she too had been subjected to Elders's unwanted sexual advances.  Elders refused to be interviewed, submitting instead an unsworn letter characterizing the sexual harassment and battery accusations as "totally false." Exhibit 4 at 3.

Finding that Diaz's testimony was credible, Colonel Inglis wrote that Diaz "provided clear and compelling testimony that Lt. Col. Elders sexually harassed her for a period dating from at least mid-2000 to the present.  These include an unwanted kiss aboard a local training flight on probably 25 May 2000, an offer to travel alone with him to Amsterdam . . . and an unwanted kiss with an attempt to insert his tongue in her mouth in the Fall of 2001." Exhibit 4 at 8.  Colonel Inglis dismissed the notion that the allegations were entirely fabricated.  *Id.*

Due to the gravity of the findings made and conclusions reached in Inglis's investigation, Major General Bruce Tuxill, then the Assistant Adjutant General for Air and the highest ranking officer in the MDANG, appointed Colonel Arthur Werts of the New Jersey Air National Guard (NJANG) to conduct an independent headquarters-level investigation.  Exhibit 5 at 1.  Possessed of the record compiled in the Inglis Investigation, Colonel Werts commenced his inquiry, submitting a formal Report of Investigation to General Tuxill on June 7, 2002.  *See* Exhibit 5.  After taking the sworn testimony of both Diaz and Elders, along with the

12

statements of fifteen other military witnesses, and citing the lack of corroborative evidence, Exhibit 5, Index of Witnesses at 17-18, Colonel Werts determined that Diaz's allegations regarding Elders's two attempts to kiss her and his comments relative to inviting her to accompany him to Amsterdam could not be substantiated by a preponderance of the evidence. *Id.* at 4-8. Noting that Diaz had reported the 2001 Christmas-party-wrist-grabbing incident to other squadron officers shortly after its occurrence and that several witnesses affirmed that Diaz looked scared at the time of the incident, Colonel Werts found that Elders had indeed grabbed and twisted Diaz's wrist. *Id.* at 7-8.

The undisputed facts show that Diaz has had no unprivileged discussions of her allegations with anyone outside of the National Guard. Exhibit 3, Diaz Declaration at 2, ¶ 5. She has never discussed her allegations with anyone at Franklin Square Hospital. *Id.* Additional facts will be added, where necessary, in the Argument that follows.

### III.  ARGUMENT

#### Motions For Summary Judgment--The Legal Standard

It is settled that summary judgment shall be granted when

the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

13

(1986). Stated another way, when a party fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which the party will bear the burden at trial, summary adjudication is in order. *Celotex*, 477 U.S. at 322. A fact is material for purposes of summary judgment when, if applied in light of the pertinent substantive law, it affects the outcome of the litigation. *Reece v. Martin Marietta Technologies, Inc.*, 914 F. Supp. 1236, 1239 (D. Md. 1995).

Clearly, the movant for summary judgment need not support its motion with evidence negating the opponent's case; rather, the movant may satisfy its burden by showing that there is an absence of evidence to support the nonmovant's case. *Latimer v. Smithkline & French Lab.*, 919 F.2d 301, 303 (5th Cir. 1990). If that showing is made, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *Celotex*, 477 U.S. at 325. "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' ... by 'conclusory allegations,' ... by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (same). As explained below, fidelity to these principles in the instant case impels summary adjudication.

A. __Intramilitary Immunity Bars Elders's Claim__

Elders has known since at least December 16, 2002, when Diaz filed her initial motion to dismiss, that evidence of defamatory statements to people outside of the National Guard would be necessary in order to overcome the defenses of intramilitary immunity and Westfall Act immunity. Indeed, Elders argued in his opposition to Diaz's initial motion to dismiss that he filed on January 21, 2003, that Diaz made defamatory statements to civilian third parties. It was because of these vague and conclusory allegations that the Court initially denied Diaz's motion to dismiss and ordered Elders to file an amended complaint specifying the civilian third parties to whom he alleges Diaz made defamatory statements. *See* 2/12/03 Order at ¶ 3.

