1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MARYLAND

3

4    KARL L. ELDERS,              )

5              Plaintiff         )

6              vs.               ) Case No.

7    MARIA C. DIAZ,              ) MJG-02-3892

8              Defendants.        )

9                   -    -    -    -    -

10          The deposition of MARIA C. DIAZ was taken

11   on Thursday, January 15, 2004, commencing at

12   10:05 a.m., at the offices of Heise Gorgenson &

13   Stefanelli, 18310 Montgomery Village Avenue,

14   Suite 400, Gaithersburg, Maryland, before Donna

15   M. Hall, Notary Public.

16

17                   -    -    -    -    -

18

19   **ELDERS v. DIAZ**

20   **Civil No. MJG-02-3892**

21   **Government Exhibit No. 3**

21

1    A.    No, I did not.

2    Q.    Okay.  Without trying to determine at

3    what point in time it occurred, who have you

4    discussed the airplane incident with?  By listing

5    the individuals, which people have you discussed

6    what you purport to have alleged happened to you

7    on the airplane in May of 2000?

8    A.    The only time I discussed this was when

9    Col. Inglis started the investigation.  No one

10   knows what happened other than the investigation.

11   Q.    Okay.  So and again what I might do at

12   times is repeat just to make sure I understand

13   what you are saying so that there is no confusing

14   and also make for a clearer record later on.

15        Prior to the time that you were

16   interviewed by Col. Inglis, you had never

17   discussed the allegations of what transpired on

18   the airplane with anyone, is that what you are

19   saying?

20   A.    That is what I'm saying.

21   Q.    Okay.  Now my understanding of the

38

1    in February about the incidents that he relates

2    you told him about which is some of what we just

3    talked about before.

4         Now you had indicated from how I

5    understood your responses to me, that when we

6    went through the incidents, you hadn't talked

7    about it to anyone until you met with Col.

8    Inglis.  So that's not entirely true, correct?

9         A.    This is true in the sense that I did not

10   talk to anybody.  Col. Willem is head of security

11   police.  And the reason I talked to him was

12   because I was feeling very uncomfortable and I

13   did not know how to handle the situation and that

14   is why I talked to him.  But he is the chief of

15   security police, at that time he was.

16        Q.    Okay.

17        A.    And he was active duty.

18        Q.    Okay.  And that's fine.  But I was not

19   searching for a distinction between what

20   circumstance a person was in or the reason why

21   that you talked to him.  And so listen very

41

1    spoken to him before that time about any of the

2    sexual harassment allegations?

3        A.    I don't recall.

4        Q.    What was the nature in which or the

5    circumstances in which you had this discussion

6    with Maj. Willem?

7            MS. DESHIELDS:  Objection.  What

8    discussion?

9            MR. ZAID:  The discussion referred to in

10   Maj. Willem's memorandum.

11           MS. DESHIELDS:  Of March 7, 2002?

12           MR. ZAID:  Correct.

13           THE WITNESS:  Can you repeat it?

14           MR. ZAID:  Sure.

15   BY MR. ZAID:

16       Q.    The conversation that Maj. Willem is

17   relating in this memorandum that you and he had

18   in February of 2002, what were the circumstances

19   of that discussion?  Why were you having that

20   discussion with him?

21       A.    I was on base and they were getting

43

1    in official Guard capacity, correct?

2        A.    Yes, I was.

3        Q.    Was there anyone else present during the

4    conversation besides the two of you?

5        A.    No, it was just us two.

6        Q.    And was Maj. Willem, I think you said he

7    was, but just clarify, was he on duty at the

8    time?

9        A.    To the best of my knowledge, he was.

10       Q.    Okay.

11       A.    He had a uniform on.

12       Q.    Okay.  And was this conversation since

13   you were I guess dealing with him from a medical

14   standpoint, correct, was this in your, I don't

15   know what your medical office is called, were you

16   engaged in a doctor-patient issue or were you in

17   the cafeteria or do you remember where the

18   conversation took place?

19       A.    It took place -- I can't -- it took

20   place in security.

21       Q.    So you had gone to his office?

44

1    A.   I had gone, it took place in security.

2  I don't know if it was his office or it was not

3  his office.

4    Q.   And do you recall whether did you decide

5  to go there to talk to him or you were there

6  again with respect to preparing him for

7  deployment?

8    A.   Not preparing him.  I was preparing

9  security for deployment, okay.  You are making it

10  sound like I was there for him.  I was there for

11  the security people, they were being deployed.

12    Q.   I'm not meaning that you were there only

13  for him.

14    A.   Please clarify that because it doesn't

15  sound right.

16    Q.   That's what I'm saying, if I say

17  something that you think is inaccurate, then

18  definitely clarify that for the record.

19    I'm referring that you not necessarily

20  went to base for him, you were doing whatever

21  else you were doing, but for purposes of the

45

1    conversation you had with him there, you were

2    functioning, as you say, in your medical capacity

3    with helping him prepare for deployment or no?

4    I'm trying to get to the nature of what --

5         A.   I'm repeating to you, I was preparing

6    security.  He was there, but I was not preparing

7    just him, I was preparing security.

8         Q.   I realize that.  But the --

9         A.   How many ways are you going to put it?

10   I mean, I don't want you to say I was there for

11   him because at no time was I there for him.  I

12   was there to prepare them for deployment.

13        Q.   Including him or no?  That's what I'm

14   asking, your reason for having a conversation

15   with him.

16        A.   But you are making it sound like I was

17   there for him.  It's including the whole

18   security.

19        Q.   I understand that's why you were at

20   security offices because the other members of

21   security that are there, you are doing whatever

46

1   you were doing, including meeting with Willem.

2   But the purpose of your meeting with Willem was

3   to prepare him for his deployment.

4           That's what I'm trying to clarify.  I'm

5   not saying you weren't there for everybody else.

6   I'm not saying you went to security only for

7   him.

8       A.   When you talk to me, it's making me feel

9   like I went there specifically to talk to him.

10      Q.   That's exactly what I'm saying you

11   didn't do.

12      A.   I did not do that.

13      Q.   That's exactly what I'm saying.

14      A.   I'm sorry.  If I'm just --

15      Q.   That's what I meant.  I'm in full

16   agreement with you on that.  Now is it your

17   understanding or do you know -- let me put it

18   this way.  Willem is a police officer, do you

19   know, in his civilian capacity?

