# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KARL L. ELDERS       *

       Plaintiff,       *

       v.       *      Case No. MJG-02-3892

MARIA C. DIAZ       *

       Defendant.       *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT REGARDING THE GOVERNMENT'S CERTIFICATION ON SCOPE OF EMPLOYEMNT

In accordance with subsections (b) and (c) of Rule 56 of the Federal Rules of Civil Procedure and Local Rule 105.1, the plaintiff, Karl L. Elders, by his undersigned counsel, hereby moves the Court to issue an Order granting his Motion for Summary Judgment. The bases supportive of the Motion are set forth in the attached memorandum. A proposed Order accompanies this Motion.

Date:   July 13, 2005

                     Respectfully submitted,

                           /s/
                     _____
                     Mark S. Zaid, Esq.
                     Federal Bar #023887
                     Krieger & Zaid, PLLC
                     1920 N Street, N.W.
                     Suite 300
                     Washington, D.C.  20036
                     (202) 454-2809
                     (202) 293-4827 fax
                     E-mail: ZaidMS@aol.com

                     ATTORNEY FOR PLAINTIFF

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KARL L. ELDERS                          *
                                        *
        Plaintiff,                      *
                                        *
        v.                              *        Case No. MJG-02-3892
                                        *
MARIA C. DIAZ                           *
                                        *
        Defendant.                      *
                                        *
*     *     *     *     *     *     *     *     *     *     *     *     *

## TABLE OF CONTENTS

FACTUAL BACKGROUND . . . . . . . . 3

PROCEDURAL BACKGROUND . . . . . . . 5

ARGUMENT . . . . . . . . . . . 7

I.   ELDERS' CLAIMS ARE COGNIZABLE BECAUSE DIAZ WAS NEVER
     A FEDERAL EMPLOYEE AND, EVEN IF SO, ACTED OUTSIDE OF
     HER SCOPE OF EMPLOYMENT THEREBY RENDERING HER,
     AND NOT THE UNITED STATES, AS THE PROPER DEFENDANT
     SUBJECT TO LIABILITY . . . . . . . . 8

     A.  The United States Attorney's Certification Is Inadequate To Justify
         Substitution Absent Submission Of Additional Supporting Evidence     9

     B.  Diaz Was Not A Federal Employee At The Time She Made Her
         Defamatory Statements . . . . . . . 12

     C.  Even If Diaz Was A Federal Employee For Purposes Of The FTCA She
         Was Not Acting In The Scope Of Her Employment When She Spread
         Her Defamatory Statements To Certain Members Of The Maryland
         Air National Guard . . . . . . . 16

         1.  Diaz Admitted She Never Filed An Informal Or Formal Complaint
             Regarding Her Allegations Of Sexual Harassment . . 21

         2.  Because Diaz Was Or Should Have Been Fully Aware Of The
             Available Procedures To File Sexual Harassment Complaints
             And Intentionally Failed To Utilize Them, Her Deliberate
             Third-Party Discussions Fall Outside Her Scope Of Employment     22

         3.  Diaz's Defamatory Statements Were Made For Purely Personal

Reasons And Not To Serve The Mission Of The MD ANG    .    26

4.  The Need To Maintain Military Order And Discipline Overrides
    Any Policy Consideration That Diaz's Statements Could Be
    Considered As Made Within The Scope Of Her Employment    .    27

CONCLUSION    .    .    .    .    .    .    .    .    30

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| KARL L. ELDERS | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *    Case No. MJG-02-3892 |
| | * |
| MARIA C. DIAZ | * |
| | * |
| Defendant. | * |
| | * |

\* \* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT REGARDING THE GOVERNMENT'S CERTIFICATION ON SCOPE OF EMPLOYEMNT

### (ORAL ARGUMENTS REQUESTED)

Plaintiff Karl L. Elders  ("Elders"), in his private capacity, brought defamation and false light claims under the laws of the State of Maryland against defendant Maria C. Diaz ("Diaz"), who was named in her private capacity. Rather than substantively respond to the claims, Diaz instead sought the protection of the United States Government, not to truthfully defend her actions against what she might perceive as false allegations but simply to hide behind a cloak of immunity.

The United States Government, through the U.S. Attorney for the District of Maryland, has sought to intervene in this matter and has claimed that Diaz was acting within her scope of employment with the Maryland Air National Guard ("MD ANG") when she uttered the defamatory statements. If the Government is correct, then this case admittedly must be dismissed.

However, Diaz was never a federal employee during the relevant period of time in which her comments were made. It is well-settled law that National Guard military members are state employees, not federal, except in certain circumstances that are not applicable here. Thus, the Federal Tort Claims Act does not apply, and the U.S.

Attorney's certification is immaterial. The U.S. Government simply has no standing in this case.

Moreover, even were Diaz to be considered a federal employee, her comments were made outside of the scope of her employment as her actions were contrary to the mission, rules and regulations that govern the MD ANG. The need to preserve good military order and discipline and the chain of command structure is paramount, and overrides any notion that Diaz's actions would hinder or harm the objectives of the Equal Employment Opportunity ("EEO") system. That these principles are taken seriously is beyond dispute. Officers can be harshly disciplined for spreading even the slightest criticism of superiors, especially when the statements are made to those subordinate in rank. Even what most people consider as sacred Constitutional rights, such as those afforded under the First Amendment through Freedom of Speech and Religion, can fall by the wayside when it comes to the need for the military to preserve and uphold its unique system of strict adherence to the rules.

At this legal juncture this case is not about sexual harassment. It is not about defamation. Indeed, the veracity of the specific statements at issue is irrelevant. In spreading defamatory accusations against Elders, Diaz operated outside of the system. She did so intentionally, with deliberation and with malice. She did so in violation of numerous military regulations and policies. She did so outside of the scope of her employment.

Both the law that governs this action and the facts that surround it support a denial of the Government's certification, and Elders' lawsuit should be permitted to proceed forward as the run of the mill defamation case that it is.

## **FACTUAL BACKGROUND**

During the relevant period of time both Diaz and Elders were traditional guardsmen (i.e., weekend warriors) with the MD ANG. [1] Elders left the MD ANG in 2003, and Diaz remains a member. At the time the defamatory comments presumably began to be spread by Diaz, Elders was serving as the Squadron Commander of the 135th Tactical Airlift Squadron, and Diaz was the flight surgeon.

Since at least Fall 2001, Diaz has been falsely telling third parties that Elders sexually harassed and assaulted her. See First Amended Complaint at ¶¶6-7 (filed March 3, 2003)("FAC"). Her false statements have been primarily made to fellow National Guardsmen, id. at ¶8. [2] However, although Diaz was intentionally spreading these false rumors, she never complained to superior officers, EEO representatives or anyone with the authority to resolve her alleged problems with Elders. Nor did ever she seek to file a sexual harassment complaint, whether informal or formal, concerning Elders' alleged conduct until others exercised their own discretion and complained on her behalf. Id. at ¶12.