Elders filed his first Amended Complaint on March 3, 2003. In that Amended Complaint, Elders made detailed factual allegations that Diaz defamed him to her medical colleagues and co-workers at Franklin Square Hospital since the fall of 2001 and specifically listed fifty named doctors in the General Surgery Department. Amd. Compl. ¶ 9. He also alleged that she defamed him to her close personal friends and nanny since the fall of 2001. Amd. Compl. ¶ 10. Thereafter, this Court permitted Elders to depose Diaz. *See* 12/12/03 Order. In so doing, this Court properly recognized that in order to survive the application of the doctrine of intramilitary immunity, Elders had to produce admissible evidence

15

that Diaz defamed him to civilians outside of the National Guard. Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49 (1986). Despite being afforded ample opportunity to do so, Elders has come forward with no such evidence.

During Diaz's day-long deposition on January 15, 2004, Elders, in addition to inquiring about racism, Diaz's recollections of the tenor of his relationships with other MDANG members, and alleged attempts to thwart Elders's military advancement, queried whether Diaz told anyone of her allegations respecting Elders's alleged sexual harassment. Diaz explained that she spoke to Colonel Raul Willem. Exhibit 3 at 38, lines 9-15, 1/15/04 Deposition of Maria C. Diaz. Diaz stated that one day, while both were on the military base, Willem noticed that she was particularly quiet and asked her what was wrong. *Id*. at 41-42. No one else was present at the time. *Id*. at 43. Diaz was on duty and so was Willem, who was also in uniform. *Id*. Diaz added that she did not socialize with Willem, though she knew that he was also a police officer in a civilian capacity. *Id*. at 46-48. Although Willem advised Diaz to make a formal complaint for harassment, Diaz demurred because she felt that she would not be believed. *Id*. at 47-49.

Diaz stated further that she has a sister and aunt who both reside in Puerto Rico. *Id*. at 61. After the MDANG instituted investigations into the allegations of sexual harassment, Diaz, in a telephone call to her sister, told her that she had "pressed

16

harassment charges against an officer and that was it." *Id*. at 62-63, 283. The conversation was conducted in Spanish. *Id*. Elders's name was not revealed and no details about the nature of the harassment were shared with the sister, other than that the investigation by Colonel Werts was continuing. *Id*. at 63-64. Diaz told her aunt the same thing that she told her sister. *Id*. at 65. The aunt has never visited Maryland. *Id*. at 282-84.

Diaz has no near-by neighbors, *id*. at 66, and never told anyone who lived near or worked at her office about the allegations, including her secretary. *Id*. at 66-67. Her secretary, Mary Farlow, "found out" when the sheriff delivered papers to Diaz's office. *Id*. at 67. The secretary thought Diaz was being sued for malpractice and Diaz told her "this was just problems with the Guard." *Id*. Diaz never mentioned Elders by name or the specific nature of the "problems with the Guard." *Id*. at 67-68. Diaz never discussed Elders with "work neighbors." *Id*. at 68. Nor did she discuss Elders with anyone at Franklin Square Hospital. *Id*. 68-73.

Diaz did advise her husband of the allegations after the investigation was initiated by Colonel Inglis. *Id*. at 73-76. No one else was present during those conversations. *Id*. Diaz's husband did not tell anyone about the conversations. *Id*. at 76.

Diaz stated further that she advised Major Mentges of certain comments Elders made to her and that Elders had grabbed her wrist.

*Id.* at 84-98, 118-19.  The discussions occurred on the military base.  *Id.* at 280.  Diaz does not socialize with Mentges "outside of the base," and although she has spoken with Mentges's wife on the telephone, Diaz never mentioned Elders to Mentges's wife.  *Id.* at 97.  Diaz did not recollect having any conversation with Todd Wilkinson, another MDANG member, about concerns with Elders until after Elders filed the instant suit against her.  *Id.* at 97, 114-15.  That conversation related to the "wrist incident."  *Id.* at 115.