20      A.   Yes, I do know that.

21      Q.   How long have you known Raul Willem?

47

1      A.   I don't recall.

2      Q.   Approximately?  Five years?  Ten years?

3      A.   I don't recall.  I guess -- I guess.

4      Q.   You have been in the Guard for how long?

5      A.   Since 1990.

6      Q.   Was he always in the Guard with you?

7      A.   He was in the clinic.

8      Q.   Okay.

9      A.   I don't know.  I don't know when he came

10     in.  I don't know how long he's been there.  I

11     was in the clinic and I was mainly just doing the

12     clinic functions.

13     Q.   Is Willem someone that you ever

14     socialized with outside of the base?

15     A.   No.

16     Q.   Okay.  Do you know any members of his

17     family?

18     A.   No.

19     Q.   Now when you had the conversation with

20     Willem, did he advise you to file a formal claim

21     or report of harassment?

48

1      A.   Yes, he did.

2      Q.   And when you had the conversation with

3   Willem, it was not for the purpose of reporting

4   Mr. Elders, correct?

5      A.   It was not -- what I needed was guidance

6   as to what to do.  I did not know what to do.  It

7   was very straining for me especially with

8   everything that was going down, going on with the

9   operations.  And I could not -- I did it because

10  he was chief of security police.

11     Q.   But now, as you said before though, you

12  didn't go for the purpose of talking to him.  It

13  was that he had asked you, as you said, that he

14  thought he noticed something that didn't seem

15  correct with you, right?  He had inquired from

16  you; is that correct?

17     A.   That is correct.

18     Q.   Now did you tell him not to tell anyone

19  what you had told him?

20     A.   I told him I was afraid to make any

21  formal complaints and I told him that I just

49

1    didn't know what to do.

2        Q.    Okay.  But did you tell him not to tell

3    anyone?

4        A.    I told him I was scared.

5        Q.    Okay.  I realize that.  And if there is

6    anything else you want to say that you told him,

7    that would be fine.  But --

8        A.    I told him that nobody would believe me.

9        Q.    Okay.  But did you tell him not to

10   repeat the allegations to anyone?

11       A.    I did tell him not to say anything.

12       Q.    Okay.  Do you recall did he advise you

13   to report it through your chain of command?

14       A.    Yes, he did.

15       Q.    Okay.  At that time who was your chain

16   of command?

17       A.    Col. Elders.  I reported to Col. Elders.

18       Q.    And how about going up through the

19   ranks, how would your chain of command have

20   worked?

21       A.    I believe then it would be Col. Elders,

61

1      Q.    Are there any individuals who you

2  socialize with in a civilian capacity?

3      A.    No, I don't.

4      Q.    No one at all?

5      A.    No one.

6      Q.    Outside of work?

7      A.    No one.

8      Q.    You don't go out to dinner with anyone?

9      A.    No, we do not.  My husband and I do not.

10     Q.    Or take vacations with anyone?

11     A.    We take vacations with the kids.

12     Q.    How about family members, do you have

13 siblings?

14     A.    I have one sister who is in Puerto Rico.

15     Q.    Are you close with her?

16     A.    Extremely close.

17     Q.    Have you at any time told her about any

18 of the incidents with Karl Elders?

19     A.    I told my sister about the incident

20 after the investigation was started.

21     Q.    And the investigation you are referring

62

1      to is Col. Inglis' investigation?

2          A.   Yes.

3          Q.   Okay.  So we're talking about March of

4      2002, thereabouts, I guess?

5          A.   I don't -- whatever date the

6      investigation of March, 2002.

7          Q.   Did you tell her at any time before

8      that, any contemporaneous discussion with her

9      about --

10         A.   No.

11         Q.   None at all?

12         A.   None at all.  None at all.

13         Q.   What is it that you told her?

14         A.   I told my sister that I had pressed

15     harassment charges against an officer and that

16     was it.

17         Q.   Did you discuss any of the details of

18     what the harassment allegations were?

19         A.   No, I did not.

20         Q.   And this was a telephone conversation?

21         A.   In my house.

63

 1      Q.   Personal?

 2      A.   In my house and in Spanish.

 3      Q.   I mean on the telephone though?

 4      A.   In my house --

 5      Q.   No, I realize that.

 6      A.   I'm telling you yes.

 7      Q.   That's what I'm saying.  When you say in

 8 your house, you're giving me the impression maybe

 9 you were having a conversation with her in your

10 house.

11      A.   It would have to be on the telephone.

12      Q.   I'm sorry.  Again, so when we go back

13 and read the record just to make sure.  It may

14 seem ridiculous as we sit here.  But just so we,

15 when we go back and read the record.

16          All right, telephone conversation with

17 her from your house.  Besides that one telephone

18 conversation, did you ever discuss it with her

19 after that?

20      A.   I discussed it with her when the Col.

21 Werts investigation started.

64

1   Q. Okay.  What is it that you told her?

2   A. That it was continuing.

3   Q. How about any other conversations with

4 her?

5   A. Other than to say that Col. Elders sued

6 me.

7   Q. Okay.

8   A. No other conversations.

9   Q. But, again, you are saying that you

10 never discussed any of the specific allegations

11 with her?

12   A. Before -- what you are saying is that

13 I -- the paper that I wrote down, no, I did not

14 discuss that with her.  No, I did not.

15   Q. Again, clarification, you didn't tell

16 her specifically about the airplane incident or

17 the office incident?

18   A. No incidents at all.

19   Q. Do you remember if you mentioned Elders

20 by name?

21   A. No.  I said officer.

65

1      Q.   Okay.

2      A.   I never mentioned him by name.

3      Q.   She is your only sibling?

4      A.   She's my only sibling.

5      Q.   How about your parents?

6      A.   My parents are both dead.

7      Q.   Are there any other family members who

8 you're close to?  Let me put it this way, are

9 there any other family members who you told about

10 the allegations or the existence of the

11 allegations?

12     A.   I told my aunt.

13     Q.   Okay.  Where does your aunt live?

14     A.   She lives in Puerto Rico.

15     Q.   When is it that you told your aunt?

16     A.   A week after telling my sister.

17     Q.   Okay.  And what do you recall that you

18 told her?

19     A.   The same things I told my sister.

20     Q.   Okay.  Just that there were these

21 allegations that were out there.  Were you

66

1    specific at all?

2        A.    No.

3        Q.    Okay.  Now have you ever told any of

4    your neighbors, your residential neighbors, of

5    the situation with Karl Elders?

6        A.    We have no neighbors.

7        Q.    Okay, no neighbors.  At the office have

8    you ever told anyone who lives or works around

9    the office about the allegations?