On or about March 15, 2002, Elders was relieved of command of his Squadron,

---

[1] The National Guard is the original military of the United States. The Constitution empowers Congress "to provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of Training the Militia according to the discipline prescribed by Congress." U.S. Const. art. 1, 8, cl. 15,16. The National Defense Act of 1916 materially altered the status of the militias by creating the National Guard. Essentially, it "federalized" the state militias in certain respects. "The Guard is thus the successor to the State militias, but it is now a hybrid state-federal organization, for the Governor remains in charge of the National Guard in each state except when the Guard is called into active federal service." Holdiness v. Stroud, 808 F.2d 417, 420 (5th Cir. 1987). For a history of the National Guard and the Maryland National Guard, see Estate of Burris v. State, 360 Md. 721, 759 A.2d 802 (Md. 2000).

[2] Diaz also acknowledged telling her spouse and other family members. She denied telling any friends on the basis that she had none and never socialized with anyone outside of her family. See Deposition of Maria C. Diaz at 60-61 (January 15, 2004)("Diaz Depo"), attached at Exhibit "1".

removed from flying status, and restricted from classified information and full participation in an organization that he had served faithfully for the preceding 12 years. This action was primarily taken on the basis of two hearsay memorandums signed by Major James M. Mentges ("Mentges") and Major Raul Q. Willem ("Willem"), which were based on false statements made to them by Diaz over a period of months.[3] <u>See</u> Exhibit "2". Both Mentges and Willem were subordinate in rank to Diaz and have never fallen within her military chain of command. <u>Id</u>. at ¶8.

The stories provided to Mentges and Willem by Diaz were never intended to serve as any type of complaint of sexual harassment. The conversations were nothing more than discussions among friends and buddies. <u>Id</u>. At no time did she ever request either Mentges or Willem to act upon her allegations. Indeed, she directed them not to do anything.

Following the actions of Mentges and Willem, the MD ANG launched a Command Directed Inquiry into the allegations. Colonel John Inglis ("Inglis"), who was Elders' immediate superior, was assigned to handle the investigation in violation of regulation. <u>Id.</u> at ¶15. Inglis, however, did little more than undertake a sham investigation involving a select few people who intentionally and knowingly repeated the false allegations in order to harm Elders. <u>See</u> Defendant Maria C. Diaz's Motion for Summary Judgment, Exhibit "4" (filed April 10, 2003)("Def's 2003 Memo"). Inglis would not even inform Elders of the specific allegations against him. Based on nothing more than a few statements, Inglis concluded the allegations were substantiated. <u>Id</u>. However, before a legal review was conducted and the report was finalized, the MD ANG leadership intervened and assigned

---

[3] Mentges and Willem were subsequently promoted to Lieutenant Colonels. However, at all times relevant to this litigation, they were Majors and will be referred to in that vein. The same applies to Todd Wilkinson.

an independent investigator, Colonel Arthur Werts ("Werts") from the New Jersey National Guard, to conduct a full and unbiased investigation. See FAC at ¶15.

Over the course of several weeks, Werts interviewed or took sworn statements from eighteen witnesses (including those interviewed by Inglis), and obtained documentary and audio evidence. A final report was completed in June 2002, and in July 2002, Elders was notified that the investigation concluded that Diaz's sexual harassment claims were unsubstantiated. Yet, Elders was not returned to his former position of leadership, and was, instead, reassigned because of the "ill feelings" that the allegations had created.

Although he was "essentially" cleared of any wrongdoing, Elders continued to suffer the vindictive wrath of Diaz, particularly through her continued efforts to tell third parties about the fabricated events. Id. at ¶¶8-10. Even worse, third parties repeated the allegations first made by Diaz and the rumors swelled to such a degree that it was being said by some that Elders committed rape and/or sodomy; a statement that is not only untrue but was never even alleged by Diaz. Id. at ¶17. Eventually, as a direct result of Diaz's actions, Elders left the MD ANG in March 2003, after more than a decade of service.

## PROCEDURAL BACKGROUND

This case was filed on October 25, 2002, in the Circuit Court for Baltimore County. Diaz was properly served with the Summons and Complaint on October 31, 2002. Pursuant to 28 U.S.C. § 2679, the United States Government removed Elders' lawsuit from state court to this Court on November 29, 2002. Additionally, because the Government alleged that Diaz was acting in the scope of employment, it simultaneously sought to substitute the United States for Diaz as the defendant. See Notice of Removal and Motion for Substitution (filed Nov. 29, 2002).

On December 9, 2002, Elders filed an Opposition to the Government's Motion challenging the substitution. See Plaintiff's Opposition to Defendant's Notice of Removal and Motion for Substitution (dated Dec. 7, 2002). Elders noted that before this

5

Court should comply with the Government's request, he was entitled to challenge the Government's certification regarding scope of employment through discovery. Diaz replied with a motion to dismiss Elders' claims altogether. See Motion of Defendant Maria Diaz to Dismiss (filed Dec. 16, 2002).

Following the briefing of these Motions, by Order dated February 12, 2003, this Court denied Diaz and the Government's two pending Motions and instructed Elders to file an Amended Complaint. See Order (dated February 12, 2003). Furthermore, the Court explicitly instructed the Government that any "certification as to the scope of employment must address the specific actions alleged by the Plaintiff to be tortious." Id.

Based on the information available to him at the time, Elders filed a First Amended Complaint on March 3, 2003. In response, before any discovery had been undertaken, the Government, on behalf of Diaz, filed a Motion for Summary Judgment on April 10, 2003.[4] By Memorandum and Order dated November 4, 2003, this Court denied Diaz's Motion to Dismiss and the Government's Motion to Substitute Defendant. The Court granted Elders the right to pursue discovery on the question of scope of employment, and directed him to submit a proposed discovery plan. After consideration of the discovery plan, the Court permitted Elders to only take Diaz's deposition on the issue of scope of employment. The deposition was conducted on January 15, 2004.

After several consultations with the Court, a scheduling order was issued on March 15, 2005, that set May 4, 2005, for an evidentiary hearing on the issue of scope of employment. On April 25, 2005, Elders served the U.S. Attorney's Office with several subpoenas for documents and witness testimony in order to ensure certain information would be brought before the Court during the evidentiary hearing. On April 28, 2005, the Government responded with another attempt to dismiss the case based on scope of

---

[4]Although the Government once again raised the issue of substitution, it technically did not file any specific motion requesting that substitution be granted. Instead, it attempted to incorporate its earlier motion for substitution by reference. See Def's 2003 Memo at 2.

employment even though the scheduled evidentiary hearing had not yet taken place. That motion was formally denied by the Court on May 3, 2005.

An evidentiary hearing purely on the issue of scope of employment was held on May 4, 2005. Elders presented five witnesses, two of whom were experts on the relevant Air Force, National Guard and MD ANG regulations and policies. The Government declined to present any evidence. This Motion for Summary Judgment logically follows.

## **ARGUMENT**

Diaz has publicly and privately spread to third parties serious accusations that Elders sexually harassed and assaulted her. These statements are defamatory *per se* given that they impute Elders committed a criminal offense involving moral turpitude, impute unfitness to his performance of the offices or duties of employment, or lack of his integrity in the discharge of those duties, and prejudice him in his or her profession or trade. Wells v. Liddy, 186 F.3d 505, 522 (4th Cir.1999), cert. denied, 120 S.Ct. 939 (2000).