While the MDANG investigation was being conducted by Colonel Werts, Diaz did not discuss the matter with either Mentges, Willem or Todd Wilkinson.  *Id.* at 126-28.  Diaz did not discuss Elders with either an individual named Debbie Gregory, Dave Rein, Michael Lunt, or "Dee" Maurer.  *Id.* at 133-36, 141-42, 196.  After the Daily Record published an article about Elders's defamation suit, Diaz was approached by various people but she never provided any information beyond that she had made allegations of sexual harassment and that she could not talk about the matter.  *Id.* at 145.

The undisputed facts clearly establish that Elders's claim is barred by application of the doctrine of intramilitary immunity because it arises from military service.  *Feres v. United States*, 340 U.S. 135, 146 (1950); *United States v. Stanley*, 483 U.S. 669, 679-84 (1987).  In *Stanley*, the Supreme Court applied the 'arising

from or incident to military service" test first articulated in *Feres* to bar suits against military personnel in their individual capacities. *Stanley*, 483 U.S. at 682-83. Therefore, it makes no difference, for purposes of intramilitary immunity, whether the United States or Lt. Col. Diaz is the party-defendant. **The identical standard controls**. *Id.* Accordingly, the Court can decide the intramilitary issue before it reaches the more narrow scope issue.

At least two circuits have squarely held that sexual harassment claims by members of the Armed Forces are barred by the intramilitary immunity doctrine. *Mackey v. United States*, 226 F.3d 773 (6th Cir. 2000); *Smith v. United States*, 196 F.3d 774 (7th Cir. 1999). It would be absurd to suggest that the victim of sexual harassment is barred from suit while the alleged military harasser is free to hail his victim into court in a defamation action. If the alleged sexual harassment took place in the context of military service, all lawsuits arising from the matter are necessarily barred by intramilitary immunity.

The Court of Appeals teaches that the arising-from-or-incident-to-military-service test for intramilitary immunity "'encompass[es], at a minimum, **all** injuries suffered by military personnel that are even remotely related to the individual's **status** as a member of the military.'" *Stewart v. United States*, 90 F.3d 102, 105 (4th Cir. 1996), *quoting Major v. United States*, 835 F.2d

19

641, 644 (6th Cir. 1987)(emphasis in original).  The Court of
Appeals instructs that when a Court evaluates an assertion of
intramilitary immunity, "the proper question is whether the
plaintiff's claims 'are the *type* of claims that, if generally
permitted, would involve the judiciary in sensitive military
affairs at the expense of military discipline and effectiveness.'"
*Stewart*, 90 F.3d at 106 (*quoting United States v. Shearer*, 473 U.S.
52, 59 (1985)(emphasis in original)).  *See also Minns*, 155 F.3d at
450.  If a lawsuit has the potential to require members of the
Armed Forces "'to testify in court as to each other's decisions and
actions,'" it is barred by intramilitary immunity.  *Stewart,* 90
F.3d at 106 (*quoting Stencel*, 431 U.S. at 673).  *See also Ricks v.
Nickels*, 295 F.3d 1124, 1129 (10th Cir. 2002).  The Supreme Court
has continually stressed that "the prospect of compelled
depositions and trial testimony by military officers concerning the
details of their military commands . . . would disrupt the military
regime," and cannot be permitted.  *Stanley*, 483 U.S. at 682-83.
*See generally, Orloff v. Willoughby*, 345 U.S. 83, 94 (1953)(holding
that "[o]rderly government requires that  the judiciary be as
scrupulous not to interfere with legitimate Army matters as the
Army must be scrupulous not to intervene in judicial matters").