10       A.    No, I did not.

11       Q.    And you have a secretary or staff?

12       A.    I have a secretary.

13       Q.    What's that person's name?

14       A.    Mary Farlow.

15       Q.    Farlow?

16       A.    F-A-R-L-O-W.

17       Q.    Okay.  Was she your secretary back in

18    2000 to 2002?

19       A.    Yes.

20       Q.    And she works for you still?

21       A.    Yes.

67

1    Q.    Did you ever tell her about any of the

2    allegations?

3    A.    She found out because the sheriff

4    delivered the papers to my office and she thought

5    I was having a malpractice suit and I said this

6    was just problems that I had with the Guard.

7    Q.    Did you ever tell her any specific

8    issue, any specific information about what those

9    problems were?

10    A.    No.

11    Q.    Did she ever ask you about what was

12    going on?

13    A.    No.  As long as it wasn't a medical

14    malpractice case, she didn't -- she was not

15    involved.

16    Q.    So at no point in time you haven't

17    confided in her about anything to do with the

18    case or Karl Elders; is that correct?

19    A.    No, other than to set appointments up.

20    I mean, I have to, like today, she knows I'm not

21    in the office.  Other than that, no.

68

1      Q.    Other than obviously her possibly seeing

2  the paperwork, have you ever mentioned Karl

3  Elders to her?

4      A.    No.

5      Q.    Now at your private office, is it your

6  own office or do you have other physicians with

7  you?

8      A.    It's my own office.

9      Q.    Is it in a medical building,

10 professional building?

11     A.    It's a house.

12     Q.    It's a house.  The neighbors to that,

13 are they residential neighbors or work,

14 commercial neighbors?

15     A.    It's zoned commercial and residential.

16 I have both.

17     Q.    At any time did you discuss these

18 allegations or the issues with any of your work

19 neighbors?

20     A.    No, I did not.

21     Q.    Okay.  There was a time apparently where

69

1    you had a conversation with a neighbor about a

2    suspicious truck, do you remember that?

3        A.    That is correct.

4        Q.    And what were the circumstances about

5    that?

6        A.    She said the truck was sitting on the

7    side of the house and was watching me with

8    binoculars.

9        Q.    Did you see the truck or did just she

10    see the truck?

11        A.    I saw the truck, but I did not -- I did

12    not put two and two together.  She came and told

13    me afterwards when she was walking her dog next

14    to the truck.

15        Q.    Do you remember approximately when that

16    was?

17        A.    I don't remember.

18        Q.    Let me try --

19        A.    It was after -- I don't remember.

20        Q.    Let me try and put it in context.  Was

21    it before the investigation started or after, if

70

1  that helps?

2      A.   I want to say it was after the

3  investigation.

4      Q.   Okay.  And during that conversation with

5  her, did you at all tell her about that, hmm, I

6  wonder if this is connected to this issue I have

7  at work or anything like that?

8      A.   No, I did not.

9      Q.   You didn't give her any information?

10     A.   No.  My neighbor is, you know, how could

11  I put it to you.  I have a medical office, I just

12  go in there to see patients.  I don't go in there

13  and talk to neighbors.

14     Q.   Did you take any action with respect to

15  the truck?  Did you report it to anyone?

16     A.   I did report it.  I had to go back to

17  security police on base to report it.

18     Q.   So did you only report it to military

19  police?

20     A.   That is correct.

21     Q.   No civilian police?

71

1      A.    No.

2      Q.    And do you recall who you reported it

3    to?

4      A.    No, I don't recall.

5      Q.    That's fine.  Did you actually fill out

6    a report?

7      A.    Yes, I did.  It might be on that report.

8      Q.    Probably.

9      A.    You could get it from security police.

10     Q.    Do you have any knowledge as to whether

11   they actually investigated the incident?

12     A.    I don't know.

13     Q.    So you don't know if there was an

14   outcome?

15     A.    I do not know if there was an outcome.

16     Q.    Now at the hospital are there any

17   particular staff members who you are close to?

18     A.    No.

19     Q.    Are there any staff or other physicians

20   that you socialize with at all?

21     A.    No.

72

1    Q.    How about as far as when you will go to

2    lunch, would you typically go to lunch with

3    people at the hospital?

4    A.    I don't eat lunch.

5    Q.    You don't eat lunch, okay.    Cup of

6    coffee?  Anything?

7    A.    I'm not -- no.

8    Q.    At any point in time did you have any

9    conversations with anyone at Franklin Square

10   Hospital about the allegations?

11   A.    No, I did not.

12   Q.    Even in the sense of without mentioning

13   who it was that you said, did you ever tell

14   anyone that I was being harassed by someone?

15   A.    No, I did not.

16   Q.    Did you ever have any conversations with

17   anyone about Karl Elders?

18   A.    No, I did not.

19   Q.    Outside of Franklin Square Hospital, are

20   there any physicians that you would, say, go to a

21   medical conference with or anything like that,

73

1    anyone that you would consider that you are a

2    friend of, rather than just a colleague?

3        A.   No.

4        Q.   At any time you never went to a medical

5    conference and discussed the allegations with

6    them?

7        A.   No, I did not.

8        Q.   Now there came a point in time where you

9    did tell your husband, right?  I'm not asking you

10   to tell me what you said to him.

11       A.   Yes.

12       Q.   And do you recall approximately when you

13   first told him something?

14       A.   I told my husband after the

15   investigation was started with Col. Inglis.  I

16   did not mention anything and that was told in my

17   house.

18       Q.   So at no time before --

19       A.   No, I didn't.

20       Q.   Col. Inglis, this became more of a

21   public matter at the base, you never told him

74

1    about -- I'm sorry; I don't want to get into what

2    you told him.  Skip that.  Don't answer that

3    question.

4         A.    Thank you.

5         Q.    Besides the time you first told your

6    husband, were there any other times in which you

7    had conversations with him about the allegations?

8         A.    No, I did not.

9         Q.    So in the, gosh, we're almost at two

10   years now, a little less than two years, there

11   has only been that one conversation?

12        A.    After the investigation started, I told

13   my husband.

14        Q.    That's what I mean.  There has been more

15   than one conversation with your husband, right?

16        A.    That's private.

17        Q.    No, no.  I'm not asking you to tell me

18   what the discussion was.  That's protected

19   information.  I'm only talking about the number

20   of conversations that you had with him.  You did

21   have more than one conversation with him about

1    the allegations, right?  I'm not going to be

2    asking you what your conversations were, just the

3    number.