The Government seeks to intervene in this litigation in order to obtain the dismissal of Elders' action. The sole determining issue at this stage is whether Diaz was acting within the scope of her employment when she uttered the defamatory statements in question. As a matter of law and based on the facts as they are known to exist, Diaz did not act within the scope of her employment. Therefore, summary judgment is appropriate on this specific issue in Elders' favor.

To support a Motion for summary judgment, it must be demonstrated that there are no genuine issues existing as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c). A Court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The movants bear "the initial responsibility of informing the district court of the basis for

7

their motion and identifying those portions of the record which show lack of a genuine

issue." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). [5]

**I.  ELDERS' CLAIMS ARE COGNIZABLE BECAUSE DIAZ WAS NEVER A
   FEDERAL EMPLOYEE AND, EVEN IF SO, ACTED OUTSIDE OF HER
   SCOPE OF EMPLOYMENT THEREBY RENDERING HER, AND NOT THE
   UNITED STATES, AS THE PROPER DEFENDANT SUBJECT TO
   LIABILITY**

The Government has three times sought to certify that Diaz acted within the scope of

her employment necessitating its substitution in her place, and dismissal of the case

pursuant to the Federal Torts Claim Act ("FTCA"). When a federal employee is sued for

a wrongful or negligent act, the Federal Employees Liability Reform and Tort

Compensation Act of 1988 (commonly known as the Westfall Act) provides that:

> [u]pon certification by the Attorney General that the defendant employee
> was acting within the scope of his office or employment at the time of the
> incident out of which the claim arose, any civil action or proceeding
> commenced upon such claim in a United States district court shall be
> deemed an action against the United States under the provisions of this
> title and all references thereto, and the United States shall be substituted as
> the party defendant.[6]

---

[5] Should the issue of scope of employment be decided in Elders' favor, the U.S.
Government has no further role to play in this case. In fact, the only role for the U.S.
Government at this time is to argue scope of employment. The Government has
repeatedly previously sought dismissal of this case through the Feres doctrine's "incident
to military service" test. However, there are no grounds for the Feres doctrine to be
before this Court. If certification is permitted, the case ends. If Diaz acted outside the
scope of her employment, then the Government has no place in this litigation as it is not a
party and Diaz has no standing to raise the defense. Additionally, although the Feres
doctrine would appear as a practical matter to encompass the scope of employment
inquiry, the questions are legally distinct. See Valdiviez v. United States, 884 F.2d 196,
198-99 (5th Cir. 1989)(Feres doctrine's "incident to service" inquiry is distinct from the
FTCA scope of employment inquiry); L. Jayson, Handling Federal Tort Claims § 216.01,
at 9-162 (1990)("the fact that a serviceman's activities would be considered 'incident
to service' for purposes of the application of the Feres doctrine ... does not necessarily make
those same activities within the scope of employment for the purposes of determining the
Government's liability under respondeat superior doctrine").

[6] Under 28 C.F.R. § 15.3, the Attorney General has delegated to the United States
Attorney the authority to provide § 2679(d) certification.

28 U.S.C. § 2679 (d)(1).[7] Upon a successful invocation of the certification, the individual

employee is dismissed from the case and the United States is substituted as defendant.

The case would then proceed under the FTCA, which confers immunity to the

Government for claims of libel and slander. See 28 U.S.C. § 2680(h).[8]

### A. The United States Attorney's Certification Is Inadequate To Justify Substitution Absent Submission Of Additional Supporting Evidence

The mere fact that the United States Attorney has certified Diaz was acting in the

scope of her employment is not enough. In Gutierrez de Martinez v. Lamagno, 515 U.S.

417 (1995), the Supreme Court held that a certificate of scope of employment is

conclusive for purposes of removal from state court only, not substitution. District courts

must, therefore, look behind the certification attempt. Without such review, the Court

held, the scope of employment issue "however contestable in fact, would receive no

judicial audience," and federal courts would be reduced to "rubberstamp work." Id. at

429. In Maron v. United States, 126 F.3d 317 (4th Cir. 1997), the Fourth Circuit

recognized that "the recent Gutierrez decision means we may no longer decline to

judicially decide whether substitution is proper." Id. at 321. Thus, discovery and an

evidentiary hearing would typically be necessary. Id.

---

[7] Section 2679 (d)(2) provides for removal of cases from state to federal court and substitution of the United States as the party defendant in those cases.

[8] In Barr v. Matteo, 360 U.S. 564, 569-73 (1959) and Westfall v. Erwin, 484 U.S. 292, 295 (1988), the Supreme Court "recognized an absolute immunity from state law tort liability for federal officials exercising discretion while acting within the scope of their employment." Mangold v. Analytic Services, Inc., 77 F.3d 1442, 1446 (4th Cir. 1996). Because absolute immunity has its costs "since illegal and even offensive conduct may go unredressed", "the common law immunity recognized in Barr and Westfall is afforded only to the extent that the public benefits obtained by granting immunity outweigh its costs." Mangold, 77 F.3d. at 1447 (citations omitted).

In his most recent undated certification, Thomas M. DiBiago, then the United States Attorney, certified that Diaz was "acting within the scope of her employment as an employee of the Air National Guard, a reserve component of the United States Air Force, at the time of such incident." <u>See</u> Exhibit "4".[9] In reaching his position, Mr. DiBiago relied solely upon his reading of the Complaint and "a November 26, 2002 memorandum from Assistant United States Attorney Tarra DeShields." <u>Id</u>. This certification on its face raises several significant concerns.

First, the lone "incident" to which Mr. DiBiago remains neither known nor identified. Obviously Elders has identified multiple incidents during the period November 2001 to the present where Diaz defamed him. Because multiple incidents make up the claims against Diaz, the scope of employment test must be applied specifically to each of the acts or incidents contained in the complaint that make up each claim, rather than broadly to the claims or complaint as a whole. <u>See</u> <u>Lyons v. Brown</u>, 158 F.3d 605, 608-09 (1st Cir. 1998).

Second, according to the certification, Mr. DiBiago reached his determination by reviewing Elders' initial Complaint, and a memorandum from the Government's counsel from November 2002. Yet Elders filed a more detailed First Amended Complaint on

---

[9] Interestingly, someone with authority in the MD ANG apparently did not share the belief that the Government should defend Diaz because they, according to Diaz, threatened her that they would withdraw their participation in this litigation if she did not resign from the MD ANG. <u>See</u> Letter dated December 2, 2002, from Diaz to Senator Barbara Mikulski and Letter dated December 18, 2002, from Diaz to Governor-Elect Robert Ehrlich, at Exhibit "5" Unfortunately, the senior MD ANG official's name is redacted from the copies Elders possesses.

March 3, 2003. More troubling is that there is absolutely <u>no</u> evidence from the Government that the U.S. Attorney's Office even bothered to review any MD ANG records to confirm whether or not Diaz was, in fact, in federal status during the relevant period in question. Furthermore, the Government's failure to specifically address Elders' First Amended Complaint in its certification was in direct contradiction to the Court's instructions. <u>See</u> Order (dated Feb. 12, 2003).