Whether involving regular or reserve components of the
military, lawsuits arising incident to military service are
uniformly barred.  *See, e.g., Jones v. New York State Division of*

20

*Military and Naval Affairs*, 166 F.3d 45, 51 (2nd Cir. 1999)(collecting cases). *See also Bowen v. Oistead*, 125 F.3d 800, 804-05 (9th Cir. 1997), *cert. denied*, 524 U.S. 938 (1998); *Uhl v. Swanstrom*, 79 F.3d 751, 755-56 (8th Cir. 1996); *Wright v. Park*, 5 F.3d 586, 591 (1st Cir. 1993)(all cases applying intramilitary immunity to bar suits incident to service of any component of military). In a well-reasoned recent opinion applying the doctrine to the National Guard, the Court of Appeals for the Second Circuit stressed that "intramilitary immunity is designed to protect a defendant from the obligation to participate in the litigation, and not merely from an adverse result." *Dibble v. Fenimore*, 339 F.3d 120, 124 (2003).

At every phase of the pretrial litigation of this case, Elders has proffered theories, written declarations, and arguments that all buttress his central claim that Diaz's allegations of sexual harassment were part of a grand scheme concocted by members of the MDANG to deny him promotion to 135th Group Commander so that Lt. Col. Warren Thomas would be selected. *See, e.g.*, Elders Decl. ¶ 7, Falter Decl. ¶ 17, Robinson Decl. ¶ 17 in Elders's Opposition to Diaz's April 10, 2003 Motion for Summary Judgment. Elders claims that Diaz fabricated the stories in an effort to conspire with Lt. Cols. Thomas, Mentges and Todd Wilkinson, and Major Doris Maurer to "ensure Lt. Col. Elders did not obtain the Group Commander's position." Elders Decl. at ¶ 17. The selection of an officer to

fill one of the most senior command positions in the Maryland National Guard will be put at issue in this lawsuit. In addition, Elders claims that Diaz and Major Mentges joined the conspiracy because they believed that he reported them to the Inspector General for allegedly plagiarizing an official military paper. Elders *Decl.* at ¶ 7 (c). Any such Inspector General investigation will also presumably be put at issue.

The Court need only to review Elders's subpoenas seeking the appearance of Lt. Cols. Todd Wilkinson, Diane Kreinbrink, Majors Mentges and Maurer and Felton Page at the May 4, 2005 hearing to conclude that Elders will resurrect the same arguments during the May 4, 2005 Westfall Act "scope" hearing. Elders's preliminary witness list demonstrates beyond any doubt that litigating his claim will necessarily require members of the Armed Forces to testify in court as to each other's decisions and actions and will require a judicial assessment of military regulations and policies. *Stewart*, 90 F.3d at 106. Litigation of the ***type*** of claim asserted by Elders thus would necessarily involve the judicial branch in sensitive military affairs at the expense of military discipline and effectiveness. *See Stewart*, 90 F.3d at 106, *quoting Shearer*, 473 U.S. at 59. Accordingly, it is barred by intramilitary immunity. Like judicial immunity, Speech and Debate Clause immunity, and qualified immunity, intramilitary immunity is an immunity from the disruptive burdens of litigation, including

22

discovery, not simply a defense to liability.  *See, e.g., Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)(holding that qualified immunity is meant to give government officials a right to avoid the burden of such pretrial matters as discovery).

Elders has utterly failed to produce any admissible evidence that Diaz made unprivileged statements to persons outside of the military.  Indeed, the deposition testimony of Diaz establishes that the harassment-related allegations at issue were made exclusively to military personnel.  It must be remembered that under Maryland law, a "defamatory statement is one that tends to expose a person to **public scorn**, hatred, contempt or ridicule, thereby discouraging **others in the community** from having a good opinion of, or from associating or dealing with, that person."  *Batson v. Shiflett*, 325 Md. 684, 72-23 (1992)(emphasis added).[3]  Defamation arises from false *public* statements that seriously affect one's reputation in the community at large.  *Id.*

Here, though Diaz testified at her deposition that she told her husband about the allegations of sexual harassment, under Maryland law, publications between spouses are absolutely privileged and cannot give rise to a defamation claim under any circumstances.  *Gohari v. Darvish*, 363 Md. 42, n.13, 767 A.2d 321, 321 *quoting* Dan B. Dobbs, *The Law of Torts* §§ 413-14.  *See also*

---

[3] The statements Elders alleges Lt. Col. Diaz made about him are thus not even defamatory under Maryland law.