4        A.    And I'm not going to give you a number.

5        Q.    Okay.  Unfortunately you are required to

6    give me -- I don't need an exact number.  You can

7    just answer you've had more than one --

8            MS. DESHIELDS:  To the best of your

9    recollection, if you've had more -- just let me

10   interject.

11           MR. ZAID:  Sure.

12           MS. DESHIELDS:  If you've had more than

13   one discussion with your husband related to the

14   allegations and you can just approximate.

15           MR. ZAID:  That would be fine.

16           MS. DESHIELDS:  That's fine.

17           THE WITNESS:  Can I say numerous?

18   BY MR. ZAID:

19       Q.    That's fine.

20       A.    Is that what you want?  But I'm not

21   going to say numerous.  Is that what you want,

76

1    you want me just to be broad.

2        Q.    That's fine, yes.

3            MS. DESHIELDS:  If you can give a

4    number, fine.  If you can't give a number, then

5    you can -- if it was more than one --

6            THE WITNESS:  It was more than one.

7            MR. ZAID:  Okay.  That's fine.

8    BY MR. ZAID:

9        Q.    At any time of those conversations, was

10   there ever anyone present but you and your

11   husband?

12       A.    It was only my husband and I.

13       Q.    Do you have any knowledge as to whether

14   or not your husband has told anyone about your

15   conversations?

16       A.    No, he has not.

17            MR. ZAID:  Just bear with me for a

18   second and let me get these documents organized.

19            Let me have that marked as Number 3,

20   please.

21            (Diaz Deposition Exhibit Number 3 was

84

1    I can't recall, and the date, I can't recall.

2        Q.    Okay.    Mentges says on at least two or

3    three, quoting from the last sentence in

4    paragraph two, on at least two or three other

5    occasions Lt. Col. Diaz confided in me that Lt.

6    Col. Elders wants to "sleep with her" or "go to

7    bed with her."  Is that an accurate statement?

8        A.    That is a statement that was made in

9    his -- when he asked me, after he overheard the

10   conversation we went to his office and he asked

11   me what was that about and then I told him.

12       Q.    That it was your perception that Elders

13   wanted to sleep with you or go to bed with you?

14       A.    After they explained to me about the

15   window shopping, yes, that was my perception.

16       Q.    Okay.    What about the two or three other

17   occasions?

18            MS. DESHIELDS:   What about it?

19   BY MR. ZAID:

20       Q.    Were the two or three other occasions

21   before this Fall of 2001 conversation or after?

85

1      A.   I just remember this conversation

2  specifically.

3      Q.   So you don't recall any other instances

4  in which you told Mentges --

5      A.   I just remember this conversation.

6      Q.   The fact that he says there are at least

7  two or three other occasions, do you believe that

8  he might be wrong in that or, you know, you just

9  don't remember?

10      A.   I don't recall.

11      Q.   But you don't deny that you might have

12  told --

13      A.   No, I do deny that, but I don't recall

14  telling him that.  I know what I said and I said

15  that the day in question.

16      Q.   Okay.  That's fine.

17      A.   And you're asking me two other instances

18  and I do not recall because I don't remember

19  saying this.  But I do remember saying that that

20  day.

21      Q.   Okay.

86

1        A.    That's convoluted.

2        Q.    Yeah.  Because I don't recall is

3    different from that you deny ever saying it,

4    that's what I'm trying to get.  Because you've

5    just said two different answers.  If you want to

6    say I don't recall that I said that what he says

7    I said two out of three times is different from I

8    deny ever saying it more than that one time I

9    remember.

10        A.    Well, I'm going to have to then say I

11    deny saying it more than one time, yes.

12        Q.    Okay.  When you had that conversation

13    with Mentges and you told him that you believe

14    Elders wanted to sleep with you or go to bed with

15    you, was that just based on the red light, the

16    window shopping incident?

17        A.    That was based on my -- if you are

18    saying it's with Col. Mentges, it's based on

19    this, but it's also based on the -- it was based

20    also on the fact when he -- different

21    conversations I had had with Col. Elders.

87

1          Q.    Okay.   Did Maj. Mentges question you

2    about why it is that you think that Elders wants

3    to sleep with you?

4          A.    No, he did not and I left it at that.

5          Q.    So other than the window shopping

6    discussion or the comment about wanting to sleep

7    with you or go to bed with you, at that

8    conversation to the best of your recollection, do

9    you recall telling Mentges any other details?

10         A.    No, I did not.

11         Q.    Do you remember whether or not you told

12   Mentges in the context of that Col. Elders was

13   harassing you?

14         A.    No, I did not.   I just told him what's

15   there.

16         Q.    Okay.   Now jumping down to the final

17   paragraph, the first sentence of that says

18   within -- this is quoting from the document,

19   within the last three months and as recently as

20   this week, meaning March 8th, 2002, Lt. Col. Diaz

21   has commented to me several times that she is

88

1    uncomfortable when she is around Lt. Col.

2    Elders.

3         What were the conversations that you had

4    with Mentges regarding what he is stating there?

5         A.    The wrist incident.

6         Q.    Anything else?

7         A.    That's all.

8         Q.    Do you remember having several

9    conversations with Mentges where you discussed

10    your relationship with Karl Elders?

11         A.    I only told him about the wrist

12    incident.  Col. Elders isn't the only -- I mean,

13    we were having our meetings, we talked about the

14    meetings, and it was all Guard business there.

15         Q.    Do you have any understanding as to what

16    prompted Maj. Mentges to draft this memorandum?

17         A.    No, I do not.

18         Q.    Did you ever have any conversations with

19    Maj. Mentges after you were shown this memorandum

20    questioning him well why did you write that

21    memorandum?

89

1      A.    I did not have any conversations with

2   anybody after the investigation started.

3           MR. ZAID:  Bear with me a moment.

4           (Pause in the proceedings.)

5           MR. ZAID:  I'll tell you what we'll do.

6   I don't have copies, obviously, of the

7   unredacted, but let's put in just so we can make

8   this easy, let's mark this packet as Exhibit 4.

9           (DIAZ Deposition Exhibit Number 4 was

10  marked for identification.)

11  BY MR. ZAID:

12      Q.    Now you don't have to read through the

13  whole thing there.  What I've had marked as

14  Exhibit 4 are selected portions of the report of

15  investigation compiled by Col. Werts dated June

16  7th, 2002.

17          Now what I'm going to do now is have you

18  be able to use the unredacted version.

19      A.    Should I just put this here?

20      Q.    Yeah, you can just put that to the

21  side.  But for the record at least we'll have

1  that in there and we could supplement it if we

2  wanted.