Although the Government's certification may have satisfied its prima facie burden, particularly to remove the case from state to federal court, it carries no evidentiary weight because it neither contains any "details" nor "explains the bases for its conclusion." <u>Maron</u>, 126 F.3d at 323. <u>See also</u> <u>Wood v. United States</u>, 995 F.2d 1122, 1123 (1st Cir. 1993)(Westfall Act certificate cannot simply deny the basic "incident" charged); <u>McHugh v. University of Vermont</u>, 966 F.2d 67 (2d Cir. 1992)(same).[10]

The burden of proof to refute the certification of scope of employment admittedly falls on Elders to "prove by a preponderance of the evidence that the defendant[] [was] not acting within the scope of [her] employment." <u>Maron</u>, 126 F.3d at 323. If Elders can so demonstrate, then the Government "must provide evidence and analysis to support its conclusion that the torts occurred within the scope of employment." <u>Id</u>.

As detailed further below, Elders has met his burden through the presentation of expert and fact witnesses at the evidentiary hearing, as well as through a legal and policy

---

[10] The First Circuit noted that the language of the Westfall Act "does not allow an immunity certificate simply to deny, say, an alleged killing, rape, assault, or some other 'egregious misconduct' that occurs during working hours. It suggests that the Act requires the certificate to explain, instead, why the alleged misconduct was not so 'egregious' as to place it outside the employee's 'scope of employment.'" <u>Woods</u>, 995 F.2d at 1126.

analysis of the circumstances. The Government, to the contrary, has failed to present any specific fact evidence or anything beyond conclusory assertions.

**B.  Diaz Was Not A Federal Employee At The Time She Made Her Defamatory Statements**

The FTCA defines an employee of the federal Government as follows:

> "Employee of the Government" includes . . . *members of the National Guard <u>while</u> engaged in training or duty under sections 316, 502, 503, 504, or 505 of Title 32*, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently, in the service of the United States, whether with or without compensation.

28 U.S.C. § 2671 (emphasis added). It goes without saying that Diaz does not work for a federal agency, and never has during the period of time in question. Except under special circumstances, the MD ANG is a state agency and its members, particularly those that are military, are state employees. There is no dispute that Diaz serves as a traditional guardsman, i.e., weekend military warrior. She is the typical National Guardsman in that she works full time in a private non-Governmental position, in her case as a physician, and occasionally with the MD ANG as a member of the state military for a certain period of time per year.

That military members of the Maryland Air National Guard, or for that matter any Guard, are generally state and not federal employees is a well-settled point of law. In <u>Maryland ex rel. Levin v. United States</u>, 381 U.S. 41 (1965), which coincidently involved the Maryland Air National Guard, the Supreme Court clearly held that "[t]heir appointment by state authorities and the immediate control exercised over them by the States make it apparent that military members of the Guard are employees of the States."

13

Id. at 48.[11] This holding was not new as numerous Courts of Appeals had previously and consistently treated military members of the Guard as employees of the States, not the Federal Government. See e.g., Blackwell v. United States, 321 F.2d 96 (5th Cir. 1963); Pattno v. United States, 311 F.2d 604 (10th Cir. 1962); Bristow v. United States, 309 F.2d 465 (6th Cir. 1962); Storer Broadcasting Co. v. United States, 251 F.2d 268 (5th Cir. 1958); McCranie v. United States, 199 F.2d 581 (5th Cir. 1952); Dover v. United States, 192 F.2d 431 (5th Cir. 1951); Williams v. United States, 189 F.2d 607 (10th Cir. 1951).

This conclusion has continued to be reached by numerous courts since then as well. See e.g., New Jersey Air Nat'l Guard v. Federal Labor Relations Authority, 677 F.2d 276, 278 (3rd Cir. 1982)(Within each state the National Guard is a state agency); Rhodes v. United States, 574 F.2d 1179, 1180 (5th Cir. 1978)(noting Federal Tort Claims Act does not provide remedy against United States for tortious conduct of national guard member unless unit has been called into federal service); Combs v. United States, 768 F. Supp. 584, 590 (E.D.Ky. 1991)(members of National Guard, except when called into federal service, are not federal employees for FTCA purposes); Engblom v. Carey, 522 F. Supp. 57, 65 (S.D.N.Y. 1981)(National Guardsmen except when "federalized" by unit are

---

[11] Although it is true that this decision was vacated and remanded in Maryland ex rel. Levin v. United States, 382 U.S. 159 (1965), the specific ruling that military members of the Guard are state, not federal, employees remained unaffected. A related successor case, Maryland use of Gliedman v. Capital Airlines, Inc., 267 F. Supp. 298 (D.Md. 1967), which sets forth the factual and procedural history that led to the Supreme Court decision made this quite clear. The District Court noted that the Supreme Court, despite the vacating of the decision, had still affirmed the ruling that the Maryland Air National Guard military officer involved in the dispute was a state employee. Id. at 301. Additionally, numerous cases have subsequently cited favorably to the finding as it was set forth in the initial Supreme Court decision. See e.g., Logue v. United States, 412 U.S. 521, 527 (1973); United States v. Massachusetts Maritime Academy, 762 F.2d 142, 153 (1st Cir. 1985); Garcia v. United States, 799 F. Supp. 674, 677 (W.D.Tex. 1992); Bloss v.

employees of the State); <u>Mela v. Callaway</u>, 378 F.Supp. 25, 28 (S.D.N.Y. 1974)("The

National Guard, while something of a hybrid under both state and federal control, is

basically a state organization").[12]

For the most part, the specific dates that Diaz disseminated the defamatory remarks

are unclear. Witnesses testified that Diaz's comments began in November 2001 and

extended at least through March 2002. <u>See</u> Exhibit "2". Major Todd Wilkinson indicated

Diaz spoke to him in December 2001, or early January 2002, as well as in February and

March 2002. Exhibit "3". Several of the discussions clearly took place during the first

and last weeks of February 2002, and the first week of March 2002. Both Willem and

Mentges executed statements to having conversations with Diaz in that time frame, and

Diaz swore under oath that their statements were true with respect to that information.[13]

<u>See</u> Exhibit "6". While it might not be clear at this time as to which specific dates Diaz

made her statements, it is perfectly clear that at no time during this period was Diaz

"engaged in training or duty under sections 316, 502, 503, 504, or 505 of Title 32." <u>Id</u>.[14]

---

<u>United States</u>, 545 F. Supp. 102, 104 (N.D.N.Y. 1982); <u>Witter v. Pennsylvania Nat'l Guard</u>, 462 F. Supp. 299, 304 (E.D.Pa. 1978).

[12] Although the current FTCA provision that "Employee of the Government" includes . . . members of the National Guard while engaged in training or duty under sections 316, 502, 503, 504, or 505 of Title 32" was enacted in 1981, and several of the cited cases above pre-date that, the general premise that military members of a National Guard are state, not federal, employees remains intact <u>unless</u> they are acting under specific provisions of Title 32, which Diaz was not.

[13] Willem noted in his Memorandum for Record dated March 7, 2002, that his conversation with Diaz occurred approximately "two weeks ago". <u>See</u> Exhibit "2".

[14] Diaz was TDY with Mentges on a MD ANG trip to Alaska during approximately February 8 – 21, 2002. However, Diaz has denied having any conversations concerning Elders during this trip, and Elders has to date not alleged otherwise. <u>See</u> Diaz Depo at 178, attached at Exhibit "1".