Restatement (Second) Torts § 592 (1977)("[a] husband or a wife is absolutely privileged to publish to the other spouse defamatory matter concerning a third person).    Accordingly, Elders's allegation that Lt. Col. Diaz made defamatory statements concerning him to her husband, Amd. Compl. at 4, ¶ 10, cannot support Elders's defamation claim.

Likewise, statements made to Diaz's aunt and sister are not defamatory.    Diaz told both women that she had filed a sexual harassment complaint and nothing more.    Exhibit 3 at 62-63, 283.  Elders was not identified by name and no details of the allegations were provided.    *Id.*    Moreover, neither the sister nor the aunt live in Maryland and thus the innocuous statement made by Diaz did not discourage ***others in the community*** from having a good opinion of, or from associating or dealing with, Elders.

Additionally, all statements made by Lt. Col. Diaz to fellow National Guard members reporting Lt. Col. Elder's sexual harassment are absolutely privileged.    The Court of Appeals, in *Mangold v. Analytic Services Incorporated*, 77 F.3d 1442, 1447 (4th Cir. 1996), a case strikingly similar to the one at bar, held that all statements made during official military investigations are absolutely privileged.    In *Mangold*, an Air Force Lt. Col. reported his superior officer, Col. Mangold, to Air Force authorities for improperly pressuring a contractor to hire a family friend.    *Id.* at 1445.    Prior to formally reporting Col. Mangold's misconduct, the

24

Lt. Col. discussed the Col.'s misconduct with fellow Air Force officers. *Id.*

As a result of the Lt. Col.'s complaint, the Air Force conducted an internal investigation and Col. Mangold was removed from his position. *Id.* Colonel Mangold then filed suit in Virginia state court against the Lt. Col., the contractor, and its executives alleging that they had defamed him by fabricating the charges of misconduct. *Id.* Pursuant to the Westfall Act, 28 U.S.C. 2679(d)(2), the Attorney General certified that the Lt. Col. was acting within the scope of his federal employment when he made the allegedly defamatory statements, removed the case to federal court, and substituted the United States for the Lt. Col. as the party-defendant. *Id.*

Relying on the Supreme Court's opinions in *Barr* and *Westfall, supra*, the Fourth Circuit recognized that under federal common law, government employees participating as witnesses in official investigations are shielded by absolute immunity. *Mangold*, 77 F.3d at 1447. The Court reasoned that "if government employees cooperating in such investigations are left exposed to lawsuits filed by those under investigation, they might be reluctant to cooperate, even if they are eyewitnesses to improper conduct." *Id.* The *Mangold* court then extended this absolute immunity to civilians cooperating with official investigations. *Id.* at 1448-49.

Applying *Mangold* to the instant case, it is apparent that all

statements made by Lt. Col. Diaz during the two official Air National Guard investigations are absolutely privileged. *Id.* at 1447. Furthermore, Diaz's informal reports to fellow National Guard members should also be protected by absolute privilege. Official National Guard policy encourages National Guard soldiers and airmen to make informal complaints reporting sexual harassment prior to filing formal complaints. *See* Diaz 6/13/03 Reply to Elders's Opposition to Diaz's 4/10/03 Motion for Summary Judgment Exhibit 1, Page Declaration at 3-4, ¶¶ 12-14, incorporated herein by reference. Such informal complaints advance the critical National Guard imperative of preventing, identifying, and eliminating sexual harassment. *Id.* at 4, ¶ 15. All statements made by Lt. Col. Diaz accusing Lt. Col. Elders of sexual harassment are privileged under the law of defamation. The undisputed facts show that this lawsuit arises from military service and therefore, Lt. Col. Diaz is entitled to summary judgment on the ground of intramilitary immunity.