3          Well, we're going to deal with that

4  however you want from a privacy standpoint, the

5  unredacted thing, but I want to work off of that

6  because that will obviously give you more

7  information.

8          If you look at page 177, and they're

9  marked in the upper left-hand corner.  And this

10  is Maj. Mentges' testimony given under oath to

11  Col. Werts.

12      A.    On 177?

13      Q.    Yeah.  So on 177 up towards the top,

14  Maj. Mentges is talking with Col. Werts about the

15  conversations he believes or recalls that you had

16  with him about whether Col. Elders wanted to

17  sleep with you or go to bed with you.

18          And he says that -- why don't you read

19  say up maybe to the halfway point actually where

20  he ends saying yeah, it was my office or private

21  setting.  Read from the top of the page to where

91

1  you get to that line.

2      A.   I don't actually see --

3      Q.   I'm sorry; did I say 177?

4      A.   Yes, you did.

5      Q.   178.  My apologies.  I do apologize.

6          MS. DESHIELDS:  All right.  Starting

7  from what line?

8          MR. ZAID:  From the top.  And then

9  you'll see as you get to about --

10          MS. DESHIELDS:  Where he says oh, I

11  don't know specifically?

12          MR. ZAID:  Correct.  And when you get to

13  the line that says yeah, it was my office, a

14  private setting.

15          THE WITNESS:  Oh, okay.  All right.  Now

16  I understand.

17          MR. ZAID:  Sorry about that.

18  BY MR. ZAID:

19      Q.   Now as you can see, Maj. Mentges is

20  indicating that the discussions happened between

21  that period of November of 2001 and January of

92

1    2002.  In reading Maj. Mentges' testimony, does

2    that refresh your recollection at all about those

3    conversations?

4        A.   I told you it was in his office from the

5    last one.

6        Q.   No, I'm talking about the several

7    conversations that he's saying you engaged in

8    with him?

9        A.   And I gave you an answer.

10       Q.   I realize that.

11       A.   It's the same answer.

12       Q.   That's fine.  These are things we do.

13   We have you read documents and see if after

14   reading that document does it change your

15   testimony at all because it's made you remember

16   something.  So you are saying it has not made you

17   remember any of the conversations, correct?

18       A.   I haven't.  Yeah, this is the first time

19   I'm seeing this.

20       Q.   I understand.  That's why you can take

21   as much time as you ever need to read this.

93

1          While you're doing that, and if you need

2    to read more, just let me know.  Why is it that

3    you were telling Mentges anything about the

4    situation you believe was occurring with Col.

5    Elders?

6          A.    Rephrase that.

7          Q.    Sure.  Why was it that you were having

8    any conversations with Mike Mentges about Karl

9    Elders and what you believed was occurring to you

10   with respect to sexual harassment allegations,

11   meaning other than work related and going and

12   saying something about something work related?

13         A.    I'm getting a little confused.  First

14   you asked me the question about where it

15   happened.

16         Q.    Right.

17         A.    And when.  And I told you it was the day

18   that they were talking.  Now you are asking me

19   why I was talking to him about --

20         Q.    I'm not talking about just that one

21   time.

94

1      A.    Okay.

2      Q.    Mike Mentges is saying you had numerous

3    conversations with him.

4      A.    And I'm telling you that what I repeated

5    was that I did tell him that time in the office.

6      Q.    I realize that.  But that's not the only

7    time you had conversations with Mentges about

8    these issues.  You had more than one conversation

9    with him, didn't you?

10     A.    But it was the issues with the wrist.

11     Q.    Only the wrist?

12     A.    And the fact that he wanted, and it's

13   written on my statement about coming over for the

14   OPR.  But other than that, I don't understand

15   what you are trying to ask me.  And everything is

16   documented.

17     Q.    Okay.

18     A.    So I don't -- or maybe I'm blocked and I

19   need time out.  Maybe that's it, but I don't

20   understand.

21     Q.    Why don't you turn to page 35 as

95

1   indicated in the upper right-hand corner of the

2   document.  Now this is part of your testimony

3   that you gave on April 18th, 2002.  Is that

4   correct?

5           MS. DESHIELDS:  Do you recognize this?

6           THE WITNESS:  This is the first time I

7   mean, other than not seeing it, I never got

8   this.

9           MS. DESHIELDS:  Look at the first page.

10  BY MR. ZAID:

11      Q.   The first page is 25.

12      A.   Okay.  All right.

13          MS. DESHIELDS:  Does that refresh your

14  recollection as to the statement?

15          THE WITNESS:  Yes.

16          MS. DESHIELDS:  You made that statement

17  on that date?

18          THE WITNESS:  Yes.

19  BY MR. ZAID:

20      Q.   Okay.  Now directing your attention to

21  page 35, which also has a page number eleven down

96

1    at the bottom left corner.

2         A.    Yes.  Yes, I see that.

3         Q.    If you look towards the bottom, maybe a

4    quarter of the page up, it's indicating that you

5    had told Col. Werts that the reason why you were

6    talking to Mike Mentges is that, this is the line

7    that begins with Buddy from England, that you're

8    friends and that you know his family.

9         A.    I don't know where that is.

10        Q.    If you need to read any portion before

11   or afterwards to put it into context, go right

12   ahead.

13        A.    I see it now.  Okay.

14        Q.    Now you were having these conversations

15   and telling Mike Mentges about the incidents that

16   you did tell him about because you're friends,

17   right?

18        A.    We are colleagues.  There is a

19   difference in what you are trying to say what

20   friends are here.  I was allowed to go to Brooks

21   Air Force Base with Col. Mentges.  There he had a

1    medical condition which we discovered and I

2    brought him back to Hopkins and he had a

3    procedure done.

4              In that course it turns out that there

5    is a genetic predisposition and it's in the

6    family.  So by friends in the sense of being the

7    physician, yes, I was the physician in charge.

8    But friends, and I believe this is the way you

9    are saying it, as going out together, no.

10        Q.   Well, have you ever socialized with

11   Mentges outside the base?

12        A.   No, I have not.  No, always at the

13   base.  And at that time it was a pretty dramatic

14   procedure.

15        Q.   Do you know Mike Mentges' wife?

16        A.   I talked to her on the phone.

17        Q.   Did you ever talk to her about Karl

18   Elders?

19        A.   Absolutely not.  The only conversations

20   we had were about Mike's condition or Col.

21   Mentges.

98

1       Q.   But when you talked to Mike Mentges

2    about the Amsterdam incident, about the wrist

3    incident, you were doing it in the nature of

4    because he was your, however you want to

5    determine it, friend and colleague, right?