Section 316 of Title 32 refers to "Detail of members of Army National Guard for rifle instruction of civilians", section 502 pertains to "Required drills and field exercises", section 503 involves "Participation in field exercises", section 504 deals with "National Guard schools and small arms competitions" and, finally, section 505 addresses "Army and Air Force schools and field exercises." Although Diaz continually failed to recall specifics of where she was or what she was doing when the conversations involving the defamatory allegations took place, she did claim that her conversation with Willem occurred at the military police office while she was engaged in administering other Guardsmen with their vaccinations, though there is absolutely no proof that her story is accurate, particularly given that her official military orders do not corroborate her story. See Diaz Depo. at 37-51, attached at Exhibit "1".

Diaz's official military orders with the MD ANG do not reflect any federal service whatsoever during the crucial time period and dates. See Exhibit "7". Additionally, the relevant scheduled Unit Training Assemblies, or UTAs, which also do not denote federal status, for the MD ANG were December 8-9, 2001, January 12-13, 2002, and February 2-3, 2002. Diaz attended each, though the statements in question do not appear to have been made during the UTAs. See Exhibit "8".

None of the sections in Title 32 that define the term "federal employee" in the FTCA are applicable to Diaz or the role she was in during the November 2001 – February 2002 period when the statements were made. Therefore the U.S. Government has no legal

standing to invoke the FTCA and attempt to substitute itself for Diaz, and Elders is entitled to summary judgment on this Motion.[15]

### C. Even If Diaz Was A Federal Employee For Purposes Of The FTCA She Was Not Acting In The Scope Of Her Employment When She Spread Her Defamatory Statements To Certain Members Of The Maryland Air National Guard

Diaz previously informed this Court through her sworn declaration that in or about February 2002, she "had conversations with fellow Maryland Air National Guard officers in which I raised my concern that Lt. Col. Elders was sexually harassing me." See Declaration of Maria C. Diaz at ¶4 (dated April 8, 2003), attached at Def's 2003 Memo, Exhibit "3". Although Diaz neglected at the time to identify to the Court who these "fellow Maryland National Guard Air officers" were she has since asserted they were Mentges and Willem.[16] See Transcript of Proceedings Before the Honorable Marvin J. Garbis, May 4, 2005, Testimony of Maria C. Diaz at 22 ("Evid Tr."), attached at Exhibit "9". However, Diaz intentionally failed to recount numerous conversations she had with at least one of these individuals dating back to November 2001, and, in fact, no less than

---

[15] Diaz and the Government have previously tried to make much out of the fact that at times she *might* have been in uniform, and most likely was on the premises of the MD ANG at the time of the statements. But these facts do not alter the undeniable fact that she was not a federal employee per the legal definition of that term in the FTCA. In order for the U.S. Government to counter Elders' arguments on this point, it must provide this Court with copies of the relevant paperwork that would have placed Diaz in the required Title 32 status for the exact time periods in question.

[16] The Inglis investigative report indicates Diaz also had conversations with Major Wilkinson. See Def's 2003 Memo, Exhibit "4", at 8 fn.14. Wilkinson contemporaneously testified that he had numerous conversations with Diaz about the sexual harassment allegations. See Exhibit "3". Diaz denies she had even one conversation with Wilkinson, see Diaz Depo at 101-102,113-115, attached at Exhibit "1", and for good reason. She had absolutely no reason or justification to reveal her allegations to Wilkinson. Any conversation would have been inappropriate, as Diaz herself admitted, id. at 162-173, and outside the scope of her employment.

one additional individual – Major Todd Wilkinson.[17] The reason for this omission is simple: the conversations occurred outside of the scope of her employment.

Assuming Diaz was somehow considered a "federal employee" for purposes of the FTCA, the scope of employment inquiry of whether she was acting within the line of duty is defined by the applicable state law of respondeat superior. Jamison v. Wiley, 14 F.3d 222, 227 n.2 (4th Cir. 1994). In this case, Maryland law applies. Under Maryland law, an act is within the scope of employment if it is authorized. Sawyer v. Humphries, 322 Md. 247, 255, 587 A.2d 467, 470-71 (Md. 1991); see also Lovelace v. Anderson, 366 Md. 690, 785 A.2d 726, 742 (Md. 2001)(summarizing Maryland's law of respondeat superior). An act is authorized if it "was incident to the performance of the duties entrusted to [the servant] by the master, even though in opposition to [the master's] express and positive orders." Id. at 255, 470, quoting Hopkins Chem. Co. v. Read Drug & Chem. Co.,

124 Md. 210, 214, 92 A. 478, 479-80 (Md. 1914).

Maryland law states:

> To be within the scope of the employment the conduct must be of the kind the servant is employed to perform and must occur during a period not unreasonably disconnected from the authorized period of employment in a locality not unreasonably distant from the authorized area, and actuated at least in part by a purpose to serve the master.

East Coast Freight Lines, Inc. v. Baltimore, 190 Md. 256, 285, 58 A. 2d 290, 304 (1948) (citations omitted). In Sawyer, the court further noted that the conduct must be "expectable" or "foreseeable." 322 Md. at 256, 587 A.2d at 471. The Sawyer court also found that:

> particularly in cases involving intentional torts committed by an employee, this Court has emphasized that where an employee's actions are personal, or where they represent a departure from the purpose of furthering the employer's business, or where the employee is acting to

---

[17] Diaz has also admitted to telling certain information to her spouse, sister and aunt. See Diaz Depo. at 61,65,73, attached at Exhibit "1". Additionally, she communicated information to the offices of two political officials. See Exhibit "5".

> protect his own interests, even if during normal duty hours and at an
> authorized locality, the employee's actions are outside the scope of his
> employment.

Id. at 256-57, 587 A.2d at 471. Finally, the court noted that "'where the conduct of the

servant is unprovoked, highly unusual, and quite outrageous,'" this can in and of itself be

sufficient to indicate that the conduct was personally motivated and outside of the scope

of employment. Id. at 257, 587 A.2d at 471-72, quoting Prosser and Keaton On The Law

of Torts § 70, at 506 (5th ed. 1984).

Interestingly, actions taken out of "a desire to fulfill sexual urges may not be actuated

by a purpose to serve the employer" and are outside the scope of employment. Lewis v.

Forest Pharms., Inc., 217 F. Supp. 2d 638, 659 (D. Md. 2002), citing Burlington Indus.

Inc. v. Ellerth, 524 U.S. 742, 756 (1998). Therefore, it should not be any stretch of the

imagination that intentionally spreading defamatory lies, particularly with malice,

concerning allegations regarding supposed "sexual urges" that were investigated and

found to be unsubstantiated is certainly not an authorized act within the MD ANG, nor

incident to the performance of any legitimate duties entrusted to Diaz by the Guard.