## B. Elders's Subpoenas For Witnesses And Documents Must Be Quashed

Finally, this Court should quash Elders's subpoenas requesting the United States to compel the appearance of Lt. Cols. Todd Wilkinson, Diane Kreinbrink, Majors James M. Mentges, Doris Maurer, and Felton Page, Chief, National Guard Directorate for EEO, at the May 4, 2005 hearing. Exhibit 1. This Court has yet to rule on whether the United States will be substituted as the sole party-

defendant in the instant case. Consequently, Elders must first comply with *United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 467 (1951) before demanding the appearance of the aforementioned individuals. Courts cannot compel federal employees to testify in contravention to an agency's regulations. *Id*. at 467.

The *Touhy* regulations which govern the production or disclosure of federal employee witnesses in a court proceeding are set forth at 28 C.F.R. § 16.21 *et seq*. Under the regulations, a witness may only be produced to testify if the United States Attorney's Office, in conjunction with the FBI, determines that the production of a witness is consistent with the considerations set forth at 28 C.F.R. § 16.26(a), including in relevant part, (1) whether the witness' testimony is appropriate under the rules of procedure; and (2) whether the testimony would violate substantive privilege laws. The regulations require that the party (or his counsel) subpoenaing the witness summarize the substance of the testimony sought in the form of an affidavit. *Id*. at § 16.23(c). Elders has not done such and the subpoena must be quashed. It does not even appear that Elders has made proper service on the individuals that he seeks to subpoena. Fed.R.Civ.P.45(b)(1).

Additionally, Elders's subpoena requesting the production of documents from Diaz and the MDANG fails to allow reasonable time to effect compliance and so should be quashed. Fed.R.Civ.P.45(c)(3)(A). Moreover, the documents sought may be

27

privileged, protected by the Privacy Act, and are not relevant to the nature of the Westfall Act May 4, 2005 proceeding.  The document request, *inter alia*, seeks materials ranging from complaints made by Diaz about retaliation to any document sent by Diaz to any elected official or Office of Inspector General about Elders or the MDANG.  Elders's document request even seeks an unredacted copy of a May 21, 2001 letter that Diaz wrote to a Colonel Walsh, a document that this Court denied Elders access to under the FOIA.  *See* 12/7/04 Order and Memorandum Opinion in *Elders v. MDANG, et al.*, Civ. No. MJG-03-3151.  The subpoena requesting production of documents should be quashed.

## IV.  <u>CONCLUSION</u>

Based upon the foregoing, the Defendant, Lieutenant Colonel Maria C. Diaz, requests that Elders's Amended Complaint be dismissed and summary judgment be granted in the Defendant's favor and the United States requests that Elders's subpoenas requesting

28

the production of witnesses and documents be quashed.

Respectfully submitted,

ALLEN F. LOUCKS
United States Attorney

By: _____/s/_____

TARRA DeSHIELDS
Assistant United States Attorney
General Bar No. 07749

Office of the United States Attorney
36 South Charles Street
Fourth Floor
Baltimore, Maryland  21201
(410) 209-4800

Counsel for Defendant Diaz and the
United States

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 28th day of April, 2005, a copy
of the foregoing Renewed Motion For Summary Judgment and Motion to
Quash was filed electronically, and so served upon, Mark S. Zaid,
Krieger & Zaid, PLLC, 1747 Pennsylvania Avenue, N.W., Suite 300,
Washington, D.C. 20006.

_____/s/_____

TARRA DeSHIELDS
Assistant United States Attorney