6       A.   He was a colleague.

7       Q.   And --

8       A.   And I was doing it with the wrist.   I

9    did it because I was scared.

10      Q.   Is Mentges in your chain of command?

11      A.   Mentges is a senior officer.

12      Q.   Is he in your chain of command?

13      A.   No, he is not.

14      Q.   Okay.  And at the time you had these

15   conversations with Willem and Mentges, they were

16   both majors, correct?

17      A.   Yes, they were.

18      Q.   And you were, I presume, and still are,

19   a lieutenant colonel?

20      A.   Yes.

21      Q.   And at the time Karl Elders was a

1      Q.    So you didn't know that there were any

2  EEO officers?

3      A.    Medical -- when they have medical

4  doctors, their process of training is totally

5  different.  I do not recall being given any type

6  of training on sexual harassment or who to report

7  it to.

8      Q.    But outside of even the context of a

9  sexual harassment issue, if you had any sort of

10  problem with an individual --

11      A.    Where?

12      Q.    Within the Guard --

13      A.    Okay.

14      Q.    You certainly know, do you not, that you

15  don't go to lower ranking officers to complain

16  about higher ranking officers, correct?

17      A.    These weren't lower ranking officers.

18  They might be lower ranking, but they had command

19  positions.  These were not low ranking officers,

20  they both were in command.

21      Q.    Besides Mentges and Willem, did you ever

1    have any other conversations about your concerns

2    regarding Karl Elders before the Inglis

3    investigation started?

4         A.   No, I did not.

5         Q.   What about Todd Wilkinson?

6         A.   No, I did not.

7         Q.   Did you not have a conversation with him

8    regarding the fact that you were thinking about

9    confronting Karl Elders about what you perceived

10   was occurring?

11            MS. DESHIELDS:  The him that you are

12   referencing is who?

13            MR. ZAID:  Wilkinson.

14            THE WITNESS:  No, I don't remember

15   that.  I'm afraid of Karl Elders.  Why would I

16   confront him?

17   BY MR. ZAID:

18        Q.   Now I've handed you a document dated

19   December 28th, 2001.

20        A.   Yes.

21        Q.   Do you recall or recognize that

103

1    document?

2        A.    Yes, I do recall this.

3        Q.    Okay.  And that, as I understand it, was

4    an incident where you were called in to deal with

5    a landing gear mishap?

6        A.    That is correct.

7        Q.    And I guess medically check out the

8    crew?

9        A.    That is correct.

10       Q.    Do you remember that day?  Or I don't

11   know if it was night or day, but do you remember

12   that event sitting here today?

13       A.    I remember the event.

14            MR. ZAID:  Okay.  We'll couple that with

15   this.

16            (DIAZ Deposition Exhibit Number 5 was

17   marked for identification.)

18   BY MR. ZAID:

19       Q.    I've had that document now marked as

20   part of Exhibit Number 5, along with the sworn

21   declaration of Gary Bernard dated May 17th,

114

1      Q.   Are you denying that -- I'm sorry, let

2  me rephrase it.  Are you indicating that Todd

3  Wilkinson's statement is not true in that he says

4  you spoke to him about what happened at the

5  Christmas party and that you were going to

6  confront Lt. Col. Elders?

7      A.   First of all, I never said I was going

8  to confront Lt. Col. Elders.  And, secondly, I

9  did not talk -- I talked to only Maj. Mentges and

10  Maj. Willem.

11     Q.   Okay.  So if you look at --

12     A.   I answered it.

13     Q.   What it says in paragraph three is not

14  true then, right?

15     A.   I never said I was going to confront

16  him.

17     Q.   Have you ever had at any time any

18  conversations with Todd Wilkinson regarding Karl

19  Elders and these allegations, that's up to today

20  in time?

21     A.   No one -- I mean, the wrist incident,

1    yes, after the investigation started.  That was

2    the only thing.  Otherwise no, no other

3    conversations.

4        Q.    I'm sorry, the reason why I keep

5    thumbing through papers is because some of the

6    pages did not copy.  Could I have the book,

7    please, just for one second?  And we'll go back.

8    I'm sorry.  The copy machine apparently was not

9    picking up all of the pages.

10       A.    Can I clarify something?

11       Q.    Sure.

12       A.    I said and I want to make sure it's

13   clarified, I said investigation.  I should say

14   lawsuit, not investigation.  If you could clarify

15   that.

16       Q.    And what you are referring to, just

17   again for the record, that you had not spoken to

18   Todd Wilkinson?

19       A.    Correct.

20       Q.    Until the lawsuit was filed?

21       A.    Until after it was filed, yes.  And it

118

1   should go talk to Warren Thomas or John Inglis or

2   General Beasley or anyone?

3        A.    They only said I should report it.

4        Q.    Now have you ever been to Mike Mentges'

5   house?

6        A.    No.

7        Q.    Personal home?

8        A.    No, I've never been there.

9             MR. ZAID:   Okay.  Let's mark this as 7.

10            (DIAZ Deposition Exhibit Number 7 was

11   marked for identification.)

12   BY MR. ZAID:

13        Q.    Now I handed to you what is now marked

14   as Plaintiff 7, is your declaration submitted as

15   part of this case, is it not?

16        A.    Yes.

17        Q.    Now if you could turn to the second

18   page, is that your signature?

19        A.    Yes.

20        Q.    And in paragraph four, you indicate that

21   in or about February of 2002, you had

119

1    conversations with fellow Maryland Air National

2    Guard officers in which I raised my concern that

3    Lt. Col. Elders was sexually harassing me.

4    Besides Mike Mentges and Raul Willem, are you

5    referring to any other individuals?

6        A.    No, only those two.

7        Q.    Would you say it is true, though, that

8    that is a somewhat incomplete statement in that

9    you had had conversations with at least Mentges

10   before February of 2002, it's not limited to just

11   February of 2002.  Would that be fair to say?

12       A.    I don't recall whether it was January or

13   February.  I would say February.

14       Q.    Well, he had said in the --

15       A.    I mean, the dates are so, it could

16   have -- on or about February 2.

17       Q.    I'm going to turn back and if you don't

18   mind sort of stand up over you, unfortunately my

19   pages didn't copy.  All right.  I'm referring

20   still to your testimony of April 18th, 2002,

21   before Col. Werts.

1    he showed you the Willem memo, he showed you the

2    Mentges memo, correct?

3        A.    Correct.

4        Q.    Had you had any conversations with

5    either Mentges or Willem about the fact that

6    Inglis was going to talk to you?

7        A.    No, I did not.

8        Q.    How about with respect to Thomas or

9    Wilkinson?

10        A.    No.

11        Q.    Okay.  Before you testified the first

12    time before Col. Werts, did you talk to Willem,

13    Mentges, Thomas or Wilkinson about your

14    testimony, your forthcoming testimony?