National Guard Regulation (NGR) 600-22/ANGI 36-3, a copy of which is attached as

Exhibit "10" and can also be found at *http://www.ngbpdc.ngb.army.mil/pubfiles/*

*36/363I.pdf*, recognizes that "[a]ll National Guard personnel are entitled to serve in an

environment free from sexual harassment." This document sets forth the complete sexual

harassment policy of the National Guard, which includes the MD ANG.[18] It is, according

to Brig. General David McGinnis (ret), who testified at the evidentiary hearing, "the

bible." See Evid. Tr. at 58 (Testimony of David McGinnis), attached at Exhibit "9". If a

---

[18]The allegations investigated by Colonel Werts were, in fact, framed as potential
violations of this regulation. See Def's 2003 Memo, Exhibit "5", at 2.

policy or procedure is not reflected in this document or other referenced writings in this brief, it does not exist.[19]

 The NGR created a Military Discrimination System which specifically:

> establishes policies and procedures for filing, processing, investigating, settling, and adjudicating discrimination complaints in the Army National Guard (ARNG) and Air National Guard (ANG). It implements Title VI of the Civil Rights Act of 1964, as amended, DoD Directives 1350.2, and 5500.11, Army Regulation 600-20, and Air Force Instruction 36-2706, prohibiting discrimination based on race, color, religion, gender, national origin, or reprisal.[20]

 NGR 600-22 specifically addresses the filing of both formal and informal complaints.[21] "The chain of command will be the primary channel for resolving discrimination complaints. Individuals will be encouraged to use command channels for redress of grievances....The sole mechanism for appealing the disposition of an informal complaint shall be to file a formal complaint." NGR 600-22, 1.7(f).

---

[19] At no time during this litigation, now three years old, has the Government or Diaz identified any other relevant document other than NGR 600-22/ANGI 36-3. The MD ANG did adopt specific policies in line with those set forth by the National Guard Bureau. Two such policy announcements were adopted by Major General James F. Fretterd, then the Adjutant General of the Maryland National Guard, on November 9, 1987 and February 1, 1995. These two policies echo the filing profile set forth in NGR 600-22. See Evid. Tr. at 83 (Testimony of Charles Robinson), attached at Exhibit "9". Two later memos were issued by Brigadier General David A. Beasley, 175th Wing Policy Letter 97-04 (April 8, 1997) and 97-09 (November 24, 1997). Nothing within these two documents supports Diaz's arguments or contradicts those espoused by Elders.

[20] Sexual harassment falls within the category of discrimination. NGR 600-22, 1.10 (citing DoD Instruction 1350.3).

[21] An "Informal Complaint" is specifically defined by the governing regulations to be a "complaint of [sic] alleging illegal discrimination expressed verbally (or filed on NGB Form 333 with only the 'Informal' block checked and initialed) to a member of the complainant's chain of command at any level, EOA or MEO staff, or other state NG officials." NGR 600-22, Glossary, at 37.

Throughout this litigation the Government and Diaz have claimed it is official Guard policy that informal complaints can be made to any member of the Guard, and that doing so is an act that is within the scope of employment. It is this argument that is solely relied upon by the defense in order to justify substitution. Yet this assertion is not supported by either the documentary or testimonial evidence. Nor did the Government, though it was afforded the opportunity, introduce any expert testimony at the evidentiary hearing to support this position.[22]

NGR 600-22, 2-1, pertains to "Informal Complaints" and addresses to whom one should be brought:

> An informal complaint of discrimination, although it may be initially verbal, shall be put in writing on NGB Form 333 with only the "Informal" box checked and initialed by the complainant....An informal complaint may be brought to the attention of any member of the chain of command at the lowest level of command where a remedy or resolution is possible, or to the equal opportunity representative or equal opportunity advisor at that level.

NGR 600-22, 2-1(a). In fact, the regulation specifically addresses the exact situation that supposedly befell Diaz wherein it noted that "[i]f the complaint is brought against the company or squadron commander, then the informal complaint will be brought to the

---

[22] In its second effort to dismiss this case the Government relied upon the declaration of Felton Page, Chief, National Guard Directorate for Equal Opportunity, to support their scope of employment argument. See Declaration of Felton Page (dated April 8, 2003), attached to Def's 2003 Memo. During its first effort the Government produced the declaration of Lieutenant Colonel Allyson Solomon, a MD ANG officer allegedly with EEO experience, to support the premise that Diaz's actions were military in nature. See Reply Memorandum in Support of Defendant Maria Diaz's Response to the Plaintiff's Opposition to Diaz's Motion to Dismiss and Opposition to Plaintiff's Discovery Requests at 13-14 (filed February 10, 2003), Exhibit "1". Both Mr. Page and Lt Col Solomon, who is still employed by the MD ANG, were conspicuously absent as witnesses for the Government at the evidentiary hearing.

equal opportunity representative, or to a member of the chain of command at the next higher level of command (battalion/group)." Id.[23]

The regulations quite clearly and specifically identify all categories of individuals to whom an informal complaint is recommended to be made:

> Military members who believe they have been illegally discriminated against are encouraged to discuss their complaints with and to seek assistance from their Equal Opportunity Representative or Advisor (ARNG) or their Wing Military Equal Opportunity personnel (ANG), or any member of their unit chain of command.

Id. at 2-1(b). Nowhere does it identify "fellow National Guard members".[24] If that was the intent of the policy, surely the governing document - which was issued on March 30, 2001 and governs the very time period in question - would have included such broad language.

        1.      <u>Diaz Admitted She Never Filed An Informal Or Formal Complaint Regarding Her Allegations Of Sexual Harassment</u>

According to General McGinnis, Diaz had only one option to pursue: that of filing a formal complaint. "[I]f you have a unit commander who has allegedly done something, then there's only one recourse, and that's a formal complaint to the next commander in the chain of command." <u>See</u> Evid. Tr. at 59-60 (Testimony of David McGinnis), attached at Exhibit "9".

---

[23]NGR 600-22, 2-7(a), further states that "[w]hen a military member believes that his or her commander was responsible for the alleged discrimination, the member <u>will</u> file the formal complaint with the next higher commander in the chain of command." (emphasis added).

[24]The formal complaint, NGB Form 333, states that a complainant is "encouraged to discuss the complaints with and to seek assistance from your immediate supervisor, unit commander, members of the chain of command or EOA/EOT staff."

Diaz testified at the evidentiary hearing that at no time was she attempting to file, whether informal or formal, a sexual harassment complaint against Elders.

> Q.    You weren't filing a complaint of sexual harassment against Karl Elders, correct?
>
> A.    That's correct.
>
> Q.    You weren't filing an informal complaint against Karl Elders, correct?
>
> A.    Correct.
>
> Q.    Or a formal complaint, correct?
>
> A.    Correct.

Id. at 32 (Testimony of Maria C. Diaz).

In fact, Diaz specifically instructed both Mentges and Willem not to do anything about her allegations. Id. at 31.

> 2.    Because Diaz Was Or Should Have Been Fully Aware Of The Available Procedures To File Sexual Harassment Complaints And Intentionally Failed To Utilize Them, Her Deliberate Third-Party Discussions Fall Outside Her Scope Of Employment

During the investigation conducted by Colonel Werts, Diaz emphatically stated that she knew if she did want something done, she should go through her chain of command. See Exhibit "11", at 6. She also testified that she was aware of the EEO process. Id. at 7.