15        A.    I don't understand that.  Like they knew

16    I was on base.

17        Q.    Right.

18        A.    But I did not specifically go and say

19    I'm going to be on base this and this date.  They

20    knew there was an investigation going on and they

21    saw me going to state headquarters.

127

1      Q.    Did you have any substantive

2   conversations with them about what questions

3   might have been discussed?

4      A.    Before?

5      Q.    Correct.  What questions maybe would

6   come up?

7      A.    No, I did not.

8      Q.    What answers perhaps would be given?

9      A.    No, I did not.

10     Q.    Okay.  How about with respect to your

11  second interview with Col. Werts, which was, I

12  believe, in May, 2002.  I think it was a two week

13  period, April 18th to May 3rd, 2002, did you have

14  any --

15     A.    No, I didn't.

16     Q.    I'm sorry, I've got to finish the

17  question for the record.

18     A.    I'm sorry.

19     Q.    That's okay.  Did you have any

20  substantive conversations with Willem, Mentges,

21  Wilkinson, or Thomas about what questions would

128

1   perhaps be asked and answers that would be given?

2       A.   We were told not to discuss the

3   investigation.

4       Q.   Okay.  Now you've also been interviewed

5   by Col. Scott Hines of the Air Force IG's office,

6   correct?

7       A.   That is correct.

8       Q.   And that, without asking you what he

9   told you, in the interview or interviews, you did

10  discuss the sexual harassment allegations, did

11  you not?

12      A.   I can't discuss those investigations.

13      Q.   Actually you can't discuss what he told

14  you?

15      A.   I'm not going to open myself to that one

16  because I don't know the law too well and I was

17  told not to discuss whatever Col. Hines said.  Do

18  you know the military?

19      Q.   That's okay.

20      A.   I don't know.

21      Q.   That's okay.  That's okay.  Don't worry

135

1          THE WITNESS:  No, I was not aware.

2     BY MR. ZAID:

3          Q.   Okay.  That's fine.  Because you were

4     not having any relationship with Mentges other

5     than the professional one, that's true, right?

6          A.   That is correct.

7          Q.   What about with Warren Thomas?

8          A.   Professional.

9          Q.   Now when you work sometimes with Thomas'

10    wife, is that at the hospital or you just happen

11    to share some patients?

12         A.   One patient.

13         Q.   Okay.  Does that require you to talk to

14    her?

15         A.   Give orders for the patient, the patient

16    passed away.

17         Q.   Oh, I'm sorry.

18         A.   Yes.

19         Q.   Have you ever had any conversations with

20    Debbie Gregory about Karl Elders and one or more

21    of these alleged incidents?

136

1      A.   That's incorrect.

2      Q.   I'm saying if you had.

3      A.   No.

4      Q.   I'm not saying you have.  So you never

5   have?

6      A.   No.

7      Q.   Okay.  At any time did you solicit her

8   support for allegations against Karl Elders?

9      A.   I did not solicit her support.

10     Q.   Have you ever had any conversations with

11  Dave Rein about Karl Elders and one or more of

12  these incidents?

13     A.   That is incorrect, I've never had

14  conversations with Dave Rein.

15     Q.   Actually you don't have to say it's

16  incorrect.  I'm not saying that you did.  Just so

17  it's clear on the record.

18     A.   I have to clarify that, no.

19     Q.   That's fine.  Okay.  Have you ever had

20  any conversations with Michael Lunt about Elders

21  and one or more of these alleged incidents?

 1       A.   No.

 2       Q.   Now at any time were you aware that

 3  Thomas had provided Elders with a letter of

 4  counseling in 2001?

 5            MS. DESHIELDS:  Objection.

 6            THE WITNESS:  No, I was not aware.

 7  BY MR. ZAID:

 8       Q.   Now did you ever participate in any

 9  conversations with anyone about a plan to get

10  Elders fired from the Guard?

11       A.   That is incorrect.  I mean, no, I did

12  not.

13       Q.   Did anyone ever ask you to participate

14  in a plan to have Elders relieved from command?

15       A.   No.

16       Q.   Are you aware as to whether anyone else,

17  not saying at your request or anything, anyone

18  else going around and asking other women to

19  participate in a plan to have Elders removed from

20  command?

21       A.   No.

138

1      Q.   Did you ever have any conversations with

2   Kristin Brawley about a plan to get Elders

3   removed from command?

4          MS. DESHIELDS:  Objection, she's asked

5   and answered.

6          THE WITNESS:  No.

7   BY MR. ZAID:

8      Q.   Did you ever have any type of

9   conversation with Kristin Brawley about asking

10   her to choose sides?

11      A.   No.

12      Q.   Were you ever asked by anyone to choose

13   sides regarding Karl Elders?

14          MS. DESHIELDS:  Objection.

15          THE WITNESS:  Col. Elders asked me, that

16   at one point I would have to choose sides.

17   BY MR. ZAID:

18      Q.   And what was that?

19      A.   Not asked me.  It was during the

20   facilitator meetings and it was not a direct ask,

21   it was -- how can you say.

140

1              THE WITNESS:  Okay.

2    BY MR. ZAID:

3        Q.    Do you know as to whether any other

4    women in the Guard were asked to choose sides

5    regarding the Elders situation?

6              MS. DESHIELDS:  Objection.

7              THE WITNESS:  No, I don't.

8    BY MR. ZAID:

9        Q.    Are you aware of Mentges, Wilkinson, or

10   Thomas asking any unit members to participate in

11   a plan to remove Elders from command?

12             MS. DESHIELDS:  Objection, she's asked

13   and answered that.

14             THE WITNESS:  (Shaking head.)

15   BY MR. ZAID:

16       Q.    I'm sorry, you've just got to verbalize

17   it.

18       A.    No.  No.

19       Q.    There is a reason why counsel is

20   objecting and I understand that I sometimes still

21   need to reask the questions in a specific way.

141

1    Also, sometimes I have the same question written

2    down twice that I'm not paying attention to, so

3    it happens.

4           Other than Mentges and Willem, did

5    anyone else encourage you to file a complaint

6    against Karl Elders?

7        A.   I did not speak to anybody else.

8        Q.   Have you ever had a conversation with

9    Dee Maurer concerning Karl Elders and the sexual

10   harassment allegations?