The situation presented here should be treated analogous to when a plaintiff seeks to pursue sexual harassment claims against an employer under Title VII. The unreasonable failure of a plaintiff to take advantage of an effective sexual harassment policy will provide an employer an affirmative defense against a claim that a supervisor violated the law. See Barrett v. Applied Radiant Energy Corp., 240 F.3d 262 (4th Cir. 2001).[25]

---

[25]This has become known as the Faragher/Ellerth affirmative defense based on the Supreme Court's pronouncements in Faragher v. City of Boca Raton, 524 U.S. 775, 807-08 (1998) and Burlington Industries, Inc. v. Ellert, 524 U.S. 742, 764-65 (1998).

23

Conversely, an individual who levies defamatory claims of sexual harassment against another individual should be held to act outside the scope of their employment if they similarly failed to take advantage of an effective sexual harassment policy.

The facts in Barrett offer essentially identical fact patterns. Barrett admitted that she received a copy of her company's sexual harassment policy. Id. at 267. Diaz admitted to being familiar with the MD ANG's sexual harassment policy. See Exhibit "11" at 7. She also admitted to knowing about the complaint process. Id. at 8. Barrett conceded that she never complained to any of her employer's managers. Barrett, 240 F.3d at 267. Diaz never complained to anyone within her unit chain of command or within the EEO structure. According to Barrett, she never told any of the managers because she feared retaliation and she doubted that her complaints would be taken seriously. Barrett, 240 F.3d at 267.

Diaz likewise alleged she felt no one would believe her, and that she was "afraid". See Evid. Tr. at 31 (Testimony of Maria C. Diaz), attached Exhibit "9".

For Barrett, the Fourth Circuit Court of Appeals declined to accept that any of her explanations justified her failure to report the alleged sexual harassment. Indeed, the Court noted that these arguments:

> runs contrary to the case law of this circuit. In Lissau [v. Southern Food Service, Inc., 159 F.3d 177, 182 (4th Cir.1998)], we noted that any evidence that the plaintiff failed to utilize the company's complaint procedure "will normally suffice to satisfy [the company's] burden under the second element of the defense." ... A generalized fear of retaliation does not excuse a failure to report sexual harassment. Instead, the law is specifically designed to encourage harassed employees to turn in their harasser because doing so inures to everyone's benefit. Reporting the harasser benefits the victim by allowing the company to halt future harassment. It benefits others who might be harassed by the same individual, and it benefits the company by alerting it to the disruptive and unlawful misconduct of an employee. Thus, the reporting requirement serves the "primary objective" of Title VII which "is not to provide redress but to avoid harm." ... By advancing a speculative "fear of retaliation" excuse for remaining silent, Barrett's argument would undermine the primary objective of Title VII and could result in more,

24

not less, sexual harassment going undetected.

Barrett, 240 F.3d at 267 (citations omitted).

Indeed, both Title VII and NGB 600-22/ANG 36-3 expressly prohibit any retaliation against an individual reporting allegations of sexual harassment. See 42 U.S.C. § 2000e-3(a) and NGB 600-22, 1-7(d). It is for this reason that the courts have consistently refused to recognize a nebulous "fear of retaliation" as a basis for remaining silent. Madray v. Publix Super Mkts., Inc., 30 F. Supp.2d 1371, 1375 (S.D. Fla. 1998), aff'd 208 F.3d 1290 (11th Cir. 2000)("An employee's generalized fear of repercussions cannot form the basis for an employee's failure to complain to his or her employer."); Shaw v. AutoZone, Inc., 180 F.3d 806, 813 (7th Cir. 1999)(same); Hylton v. Norrell Health Care of New York, 53 F. Supp.2d 613, 618 (S.D.N.Y. 1999)(same); Jones v. USA Petroleum Corp., 20 F. Supp.2d 1379, 1386 (S.D. Ga. 1998)(same). "[T]he law against sexual harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists." Shaw, 180 F.3d at 813 (internal quotations omitted). An employee's subjective belief in the futility of reporting a harasser's behavior is not a reasonable basis for failing to take advantage of any preventive or corrective opportunities provided by the employer. See Lissau, 159 F.3d at 182.[26]

If an individual seeking to pursue Title VII liability for claims arising out of alleged sexual harassment incidents loses his/her legal remedy because of their failure to exercise existing protections, then so too should an individual who falsely claims the existence of

---

[26]The Fourth Circuit added that "[w]e cannot accept the argument that reporting sexual harassment is rendered futile merely because members of the management team happen to be friends. Crediting this view would impose an impermissible burden on any company, especially small businesses. People who start and manage small businesses together frequently do so in part because of their pre-existing friendships. Barrett claims that these friendships should relieve an employee of her reporting obligation and effectively impose automatic liability on the employer. Automatic liability, however, is precisely what the Supreme Court sought to avoid in fashioning the Faragher/Ellerth affirmative defense." Barrett, 240 F.3d at 268 (citation omitted).

sexual harassment lose out on the protection of the scope of employment shield of immunity. The Government's argument that Diaz acted within the scope of her employment, even though she deliberately disregarded the most fundamental and clearest

rules that exist, invites an open-door policy for fabricated allegations of sexual harassment or other misconduct in order to achieve personal objectives that might be based on hate, jealousy or retribution.

If the Court adopts the Government's position, then it will make a mockery of the military system of order, discipline, and the chain of command. The military EEO system was designed to provide the necessary mechanisms and protection for the filing of sexual harassment complaints. If the system is not followed, particularly when the procedures are known to the alleged victim, then the invitation for abuse will run rampant.

The system in place applies to everyone within the military, no matter their rank. General McGinnis reflected upon the circumstances that befell his friend General Claudia

Kennedy, who herself was the victim of substantiated unwanted sexual advances by a senior officer[27], and compared it to Diaz's situation.

> General Claudia Kennedy was a friend of mine in the Pentagon, and here she went through this as s senior staff officer, but she went right in the chain of command. She didn't talk to me about it, she didn't talk the [sic] anybody else, went right to the general and brought the situation up because she was in that position. My argument is if she's a flight surgeon of the squadron, she should be able to kick the group commander's door down any time she wants to. That would be the process that I would expect from a person of that – in that position.

See Evid. Tr. at 72-73 (Testimony of David McGinnis), attached at Exhibit "9".

---

[27] See e.g., "General Seeks to Retire As Charges Are Supported," New York Times, July 8, 2000; "General's Harassment Allegation Substantiated By Investigators," Chicago Tribune, May 12, 2000; "General claims harassment;  Army's top-ranking woman accuses another general," Chicago Sun-Times, March 31, 2000.

3.  <u>Diaz's Defamatory Statements Were Made For Purely Personal Reasons And Not To Serve The Mission Of The MD ANG</u>

At no time did Diaz ever seek to follow the procedures that the MD ANG and National Guard Bureau required her to abide by. Though superior officers and EEO representatives were always available to her, Diaz instead, for her own personal reasons and apparently months and even years after the alleged incidents occurred, spoke to subordinate officers, none of whom were within either her or Elders' chain of command.

For example, she testified to Colonel Werts that "*I had also talked to Mike Mentges because Mike was my buddy. Mike and I are good friends.*" She also stated "I think what I needed (was) what I always give people ... just (for him) to listen." <u>See</u> Def's 2003 Memo, Exhibit "5", at 5-6 (changes original, emphasis added).[28] Mentges testified to numerous conversations with Diaz concerning Elders, both through sworn statements and live testimony. <u>See</u> Exhibit 2; Evid. Tr. at 103 (Testimony of Mike Mentges)(noting that the Memorandum for Record was accurate), attached at Exhibit "9". Nor was he in Elders' chain of command. <u>Id</u>. at 105.