11       A.   The only time was after the

12   investigation.

13       Q.   And when was that?

14       A.   I did not -- Col. Inglis' investigation

15   was in March.  I would have to say about March,

16   after the investigation.

17       Q.   And where was the conversation?

18       A.   It was on base.

19       Q.   What was said in the conversation?

20       A.   That she had been called in to talk to

21   Col. Inglis.

142

1      Q.   And did she say anything else?

2      A.   And that was the basic gist of it.

3      Q.   Did she tell you -- did she verbalize to

4 you any of what her concerns were about Karl

5 Elders, in the sense did she tell you her story,

6 her version of the events?

7      A.   Not really.  She did not talk to me

8 about that.  She just wanted to let me know that

9 she had gone in to see Col. Inglis.

10     Q.   And did you tell anything specific about

11 the allegations that you had indicated had

12 happened to you?

13     A.   No, I did not.

14     Q.   Do you have any knowledge as to what

15 prompted Dee Maurer to have spoken to Col.

16 Inglis?

17     A.   No.

18     Q.   Is Dee Maurer -- let me put it this

19 way.  Do you ever see Dee Maurer outside of the

20 base?

21     A.   No.

144

1  A. I don't remember that.

2  Q. Now when you had that conversation with

3 Dee Maurer, had she sought you out or did you

4 seek her out?

5  A. I don't recall.

6  Q. Did you ever tell Master Sgt. Doug

7 Neilson about the allegations concerning Karl

8 Elders?

9  A. Not the allegations.

10  Q. What did you have a conversation with

11 him about?

12  A. It was after the investigations and he

13 had asked what was going on and I said there was,

14 that I had reported sexual harassment.

15  Q. And who was Doug Neilson?

16  A. He's a master sergeant.  He's a load

17 master.

18  Q. And what was the reason for you having

19 conversation with him?

20  A. About that time the Daily Record had

21 come out and it was circulating around

145

1    operations, that's how it came out.

2         Q.    And did he approach you and ask you

3    about it?

4         A.    I had a lot of people approaching me and

5    asking me about it because of that.

6         Q.    And people were, what, coming up saying

7    hey, I saw the article or I heard this story from

8    someone?

9         A.    Yes.  Someone put it in my in box and

10   there had been numerous placed in different in

11   boxes.

12        Q.    Somebody had actually put the story in

13   people's mailboxes?

14        A.    Yes.

15        Q.    And when people would ask you about what

16   was going on, what would you typically tell them?

17        A.    I had pressed sexual harassment charges

18   and I cannot speak about it.

19        Q.    Did you ever give them any of the

20   details about the allegations?

21        A.    No.

196

1        Q.    And besides the one time that you had

2    talked about earlier, were there any

3    conversations that you ever had with Dee Maurer

4    about the litigation?

5        A.    The only conversation we had was that we

6    wanted a copy of the investigation and they

7    denied us that copy.  That was the only

8    conversations we had.

9        Q.    They shouldn't have.

10       A.    Well, they denied both of us.  All I

11   wanted was the excerpts of what I said and she

12   just wanted what she said and it was denied.

13       Q.    Under different circumstances I would

14   say I'd represent you.

15       A.    I don't want you to.

16       Q.    You had a legal entitlement to get your

17   copies, but that's another day.

18            So between and those times that you

19   spoke to her, what you are saying is you

20   developed a friendship strong enough that you

21   wanted to host a party for her and invite others

282

1    Col. Elders' conduct to Cols. Willem and Mentges?

2       A.   Yes.

3       Q.   Now you indicated that your sister lives

4    in Puerto Rico presently, correct?

5       A.   Correct.

6       Q.   When you spoke to her about the fact

7    that you pressed allegations of sexual harassment

8    against a member of the Guard, was she still then

9    living in Puerto Rico?

10       A.   She was still in Puerto Rico.

11       Q.   What language was that conversation

12    conducted in?

13       A.   Spanish.

14       Q.   Did you ever identify the guardsman

15    against whom you had pressed sexual harassment

16    charges to your sister?

17       A.   No.

18       Q.   Does your sister know Col. Elders at

19    all?

20       A.   No.

21       Q.   Does she have any contacts with anyone

283

1    in Maryland?

2        A.    No, other than myself and my children

3    and my husband.

4        Q.    And you also expressed that you had a

5    conversation with your aunt in which you also

6    told her that you had pressed sexual harassment

7    charges against someone in the Guard; is that

8    correct?

9        A.    That is correct.

10       Q.    Why did you tell your aunt?

11       A.    My aunt is now my mother since my mother

12   passed away, and that's why I told her.

13       Q.    Why did you tell your sister?

14       A.    My sister in my confidante.  She is not

15   only my sister, she is my friend.

16       Q.    The conversation with your aunt, in what

17   language did that occur?

18       A.    Spanish.

19       Q.    Where does your aunt reside?

20       A.    Puerto Rico.

21       Q.    Did she reside in Puerto Rico when you

284

1    had the conversation with her about pressing

2    sexual harassment charges with somebody in the

3    Guard?

4         A.    Yes.

5         Q.    Did you ever mention Col. Elders' name

6    in connection with the sexual harassment charges?

7         A.    I did not mention his name.

8         Q.    Does she know Col. Elders?

9         A.    No.

10        Q.    Did she have any contacts with anyone in

11   Maryland?

12        A.    Only family.

13        Q.    Only family contacts?

14        A.    Only family contacts.  She has never

15   visited the State of Maryland.

16        Q.    You were also asked about a conversation

17   with an individual by the name of Mike Vichich,

18   do you recall that, Mr. Zaid asking you?

19        A.    Yes, I do recall him asking me.

20        Q.    He asked you whether you knew or did you

21   have any idea of how Vichich learned of the

285

1    allegations relative to Col. Elders' conduct,

2    correct?  Do you recall that question?

3        A.    Yes.

4        Q.    Do you recall when it was that the

5    article in the Daily Record appeared?

6        A.    It was right after I received the

7    lawsuit.  I received the lawsuit in my office

8    October 2nd, and I first saw it at the Guard in

9    my mailbox.

10       Q.    Did members of the Guard know about that

11   newspaper article?

12       A.    They, when I looked at the other

13   mailboxes, all of the mailboxes had the paper in

14   there.  So I would imagine that they knew and

15   obviously Maj. Falter and Col. Robbins didn't

16   help by making it a laughing matter and

17   projecting it in a loud voice and in an open

18   area.

19       Q.    I have no further questions.

20            MR. ZAID:  Just a few follow-up.

21                        EXAMINATION