As previously noted, Diaz has adamantly denied ever telling Major Wilkinson about any of the alleged sexual harassment allegations. <u>See</u> Diaz Depo at 101-102,113-115, attached at Exhibit "1". Yet, Major Wilkinson, who apparently has no reason to lie, has consistently told a completely different story. Within days of having numerous conversations with Diaz, Wilkinson provided a sworn statement to Colonel Inglis (the contents of which Colonel Inglis also affirmed in his own memo for the record). <u>See</u> Exhibit "3". In it he stated that Diaz told him in December or January that Elders wanted to sleep with her, and that in mid-February she repeated the allegations and indicated she planned to confront Elders. <u>Id</u>. At the evidentiary hearing Wilkinson again confirmed that

---

[28]In discussing her conversations and relationship with Mentges, she added that "I am doctor and then I am friend." Def's Memo, Exhibit "5", at 5. It is noteworthy that Diaz did not refer to her military position in any way. This is persuasive evidence that she did not consider her discussions with Mentges to be related to her military scope of employment.

he had been having conversations with Diaz in December 2001, and January and February 2002 concerning the alleged sexual advances made by Elders. <u>See</u> Evid. Tr. at 96 (Testimony of Todd Wilkinson), attached at Exhibit "9". He also noted that he was subordinate in rank to Elders and not in his chain of command. <u>Id</u>. at 96-97.

During the course of a separate lawsuit brought pursuant to the Freedom of Information Act, the MD ANG/National Guard Bureau released two letters sent by Diaz that specifically discussed Elders. The first, dated December 2, 2002, was sent to Senator Barbara Mikulski, and the second, dated December 18, 2002, was sent to Governor-Elect Robert Ehrlich. <u>See</u> Exhibit "5". Particularly in the letter sent to then Congressman Ehrlich, who was not Diaz's congressional representative, Diaz provides false details concerning Elders and the sexual harassment allegations. Neither of these letters could reasonably be construed as having been sent within the scope of Diaz's employment with the MD ANG.[29]

4. <u>The Need To Maintain Military Order And Discipline Overrides Any Policy Consideration That Diaz's Statements Could Be Considered As Made Within The Scope Of Her Employment</u>

The Supreme court has repeatedly held that "the military is, by necessity, a specialized society separate from civilian society." <u>Parker v. Levy</u>, 417 U.S. 733, 743 (1974). <u>See also</u> <u>Chappell v. Wallace</u>, 462 U.S. 296, 300 (1983); <u>Schlesinger v. Councilman</u>, 420 U.S. 738, 757 (1975); <u>Orloff v. Willoughby</u>, 345 U.S. 83, 94 (1953). "[The] military must insist upon a respect for duty and a discipline without counterpart in civilian life," <u>Schlesinger</u>, 420 U.S. at 757, in order to prepare for and perform its vital role. <u>See also</u> <u>Brown v. Glines</u>, 444 U.S. 348, 354 (1980).

---

[29] The question of whether these communications are either defamatory in nature or may, in fact, be privileged is not relevant to the matter at hand or ripe for adjudication. The only question before this Court is whether these communications were written within the scope of Diaz's "federal" employment with the MD ANG.

This premise is so important that the courts have not hesitated to rule in favor of the military even where the Constitution would have protected civilians in a parallel situation. For example, the military need not encourage debate or tolerate protest to the extent that such tolerance is required of the civilian state by the First Amendment; to accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps. See e. g., Chappell, 462 U.S. at 300; Greer v. Spock, 424 U.S. 828, 843-44 (1976)(Powell, J., concurring); Parker, 417 U.S. at 744. The essence of military service "is the subordination of the desires and interests of the individual to the needs of the service." Orloff, 345 U.S. at 92.

Even accepted religious practices have fallen victim to the need to maintain military order. In Goldman v. Weinberger, 475 U.S. 503 (1986), the Supreme Court ruled that the Free Exercise Clause did not require the Air Force to exempt an Orthodox Jewish officer from uniform dress regulations so that he could wear a yarmulke indoors. In a military community, the Court observed, "there is simply not the same [individual] autonomy as there is in the larger civilian community." Id. at 507 (brackets in original, internal quotation marks omitted).

In bringing her allegations against Elders to light Diaz did not follow well-established and easily accessible military protocol and regulations. Indeed, she intentionally sought not to utilize the existing military framework for reporting sexual harassment allegations against a superior officer. Instead, she – again deliberately – went out of her way to severely disparage the reputation of a senior officer to lower ranking members of the MD ANG; an offense punishable both criminally under the Uniform Military Code of Justice and administratively by the Guard.

General McGinnis provided expert testimony that Diaz's conduct to disseminate derogatory information about a senior officer to subordinates was "contrary to the good order and discipline" of the MD ANG, see Evid. Tr. at 63 (Testimony of David

29

McGinnis), attached at Exhibit "9", and it "creates dissension within the ranks all the way up." Id. at 65.

> Individuals talking about seniors to subordinates is, to put it in a common context, it's a sin. And it can lead to – it can lead to action. It can lead to administrative or non judicial or judicial punishment, depending on what it's [sic] said, when it's said, and in what context it's said.

Id. General McGinnis further commented that "regardless of what the allegation is and what area it's in, that's irrelevant in any case with senior people. It needs to get into the chain of command to be adjudicated in a timely manner and effectively." Id. at 74.[30]

Chief Master Sergeant Charles Robinson (ret-MDANG), who served as an EEO officer with the MDANG, echoed the conclusions and opinions offered by General McGinnis. Id. at 88. He also noted the serious ramifications for conduct such as that committed by Diaz because "one of the problems would be the fact that it would cause the commander ineffective ability to run his command, because everyone would be undermining what's taking place…." Id. at 87.[31]

In order for the military EEO system to run properly and effectively, it cannot be found that Diaz's statements were made within the scope of her employment.

---

[30] Based on General McGinnis' review of the relevant Air Force and MD ANG documentation, as well as his knowledge of the specific facts of this case, it was his expert opinion that Diaz had not acted in an authorized function of the MD ANG or within her scope of employment. See Evid. Tr. at 68 (Testimony of David McGinnis), attached at Exhibit "9".

[31] Even Wilkinson, one of the MD ANG members to whom Diaz spoke concerning Elders, also agreed that military order and discipline is based on the officers in particular following the rules that exist within the structure. Id. at 102 (Testimony of Todd Wilkinson), attached at Exhibit "9".

**<u>CONCLUSION</u>**

Based on the foregoing, Elders respectfully requests that this Court determine that Diaz was not acting within the scope of her employment, preclude the Government's substitution in this case and allow the litigation to proceed.

Date:   July 13, 2005

Respectfully submitted,

/s/

_____
Mark S. Zaid, Esq.
Federal Bar #023887
Krieger & Zaid, PLLC
1920 N Street, N.W.
Suite 300
Washington, D.C.  20036
(202) 454-2809
(202) 293-4827 fax
E-mail: ZaidMS@aol.com

ATTORNEY FOR PLAINTIFF