<u>Elders v. Diaz</u>, Case No. MJG-02-3892 (D.Md)

# EXHIBIT "1"

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF MARYLAND

3

4    KARL L. ELDERS,              )

5              Plaintiff         )

6          vs.                    ) Case No.

7    MARIA C. DIAZ,               ) MJG-02-3892

8              Defendants.        )

9                    -    -    -    -    -

10         The deposition of MARIA C. DIAZ was taken

11   on Thursday, January 15, 2004, commencing at

12   10:05 a.m., at the offices of Heise Gorgenson &

13   Stefanelli, 18310 Montgomery Village Avenue,

14   Suite 400, Gaithersburg, Maryland, before Donna

15   M. Hall, Notary Public.

16

17                    -    -    -    -    -

18

19

20

21

Maria Diaz                                                          1/15/2004

```
 1                 A P P E A R A N C E S

 2

 3

 4          Mark S. Zaid, Esquire

 5          Kreiger & Zaid, PLLC

 6          Suite 300

 7          1747 Pennsylvania Avenue, N.W.

 8          Washington, DC 20005

 9          (202) 223-9050

10                  On behalf of the Plaintiff

11

12

13          Tarra DeShields, Esquire

14          ASSISTANT UNITED STATES ATTORNEY

15          6625 U.S. Courthouse

16          101 West Lombard Street

17          Baltimore, Maryland 21201

18          (410) 209-4800

19                  On behalf of Dr. Diaz

20

21   ALSO PRESENT:  Karl L. Elders
```

Maria Diaz                                                                    1/15/2004

                                                                        Page 3

1                    P R O C E E D I N G S

2                    -    -    -    -    -

3    Whereupon --

4                    MARIA C. DIAZ, M.D.,

5    a witness, called for examination, having been

6    first duly sworn, was examined and testified as

7    follows:

8                         EXAMINATION

9    BY MR. ZAID:

10       Q.    Good morning, my name is Mark Zaid.

11   This is Thursday, January 15th, 2004.  We're here

12   for the deposition of Maria Diaz in the case of

13   Karl Elders versus Maria Diaz in the District of

14   Maryland, caption number which I don't have in

15   front of me.

16            Present we have the defendant,

17   plaintiff's counsel, the plaintiff, and government

18   counsel, Tarra DeShields.

19            And what I'm first going to do is just

20   go through some procedural background about the

21   process for this morning.  Let me ask you first

Maria Diaz                                                                                           1/15/2004

Page 4

1    if you have ever been deposed before.

2        A.    No, I have not.

3        Q.    Okay.  And as we ask questions, of course

4    the court reporter is taking down everything that

5    we are saying, so to the best that we can, which

6    applies to, not Mr. Elders because he won't be

7    saying anything, but the three of us, not to talk

8    over one another, even if you might be able to

9    anticipate what my question might be or I might be

10   able to anticipate what your answer might be, so

11   we can keep the cross talk to a minimum so the

12   court reporter can take the testimony down.

13            None of us can -- or let me put it this

14   way, when we answer, we need to verbalize our

15   response and also in an affirmative manner of yes

16   or no or yeah or nay, versus uh-huh or uh-uh,

17   because it's too difficult to then discern later

18   on.  So you can't shake your head or nod or

19   anything like that, so we need to verbalize the

20   answer.

21            Have you ever been involved in

Maria Diaz                                                                    1/15/2004

Page 5

1    litigation as a plaintiff, defendant or a

2    witness?

3         A.    Litigation, yes, I have.

4         Q.    And what was that?

5         A.    Medical malpractice.

6         Q.    What was -- in general, I don't need any

7    details --

8         A.    It was dismissed.

9         Q.    How long ago?

10        A.    Oh  --

11        Q.    Approximately?

12        A.    Between '95 and '96.  I'm not --

13        Q.    Okay, that's fine.  Is that the only

14   case?

15        A.    Uh-huh.

16        Q.    If you don't hear?

17        A.    Oh, yes.  I'm sorry.  I should say yes.

18   You asked me if that was the only case and I did

19   it wrong.

20        Q.    That's okay.  You did fine.

21               If you don't hear me and for whatever

Maria Diaz                                                                                      1/15/2004

Page 6

1    way, if I mumble or you just didn't hear the

2    question or you didn't understand the question,

3    just ask me to repeat it.  I'll be very happy to

4    do so.

5           If you want to take a break, and this

6    applies really to anyone, if anyone needs to take

7    a break for whatever reason, if you would like

8    some more water or coffee, if you want to use the

9    restroom facilities, if you just need to stretch

10   your legs, just let me know, that's not a

11   problem, we can do so.

12          If we're getting tired -- in fact, if

13   you just need to stretch while we're doing the

14   deposition, that's fine too, you won't break my

15   train of thought.  It's not a problem.  I have a

16   bad back, I can't sit for a long period of time,

17   so sometimes, you know, you need to move around.

18          If you don't know or remember the answer

19   to what my question is, you can just say that,

20   that's your answer.  That's all I want for you to

21   do is to answer the question.  So if you say I

Maria Diaz                                                                    1/15/2004

Page 7

1    don't remember, I don't know, that's fine.  So

2    don't -- you know, not that I'm encouraging you

3    to say that, but if that's what your answer is,

4    then that's what you should answer.

5            If you answer a question, I'm going to

6    assume that you heard it and that you understood

7    what I asked of you.  So for purposes later on,

8    since this is even though an informal setting as

9    far as the deposition, it won't be like on Law

10   and Order where you're being attacked on the

11   witness stand or anything like that.

12           This is a formal deposition so

13   everything you are saying is taken under oath.

14   It can or will be used later in additional court

15   proceedings.  The penalties of perjury still

16   apply to this just like if it were an actual

17   courtroom setting.

18           And obviously you are not in a position

19   or should not perjure yourself or give false

20   answers during the course of the deposition.

21           There may be a time when there are

Page 8

1    objections expressed by government counsel.

2    Unless government counsel instructs you not to

3    answer the question, you are still required to

4    answer the question.  The objections are for

5    preservation of the record later on where there

6    could be a challenge to it.

7            So, for example, if government counsel

8    had said objection, calls for speculation, that's

9    fine, you still then are to answer that

10   particular question.

11           Do you understand all the instructions

12   and explanations I just said?

13   A.    I understand.

14   Q.    Okay.  Great.

15           Now as you know we're here to talk about

16   the allegations surrounding sexual harassment

17   primarily, and battery as one of the allegations

18   was characterized, that were alleged to have

19   happened during a period of time between, I

20   believe, 2000 and 2002.

21           And what I would first like you to do,

Maria Diaz                                                              1/15/2004

Page 9

1    and we will go back and forth between things,

2    first what I would like you to do, please, is I

3    would like to take you through each of the

4    allegations that you made to get a sense, an

5    understanding for myself as to what your beliefs

6    are, at least remembering it today, of course,

7    what transpired.

8            My understanding is that the first

9    incident was in -- now you had indicated

10   somewhere -- and if I ever say anything factually

11   that you don't agree with, then say so, please.

12           I mean, I'm going to base it off my

13   recollection of reading through documents.  And

14   so if I say, you know, Dr. Diaz, my understanding

15   is you said that this had happened on this date,

16   and that's not -- it didn't happen or it didn't

17   happen on that date, then correct me obviously,

18   because if you answer that, I'm going to assume

19   again that I said it correctly.

20           So it's my understanding that it had

21   been indicated that the first incident in the

Maria Diaz                                                                1/15/2004

Page 10

1    airplane was in the summer of 2000, although I

2    guess it was checked and it was alleged to have

3    actually been May 25th, 2000.  Does that sound

4    accurate?

5        A.    That sounds correct.

6        Q.    Okay.  Now walk me through, if you

7    would, the airplane incident.

8            MS. DESHIELDS:  Objection.  We're here,

9    Mr. Zaid, to discuss scope of employment.  The

10   specific allegations you know about, you know

11   what they are.  If you're just simply doing this

12   because you want to establish a time frame, then

13   that's fine.  But we're not going to go through

14   every single allegation so that you can test what

15   the recollection of the incident was.

16   BY MR. ZAID:

17       Q.    Okay.  Let me do it this way.  I mean,

18   obviously I do know what's in the testimony

19   itself about the incidents.  Let's do it this way

20   and then we can address that if I have a dispute

21   on it.

Maria Diaz                                                          1/15/2004

Page 11

1            Who do you remember was on the plane as

2    well at that time, if you do?

3        A.   Everything is written in the statement

4    that I gave.

5        Q.   I do not believe, now again --

6        A.   Everything is written there.

7        Q.   I do not have -- and understand this, up

8    until this morning we only have redacted copies

9    of yours and others either written statements or

10   verbal testimony.

11           In producing those documents to us,

12   names, who are not either myself or Mr. Elders,

13   are redacted out.  So we actually don't get --

14   this is the typical document that I get.

15       A.   Yes, but I --

16       Q.   So I don't know names of people.

17       A.   There is a statement there that I made

18   and in that statement it walks it right through.

19   It does everything -- in fact, it was one that I

20   had signed.

21       Q.   This morning I was handed the unredacted

Maria Diaz                                                                    1/15/2004

Page 12

1    copies of --

2        A.   No, those that's not it.

3        Q.   Okay.  Which statement are you referring

4    to?

5             MS. DESHIELDS:  Why don't you direct her

6    to which statement.

7             MR. ZAID:  I don't know which statement

8    she is referring to.

9    BY MR. ZAID:

10       Q.   I'm not aware of any statement that

11   lists who was on the plane.

12       A.   Because -- you have the statement.  You

13   should have the statement.  It was the statement

14   that I gave when Col. Inglis talked to me.

15       Q.   As I recall you provided two written

16   statements on March 9th and March 14th.

17       A.   I don't remember dates.  You've got to

18   show them to me.

19       Q.   Okay.  That's fine.

20       A.   I do not remember dates.

21       Q.   That's why we bring all the documents.

Maria Diaz                                                          1/15/2004

Page 13

1            What I'm going to do is pass over to you

2     a statement, let me ask you whether you recognize

3     this document taken from Col. Inglis' report?

4         A.    This is the statement that I gave him

5     exactly, yes.

6         Q.    Okay.

7         A.    In that statement it has what happened.

8         Q.    Okay.  That's not my --

9         A.    And that's basically my recollection of

10    the whole thing.

11        Q.    Okay.  So are you telling me you don't

12    remember who the other flight crew members were?

13        A.    I'm telling you this is my statement.

14    And if you want, this is what --

15        Q.    Okay, Doctor, I don't want to start off

16    in a wrong foot here.  There is a difference

17    between whether if you don't remember, and I'm

18    not going to take fault with you if you don't

19    remember who the flight crew members were --

20        A.    I'm telling you this is my statement.

21    You can have it from here.

Maria Diaz                                                    1/15/2004

Page 14

1        Q.    So where in this statement does it

2    indicate who the other flight crew members were

3    on that flight?

4             MS. DESHIELDS:   Objection.

5    BY MR. ZAID:

6        Q.    Or does that statement indicate who the

7    other flight crew members were?

8             MS. DESHIELDS:   I'm still going to

9    object to this line of questioning, Mr. Zaid.  I

10   don't see how this is at all relevant to the

11   issue that we are here specifically to address.

12            MR. ZAID:   That's fine.  Relevance is a

13   standing objection throughout.  She still needs

14   to answer the question.  I still need to be able

15   to ascertain who witnesses were in the context --

16            THE WITNESS:   And I'm telling you this

17   is done under oath.

18            MR. ZAID:   I realize that.

19            MS. DESHIELDS:   The witnesses to whom

20   she spoke about her allegations against Col.

21   Elders.  And going back and asking her who was

Maria Diaz                                                      1/15/2004

Page 15

1    present on the flight crew when an incident

2    allegedly occurred doesn't specifically get to

3    that issue.

4            MR. ZAID:  If I'm going to ascertain who

5    she spoke to, I would like to know who was around

6    her that she might have been able to speak to.

7            MS. DESHIELDS:  Well, then why don't you

8    ask her that.

9            MR. ZAID:  That's fine.  I'm going to

10   ask questions as I deem fit.  Now you are free to

11   object, that's your right.  And unless you have a

12   privilege, you are not free to instruct her not

13   to answer.

14           MS. DESHIELDS:  I have not instructed

15   her not to answer.

16           MR. ZAID:  And I'm not saying you did.

17   I recognize that.

18           MS. DESHIELDS:  I've told you that I

19   think that this line of questioning isn't

20   relevant and I want a standing objection to it.

21           MR. ZAID:  Absolutely.  You don't need

Maria Diaz                                                                  1/15/2004

Page 16

1    my permission to have that standing objection

2    obviously.

3              MS. DESHIELDS:  No, I don't.

4              MR. ZAID:  All right.  Let's see where

5    we can go with this.

6    BY MR. ZAID:

7       Q.   Let me start from a summary perspective

8    of what I understand is the allegations and then

9    we'll jump off from there.

10             From what your testimony has been in the

11   written testimony and the verbal testimony, I

12   understand that there is essentially four major

13   allegations.

14             One is the incident on the airplane.

15   The second is the Amsterdam conversation, which

16   was alleged to have taken place in the summer of

17   2001.  Does that sound correct?

18             And again, believe me, I'm not trying to

19   pigeonhole you into a wrong date.  If you don't

20   remember and you want to refer me to the

21   statement, that's fine.

Maria Diaz                                                                      1/15/2004

Page 17

```
1       A.    I'm going to refer you to the

2    statement.

3       Q.    Okay.  Then there was an office kiss, an

4    alleged office kiss incident, correct?

5       A.    And I'm going to refer you to the

6    statement.

7       Q.    And a phone call on a Monday evening?

8       A.    I'm going to refer you to the statement.

9       Q.    And a Christmas party incident in

10   December of 2001, correct?

11      A.    And that's in the statement also,

12   correct.

13      Q.    Nothing I've said is inconsistent with

14   what you believe are in the statements, right?

15      A.    That is correct.

16      Q.    Okay.  Now with respect to the office

17   incident, it's just the two of you you're saying,

18   right, there was no other individuals present?

19      A.    That's in the statement.

20      Q.    Okay.  At the time that you say the

21   airplane incident happened, did you tell anyone
```

Maria Diaz                                                                      1/15/2004

Page 18

1    at that contemporaneous point in time of what you

2    alleged transpired on the plane?

3         A.    That's in the statement.

4         Q.    That's great.  But that's -- Dr. Diaz,

5    when I ask you these questions, we can go back

6    and forth all day on that.  And I'm here to get

7    what your recollections are today on everything.

8    I am not required to have memorized everything in

9    all of these documents, much of which --

10        A.    And I'm going to tell you --

11        Q.    Please let me finish because I won't

12   talk over you.

13        A.    I'm sorry.  I'm so sorry.

14        Q.    Much of which again I only have redacted

15   copies of your statements.  So when you refer me

16   back to the statement because you think there is

17   something in there, I actually might not know

18   what's in that statement because that information

19   would have been redacted.

20             Anyone that you told, Col. Werts or Col.

21   Inglis that you spoke to, if you told him I spoke

Maria Diaz                                                                    1/15/2004

Page 19

1    to Mike Mentges, I spoke to Todd Wilkinson, I

2    won't know that because their names will be

3    redacted from the documents, if you understand.

4          So I'm going -- I mean, I'm going to ask

5    again whether or not you told anyone at the time

6    of the alleged airplane incident.

7      A.    And I'm going to repeat it's in the

8    statement.  I'll read the statement to you, if

9    that's what you want.

10     Q.    No, I'm very good at reading.

11     A.    Because this is not -- you say it's

12   redacted, but there is nothing redacted here.

13     Q.    That's a document presented to me for

14   the first time this morning.  I've never seen

15   that unredacted statement before.  I have a very

16   redacted statement of that.

17          I have these documents, and what I have

18   before me are two binders.  One purports to be

19   the command directed report of investigation by

20   Col. John Inglis of 19 March 2002.  And the

21   second, a larger binder, purports to be the

Maria Diaz                                                            1/15/2004

Page 20

1    command directed report of investigation prepared

2    by Col. Werts on June 7th, or dated June 7th,

3    2002.

4              Have you read through these two binders?

5         A.   I have never seen those binders.

6         Q.   Okay.  Have you read through, have you

7    ever been given a copy of Col. Inglis's ROI?

8         A.   No, I was not.  But let me clarify that,

9    when the lawsuit went forward it was part of the

10   documentation.  Am I saying that clearly?

11        Q.   In the sense are you referring to at a

12   point in time?

13        A.   When I received my copies of the

14   lawsuit.

15        Q.   Not of the lawsuit.  You mean at one

16   point the government had --

17        A.   But I've never seen these.  No, the

18   government refused to give it to me.

19        Q.   Okay.  Prior to the lawsuit time, had

20   you ever seen any portions of your own

21   statements?

Page 21

1       A.    No, I did not.

2       Q.    Okay.  Without trying to determine at

3   what point in time it occurred, who have you

4   discussed the airplane incident with?  By listing

5   the individuals, which people have you discussed

6   what you purport to have alleged happened to you

7   on the airplane in May of 2000?

8       A.    The only time I discussed this was when

9   Col. Inglis started the investigation.  No one

10  knows what happened other than the investigation.

11      Q.    Okay.  So and again what I might do at

12  times is repeat just to make sure I understand

13  what you are saying so that there is no confusing

14  and also make for a clearer record later on.

15            Prior to the time that you were

16  interviewed by Col. Inglis, you had never

17  discussed the allegations of what transpired on

18  the airplane with anyone, is that what you are

19  saying?

20      A.    That is what I'm saying.

21      Q.    Okay.  Now my understanding of the

Page 22

1   Amsterdam incident from what I've read, and just

2   tell me if I'm mischaracterizing it --

3          MS. DESHIELDS:  Mr. Zaid, could we get

4   some date so that we could clarify what time

5   frame we're talking about, please?

6          MR. ZAID:  Sure.  Sure.  Let me think

7   how I'm going to do this.  That will be helpful.

8   Let's put together a time line.

9   BY MR. ZAID:

10     Q.   And bear with me because I'm going to --

11  not knowing the order in these unredacted

12  binders, I may need to find things.  And

13  everything I will put before you so you don't

14  have to worry about that.

15     A.   Could you because I --

16     Q.   And I do have multiple copies of certain

17  documents.  Again, they're not unredacted

18  unfortunately, so let me do that.

19         MS. DESHIELDS:  The Amsterdam thing was

20  summer of 2000.

21         MR. ZAID:  Summer of 2001 is actually

Maria Diaz                                                                    1/15/2004

Page 23

1    the Amsterdam incident.

2          Let's mark this as Exhibit 1.

3          (Diaz Deposition Exhibit Number 1 was

4    marked for identification.)

5          MS. DESHIELDS:  May I ask where you took

6    these copies?  Were these copies in your

7    possession before I gave you --

8          MR. ZAID:  Yes.

9    BY MR. ZAID:

10     Q.   What I've just had marked as Exhibit 1

11   is command directed report of investigation by

12   Col. Inglis.  Actually I think this was the one

13   that you submitted as part of the case.  Either

14   that or I'll just, not that I need to, but as far

15   as my recollection is every document that I'm

16   using has been either produced by the government

17   as part of the case or produced by the government

18   in response to a FOIA request.

19         We're going be jumping around

20   unfortunately just by the basis of the case, but

21   just looking at, so you know where I am at, on

Maria Diaz                                                          1/15/2004

Page 24

1   page five, and the pages are in the bottom right

2   corner, the page numbers, and this particular

3   page just lists the chronology of events, so I

4   will just use that as a basis for now.

5          So in the summer of 2001, and this is

6   what you purportedly told Col. Inglis, that Karl

7   Elders had offered you to travel to Amsterdam on

8   a free buddy pass, where he would show you a good

9   time and go window shopping.

10          And then my understanding is as it says

11   throughout later in the report that you were

12   later told by individuals that window shopping

13   referred to red light district, which is I think

14   what everybody understands a red light district

15   is.

16          Did you discuss with anyone prior to the

17   time that you talked to Col. Inglis that incident

18   with respect to the invitation to go to

19   Amsterdam?

20      A.   No, I did not.

21      Q.   Okay.

Maria Diaz                                                                          1/15/2004

Page 25

1       A.    At that time.  Of course, during the

2    report I had to tell Col. Inglis, and it's

3    written here.

4       Q.    So at the time when it happened in 2001,

5    though --

6       A.    At the time, no.

7       Q.    You didn't mention it to anybody.  And

8    you are saying you didn't mention it to anybody

9    until you had your conversation with Col. Inglis?

10      A.    Let me correct that.  It was mentioned

11   in Col. Elders' office when he was there with

12   Maj. Falter and it was one evening -- not

13   evening, I should say afternoon.  Date-wise I

14   can't tell you.  But it was mentioned a second

15   time with Maj. Falter.

16      Q.    Do you have any recollection of even, I

17   mean not an exact date, but a sense --

18      A.    It was -- I'm going to say no, I don't

19   have an exact date.

20      Q.    Okay.  Then in also the summer of 2001,

21   still looking at page five, how you had told Col.

Page 26

1    Inglis about an incident, an alleged incident

2    where you had gone to Karl Elders' office, I

3    presume at the base --

4         A.    Can I put my glasses on?

5         Q.    Absolutely.

6         A.    I forgot, I need glasses.  I'm squinting

7    and it's not conducive.  I'm sorry to interrupt.

8    I am so sorry.

9         Q.    Not a problem.

10        A.    Better.  Okay.

11        Q.    Sure.  An incident in the office where

12   you had alleged that he had tried to kiss you.

13   At the time contemporaneous with the event, did

14   you tell anyone about that incident?

15        A.    No, I did not.

16        Q.    Okay.  Before the time that you met with

17   Col. Inglis and related the information to him,

18   did you have any discussions with anyone

19   regarding the incident?

20        A.    No, I did not.

21        Q.    Okay.  And skipping the OPR telephone

Page 27

1    call issue then where there was an allegation

2    that at a Christmas party, two Christmas parties,

3    December 14th, 2001, and then I think really the

4    more significant one is December 21st, 2001, you

5    had alleged that at that time Karl Elders had

6    forcibly grabbed you and committed what we would

7    say in legal terms a battery upon you.

8           At the time that that alleged incident

9    happened, did you tell anyone about the incident?

10   A.   In that respect I did mention that he

11   had twisted my arm and I mentioned it to at that

12   time Maj. Mentges.  But other than that it just,

13   that was the only thing I said.

14   Q.   And where were you, if you recall?

15   A.   I was in operations.  It was outside the

16   door.  Well, not really operations.  It's the

17   exit door to maintenance and to walking towards

18   the airplanes.  So I don't know, the back door.

19   Q.   Okay.

20   A.   I mean, I really don't know if it's

21   called a back door or not.

Maria Diaz                                                      1/15/2004

Page 28

1      Q.    That's okay.   That's okay.   Now the

2   Christmas party, was this an evening party or an

3   afternoon party?

4      A.    An afternoon party.

5      Q.    And are you all in uniform at the time?

6      A.    I don't --

7      Q.    Or not necessarily formal uniform, but

8   any military gear?

9      A.    This was the Christmas party for the

10  people who work there, technicians.

11     Q.    Status-wise, what is your understanding

12  of your status when you were there, active duty,

13  Guard duty, just dropping by as a civilian, do

14  you know?  I've never been in the military, so in

15  some sense you might have to walk me through some

16  issues about the military context.

17     A.    I'm going to have to correct you there.

18     Q.    Sure.

19     A.    Because I am there frequently and the

20  reason I am there frequently is because I'm the

21  doctor that's closest to the base.  I also give a

Page 29

1    lot of vaccinations.  I give ATC 130

2    vaccinations.  If there is problems and physicals

3    are supposed to be done, then I'm there.  So I'm

4    there a lot.

5            Now when I'm there, I'm there in an

6    official capacity.  And you want me to tell you

7    whether it's active duty or what?

8        Q.   Well, there is a distinction, right, as

9    far as when you may be on active duty, correct?

10   Between -- you are activated on certain orders at

11   times.

12       A.   There is --

13       Q.   And to Title 10 status or Title 32

14   status.

15       A.   I don't understand that to be honest

16   with you.  I know that when I'm there, I'm in an

17   official capacity because I have to give

18   vaccinations, I have to do physicals, and they

19   need these things done.

20       Q.   And how often would you say that you

21   would go to the base?  Obviously that could vary,

Maria Diaz                                                                                                          1/15/2004

Page 30

1    but.

2        A.    It varies.

3             MS. DESHIELDS:    What time frame?

4    BY MR. ZAID:

5        Q.    And that's fine.    During the time frame

6    of 2000, May 2000 to 2002, March of 2002.    You

7    don't even have to --

8        A.    That's hard to answer because I would

9    be -- it's just hard to answer.

10       Q.    From a requirement standpoint, you are a

11   traditional Guard member, correct?

12       A.    Uh-huh.    I mean yes, I am.    Sorry.

13       Q.    Thank you.    Sometimes I don't even catch

14   it.    So you are required without obviously that

15   there could be an excuse for not attendance, but

16   as a custom or as a practice, you would be

17   required as any traditional Guard member to be

18   there for duty one weekend a month, correct?

19       A.    Yes.

20       Q.    And other than that, what other

21   requirements did you have during the period 2000,

Maria Diaz                                                                1/15/2004

Page 31

1    2002, if they're the same now you can extend the

2    time frame, to be on base other than the weekend

3    duty?

4         A.    I don't understand your question because

5    I thought I answered it.

6         Q.    Okay.

7         A.    Sometimes, especially after 9-11, they

8    needed people to get vaccinated with Anthrax

9    shots.  I was there to give the Anthrax shot to

10   get the people ready for deployment.

11            A lot of people were leaving so I had to

12   do physicals or even have signing so that they

13   could be ready to have -- you know, medical

14   readiness is very important.  I don't know how

15   many times I am on base because it's constantly

16   coming and going.

17        Q.    Okay.  And in these times and understand

18   now as people are deploying to Afghanistan, to

19   Iraq, you would come in, what, even during the

20   week, right, to do these functions?

21        A.    That is correct.

Maria Diaz                                                                                          1/15/2004

Page 32

1        Q.    And are these functions where you would

2     come in during the week times in which you would

3     be paid for your services to the Guard?

4        A.    I was not paid.  If Col. Elders

5     remembers, I flew almost a whole year without

6     being paid because I did not know how to fill out

7     the forms.  Call it stupid, but I did not know.

8     And that was a big -- I was a big joke.

9        Q.    As a normal practice, what would you do,

10    would you -- there is obviously no time punch

11    clock or anything, but if you would show up on a

12    Tuesday to perform some official services --

13       A.    I would go do the service.  I'm sorry, I

14    interrupted you.

15       Q.    That's okay.  I appreciate that.  Would

16    you then fill out a form that you hand in to

17    personnel that would say I was here today in my

18    official capacity so I should be paid for this

19    day or would somebody else do that?

20            How would the Guard know that you were

21    there on a particular -- besides obviously

Maria Diaz                                                                1/15/2004

Page 33

1    remembering you might have been there on a day,

2    how would the Guard know from a documentation

3    standpoint that you were performing a function as

4    a Guard member?

5        A.    When I signed the paper.  If I give a

6    shot, I have to sign it on the immunization

7    record.  If I do anything to a patient, I have to

8    sign it.

9        Q.    But there would, as I understood you

10   saying, there is a formal process that you would

11   sign documentation to indicate to the Guard that

12   you were working part or all of that day; is that

13   correct, there is some sort of form, I don't know

14   what the AF form number is, or whatever, that you

15   would sign to indicate to the Guard, it's

16   Tuesday, I'm not normally supposed to be here,

17   it's not a UTA drill.

18       A.    The only reason I would be on base is if

19   they would call me or if I was going to fly.

20       Q.    Would you ever go to base just to stop

21   by and talk to people?

Maria Diaz                                                              1/15/2004

Page 34

1            MS. DESHIELDS:  During what time frame?

2            MR. ZAID:  During the time period of

3    2000 and 2002.

4    BY MR. ZAID:

5        Q.    Was that customary for you to do, to

6    just drop by and say hello, talk to people, see

7    what's going on?

8        A.    I don't recall how many times I went

9    down there, but every time I would go down there

10   I would stop by and talk to people, but usually

11   it would be when I was required to go down there.

12       Q.    But there were times where you just

13   would stop --

14       A.    I think I answered your question.

15       Q.    That's okay.

16       A.    You keep on asking me the same question

17   in a different form, but I've answered your

18   question.

19       Q.    I realize you may think so, but at times

20   I don't necessarily think so.  And my purpose

21   here is just to make sure we get exactly to the

Maria Diaz                                                        1/15/2004

Page 35

1   answer.

2            I don't want to be in a position for

3   either of us -- the best outcome is that both of

4   us agree that there is an answer.  And maybe I

5   won't like the answer, but I want to make sure

6   that I get the answer.  Sometimes maybe you can

7   say that I might not be as swift as I should be

8   to understand.  So bear with me if that's the

9   case.

10           I interpret from what you are saying is

11  that there were times where you would just stop

12  by the base, not in an official capacity, and

13  talk, say hello, whatever?

14      A.   And I'm repeating to you again, I said

15  that I would only go down there if they called

16  me, if there was a problem.

17      Q.   Okay.  And in those circumstances that

18  you would go to the base, would you be in uniform

19  or civilian clothes or it could be either?

20      A.   It is hard to recollect.  But sometimes

21  I would be in civilian clothes in an official

Maria Diaz                                                           1/15/2004

Page 36

1    capacity.  You can be in civilian clothes and be

2    in an official capacity.  If not, I would not

3    have been able to sign off on medical records.

4        Q.    Okay.  Now, for example, see there is

5    always a reasoning for my questioning.  My

6    understanding is that at times you would go to

7    the base just in a civilian capacity to stop by

8    and talk to people.

9            So, for example, it's my understanding

10   that one late evening you brought Warren Thomas

11   some dinner.  Is that something you recall during

12   the time frame that we're talking about, 2000 and

13   2002?

14       A.    I don't recall bringing him dinner.

15       Q.    Okay.  Let me have marked this as Number

16   2, please.

17           (Diaz Deposition Exhibit Number 2 was

18   marked for identification.)

19   BY MR. ZAID:

20       Q.    Dr. Diaz, I had marked as Exhibit Number

21   2 --

Maria Diaz                                                              1/15/2004

Page 37

1    A.    Do you want this back?

2    Q.    You can just hold that actually next to

3  you because we may refer back to it.

4    A.    Okay.

5    Q.    I've had marked as Exhibit Number 2, a

6  declaration executed by Raul Willem on March 7,

7  2002.  Take your time and read through it and

8  just let me know when you're ready after you've

9  read it.

10    A.    Okay.

11    Q.    Is this a document you've ever seen

12  before?

13    A.    I saw this during the investigation.

14    Q.    And when you say the investigation, are

15  you referring to the Inglis investigation?

16    A.    And Col. Werts.

17    Q.    Okay.

18    A.    And with the lawsuit.

19    Q.    Right.  Correct, it was an exhibit at

20  one point.  Now in this document, then Maj.

21  Willem is indicating that you had spoken to him

Maria Diaz                                                                    1/15/2004

Page 38

```
 1    in February about the incidents that he relates

 2    you told him about which is some of what we just

 3    talked about before.

 4            Now you had indicated from how I

 5    understood your responses to me, that when we

 6    went through the incidents, you hadn't talked

 7    about it to anyone until you met with Col.

 8    Inglis.  So that's not entirely true, correct?

 9       A.   This is true in the sense that I did not

10    talk to anybody.  Col. Willem is head of security

11    police.  And the reason I talked to him was

12    because I was feeling very uncomfortable and I

13    did not know how to handle the situation and that

14    is why I talked to him.  But he is the chief of

15    security police, at that time he was.

16       Q.   Okay.

17       A.   And he was active duty.

18       Q.   Okay.  And that's fine.  But I was not

19    searching for a distinction between what

20    circumstance a person was in or the reason why

21    that you talked to him.  And so listen very
```

Maria Diaz                                                              1/15/2004

Page 39

1    carefully when I ask the questions.

2           I had asked whether you had spoken to

3    anyone about a particular incident.  So now we

4    have that you did speak to Maj. Willem prior to

5    speaking to Col. Inglis.

6       A.   And I said yes.

7       Q.   Okay.  But that's not what you said

8    before.

9       A.   Well, he's chief of security police.

10      Q.   Okay.  That's irrelevant for the purpose

11   of the question.  So, for example, we'll talk

12   about you also talked to Maj. Mentges before you

13   spoke to Col. Inglis, correct?

14      A.   Yes.  And he's a senior -- he works at

15   the base.  He is -- he just works at the base.

16      Q.   Okay.  And I understand.  And please

17   understand --

18      A.   And it's written there.

19      Q.   I realize that.  And, again, you really

20   need to listen to my questions because I'm not

21   asking for what the individual's capacity was or

1/15/2004

Page 40

1    even at this stage why you spoke to them.

2        A.   Okay.

3        Q.   I'm only trying to ascertain at this

4    moment who you spoke to and at what point in time

5    that you spoke to them.  And so earlier when I

6    asked you about well did you tell anyone about

7    this incident or that incident, you had responded

8    no, and then you said you didn't speak to anyone

9    until you spoke to Col. Inglis, and that's not

10   true, right, because you spoke to people before

11   you spoke to Col. Inglis, right?

12       A.   That is correct.

13       Q.   Okay.  So, again, I'm not trying to

14   trick you into saying something, I'm only trying

15   to get at what the facts are as you understand

16   them to be.

17           Now let's start with Maj. Willem.  When

18   was the first time -- let's put it this way, he

19   says in his statement that he refers to a time of

20   about two weeks ago which would put it at March

21   of 2002, that you spoke to him.  Had you ever

Maria Diaz                                                          1/15/2004

Page 41

1    spoken to him before that time about any of the

2    sexual harassment allegations?

3        A.    I don't recall.

4        Q.    What was the nature in which or the

5    circumstances in which you had this discussion

6    with Maj. Willem?

7            MS. DESHIELDS:   Objection.   What

8    discussion?

9            MR. ZAID:   The discussion referred to in

10   Maj. Willem's memorandum.

11           MS. DESHIELDS:   Of March 7, 2002?

12           MR. ZAID:   Correct.

13           THE WITNESS:   Can you repeat it?

14           MR. ZAID:   Sure.

15   BY MR. ZAID:

16       Q.    The conversation that Maj. Willem is

17   relating in this memorandum that you and he had

18   in February of 2002, what were the circumstances

19   of that discussion?   Why were you having that

20   discussion with him?

21       A.    I was on base and they were getting

Maria Diaz                                                           1/15/2004

Page 42

1    ready for deployment and he noticed I was just

2    very, very quiet.  He knew something was wrong

3    and so he asked me.

4        Q.    Now you had a UTA in early February,

5    correct, a UTA weekend?

6        A.    I don't remember.

7        Q.    Okay.

8        A.    I don't remember.

9        Q.    Do you recall that the day that you had

10    this conversation with Maj. Willem, was that one

11    of the days where you were called in to do the

12    vaccinations?

13        A.    I told you, I don't remember the date.

14    I know it was deployment.  I know I was getting

15    them ready, but date-wise I don't remember.

16        Q.    Okay.  And I'm not asking you for

17    the specific date.  But do you have any

18    recollection --

19        A.    I do not remember.

20        Q.    Okay.  But you are saying you were on

21    official status, at the time you were functioning

Maria Diaz                                                                          1/15/2004

Page 43

1    in official Guard capacity, correct?

2         A.    Yes, I was.

3         Q.    Was there anyone else present during the

4    conversation besides the two of you?

5         A.    No, it was just us two.

6         Q.    And was Maj. Willem, I think you said he

7    was, but just clarify, was he on duty at the

8    time?

9         A.    To the best of my knowledge, he was.

10        Q.    Okay.

11        A.    He had a uniform on.

12        Q.    Okay.  And was this conversation since

13   you were I guess dealing with him from a medical

14   standpoint, correct, was this in your, I don't

15   know what your medical office is called, were you

16   engaged in a doctor-patient issue or were you in

17   the cafeteria or do you remember where the

18   conversation took place?

19        A.    It took place -- I can't -- it took

20   place in security.

21        Q.    So you had gone to his office?

Maria Diaz                                                        1/15/2004

Page 44

1    A.    I had gone, it took place in security.

2    I don't know if it was his office or it was not

3    his office.

4    Q.    And do you recall whether did you decide

5    to go there to talk to him or you were there

6    again with respect to preparing him for

7    deployment?

8    A.    Not preparing him.  I was preparing

9    security for deployment, okay.  You are making it

10   sound like I was there for him.  I was there for

11   the security people, they were being deployed.

12   Q.    I'm not meaning that you were there only

13   for him.

14   A.    Please clarify that because it doesn't

15   sound right.

16   Q.    That's what I'm saying, if I say

17   something that you think is inaccurate, then

18   definitely clarify that for the record.

19        I'm referring that you not necessarily

20   went to base for him, you were doing whatever

21   else you were doing, but for purposes of the

Maria Diaz                                                    1/15/2004

Page 45

1   conversation you had with him there, you were

2   functioning, as you say, in your medical capacity

3   with helping him prepare for deployment or no?

4   I'm trying to get to the nature of what --

5        A.   I'm repeating to you, I was preparing

6   security.  He was there, but I was not preparing

7   just him, I was preparing security.

8        Q.   I realize that.  But the --

9        A.   How many ways are you going to put it?

10  I mean, I don't want you to say I was there for

11  him because at no time was I there for him.  I

12  was there to prepare them for deployment.

13       Q.   Including him or no?  That's what I'm

14  asking, your reason for having a conversation

15  with him.

16       A.   But you are making it sound like I was

17  there for him.  It's including the whole

18  security.

19       Q.   I understand that's why you were at

20  security offices because the other members of

21  security that are there, you are doing whatever

Page 46

1   you were doing, including meeting with Willem.

2   But the purpose of your meeting with Willem was

3   to prepare him for his deployment.

4          That's what I'm trying to clarify.  I'm

5   not saying you weren't there for everybody else.

6   I'm not saying you went to security only for

7   him.

8      A.   When you talk to me, it's making me feel

9   like I went there specifically to talk to him.

10     Q.   That's exactly what I'm saying you

11  didn't do.

12     A.   I did not do that.

13     Q.   That's exactly what I'm saying.

14     A.   I'm sorry.  If I'm just --

15     Q.   That's what I meant.  I'm in full

16  agreement with you on that.  Now is it your

17  understanding or do you know -- let me put it

18  this way.  Willem is a police officer, do you

19  know, in his civilian capacity?

20     A.   Yes, I do know that.

21     Q.   How long have you known Raul Willem?

Maria Diaz                                                              1/15/2004

Page 47

```
1      A.    I don't recall.

2      Q.    Approximately?  Five years?  Ten years?

3      A.    I don't recall.  I guess -- I guess.

4      Q.    You have been in the Guard for how long?

5      A.    Since 1990.

6      Q.    Was he always in the Guard with you?

7      A.    He was in the clinic.

8      Q.    Okay.

9      A.    I don't know.  I don't know when he came

10     in.  I don't know how long he's been there.  I

11     was in the clinic and I was mainly just doing the

12     clinic functions.

13         Q.    Is Willem someone that you ever

14     socialized with outside of the base?

15     A.    No.

16         Q.    Okay.  Do you know any members of his

17     family?

18     A.    No.

19         Q.    Now when you had the conversation with

20     Willem, did he advise you to file a formal claim

21     or report of harassment?
```

Maria Diaz                                                    1/15/2004

Page 48

1       A.    Yes, he did.

2       Q.    And when you had the conversation with

3   Willem, it was not for the purpose of reporting

4   Mr. Elders, correct?

5       A.    It was not -- what I needed was guidance

6   as to what to do.  I did not know what to do.  It

7   was very straining for me especially with

8   everything that was going down, going on with the

9   operations.  And I could not -- I did it because

10  he was chief of security police.

11      Q.    But now, as you said before though, you

12  didn't go for the purpose of talking to him.  It

13  was that he had asked you, as you said, that he

14  thought he noticed something that didn't seem

15  correct with you, right?  He had inquired from

16  you; is that correct?

17      A.    That is correct.

18      Q.    Now did you tell him not to tell anyone

19  what you had told him?

20      A.    I told him I was afraid to make any

21  formal complaints and I told him that I just

Maria Diaz                                                                1/15/2004

1    didn't know what to do.

2        Q.    Okay.  But did you tell him not to tell

3    anyone?

4        A.    I told him I was scared.

5        Q.    Okay.  I realize that.  And if there is

6    anything else you want to say that you told him,

7    that would be fine.  But --

8        A.    I told him that nobody would believe me.

9        Q.    Okay.  But did you tell him not to

10   repeat the allegations to anyone?

11       A.    I did tell him not to say anything.

12       Q.    Okay.  Do you recall did he advise you

13   to report it through your chain of command?

14       A.    Yes, he did.

15       Q.    Okay.  At that time who was your chain

16   of command?

17       A.    Col. Elders.  I reported to Col. Elders.

18       Q.    And how about going up through the

19   ranks, how would your chain of command have

20   worked?

21       A.    I believe then it would be Col. Elders,

Maria Diaz                                                          1/15/2004

Page 50

1   Col. Thomas, Col. Inglis.

2        Q.   Do you know who would be?

3        A.   Gen. Beasley, I guess.

4        Q.   Now was Raul Willem in your chain of

5   command?

6        A.   He's chief of security police.

7        Q.   Okay, I understand that.  But was he in

8   your chain of command?

9        A.   And I'm repeating to you he's security

10  police.

11       Q.   Okay.  I realize that.  I'll repeat to

12  you, was he in your chain of command?  That's a

13  very specific military issue.  Was he in your

14  chain of command?

15       A.   My chain of command would have been Col.

16  Elders.

17       Q.   And then you said Thomas, Inglis and

18  Beasley.  So the answer would be no, Willem was

19  not in your chain of command, right?  Right?

20  This is not a trick question.

21       A.   I'm telling you he was chief of police.

Maria Diaz                                                                    1/15/2004

                                                                              Page 51

1        Q.    I realize that.  But you are not

2    answering the question whether he --

3        A.    I think I answered the question.

4        Q.    I mean, you've been in the military for

5    more than a dozen years.  I presume you know what

6    is or who is or who is not in your chain of

7    command.

8        A.    To be quite honest with you, my only

9    chain of command was Col. Elders as far as I was

10   concerned.

11       Q.    Okay.

12       A.    I reported to Col. Elders.

13       Q.    As a medical officer, do you also have a

14   medical chain of command?

15       A.    No, because I'm with squadron.

16       Q.    Okay.  Now during the period of 2000 to

17   2002, how would you characterize your

18   relationship with Warren Thomas?

19             MS. DESHIELDS:  Objection.

20   BY MR. ZAID:

21       Q.    Was he a friend?

Maria Diaz                                                                    1/15/2004

Page 52

```
1      A.    He was the DCO.

2      Q.    Okay.  Was he a friend of yours?

3      A.    He's a colleague of mine at the National

4   Guard.

5      Q.    How about socially, were you social

6   friends with him?

7      A.    No, I was not social friends with him.

8      Q.    Have you ever been to his house?

9      A.    His mother passed away.  They had a

10  small wake at his house, yes.  But it was

11  after -- oh gosh, when did it -- his wife's

12  mother passed away and that was recently too,

13  that was 2003.

14     Q.    Besides the wakes, are those the only

15  times that you went to Warren Thomas' house?

16     A.    Uh-huh, the wake.

17     Q.    Are you friendly with his wife?

18     A.    She's a hospice nurse.  I am not

19  friendly with his wife.  And I do give  -- she

20  has taken care of some of my patients on the

21  outside.
```

Maria Diaz                                                          1/15/2004

Page 53

1      Q.    Would you say that Warren Thomas was

2   someone who you felt comfortable in confiding in?

3           MS. DESHIELDS:  Objection.

4           THE WITNESS:  No, I did not confide in

5   him.

6   BY MR. ZAID:

7      Q.    At times during 2000 and 2002, if there

8   was something bothering you about something that

9   was going on at work, an issue at work, you are

10  out of syringes or whatever, I'm making that up,

11  obviously, would you talk to Lt. Col. Thomas

12  about these situations?

13     A.    No, I did not talk to Col. Thomas about

14  this.

15     Q.    I didn't ask about this.  But if there

16  is an issue, you're unhappy with something going

17  on completely work related, would you talk to

18  Thomas?

19     A.    I would talk to Col. Elders and Col.

20  Thomas both if there was an issue going on.

21     Q.    Okay.  And during 2000 to 2002, how

Maria Diaz                                                        1/15/2004

Page 54

```
 1   would you characterize your relationship with

 2   Col. Inglis?  Besides being one of your

 3   commanding officers, was he somebody you were

 4   friendly with?

 5        A.   No.

 6        Q.   Did you ever socialize with him?

 7        A.   No.

 8        Q.   If there was a problem about anything,

 9   would you go and talk to him?  A work problem,

10   would you ever go and talk to him?

11        A.   No.

12        Q.   Did you feel that you were in a position

13   if there was something bothering you to go talk

14   to either Thomas or Inglis?

15        MS. DESHIELDS:  Objection.

16        MR. ZAID:  Can you do me a favor and

17   state the grounds for your objection, please?

18        MS. DESHIELDS:  I don't see the

19   relevance of your questions at all.  We are here

20   on one issue.  And I know that I'm beating this

21   like a dead horse, but we're here on the issue of
```

Maria Diaz                                                                    1/15/2004

Page 55

1   scope of employment.  And your questions are

2   ranging far afield from that very narrow issue.

3          MR. ZAID:  Okay.  If it's a relevance

4   objection, you have a standing objection, you

5   don't need to continue to object.

6          MS. DESHIELDS:  I will object to any

7   question that I see.  And I objected to the line

8   of questioning that you had earlier because it

9   related to something slightly different.  So I

10  will tell you when I need a standing objection.

11         MR. ZAID:  A standing objection is a

12  standing objection throughout the deposition.  If

13  you are going to continually object on a standing

14  objection, I'm going to get the judge on the line

15  and say that you are making an effort to tell the

16  witness that there is a particular problem with

17  how this particular answer could be.  Relevance

18  objections --

19         MS. DESHIELDS:  And that hasn't

20  happened.  You asked for --

21         MR. ZAID:  Let me finish and I will let

Maria Diaz                                                                                    1/15/2004

Page 56

1    you put everything on the record.

2              MS. DESHIELDS:  Go ahead.

3              MR. ZAID:  A relevance objection stands

4    and I understand that.  Now if there is a

5    different objection because of how I asked a

6    particular question, all I'm asking is for you to

7    state the grounds for the objection so that later

8    on we can figure out what it is, vague, whatever,

9    no foundation in the record.

10             All I want is just for you to state the

11   grounds for the objection just so we can try and

12   deal with it whether now or later rather than

13   just saying objection.  That's all I'm asking.

14             MS. DESHIELDS:  And when you asked me to

15   state the grounds, I did.

16             MR. ZAID:  I realize that.  And you said

17   relevance.  Relevance is a standing objection and

18   you have no need to continue to say that.  All

19   you are doing is taking time from my deposition.

20             MS. DESHIELDS:  I disagree with you on

21   that, but we can move on at this point.

Maria Diaz                                                                    1/15/2004

Page 57

1    BY MR. ZAID:

2        Q.    Now you had indicated before that you

3    knew that Willem was a police officer, correct, a

4    civilian police officer?

5        A.    That is correct.

6        Q.    Okay.  Now as far as you know, he's an

7    individual as a police officer I presume who's

8    skilled in questioning people.  Would you say

9    that's a fair assessment?

10            MS. DESHIELDS:  Objection.

11            THE WITNESS:  I don't know.

12    BY MR. ZAID:

13        Q.    Okay.  And now he had indicated that he

14    thought you were crying when you spoke to him and

15    that's something that you deny.  Is that correct?

16        A.    I was very upset, but I don't recall

17    crying.

18        Q.    Okay.  Now what is your understanding as

19    to who Maj. Willem then told about the

20    conversation that he had with you?

21        A.    I don't know who he told.

Maria Diaz                                                            1/15/2004

Page 58

1        Q.    Okay.   Do you have any knowledge besides

2   the fact that he executed this declaration as to

3   what he did with the information you told him?

4        A.    No, I don't know.   Maybe I'm -- for my

5   clarification?

6        Q.    Sure.

7        A.    Okay.   You are saying this and what he

8   did to it?

9        Q.    What I'm saying is he, Maj. Willem,

10  obviously told -- I forget whether he went to

11  Gen. Beasley or somebody and said Dr. Diaz told

12  me this information.   We know he obviously told

13  somebody.   And then he was told to write this in

14  a memo for the record.

15       A.    Okay.   Okay.

16       Q.    Other than I think it was Gen. Beasley.

17  The question that I was trying to get at is

18  whether you knew if Maj. Willem had told -- and,

19  again, obviously he told investigators before the

20  investigation started whether he had told anybody

21  else.   I'm sorry, you've just got to verbalize.

Maria Diaz                                                        1/15/2004

Page 59

```
 1      A.   I am so sorry.

 2      Q.   It happens all the time.  Don't worry

 3    about it.

 4      A.   I'm so sorry.

 5      Q.   And the answer?

 6      A.   No, I did not.

 7      Q.   Okay.  Now you are obviously a civilian

 8    doctor, correct?

 9      A.   Correct.

10      Q.   And you have your own private medical

11    office, correct?

12      A.   Correct.

13      Q.   And you work also at Franklin Square

14    Hospital, correct?

15      A.   Correct.

16      Q.   Is it hospital privileges or you have an

17    office at the hospital?

18      A.   No, hospital privileges.

19      Q.   Okay.  How often would you say that you

20    would exercise those privileges?

21      A.   Every day.
```

Maria Diaz                                                                          1/15/2004

Page 60

1      Q.    Okay.  Besides your office and Franklin

2  Square, are there any other locations or primary

3  locations that you would use for your civilian

4  work?

5      A.    My primary hospital is Franklin Square.

6      Q.    Okay.  And where is your private office,

7  it's not part of your personal home, right?

8      A.    No, it's not.

9      Q.    Where is the private office?

10     A.    It's on 6 Falls Avenue.

11     Q.    And that's where?

12     A.    That's in I want to say it's Middle

13  River, but I don't know if it's Middle River or

14  Essex, or am I right on the line, but it's I'm

15  going to say Middle River.

16     Q.    And I take it that you have -- in your

17  civilian capacity, you have people who you are

18  personally close to, friends of you, your

19  husband, your family, right?

20     A.    I do not have friends in civilian

21  practice.  I have a family.

Maria Diaz                                                          1/15/2004

Page 61

1      Q.    Are there any individuals who you

2   socialize with in a civilian capacity?

3      A.    No, I don't.

4      Q.    No one at all?

5      A.    No one.

6      Q.    Outside of work?

7      A.    No one.

8      Q.    You don't go out to dinner with anyone?

9      A.    No, we do not.  My husband and I do not.

10     Q.    Or take vacations with anyone?

11     A.    We take vacations with the kids.

12     Q.    How about family members, do you have

13  siblings?

14     A.    I have one sister who is in Puerto Rico.

15     Q.    Are you close with her?

16     A.    Extremely close.

17     Q.    Have you at any time told her about any

18  of the incidents with Karl Elders?

19     A.    I told my sister about the incident

20  after the investigation was started.

21     Q.    And the investigation you are referring

Maria Diaz                                                            1/15/2004

Page 62

```
 1    to is Col. Inglis' investigation?

 2         A.   Yes.

 3         Q.   Okay.  So we're talking about March of

 4    2002, thereabouts, I guess?

 5         A.   I don't -- whatever date the

 6    investigation of March, 2002.

 7         Q.   Did you tell her at any time before

 8    that, any contemporaneous discussion with her

 9    about --

10         A.   No.

11         Q.   None at all?

12         A.   None at all.  None at all.

13         Q.   What is it that you told her?

14         A.   I told my sister that I had pressed

15    harassment charges against an officer and that

16    was it.

17         Q.   Did you discuss any of the details of

18    what the harassment allegations were?

19         A.   No, I did not.

20         Q.   And this was a telephone conversation?

21         A.   In my house.
```

Maria Diaz                                                                          1/15/2004

Page 63

1      Q.    Personal?

2      A.    In my house and in Spanish.

3      Q.    I mean on the telephone though?

4      A.    In my house --

5      Q.    No, I realize that.

6      A.    I'm telling you yes.

7      Q.    That's what I'm saying.  When you say in

8    your house, you're giving me the impression maybe

9    you were having a conversation with her in your

10   house.

11     A.    It would have to be on the telephone.

12     Q.    I'm sorry.  Again, so when we go back

13   and read the record just to make sure.  It may

14   seem ridiculous as we sit here.  But just so we,

15   when we go back and read the record.

16          All right, telephone conversation with

17   her from your house.  Besides that one telephone

18   conversation, did you ever discuss it with her

19   after that?

20     A.    I discussed it with her when the Col.

21   Werts investigation started.

Maria Diaz                                                            1/15/2004

Page 64

1     Q.     Okay.  What is it that you told her?

2     A.     That it was continuing.

3     Q.     How about any other conversations with

4   her?

5     A.     Other than to say that Col. Elders sued

6   me.

7     Q.     Okay.

8     A.     No other conversations.

9     Q.     But, again, you are saying that you

10  never discussed any of the specific allegations

11  with her?

12    A.     Before -- what you are saying is that

13  I -- the paper that I wrote down, no, I did not

14  discuss that with her.  No, I did not.

15    Q.     Again, clarification, you didn't tell

16  her specifically about the airplane incident or

17  the office incident?

18    A.     No incidents at all.

19    Q.     Do you remember if you mentioned Elders

20  by name?

21    A.     No.  I said officer.

Maria Diaz                                                                                      1/15/2004

Page 65

1       Q.      Okay.

2       A.      I never mentioned him by name.

3       Q.      She is your only sibling?

4       A.      She's my only sibling.

5       Q.      How about your parents?

6       A.      My parents are both dead.

7       Q.      Are there any other family members who

8    you're close to?  Let me put it this way, are

9    there any other family members who you told about

10   the allegations or the existence of the

11   allegations?

12      A.      I told my aunt.

13      Q.      Okay.  Where does your aunt live?

14      A.      She lives in Puerto Rico.

15      Q.      When is it that you told your aunt?

16      A.      A week after telling my sister.

17      Q.      Okay.  And what do you recall that you

18   told her?

19      A.      The same things I told my sister.

20      Q.      Okay.  Just that there were these

21   allegations that were out there.  Were you

Maria Diaz                                                                1/15/2004

Page 66

1    specific at all?

2        A.    No.

3        Q.    Okay.  Now have you ever told any of

4    your neighbors, your residential neighbors, of

5    the situation with Karl Elders?

6        A.    We have no neighbors.

7        Q.    Okay, no neighbors.  At the office have

8    you ever told anyone who lives or works around

9    the office about the allegations?

10       A.    No, I did not.

11       Q.    And you have a secretary or staff?

12       A.    I have a secretary.

13       Q.    What's that person's name?

14       A.    Mary Farlow.

15       Q.    Farlow?

16       A.    F-A-R-L-O-W.

17       Q.    Okay.  Was she your secretary back in

18   2000 to 2002?

19       A.    Yes.

20       Q.    And she works for you still?

21       A.    Yes.

Maria Diaz                                                                  1/15/2004

Page 67

1       Q.    Did you ever tell her about any of the

2    allegations?

3       A.    She found out because the sheriff

4    delivered the papers to my office and she thought

5    I was having a malpractice suit and I said this

6    was just problems that I had with the Guard.

7       Q.    Did you ever tell her any specific

8    issue, any specific information about what those

9    problems were?

10      A.    No.

11      Q.    Did she ever ask you about what was

12   going on?

13      A.    No.  As long as it wasn't a medical

14   malpractice case, she didn't -- she was not

15   involved.

16      Q.    So at no point in time you haven't

17   confided in her about anything to do with the

18   case or Karl Elders; is that correct?

19      A.    No, other than to set appointments up.

20   I mean, I have to, like today, she knows I'm not

21   in the office.  Other than that, no.

Maria Diaz                                                          1/15/2004

Page 68

1       Q.    Other than obviously her possibly seeing

2    the paperwork, have you ever mentioned Karl

3    Elders to her?

4       A.    No.

5       Q.    Now at your private office, is it your

6    own office or do you have other physicians with

7    you?

8       A.    It's my own office.

9       Q.    Is it in a medical building,

10   professional building?

11      A.    It's a house.

12      Q.    It's a house.  The neighbors to that,

13   are they residential neighbors or work,

14   commercial neighbors?

15      A.    It's zoned commercial and residential.

16   I have both.

17      Q.    At any time did you discuss these

18   allegations or the issues with any of your work

19   neighbors?

20      A.    No, I did not.

21      Q.    Okay.  There was a time apparently where

Maria Diaz                                                              1/15/2004

Page 69

1    you had a conversation with a neighbor about a

2    suspicious truck, do you remember that?

3        A.    That is correct.

4        Q.    And what were the circumstances about

5    that?

6        A.    She said the truck was sitting on the

7    side of the house and was watching me with

8    binoculars.

9        Q.    Did you see the truck or did just she

10   see the truck?

11       A.    I saw the truck, but I did not -- I did

12   not put two and two together.  She came and told

13   me afterwards when she was walking her dog next

14   to the truck.

15       Q.    Do you remember approximately when that

16   was?

17       A.    I don't remember.

18       Q.    Let me try --

19       A.    It was after -- I don't remember.

20       Q.    Let me try and put it in context.  Was

21   it before the investigation started or after, if

Maria Diaz                                                                    1/15/2004

Page 70

1    that helps?

2         A.    I want to say it was after the

3    investigation.

4         Q.    Okay.  And during that conversation with

5    her, did you at all tell her about that, hmm, I

6    wonder if this is connected to this issue I have

7    at work or anything like that?

8         A.    No, I did not.

9         Q.    You didn't give her any information?

10        A.    No.  My neighbor is, you know, how could

11   I put it to you.  I have a medical office, I just

12   go in there to see patients.  I don't go in there

13   and talk to neighbors.

14        Q.    Did you take any action with respect to

15   the truck?  Did you report it to anyone?

16        A.    I did report it.  I had to go back to

17   security police on base to report it.

18        Q.    So did you only report it to military

19   police?

20        A.    That is correct.

21        Q.    No civilian police?

Maria Diaz                                                                    1/15/2004

Page 71

1      A.    No.

2      Q.    And do you recall who you reported it

3    to?

4      A.    No, I don't recall.

5      Q.    That's fine.  Did you actually fill out

6    a report?

7      A.    Yes, I did.  It might be on that report.

8      Q.    Probably.

9      A.    You could get it from security police.

10     Q.    Do you have any knowledge as to whether

11   they actually investigated the incident?

12     A.    I don't know.

13     Q.    So you don't know if there was an

14   outcome?

15     A.    I do not know if there was an outcome.

16     Q.    Now at the hospital are there any

17   particular staff members who you are close to?

18     A.    No.

19     Q.    Are there any staff or other physicians

20   that you socialize with at all?

21     A.    No.

Maria Diaz                                                                    1/15/2004

Page 72

```
 1      Q.    How about as far as when you will go to

 2   lunch, would you typically go to lunch with

 3   people at the hospital?

 4      A.    I don't eat lunch.

 5      Q.    You don't eat lunch, okay.  Cup of

 6   coffee?  Anything?

 7      A.    I'm not -- no.

 8      Q.    At any point in time did you have any

 9   conversations with anyone at Franklin Square

10   Hospital about the allegations?

11      A.    No, I did not.

12      Q.    Even in the sense of without mentioning

13   who it was that you said, did you ever tell

14   anyone that I was being harassed by someone?

15      A.    No, I did not.

16      Q.    Did you ever have any conversations with

17   anyone about Karl Elders?

18      A.    No, I did not.

19      Q.    Outside of Franklin Square Hospital, are

20   there any physicians that you would, say, go to a

21   medical conference with or anything like that,
```

Maria Diaz                                                                 1/15/2004

Page 73

1    anyone that you would consider that you are a

2    friend of, rather than just a colleague?

3        A.   No.

4        Q.   At any time you never went to a medical

5    conference and discussed the allegations with

6    them?

7        A.   No, I did not.

8        Q.   Now there came a point in time where you

9    did tell your husband, right?  I'm not asking you

10   to tell me what you said to him.

11       A.   Yes.

12       Q.   And do you recall approximately when you

13   first told him something?

14       A.    I told my husband after the

15   investigation was started with Col. Inglis.  I

16   did not mention anything and that was told in my

17   house.

18       Q.   So at no time before --

19       A.   No, I didn't.

20       Q.   Col. Inglis, this became more of a

21   public matter at the base, you never told him

Maria Diaz                                                                    1/15/2004

Page 74

1    about -- I'm sorry; I don't want to get into what

2    you told him.  Skip that.  Don't answer that

3    question.

4        A.    Thank you.

5        Q.    Besides the time you first told your

6    husband, were there any other times in which you

7    had conversations with him about the allegations?

8        A.    No, I did not.

9        Q.    So in the, gosh, we're almost at two

10   years now, a little less than two years, there

11   has only been that one conversation?

12       A.    After the investigation started, I told

13   my husband.

14       Q.    That's what I mean.  There has been more

15   than one conversation with your husband, right?

16       A.    That's private.

17       Q.    No, no.  I'm not asking you to tell me

18   what the discussion was.  That's protected

19   information.  I'm only talking about the number

20   of conversations that you had with him.  You did

21   have more than one conversation with him about

Maria Diaz                                                                1/15/2004

Page 75

1    the allegations, right?  I'm not going to be

2    asking you what your conversations were, just the

3    number.

4         A.   And I'm not going to give you a number.

5         Q.   Okay.  Unfortunately you are required to

6    give me -- I don't need an exact number.  You can

7    just answer you've had more than one --

8              MS. DESHIELDS:  To the best of your

9    recollection, if you've had more -- just let me

10   interject.

11             MR. ZAID:  Sure.

12             MS. DESHIELDS:  If you've had more than

13   one discussion with your husband related to the

14   allegations and you can just approximate.

15             MR. ZAID:  That would be fine.

16             MS. DESHIELDS:  That's fine.

17             THE WITNESS:  Can I say numerous?

18   BY MR. ZAID:

19        Q.   That's fine.

20        A.   Is that what you want?  But I'm not

21   going to say numerous.  Is that what you want,

Maria Diaz                                                              1/15/2004

Page 76

1    you want me just to be broad.

2         Q.   That's fine, yes.

3              MS. DESHIELDS:  If you can give a

4    number, fine.  If you can't give a number, then

5    you can -- if it was more than one --

6              THE WITNESS:  It was more than one.

7              MR. ZAID:  Okay.  That's fine.

8    BY MR. ZAID:

9         Q.   At any time of those conversations, was

10   there ever anyone present but you and your

11   husband?

12        A.   It was only my husband and I.

13        Q.   Do you have any knowledge as to whether

14   or not your husband has told anyone about your

15   conversations?

16        A.   No, he has not.

17             MR. ZAID:  Just bear with me for a

18   second and let me get these documents organized.

19             Let me have that marked as Number 3,

20   please.

21             (Diaz Deposition Exhibit Number 3 was

Maria Diaz                                                      1/15/2004

Page 77

1  marked for identification.)

2  BY MR. ZAID:

3      Q.   Dr. Diaz, I've had marked as Exhibit

4  Number 3, a March 8th memorandum for the record

5  executed by James Mentges.  Take your time, read

6  through it, and just let me know when you're

7  ready.

8            MS. DESHIELDS:  I'm sorry, while she's

9  doing that, let me just clarify, are you marking

10 this too?

11           MR. ZAID:  No, we won't worry about this

12 one.

13           MS. DESHIELDS:  Okay.

14           THE WITNESS:  Okay.

15 BY MR. ZAID:

16     Q.   Dr. Diaz, I'm just going to jump back

17 for one second.  Besides the one secretary that

18 you mentioned, during the period of 2000 until

19 today, have you had anybody else working for you

20 at the office?

21     A.   No.

Maria Diaz                                                                      1/15/2004

Page 78

1      Q.    Okay.  Now referring back to Exhibit 3,

2  is this a document that you have seen before?

3      A.    Again, I saw it during the

4  investigation.

5      Q.    Now if you look at essentially the

6  second paragraph that begins with the fall of

7  2001, Maj. Mentges is indicating --

8      A.    Okay.

9      Q.    I'm sorry?

10     A.    I was just trying to get -- I'm sorry.

11     Q.    That's all right.  I want to go along

12 with you.  Maj. Mentges is discussing that you

13 had a conversation with him about the Amsterdam

14 trip.

15         Now my understanding is that you had

16 testified earlier saying that you hadn't had a

17 conversation with anyone about the incidents

18 until you spoke to Col. Inglis.  So in that sense

19 that wasn't correct, right?

20     A.    No, that is correct.  That is correct.

21 Because the time that I saw Maj. Falter and Col.

Maria Diaz                                                          1/15/2004

Page 79

1    Elders in his office, I was standing outside the

2    doorway.

3         Q.   Okay.

4         A.   And -- well, at that time he was a

5    major, but Col. Mentges was asking me what was

6    that about and I explained it to him.  But he

7    explained to me what window shopping was.  And

8    also Maj. Falter and -- they were laughing.  It

9    was then that he had asked me about this.

10        Q.   Now so you had mentioned earlier about

11   the --

12        A.   But no, I had not.

13        Q.   I'm sorry.

14        A.   I'm telling you that it was -- I was at

15   the door and both Maj. Falter and Col. Elders

16   were in the office.

17        Q.   Okay.

18        A.   And I happened to say about Amsterdam.

19   Unfortunately since it was at the door in the

20   area of operations -- I'm going to call the work

21   space operations, even though that is not totally

Maria Diaz                                                          1/15/2004

Page 80

1    correct.  Operations is where you, where you put

2    the flights.  Anyway it was at that time that he

3    overheard.  It was a hallway.  And he asked me

4    what that was about and that's when I talked to

5    him.

6        Q.    Now so you were participating in the

7    conversation with Falter and Elders?

8        A.    That's correct and it was in his office

9    and I was outside the office.  I was at the

10   doorway.

11       Q.    But this is a separate conversation as

12   far as when you allege Elders first made the --

13   or ventured the invitation, right?

14       A.    That's the only way I think that, if

15   they asked me what that meant, it was an open

16   conversation and I answered.

17       Q.    That's what I mean because actually I'm

18   a little confused.  The invitation that --

19       A.    Those were my allegations.

20       Q.    No, I realize that.  I realize that.

21   But when the discussion that you say happened

Maria Diaz                                                        1/15/2004

Page 81

1    with you and Elders about the Amsterdam trip, is

2    that a conversation between the two of you or is

3    that actually the conversation with David Falter?

4        A.    We had one conversation between the two

5    of us.

6        Q.    Yes.

7        A.    And then I had the second conversation

8    and it was Maj. Falter and it was Col. Elders.

9    And that is when I believe he overheard that

10   because we were loud.

11       Q.    Okay.  And so then you had the

12   conversation with Mike -- well, James Mentges,

13   correct, that's what you are saying?

14       A.    That is correct.

15       Q.    Okay.

16       A.    To clarify that part, yes.

17       Q.    Sure.  And at that time is the only

18   thing that you recall or is it that you recall

19   the only thing you discussed with him was this

20   Amsterdam trip?

21       A.    That I recall at that time for this

Maria Diaz                                                                  1/15/2004

Page 82

1    Amsterdam because --

2         Q.   Now when you had the conversation with

3    Mentges, were you talking to him in the sense of

4    once he explained to you what window shopping

5    actually purports to be --

6         A.   No, Maj. Falter and Col. Elders.

7         Q.   Had explained to you what the window

8    shopping meant?

9         A.   And then he reiterated what window

10   shopping meant.

11             MS. DESHIELDS:  He who?

12             THE WITNESS:  Col. Mentges did.

13             MR. ZAID:  Let's take a break.

14             (A brief recess was taken.)

15   BY MR. ZAID:

16        Q.   Do you have any recollection as to --

17   and don't think that I'm anticipating that you

18   necessarily do, but I'm going to ask the

19   question.  Do you have any recollection as to why

20   you were participating in the conversation with

21   Falter and Elders that day or evening, whatever

Maria Diaz                                                                      1/15/2004

Page 83

1   it was?

2            MS. DESHIELDS:  Objection.

3            THE WITNESS:  I don't recall.

4   BY MR. ZAID:

5      Q.   Okay.  Do you recall whether you were

6   there on official business with the Guard?

7            MS. DESHIELDS:  Objection.  I'll just do

8   a standing objection to this line of inquiry as

9   it stands right now.

10           THE WITNESS:  I was there on official

11  business.

12  BY MR. ZAID:

13     Q.   And your basis for that is what?

14     A.   I cannot remember the date.

15     Q.   That's okay.

16     A.   If I could, I would tell you.

17     Q.   That's okay.

18     A.   I was on official business.

19     Q.   It's two and a half years ago.  I don't

20  anticipate that you might remember --

21     A.   I was on official business.  What type,

Page 84

1   I can't recall, and the date, I can't recall.

2       Q.    Okay.   Mentges says on at least two or

3   three, quoting from the last sentence in

4   paragraph two, on at least two or three other

5   occasions Lt. Col. Diaz confided in me that Lt.

6   Col. Elders wants to "sleep with her" or "go to

7   bed with her."  Is that an accurate statement?

8       A.    That is a statement that was made in

9   his -- when he asked me, after he overheard the

10  conversation we went to his office and he asked

11  me what was that about and then I told him.

12      Q.    That it was your perception that Elders

13  wanted to sleep with you or go to bed with you?

14      A.    After they explained to me about the

15  window shopping, yes, that was my perception.

16      Q.    Okay.   What about the two or three other

17  occasions?

18          MS. DESHIELDS:   What about it?

19  BY MR. ZAID:

20      Q.    Were the two or three other occasions

21  before this Fall of 2001 conversation or after?

Page 85

1     A.    I just remember this conversation

2     specifically.

3        Q.    So you don't recall any other instances

4     in which you told Mentges --

5        A.    I just remember this conversation.

6        Q.    The fact that he says there are at least

7     two or three other occasions, do you believe that

8     he might be wrong in that or, you know, you just

9     don't remember?

10       A.    I don't recall.

11       Q.    But you don't deny that you might have

12    told --

13       A.    No, I do deny that, but I don't recall

14    telling him that.  I know what I said and I said

15    that the day in question.

16       Q.    Okay.  That's fine.

17       A.    And you're asking me two other instances

18    and I do not recall because I don't remember

19    saying this.  But I do remember saying that that

20    day.

21       Q.    Okay.

Page 86

1      A.    That's convoluted.

2      Q.    Yeah.  Because I don't recall is

3  different from that you deny ever saying it,

4  that's what I'm trying to get.  Because you've

5  just said two different answers.  If you want to

6  say I don't recall that I said that what he says

7  I said two out of three times is different from I

8  deny ever saying it more than that one time I

9  remember.

10     A.    Well, I'm going to have to then say I

11 deny saying it more than one time, yes.

12     Q.    Okay.  When you had that conversation

13 with Mentges and you told him that you believe

14 Elders wanted to sleep with you or go to bed with

15 you, was that just based on the red light, the

16 window shopping incident?

17     A.    That was based on my -- if you are

18 saying it's with Col. Mentges, it's based on

19 this, but it's also based on the -- it was based

20 also on the fact when he -- different

21 conversations I had had with Col. Elders.

Maria Diaz                                                                              1/15/2004

Page 87

1      Q.    Okay.  Did Maj. Mentges question you

2  about why it is that you think that Elders wants

3  to sleep with you?

4      A.    No, he did not and I left it at that.

5      Q.    So other than the window shopping

6  discussion or the comment about wanting to sleep

7  with you or go to bed with you, at that

8  conversation to the best of your recollection, do

9  you recall telling Mentges any other details?

10     A.    No, I did not.

11     Q.    Do you remember whether or not you told

12 Mentges in the context of that Col. Elders was

13 harassing you?

14     A.    No, I did not.  I just told him what's

15 there.

16     Q.    Okay.  Now jumping down to the final

17 paragraph, the first sentence of that says

18 within -- this is quoting from the document,

19 within the last three months and as recently as

20 this week, meaning March 8th, 2002, Lt. Col. Diaz

21 has commented to me several times that she is

Maria Diaz                                                      1/15/2004

Page 88

1    uncomfortable when she is around Lt. Col.

2    Elders.

3          What were the conversations that you had

4    with Mentges regarding what he is stating there?

5     A.   The wrist incident.

6     Q.   Anything else?

7     A.   That's all.

8     Q.   Do you remember having several

9    conversations with Mentges where you discussed

10   your relationship with Karl Elders?

11    A.   I only told him about the wrist

12   incident.  Col. Elders isn't the only -- I mean,

13   we were having our meetings, we talked about the

14   meetings, and it was all Guard business there.

15    Q.   Do you have any understanding as to what

16   prompted Maj. Mentges to draft this memorandum?

17    A.   No, I do not.

18    Q.   Did you ever have any conversations with

19   Maj. Mentges after you were shown this memorandum

20   questioning him well why did you write that

21   memorandum?

Page 89

1       A.    I did not have any conversations with

2   anybody after the investigation started.

3            MR. ZAID:  Bear with me a moment.

4            (Pause in the proceedings.)

5            MR. ZAID:  I'll tell you what we'll do.

6   I don't have copies, obviously, of the

7   unredacted, but let's put in just so we can make

8   this easy, let's mark this packet as Exhibit 4.

9            (DIAZ Deposition Exhibit Number 4 was

10  marked for identification.)

11  BY MR. ZAID:

12      Q.    Now you don't have to read through the

13  whole thing there.  What I've had marked as

14  Exhibit 4 are selected portions of the report of

15  investigation compiled by Col. Werts dated June

16  7th, 2002.

17           Now what I'm going to do now is have you

18  be able to use the unredacted version.

19      A.    Should I just put this here?

20      Q.    Yeah, you can just put that to the

21  side.  But for the record at least we'll have

Maria Diaz                                                              1/15/2004

Page 90

1    that in there and we could supplement it if we

2    wanted.

3           Well, we're going to deal with that

4    however you want from a privacy standpoint, the

5    unredacted thing, but I want to work off of that

6    because that will obviously give you more

7    information.

8           If you look at page 177, and they're

9    marked in the upper left-hand corner.  And this

10   is Maj. Mentges' testimony given under oath to

11   Col. Werts.

12       A.   On 177?

13       Q.   Yeah.  So on 177 up towards the top,

14   Maj. Mentges is talking with Col. Werts about the

15   conversations he believes or recalls that you had

16   with him about whether Col. Elders wanted to

17   sleep with you or go to bed with you.

18           And he says that -- why don't you read

19   say up maybe to the halfway point actually where

20   he ends saying yeah, it was my office or private

21   setting.  Read from the top of the page to where

Maria Diaz                                                          1/15/2004

Page 91

1    you get to that line.

2       A.   I don't actually see --

3       Q.   I'm sorry; did I say 177?

4       A.   Yes, you did.

5       Q.   178.  My apologies.  I do apologize.

6            MS. DESHIELDS:  All right.  Starting

7    from what line?

8            MR. ZAID:  From the top.  And then

9    you'll see as you get to about --

10           MS. DESHIELDS:  Where he says oh, I

11   don't know specifically?

12           MR. ZAID:  Correct.  And when you get to

13   the line that says yeah, it was my office, a

14   private setting.

15           THE WITNESS:  Oh, okay.  All right.  Now

16   I understand.

17           MR. ZAID:  Sorry about that.

18   BY MR. ZAID:

19      Q.   Now as you can see, Maj. Mentges is

20   indicating that the discussions happened between

21   that period of November of 2001 and January of

Page 92

1   2002.  In reading Maj. Mentges' testimony, does

2   that refresh your recollection at all about those

3   conversations?

4       A.   I told you it was in his office from the

5   last one.

6       Q.   No, I'm talking about the several

7   conversations that he's saying you engaged in

8   with him?

9       A.   And I gave you an answer.

10      Q.   I realize that.

11      A.   It's the same answer.

12      Q.   That's fine.  These are things we do.

13  We have you read documents and see if after

14  reading that document does it change your

15  testimony at all because it's made you remember

16  something.  So you are saying it has not made you

17  remember any of the conversations, correct?

18      A.   I haven't.  Yeah, this is the first time

19  I'm seeing this.

20      Q.   I understand.  That's why you can take

21  as much time as you ever need to read this.

Maria Diaz                                                    1/15/2004

Page 93

1            While you're doing that, and if you need

2    to read more, just let me know.  Why is it that

3    you were telling Mentges anything about the

4    situation you believe was occurring with Col.

5    Elders?

6        A.    Rephrase that.

7        Q.    Sure.  Why was it that you were having

8    any conversations with Mike Mentges about Karl

9    Elders and what you believed was occurring to you

10   with respect to sexual harassment allegations,

11   meaning other than work related and going and

12   saying something about something work related?

13       A.    I'm getting a little confused.  First

14   you asked me the question about where it

15   happened.

16       Q.    Right.

17       A.    And when.  And I told you it was the day

18   that they were talking.  Now you are asking me

19   why I was talking to him about --

20       Q.    I'm not talking about just that one

21   time.

Maria Diaz                                                                                   1/15/2004

Page 94

```
 1      A.    Okay.

 2      Q.    Mike Mentges is saying you had numerous

 3   conversations with him.

 4      A.    And I'm telling you that what I repeated

 5   was that I did tell him that time in the office.

 6      Q.    I realize that.  But that's not the only

 7   time you had conversations with Mentges about

 8   these issues.  You had more than one conversation

 9   with him, didn't you?

10      A.    But it was the issues with the wrist.

11      Q.    Only the wrist?

12      A.    And the fact that he wanted, and it's

13   written on my statement about coming over for the

14   OPR.  But other than that, I don't understand

15   what you are trying to ask me.  And everything is

16   documented.

17      Q.    Okay.

18      A.    So I don't -- or maybe I'm blocked and I

19   need time out.  Maybe that's it, but I don't

20   understand.

21      Q.    Why don't you turn to page 35 as
```

Page 95

1    indicated in the upper right-hand corner of the

2    document.   Now this is part of your testimony

3    that you gave on April 18th, 2002.   Is that

4    correct?

5              MS. DESHIELDS:   Do you recognize this?

6              THE WITNESS:   This is the first time I

7    mean, other than not seeing it, I never got

8    this.

9              MS. DESHIELDS:   Look at the first page.

10   BY MR. ZAID:

11      Q.   The first page is 25.

12      A.   Okay.   All right.

13           MS. DESHIELDS:   Does that refresh your

14   recollection as to the statement?

15           THE WITNESS:   Yes.

16           MS. DESHIELDS:   You made that statement

17   on that date?

18           THE WITNESS:   Yes.

19   BY MR. ZAID:

20      Q.   Okay.   Now directing your attention to

21   page 35, which also has a page number eleven down

Maria Diaz                                                          1/15/2004

Page 96

1    at the bottom left corner.

2        A.    Yes.    Yes, I see that.

3        Q.    If you look towards the bottom, maybe a

4    quarter of the page up, it's indicating that you

5    had told Col. Werts that the reason why you were

6    talking to Mike Mentges is that, this is the line

7    that begins with Buddy from England, that you're

8    friends and that you know his family.

9        A.    I don't know where that is.

10       Q.    If you need to read any portion before

11   or afterwards to put it into context, go right

12   ahead.

13       A.    I see it now.    Okay.

14       Q.    Now you were having these conversations

15   and telling Mike Mentges about the incidents that

16   you did tell him about because you're friends,

17   right?

18       A.    We are colleagues.    There is a

19   difference in what you are trying to say what

20   friends are here.    I was allowed to go to Brooks

21   Air Force Base with Col. Mentges.    There he had a

Maria Diaz                                                    1/15/2004

Page 97

1    medical condition which we discovered and I

2    brought him back to Hopkins and he had a

3    procedure done.

4           In that course it turns out that there

5    is a genetic predisposition and it's in the

6    family.  So by friends in the sense of being the

7    physician, yes, I was the physician in charge.

8    But friends, and I believe this is the way you

9    are saying it, as going out together, no.

10      Q.   Well, have you ever socialized with

11   Mentges outside the base?

12      A.   No, I have not.  No, always at the

13   base.  And at that time it was a pretty dramatic

14   procedure.

15      Q.   Do you know Mike Mentges' wife?

16      A.   I talked to her on the phone.

17      Q.   Did you ever talk to her about Karl

18   Elders?

19      A.   Absolutely not.  The only conversations

20   we had were about Mike's condition or Col.

21   Mentges.

Maria Diaz                                                                    1/15/2004

Page 98

1      Q.    But when you talked to Mike Mentges

2    about the Amsterdam incident, about the wrist

3    incident, you were doing it in the nature of

4    because he was your, however you want to

5    determine it, friend and colleague, right?

6      A.    He was a colleague.

7      Q.    And --

8      A.    And I was doing it with the wrist.  I

9    did it because I was scared.

10     Q.    Is Mentges in your chain of command?

11     A.    Mentges is a senior officer.

12     Q.    Is he in your chain of command?

13     A.    No, he is not.

14     Q.    Okay.  And at the time you had these

15   conversations with Willem and Mentges, they were

16   both majors, correct?

17     A.    Yes, they were.

18     Q.    And you were, I presume, and still are,

19   a lieutenant colonel?

20     A.    Yes.

21     Q.    And at the time Karl Elders was a

Maria Diaz                                                          1/15/2004

Page 99

1    lieutenant colonel as well, correct?

2        A.    Yes.

3        Q.    Now when you were having these

4    conversations with Mentges and Willem, did you

5    believe that they were in a position that they

6    could do anything about the concerns that you

7    had?

8        A.    I needed guidance as to how to go about

9    dealing with the situation.

10       Q.    Did you ask them as far as what should I

11   do about the situation?

12       A.    And both of them responded I had to

13   report it.

14       Q.    And you never did, right?

15       A.    I was afraid to report it.

16       Q.    Okay.  But you never did, right?  I

17   mean, you never filed a formal complaint or an

18   informal complaint, correct?

19       A.    Correct.

20       Q.    Now did you ever have any training with

21   the Air National Guard about the process with

Maria Diaz                                                                1/15/2004

Page 100

1    respect to sexual harassment?

2        A.   No, I did not.

3        Q.   But you were familiar with what was

4    needed to be done, were you not?

5        A.   No, I was not.

6        Q.   Did you not tell Col. Werts that you

7    were familiar with the process?

8        A.   Afterwards, because at that time Col.

9    Inglis reiterated to me, I didn't know I had to

10   file paperwork.  I didn't know who to report it

11   to.

12       Q.   So as a senior officer with the Guard,

13   and you say you've been there since what, 1990?

14       A.   That is correct.

15       Q.   You've never taken any sort of courses

16   or discussions about sexual harassment or

17   discrimination?

18       A.   No.  No, I did not.

19       Q.   Were you familiar with that there were

20   EEO officers with the Guard?

21       A.   No.

Maria Diaz                                                          1/15/2004

Page 101

1      Q.   So you didn't know that there were any

2  EEO officers?

3      A.   Medical -- when they have medical

4  doctors, their process of training is totally

5  different.  I do not recall being given any type

6  of training on sexual harassment or who to report

7  it to.

8      Q.   But outside of even the context of a

9  sexual harassment issue, if you had any sort of

10 problem with an individual --

11     A.   Where?

12     Q.   Within the Guard --

13     A.   Okay.

14     Q.   You certainly know, do you not, that you

15 don't go to lower ranking officers to complain

16 about higher ranking officers, correct?

17     A.   These weren't lower ranking officers.

18 They might be lower ranking, but they had command

19 positions.  These were not low ranking officers,

20 they both were in command.

21     Q.   Besides Mentges and Willem, did you ever

Maria Diaz                                                          1/15/2004

Page 102

 1   have any other conversations about your concerns

 2   regarding Karl Elders before the Inglis

 3   investigation started?

 4       A.   No, I did not.

 5       Q.   What about Todd Wilkinson?

 6       A.   No, I did not.

 7       Q.   Did you not have a conversation with him

 8   regarding the fact that you were thinking about

 9   confronting Karl Elders about what you perceived

10   was occurring?

11           MS. DESHIELDS:  The him that you are

12   referencing is who?

13           MR. ZAID:  Wilkinson.

14           THE WITNESS:  No, I don't remember

15   that.  I'm afraid of Karl Elders.  Why would I

16   confront him?

17   BY MR. ZAID:

18       Q.   Now I've handed you a document dated

19   December 28th, 2001.

20       A.   Yes.

21       Q.   Do you recall or recognize that

Maria Diaz                                                                    1/15/2004

Page 103

1    document?

2        A.    Yes, I do recall this.

3        Q.    Okay.  And that, as I understand it, was

4    an incident where you were called in to deal with

5    a landing gear mishap?

6        A.    That is correct.

7        Q.    And I guess medically check out the

8    crew?

9        A.    That is correct.

10       Q.    Do you remember that day?  Or I don't

11   know if it was night or day, but do you remember

12   that event sitting here today?

13       A.    I remember the event.

14             MR. ZAID:  Okay.  We'll couple that with

15   this.

16             (DIAZ Deposition Exhibit Number 5 was

17   marked for identification.)

18   BY MR. ZAID:

19       Q.    I've had that document now marked as

20   part of Exhibit Number 5, along with the sworn

21   declaration of Gary Bernard dated May 17th,

Maria Diaz                                                        1/15/2004

Page 104

1    2003.  Let me ask you, and I'll give you a full

2    chance to read it, whether you have read before

3    this declaration that Gary Bernard has executed?

4        A.   I read it in the paperwork that I

5    received.

6        Q.   Right.  This was --

7        A.   But not --

8        Q.   No, this was filed as part of the

9    lawsuit.

10       A.   Yeah.

11       Q.   Now if you turn to the second page and

12   you look at paragraph five, now do you remember

13   medically examining the crew?  I mean, I'm not

14   asking you what procedures you did or anything

15   like that, but do you generically remember that

16   you medically examined the crew?

17       A.   When you say medically examined, what do

18   you mean?

19       Q.   Well, I mean just examined -- I don't

20   know what you did.

21       A.   When you do medical exams, you do a

Maria Diaz                                                                    1/15/2004

Page 105

1    complete exam.  And I'm going to say no, I did

2    not do a complete exam.

3        Q.    Understood.

4        A.    Okay.

5        Q.    Do you remember meeting with each of the

6    crew members?

7        A.    Yes.

8        Q.    Now do you remember attending the

9    debriefing afterwards?

10       A.    Yes.

11       Q.    Okay.  Now do you know Gary Bernard?

12       A.    Yes, I do.

13       Q.    And he was a member of that crew,

14   correct?

15       A.    That is correct.

16       Q.    Now Gary Bernard indicates in paragraph

17   five that at the debriefing you went and you sat

18   down directly next to Karl Elders.

19       A.    That's incorrect.  I sat across from

20   Karl Elders.  Col. Elders; I misstate.

21       Q.    That's fine.  So you dispute what Gary

Maria Diaz                                                         1/15/2004

Page 106

1    Bernard is saying there?

2         A.   That is correct.

3         Q.   And if you look at paragraph four just

4    above that, just above that on the same page.

5         A.   Okay.

6         Q.   While standing?

7         A.   Okay.

8         Q.   And he relates a discussion, a banter

9    discussion that you allegedly had with Elders and

10   Falter -- I'm sorry, not Falter, with Elders --

11        A.   Okay.

12        Q.   I just want to make sure I have my facts

13   straight, I guess just between the two.  As Gary

14   Bernard is relating, do you recall having this

15   conversation that he relates?

16        A.   The captain was not near this at all.  I

17   don't even recall him being in the room.

18        Q.   Okay.

19        A.   Col. Elders was in the room.  I was in

20   the room.

21        Q.   Okay.  But do you recall -- he's saying

Maria Diaz                                                              1/15/2004

Page 107

1    he overheard this.  Do you recall having this

2    conversation?

3        A.   No, I do not recall.

4        Q.   Okay.  Now at the time that this event

5    happened in the end of December, this was a

6    period of time in which you are alleging that you

7    were fearful of Col. Elders and avoiding him; is

8    that accurate?

9        A.   That is correct.  Can I put this aside?

10       Q.   Yes, you may?

11       A.   And does this go with this?

12       Q.   Yes.  Actually that can go back to the

13   court reporter.

14       A.   And keep the other ones?

15       Q.   Just for now.  Do you remember attending

16   the February of 2002 UTA?

17       A.   I attend every UTA.

18           MS. DESHIELDS:  Maybe just for purposes

19   to be clear on the record, would you explain what

20   a UTA is.

21           MR. ZAID:  Unit Training Assembly.

Maria Diaz                                                          1/15/2004

Page 108

1    BY MR. ZAID:

2        Q.    And the UTA is the one weekend a month

3    drill that you guys are required to go to?

4        A.    Yes, it is.

5        Q.    Now that was the UTA where, in fact, you

6    sort of got up before the squadron and you

7    apologized for being a feely touchy kind of

8    person.  Is that true?

9        A.    That is correct.

10       Q.    Now is it not true that you also

11   specifically directed your comments to Karl

12   Elders and you asked him to watch over you?

13           MS. DESHIELDS:  Objection.  Relevance.

14           MR. ZAID:  Okay.

15           THE WITNESS:  I don't recall that.

16           (DIAZ Deposition Exhibit Number 6 was

17   marked for identification.)

18   BY MR. ZAID:

19       Q.    I've had marked as Exhibit 6 the

20   declaration of David Falter submitted as part of

21   the litigation dated May 18th, 2003.  Is this a

Page 109

1    document that you've read before?

2        A.    Only after --

3        Q.    As part of the case?

4        A.    Yes.    Thank you.

5        Q.    Okay.    Now if you direct your attention,

6    please, to paragraphs eight and nine on page

7    four, now do you know David Falter?

8        A.    Yes, I do.

9        Q.    He's a member of the squad, correct?

10       A.    Yes.

11       Q.    Okay.    Now he indicates he was in

12   attendance at this February UTA, February drill,

13   where you had apologized.    And he indicates in

14   paragraph nine that you specifically pointed to

15   Lt. Col. Elders and asked that he keep a closer

16   eye on you for the future.

17            Do you deny making some sort of

18   statement to that effect?

19       A.    I don't recall looking at Col. Elders

20   and saying that.    And I don't recall that.

21       Q.    If something like that had been said, it

Maria Diaz                                                          1/15/2004

Page 110

1    would be inconsistent with the rest of what you

2    have been saying, correct?

3        A.    That is correct.

4        Q.    Would you say that's fair?

5        A.    That would be fair, yes.

6        Q.    And I gather from the conversation that

7    you had with Col. Werts and that you indicated

8    about this touchy feely situation, that you've

9    had problems yourself apparently with being a

10   little over-friendly with fellow squad members.

11   Would that be correct?

12             MS. DESHIELDS:  Objection.

13             THE WITNESS:  That is incorrect.

14   BY MR. ZAID:

15       Q.    Incorrect.  Have you ever had anybody

16   complain about your conduct with respect to being

17   too touchy feely?

18             MS. DESHIELDS:  Objection.

19             THE WITNESS:  That's incorrect.

20   BY MR. ZAID:

21       Q.    How about Chief Master Sergeant

Maria Diaz                                                                    1/15/2004

Page 111

1    Robertson?

2         A.    I found that out --

3              MS. DESHIELDS:  What about Robertson?

4              MR. ZAID:  That he was one who

5    complained about her conduct.

6              THE WITNESS:  I found that out

7    afterwards.  I did not know who it was.

8    BY MR. ZAID:

9         Q.    But somebody had complained?

10        A.    One person.

11        Q.    But enough so that you felt it was

12   necessary to apologize to everyone?

13             MS. DESHIELDS:  Objection.

14             THE WITNESS:  I was not apologizing per

15   se.  I was apologizing for the fact that it was a

16   different -- I did not want to offend people.  I

17   was apologizing if I had offended anyone.

18   BY MR. ZAID:

19        Q.    When you said before that you had

20   sat -- did you say you sat across from or

21   diagonal to, I'm sorry, to Col. Elders at the

Maria Diaz                                                              1/15/2004

Page 112

1    debriefing?

2         A.    Semantics.

3              MS. DESHIELDS:  For purposes of the

4    record, can we have some clarity as to dates when

5    the supposed briefings or whatever activities you

6    are referring to actually occurred and the people

7    involved.

8              MR. ZAID:  Sure, absolutely.  This is

9    the December 27th event that we're talking to

10   that refers to I think it was Exhibit 4 with the

11   landing gear incident and the debriefing

12   afterwards.  And I was just asking for a reminder

13   to me what you had said so I characterized it

14   properly.

15             THE WITNESS:  I do not recall sitting

16   next to Col. Elders.  I know that when I would

17   look up, I could see him.  But I don't know if it

18   was diagonal or across.  But I do not recall

19   sitting next to Col. Elders.

20   BY MR. ZAID:

21        Q.   If you would turn to page 186 in the

Maria Diaz                                                                1/15/2004

Page 113

1    Werts report.

2         A.    Can I put this away?

3         Q.    You can put that away, yes.

4         A.    186.

5         Q.    Take a look at that and tell me if

6    that's something you have ever seen before.

7         A.    I've never seen it.

8         Q.    Okay.  So why don't you take a minute

9    and read through it.  And just while you are

10   doing that, for the record, this is a statement

11   of Todd Wilkinson that is dated March 10th,

12   2002.

13        A.    Okay.

14        Q.    Okay.  Now previously you had testified

15   that the only ones you had spoken to were Mentges

16   and Willem, and you said specifically you had not

17   spoken to Todd Wilkinson.  Now after reading Todd

18   Wilkinson's sworn statement, was your testimony

19   before correct?

20        A.    I did not speak to anyone other than

21   Mentges and Willem.

Maria Diaz                                                        1/15/2004

Page 114

1       Q.    Are you denying that -- I'm sorry, let

2    me rephrase it.  Are you indicating that Todd

3    Wilkinson's statement is not true in that he says

4    you spoke to him about what happened at the

5    Christmas party and that you were going to

6    confront Lt. Col. Elders?

7       A.    First of all, I never said I was going

8    to confront Lt. Col. Elders.  And, secondly, I

9    did not talk -- I talked to only Maj. Mentges and

10   Maj. Willem.

11      Q.    Okay.  So if you look at --

12      A.    I answered it.

13      Q.    What it says in paragraph three is not

14   true then, right?

15      A.    I never said I was going to confront

16   him.

17      Q.    Have you ever had at any time any

18   conversations with Todd Wilkinson regarding Karl

19   Elders and these allegations, that's up to today

20   in time?

21      A.    No one -- I mean, the wrist incident,

Page 115

1    yes, after the investigation started.  That was

2    the only thing.  Otherwise no, no other

3    conversations.

4        Q.   I'm sorry, the reason why I keep

5    thumbing through papers is because some of the

6    pages did not copy.  Could I have the book,

7    please, just for one second?  And we'll go back.

8    I'm sorry.  The copy machine apparently was not

9    picking up all of the pages.

10       A.   Can I clarify something?

11       Q.   Sure.

12       A.   I said and I want to make sure it's

13   clarified, I said investigation.  I should say

14   lawsuit, not investigation.  If you could clarify

15   that.

16       Q.   And what you are referring to, just

17   again for the record, that you had not spoken to

18   Todd Wilkinson?

19       A.   Correct.

20       Q.   Until the lawsuit was filed?

21       A.   Until after it was filed, yes.  And it

Maria Diaz                                                         1/15/2004

Page 116

1    was only the wrist incident.

2        Q.    Did you ever have any conversations with

3    Allison Solomon about Karl Elders outside of

4    regular routine, you know, squadron work?

5        A.    No, I did not.

6        Q.    And I'm incorporating and when I say any

7    time, from beginning of time until today.

8        A.    Well, I did not know until after the

9    Inglis report that she was EO.

10       Q.    The EEO officer or whatever.

11       A.    The EEO officer, I did not know that.

12       Q.    And something affiliated with EEO,

13   okay.

14       A.    And then with the Col. Werts'

15   investigation is when we talked about it because

16   she was sitting with Col. Werts and taking

17   information down.  But other than that I have not

18   talked --

19       Q.    Did Allison Solomon at any time tell you

20   what Karl Elders or I had said during our

21   conversations with Col. Werts?

Maria Diaz                                                      1/15/2004

1          MS. DESHIELDS:  Objection.

2          THE WITNESS:  No.

3    BY MR. ZAID:

4       Q.   Now I know I had asked this question

5    with respect to Willem.  I did not with respect

6    to Mentges.  Did you specifically tell Mike

7    Mentges not to repeat any of the conversations

8    that you were having with him regarding your

9    concerns about Karl Elders?

10      A.   I did, not to say anything.

11      Q.   It came to you as a surprise, did it

12   not, when it all of a sudden mushroomed into

13   something bigger than it was at the time?

14      A.   Yes, it did come to me as a surprise.

15      Q.   You did not want them to take action on

16   anything.  It was just you were trying to talk

17   over issues with them, would that be fair to

18   say?  You weren't asking them to take any action,

19   you were just talking to them.

20      A.   I was looking for guidance.

21      Q.   And did either of them tell you that you

Maria Diaz                                                      1/15/2004

Page 118

1    should go talk to Warren Thomas or John Inglis or

2    General Beasley or anyone?

3        A.    They only said I should report it.

4        Q.    Now have you ever been to Mike Mentges'

5    house?

6        A.    No.

7        Q.    Personal home?

8        A.    No, I've never been there.

9              MR. ZAID:  Okay.  Let's mark this as 7.

10             (DIAZ Deposition Exhibit Number 7 was

11   marked for identification.)

12   BY MR. ZAID:

13       Q.    Now I handed to you what is now marked

14   as Plaintiff 7, is your declaration submitted as

15   part of this case, is it not?

16       A.    Yes.

17       Q.    Now if you could turn to the second

18   page, is that your signature?

19       A.    Yes.

20       Q.    And in paragraph four, you indicate that

21   in or about February of 2002, you had

Maria Diaz                                                                    1/15/2004

Page 119

1    conversations with fellow Maryland Air National

2    Guard officers in which I raised my concern that

3    Lt. Col. Elders was sexually harassing me.

4    Besides Mike Mentges and Raul Willem, are you

5    referring to any other individuals?

6        A.    No, only those two.

7        Q.    Would you say it is true, though, that

8    that is a somewhat incomplete statement in that

9    you had had conversations with at least Mentges

10   before February of 2002, it's not limited to just

11   February of 2002.  Would that be fair to say?

12       A.    I don't recall whether it was January or

13   February.  I would say February.

14       Q.    Well, he had said in the --

15       A.    I mean, the dates are so, it could

16   have -- on or about February 2.

17       Q.    I'm going to turn back and if you don't

18   mind sort of stand up over you, unfortunately my

19   pages didn't copy.  All right.  I'm referring

20   still to your testimony of April 18th, 2002,

21   before Col. Werts.

Maria Diaz                                                                      1/15/2004

Page 120

1      A.    Okay.

2      Q.    I'm looking specifically at page 31.

3  Okay.  Now at the bottom he asked you, so you are

4  aware of the Adjutant General's policy on sexual

5  harassment and you answered yes, I am.  And then

6  it turns over and says he asked do you know about

7  the complaint process and you answered yes, I do,

8  I have a husband.

9           Now when you are indicating, one, you

10  know about the policy, and, two, you know about

11  the complaint process, when is it that you are

12  saying that you know about these?

13     A.    Generally.  A sexual harassment, you

14  usually report.  I don't know the process in the

15  Guard.  I do not know the process.  At that time

16  I did not know the process.  Afterwards, I did,

17  after the investigation, that any sexual

18  harassment should be reported.  I'm not saying

19  not only with the Guard, but in a civilian

20  capacity.  Anybody knows that.

21           Are you asking me the process?

Maria Diaz                                                          1/15/2004

Page 121

1      Q.    No, no, no.  I'm just asking you to the

2   extent you were familiar with the process.

3      A.    I don't know the process in the Guard or

4   in the military.

5      Q.    Now looking further at this particular

6   discourse that you had with Col. Werts, it

7   indicates you shared this with your husband after

8   the second incident.  And you responded it took

9   me a couple of weeks to share it with him.

10  Before I did that, I had shared it with Maj.

11  Willem because I didn't know what to do and I was

12  scared.

13         Now this is confusing and I don't know

14  if it's just the way Werts handled the

15  investigation because my interpretation of when I

16  read this in this context, and this is what I

17  want you to clarify if this is not the proper

18  context, that after the second incident and

19  everyone has, as far as I know, taken the

20  incident sort of in chronological order as to the

21  first incident, plane, summer 2002; second

Maria Diaz                                                          1/15/2004

Page 122

1    incident, the Amsterdam issue, summer 2001; same

2    time frame, trying to kiss you in the office;

3    September, 2001, the OPR phone call; and then the

4    parties in December of 2001.

5            So this seems to be inconsistent with

6    what we were talking about before and that's why

7    I wanted to clarify this.  This seems to indicate

8    to me that you spoke to your husband sometime and

9    Willem sometime around the summer of 2001 about

10   the Amsterdam incident.

11       A.    Incorrect.

12       Q.    Okay.

13       A.    No one knew anything other than that was

14   written that I was afraid of Col. Elders, that

15   there had been instances, and that's all they

16   knew.  And my husband did not know until after

17   the investigation started.

18       Q.    Now are the statements here going back

19   and forth inaccurate or is it just that he's

20   confusing the whole situation?

21       A.    I don't know.

Maria Diaz                                                          1/15/2004

Page 123

1      Q.   Because, I mean, do you interpret this

2   the same way that I did in just reading this

3   testimony?

4      A.   This is the first time I've seen it

5   without all those little black dots.  I know what

6   I already told you.

7      Q.   And no conversations because Willem --

8   you are saying the only conversation or at least

9   the first you had with him was the time that you

10  were meeting, going over at the security office?

11     A.   At security, that is correct.

12     Q.   Now before you executed your declaration

13  that we looked at before, from the one of

14  earlier --

15     A.   Yes.

16     Q.   Last year, do you recall what documents

17  you reviewed in preparing that declaration?

18     A.   I don't understand.  I don't --

19     Q.   Sorry.  Go ahead.

20     A.   I just don't understand.

21     Q.   When you executed that declaration dated

Maria Diaz                                                                1/15/2004

Page 124

1    April 8th, did you review any documents before

2    you wrote that -- I don't know if you actually

3    typed it, but before you signed that declaration?

4        A.    I don't recall.

5        Q.    Okay.  In preparing for today's

6    deposition, did you review any documents?

7        A.    I reviewed my statements.

8        Q.    And that is the redacted versions?

9        A.    The one that's -- yes.

10       Q.    The one that has black areas?

11       A.    Right, that's all I reviewed.

12       Q.    And the copies that you have are copies

13   of the ones that were submitted as part of the

14   lawsuit?

15       A.    I did not review that.

16       Q.    No, I'm saying the redacted version of

17   your testimony, do you have the full version that

18   you obtained from somewhere or do you just have

19   the portions that we put in as part of the

20   lawsuit?

21       A.    I only have the portions that you put in

Maria Diaz                                                          1/15/2004

Page 125

1   as the lawsuit.

2       Q.   Okay.  In preparing for today, other

3   than the government's lawyer, did you talk to

4   anyone about that you were going, besides

5   scheduling, I'm going to be out of the office?

6       A.   I'm going to be out.

7       Q.   Did you talk to anyone substantively

8   about this deposition?

9       A.   My husband.

10      Q.   Okay.  Anybody else?

11      A.   My sister.

12      Q.   Okay.  Anyone else?

13      A.   Col. Walsh.

14      Q.   And was that just in the sense of

15  telling him you have the deposition?

16      A.   He's the commander.

17      Q.   Right.  But I mean --

18      A.   That was -- yes.  And it was done during

19  Guard duty, during a UTA, which was last weekend.

20      Q.   When before you met -- I'm jumping back,

21  before you met with Col. Inglis about the memos,

Page 126

1    he showed you the Willem memo, he showed you the

2    Mentges memo, correct?

3        A.    Correct.

4        Q.    Had you had any conversations with

5    either Mentges or Willem about the fact that

6    Inglis was going to talk to you?

7        A.    No, I did not.

8        Q.    How about with respect to Thomas or

9    Wilkinson?

10       A.    No.

11       Q.    Okay.  Before you testified the first

12   time before Col. Werts, did you talk to Willem,

13   Mentges, Thomas or Wilkinson about your

14   testimony, your forthcoming testimony?

15       A.    I don't understand that.  Like they knew

16   I was on base.

17       Q.    Right.

18       A.    But I did not specifically go and say

19   I'm going to be on base this and this date.  They

20   knew there was an investigation going on and they

21   saw me going to state headquarters.

Maria Diaz                                                                          1/15/2004

Page 127

1       Q.   Did you have any substantive

2   conversations with them about what questions

3   might have been discussed?

4       A.   Before?

5       Q.   Correct.  What questions maybe would

6   come up?

7       A.   No, I did not.

8       Q.   What answers perhaps would be given?

9       A.   No, I did not.

10      Q.   Okay.  How about with respect to your

11  second interview with Col. Werts, which was, I

12  believe, in May, 2002.  I think it was a two week

13  period, April 18th to May 3rd, 2002, did you have

14  any --

15      A.   No, I didn't.

16      Q.   I'm sorry, I've got to finish the

17  question for the record.

18      A.   I'm sorry.

19      Q.   That's okay.  Did you have any

20  substantive conversations with Willem, Mentges,

21  Wilkinson, or Thomas about what questions would

Maria Diaz                                                    1/15/2004

Page 128

1    perhaps be asked and answers that would be given?

2        A.   We were told not to discuss the

3    investigation.

4        Q.   Okay.  Now you've also been interviewed

5    by Col. Scott Hines of the Air Force IG's office,

6    correct?

7        A.   That is correct.

8        Q.   And that, without asking you what he

9    told you, in the interview or interviews, you did

10   discuss the sexual harassment allegations, did

11   you not?

12       A.   I can't discuss those investigations.

13       Q.   Actually you can't discuss what he told

14   you?

15       A.   I'm not going to open myself to that one

16   because I don't know the law too well and I was

17   told not to discuss whatever Col. Hines said.  Do

18   you know the military?

19       Q.   That's okay.

20       A.   I don't know.

21       Q.   That's okay.  That's okay.  Don't worry

Page 129

1    about it.

2            MS. DESHIELDS:  Can we put a time frame

3    on the record, when she had the meeting with Col.

4    Hines?

5            MR. ZAID:  Sometime in approximately

6    2002.  Well, let's put it, it was after the -- I

7    don't know.  It's 2002, 2003.  I'm sorry, I don't

8    think I know.

9    BY MR. ZAID:

10   Q.   I just want to -- let me think of, see

11   if I can phrase something because I know there

12   are some prohibitions on you and I don't want to

13   put you in a spot where you are saying something

14   you are not permitted to by law.

15           Actually, that's fine.  Before you met

16   with Col. Hines, did you have any meetings with

17   Mentges, Willem, Wilkinson, or Thomas about the

18   fact that you were going to be interviewed by

19   Col. Hines?

20   A.   The conversations per se, no.  They

21   could not find me to give me the time.  The

Page 130

1    Colonel had called the office and they were

2    looking for me to let me know.

3        Q.    And they meaning who?

4        A.    And they meaning -- it wasn't the people

5    that you mentioned.  I want to say it was Sgt.

6    Mattes.

7        Q.    But you didn't have any substantive

8    conversations with them in preparation for your

9    statements before Col. Hines?

10       A.    I did not.

11            MS. DESHIELDS:  I'm just going to object

12   on the grounds of relevance to that.

13   BY MR. ZAID:

14       Q.    And after you had your conversations

15   with Col. Hines, did you reveal those

16   conversations to Willem, Mentges, Wilkinson, or

17   Thomas?

18            MS. DESHIELDS:  Objection.

19            THE WITNESS:  No, I did not.

20   BY MR. ZAID:

21       Q.    At the time when you had those

Page 131

1    conversations with Mentges and Willem, did you

2    tell either of them that you had spoken to the

3    other?  Meaning, did you tell Mentges that you

4    had spoken to Willem or Willem that you had

5    spoken to Mentges?

6        A.    No, I did not.

7        Q.    Now I'm going to turn your attention

8    back to one of the -- I think it may be Exhibit 1

9    that we looked at, Col. Inglis' report.  Is that

10   Exhibit 1?

11       A.    Yes.

12       Q.    If you look to page three.

13       A.    Okay.

14       Q.    And if you look at the fourth paragraph,

15   the one that begins with Lt. Col. Diaz is a

16   traditional guardsman, that last sentence in that

17   paragraph, Col. Inglis wrote multiple witnesses

18   testified to having heard the same report of

19   concerns from Lt. Col. Diaz, some soon after the

20   events in question and well before this inquiry

21   was initiated.

Maria Diaz                                                                                          1/15/2004

Page 132

1          Do you have any knowledge as to which

2   multiple witnesses he's referring to?

3       A.   I do not.

4       Q.   And other than what we talked about

5   today, we've narrowed it down just to make it

6   clear in tying this to the question, the only

7   ones you spoke to were Mentges and Willem before

8   the investigation took place?

9       A.   That is correct.

10      Q.   Now, and this may be sort of parsing it,

11   but this is very specific.

12      A.   Uh-huh.  I mean yes.

13      Q.   Is it your testimony that categorically

14   these are the only two, meaning Mentges and

15   Willem that you spoke to, or you just don't

16   recall whether you might have spoken to anyone

17   else?

18      A.   I only spoke to Mentges and Willem.

19      Q.   Okay.  Now do you have any reason to or

20   can you explain at all why Todd Wilkinson would

21   say, for example, that you did have conversations

Page 133

1    with him?  Any ideas where that could have come

2    from?

3        A.    No.

4        Q.    If we look at the Werts report, and if

5    you would please turn your attention to -- I'm

6    sorry, bear with me.  Apparently my memory is not

7    very good because I'm not locating the comment

8    that I wanted.  Let me just borrow this for one

9    second.  I do apologize.

10            I don't know if I made this part of the

11   record as a separate exhibit, but I'm going to

12   refer you to page 170, which is Mentges

13   declaration that he made on March 8th of 2002, as

14   part of the Inglis investigation, but it's

15   incorporated as part of Werts report.

16            And if you look down to the second to

17   last paragraph, it's the paragraph that begins

18   with the 135th Airlift group.

19       A.    Yes.

20       Q.    And Mentges is talking about the trip

21   that you had made to England.  And the last

Maria Diaz                                                              1/15/2004

                                                                      Page 134

1    couple of sentences, the last three sentences are

2    talking about how he overheard a conversation

3    between yourself and Karl Elders, and that he

4    interpreted to be referring to him in the sense

5    of what Elders was saying.

6            And he says the tone in which this

7    statement was made as I heard it implied there

8    was more than just a working relationship between

9    myself, meaning Mentges and Lt. Col. Diaz, while

10   training in England.

11           Are you aware that Mentges had this

12   impression of that conversation, that he thought

13   Elders was, I believe, that there was something

14   else more going on between you and he?

15           MS. DESHIELDS:  Objection.

16           THE WITNESS:  He wrote this.

17   BY MR. ZAID:

18       Q.   No, I'm not saying you agree with it.

19   I'm saying were you aware that he was under that

20   impression, meaning Mentges?

21           MS. DESHIELDS:  Objection.

Maria Diaz                                                                    1/15/2004

Page 135

1            THE WITNESS:  No, I was not aware.

2    BY MR. ZAID:

3        Q.    Okay.  That's fine.  Because you were

4    not having any relationship with Mentges other

5    than the professional one, that's true, right?

6        A.    That is correct.

7        Q.    What about with Warren Thomas?

8        A.    Professional.

9        Q.    Now when you work sometimes with Thomas'

10   wife, is that at the hospital or you just happen

11   to share some patients?

12       A.    One patient.

13       Q.    Okay.  Does that require you to talk to

14   her?

15       A.    Give orders for the patient, the patient

16   passed away.

17       Q.    Oh, I'm sorry.

18       A.    Yes.

19       Q.    Have you ever had any conversations with

20   Debbie Gregory about Karl Elders and one or more

21   of these alleged incidents?

Maria Diaz                                                              1/15/2004

Page 136

1    A.    That's incorrect.

2    Q.    I'm saying if you had.

3    A.    No.

4    Q.    I'm not saying you have.  So you never

5    have?

6    A.    No.

7    Q.    Okay.  At any time did you solicit her

8    support for allegations against Karl Elders?

9    A.    I did not solicit her support.

10    Q.    Have you ever had any conversations with

11    Dave Rein about Karl Elders and one or more of

12    these incidents?

13    A.    That is incorrect, I've never had

14    conversations with Dave Rein.

15    Q.    Actually you don't have to say it's

16    incorrect.  I'm not saying that you did.  Just so

17    it's clear on the record.

18    A.    I have to clarify that, no.

19    Q.    That's fine.  Okay.  Have you ever had

20    any conversations with Michael Lunt about Elders

21    and one or more of these alleged incidents?

Maria Diaz                                                           1/15/2004

Page 137

1       A.    No.

2       Q.    Now at any time were you aware that

3    Thomas had provided Elders with a letter of

4    counseling in 2001?

5            MS. DESHIELDS:  Objection.

6            THE WITNESS:  No, I was not aware.

7    BY MR. ZAID:

8       Q.    Now did you ever participate in any

9    conversations with anyone about a plan to get

10   Elders fired from the Guard?

11      A.    That is incorrect.  I mean, no, I did

12   not.

13      Q.    Did anyone ever ask you to participate

14   in a plan to have Elders relieved from command?

15      A.    No.

16      Q.    Are you aware as to whether anyone else,

17   not saying at your request or anything, anyone

18   else going around and asking other women to

19   participate in a plan to have Elders removed from

20   command?

21      A.    No.

Maria Diaz                                                                1/15/2004

Page 138

1       Q.    Did you ever have any conversations with

2   Kristin Brawley about a plan to get Elders

3   removed from command?

4           MS. DESHIELDS:  Objection, she's asked

5   and answered.

6           THE WITNESS:  No.

7   BY MR. ZAID:

8       Q.    Did you ever have any type of

9   conversation with Kristin Brawley about asking

10  her to choose sides?

11      A.    No.

12      Q.    Were you ever asked by anyone to choose

13  sides regarding Karl Elders?

14          MS. DESHIELDS:  Objection.

15          THE WITNESS:  Col. Elders asked me, that

16  at one point I would have to choose sides.

17  BY MR. ZAID:

18      Q.    And what was that?

19      A.    Not asked me.  It was during the

20  facilitator meetings and it was not a direct ask,

21  it was -- how can you say.

Maria Diaz                                                      1/15/2004

Page 139

1      Q.    How about if I describe it and you can

2    tell me if this is accurate.

3      A.    Okay.  Right.

4      Q.    In the sense and I know there was

5    tension between groups within the Guard.

6      A.    Correct.

7      Q.    And people sort of saying there may be

8    an issue of falling in with one group versus the

9    other in the sense of where one is going to go.

10   I don't know if you want to say career-wise.

11     A.    That's not right.  There was a lot --

12           MS. DESHIELDS:  Is that a question?

13           MR. ZAID:  A question in the sense I was

14   trying hopefully to characterize it as we both

15   searched for words as to how to describe what the

16   context was.  I know what you are talking about

17   so that the record is clear for whoever is

18   reading it.  The question wasn't in the sense of

19   was this an accurate characterization.  But she's

20   saying no, I'm missing, I'm still missing kind of

21   the catch of it.  Don't worry about it.

Maria Diaz                                                    1/15/2004

Page 140

1            THE WITNESS:  Okay.

2    BY MR. ZAID:

3        Q.   Do you know as to whether any other

4    women in the Guard were asked to choose sides

5    regarding the Elders situation?

6            MS. DESHIELDS:  Objection.

7            THE WITNESS:  No, I don't.

8    BY MR. ZAID:

9        Q.   Are you aware of Mentges, Wilkinson, or

10   Thomas asking any unit members to participate in

11   a plan to remove Elders from command?

12           MS. DESHIELDS:  Objection, she's asked

13   and answered that.

14           THE WITNESS:  (Shaking head.)

15   BY MR. ZAID:

16       Q.   I'm sorry, you've just got to verbalize

17   it.

18       A.   No.  No.

19       Q.   There is a reason why counsel is

20   objecting and I understand that I sometimes still

21   need to reask the questions in a specific way.

Page 141

1    Also, sometimes I have the same question written

2    down twice that I'm not paying attention to, so

3    it happens.

4         Other than Mentges and Willem, did

5    anyone else encourage you to file a complaint

6    against Karl Elders?

7    A.    I did not speak to anybody else.

8    Q.    Have you ever had a conversation with

9    Dee Maurer concerning Karl Elders and the sexual

10   harassment allegations?

11   A.    The only time was after the

12   investigation.

13   Q.    And when was that?

14   A.    I did not -- Col. Inglis' investigation

15   was in March.  I would have to say about March,

16   after the investigation.

17   Q.    And where was the conversation?

18   A.    It was on base.

19   Q.    What was said in the conversation?

20   A.    That she had been called in to talk to

21   Col. Inglis.

Maria Diaz                                                                                          1/15/2004

Page 142

1     Q.   And did she say anything else?

2     A.   And that was the basic gist of it.

3     Q.   Did she tell you -- did she verbalize to

4 you any of what her concerns were about Karl

5 Elders, in the sense did she tell you her story,

6 her version of the events?

7     A.   Not really.  She did not talk to me

8 about that.  She just wanted to let me know that

9 she had gone in to see Col. Inglis.

10    Q.   And did you tell anything specific about

11 the allegations that you had indicated had

12 happened to you?

13    A.   No, I did not.

14    Q.   Do you have any knowledge as to what

15 prompted Dee Maurer to have spoken to Col.

16 Inglis?

17    A.   No.

18    Q.   Is Dee Maurer -- let me put it this

19 way.  Do you ever see Dee Maurer outside of the

20 base?

21    A.   No.

Maria Diaz                                                              1/15/2004

Page 143

1      Q.    Besides maybe an unofficial Guard event?

2      A.    No.

3      Q.    Now did Dee Maurer, I believe it

4   indicates that you did as part of this

5   conversation talk about this white pickup truck,

6   is that true?

7      A.    Yes.  That was after the investigations,

8   yes.

9      Q.    Is that the came conversation you had

10  just referred to, meaning the conversation where

11  you had talked with her about the white pickup

12  truck, is that a solitary conversation that we're

13  talking about?

14     A.    Yes.  Yes, it is.  And that was when I

15  was on base and I was going to report it.

16     Q.    And I take it she indicated she had

17  experienced something similar, do you know?

18     A.    I recall that.

19     Q.    Or actually that was your conversation,

20  that's what you recall.  Had she reported it?

21  Had she told you she had reported it?

Page 144

1      A.    I don't remember that.

2      Q.    Now when you had that conversation with

3   Dee Maurer, had she sought you out or did you

4   seek her out?

5      A.    I don't recall.

6      Q.    Did you ever tell Master Sgt. Doug

7   Neilson about the allegations concerning Karl

8   Elders?

9      A.    Not the allegations.

10     Q.    What did you have a conversation with

11  him about?

12     A.    It was after the investigations and he

13  had asked what was going on and I said there was,

14  that I had reported sexual harassment.

15     Q.    And who was Doug Neilson?

16     A.    He's a master sergeant.  He's a load

17  master.

18     Q.    And what was the reason for you having

19  conversation with him?

20     A.    About that time the Daily Record had

21  come out and it was circulating around

Maria Diaz                                                              1/15/2004

Page 145

1    operations, that's how it came out.

2        Q.    And did he approach you and ask you

3    about it?

4        A.    I had a lot of people approaching me and

5    asking me about it because of that.

6        Q.    And people were, what, coming up saying

7    hey, I saw the article or I heard this story from

8    someone?

9        A.    Yes.    Someone put it in my in box and

10   there had been numerous placed in different in

11   boxes.

12       Q.    Somebody had actually put the story in

13   people's mailboxes?

14       A.    Yes.

15       Q.    And when people would ask you about what

16   was going on, what would you typically tell them?

17       A.    I had pressed sexual harassment charges

18   and I cannot speak about it.

19       Q.    Did you ever give them any of the

20   details about the allegations?

21       A.    No.

Maria Diaz                                                                                          1/15/2004

Page 146

1       Q.    If you would turn to page 181 of the

2    Werts report, just still Michael Mentges'

3    testimony of, is it June -- May 3rd, 2002.

4       A.    I've got it.

5       Q.    And if you look, actually it's the

6    majority, at least half the page, if you look --

7    well, most of the page.  Why don't you read the

8    page, that might be the easiest thing.  At least

9    you can read up until the second to last time

10   where Werts says well, something.  Actually what

11   does he say?  Just let me know.

12      A.    Well, Major, it's --

13      Q.    He goes, well, Major, it's Friday.

14   Okay.  You can't tell sometimes what the heck

15   they're talking about when you have redacted

16   copy.

17            You don't have to read that bottom

18   portion well Col. Werts said, well, Major, it's.

19   So from between where Col. Werts first has a

20   reference on the page to that one, if you would

21   just read that and let me know when you're

Maria Diaz                                                      1/15/2004

Page 147

1    ready.

2        A.    Okay.

3        Q.    Now Mentges at least apparently seems to

4    believe that perhaps, my interpretation, that

5    Elders was trying to retaliate against you for

6    the sexual harassment allegations or something by

7    submitting some anonymous letter regarding an Air

8    War College paper.

9            Have you had any conversations with

10   Mentges concerning this Air War College paper

11   issue.

12           MS. DESHIELDS:   Objection.

13           THE WITNESS:   The only conversation I

14   had was that there was a question of plagiarism.

15   BY MR. ZAID:

16       Q.    And this was an allegation that was made

17   against you; is that correct?

18       A.    Uh-huh.

19       Q.    Of plagiarizing a paper that Mentges had

20   originally written.   Is that accurate?

21           MS. DESHIELDS:   Objection.

Maria Diaz                                                          1/15/2004

Page 148

1          THE WITNESS:  That is not accurate.

2   BY MR. ZAID:

3      Q.   What was the allegation?

4      A.   The allegation that they gave was

5   plagiarism.

6      Q.   Right.  Right.  But what I mean

7   plagiarism of a paper that apparently Mentges had

8   originally written?

9      A.   Of a paper.

10      Q.   Right.  Was not the allegation that you

11   had plagiarized the paper that Mentges had

12   originally written?

13          MS. DESHIELDS:  Objection.

14          THE WITNESS:  I answered it.

15   BY MR. ZAID:

16      Q.   No, you didn't.  We are saying two

17   things.  I mean you may think you answered it,

18   you didn't answer it.  The allegation was that

19   you had plagiarized a paper?

20          MS. DESHIELDS:  Objection.

21          THE WITNESS:  A paper.

Maria Diaz                                                    1/15/2004

Page 149

1    BY MR. ZAID:

2        Q.    Okay.  I know the harder you say it

3    doesn't mean it's going to make a difference.  It

4    was an allegation you had plagiarized a paper

5    that Mentges had written, correct?

6            MS. DESHIELDS:  Objection.

7    BY MR. ZAID:

8        Q.    There is a difference between those two

9    questions.  I understand you were accused of

10   plagiarizing a paper.

11       A.    That I wrote.

12       Q.    Right.  But plagiarizing means that

13   somebody had copied portions or the contents of

14   someone else's paper.  So you were alleged to

15   have copied portions or all of a paper that

16   Mentges had originally authored, correct?

17           MS. DESHIELDS:  Objection.

18           THE WITNESS:  I answered it.

19   BY MR. ZAID:

20       Q.    You didn't answer it, Doctor.  Whose

21   paper were you alleged to have plagiarized?

Maria Diaz                                                          1/15/2004

Page 150

1          MS. DESHIELDS:  Objection.

2          THE WITNESS:  That is an investigation

3    that is totally different from this.

4    BY MR. ZAID:

5      Q.   That's okay.  I'm still allowed to ask

6    the question.  Mentges appears to believe that

7    Elders retaliated against you because of the

8    sexual harassment allegations.  This is very

9    directly connected.

10         MS. DESHIELDS:  Are you asking her a

11   question?

12         MR. ZAID:  There is no question there.

13   BY MR. ZAID:

14     Q.   I still don't have an answer to the

15   question was it a paper that Mike Mentges

16   authored that you were accused of plagiarizing.

17         MS. DESHIELDS:  Objection.  And actually

18   I think I'm going to instruct her not to answer

19   because I don't know how this in any way relates

20   to the scope of employment issue.

21         MR. ZAID:  There is no privilege for you

Maria Diaz                                                          1/15/2004

Page 151

1    to instruct her not to answer.  Mentges believes

2    that there was a retaliation that the sexual

3    harassment allegations in this investigation of

4    the Air War College paper are related.

5           And in order to overcome the scope of

6    employment immunity issue or defense issue, the

7    personal issues or personal motives of the

8    employee are directly relevant.  That's also with

9    the Feres doctrine, in fact.

10          THE WITNESS:  I don't understand it.

11   BY MR. ZAID:

12     Q.   It's lawyer stuff.  Don't worry about

13   it.  But the bottom line is these are questions

14   that are directly relevant as to whether or not

15   there was a motivation to have Elders removed

16   from command, as we put in the paperwork, and you

17   can scoff at what the theory is, but that's the

18   working theory.

19          We've already got completely consisting

20   evidence by certain people here as to what Dr.

21   Diaz is saying.  It doesn't mean that you are

Maria Diaz                                                                          1/15/2004

Page 152

1    saying anything that's inaccurate.  But, you

2    know, Major or now Col. Wilkinson says you talked

3    to him and you say you didn't.  Somebody is

4    wrong.  I don't know who.  I'll try and find out.

5              MS. DESHIELDS:  Can we just go with the

6    objections and then get to the question.

7              MR. ZAID:  I have no objections to

8    having objections on the record.  I just want

9    answers to my questions.  And I don't mean to be

10   gratuitous in any way and I don't mean to be

11   argumentative in any way over really very simple

12   questions that are being drawn up into much

13   bigger issues.

14   BY MR. ZAID:

15      Q.   Now I'll ask again, was it a paper that

16   Mike Mentges authored that you were accused of

17   plagiarizing?

18             MS. DESHIELDS:  And I will object

19   again.

20             MR. ZAID:  That's fine.  That's your

21   right.

Maria Diaz                                                    1/15/2004

Page 153

1          THE WITNESS:  With both of you, I have

2     to answer that.  Okay.  It was his paper.

3     BY MR. ZAID:

4          Q.   In fact, the investigation did determine

5     that you had plagiarized portions of the paper,

6     did you not?

7               MS. DESHIELDS:  Objection.

8               THE WITNESS:  Incorrect.

9     BY MR. ZAID:

10         Q.   What was the result of the

11    investigation?

12              MS. DESHIELDS:  Objection.

13              THE WITNESS:  The result of the

14    investigation was that I had taken the quotations

15    from his paper.  That was the only thing that was

16    plagiarized was the quotations and the

17    bibliography.

18    BY MR. ZAID:

19         Q.   Portions of.  Were you disciplined as a

20    result?

21              MS. DESHIELDS:  Objection.

Maria Diaz                                                          1/15/2004

Page 154

1            THE WITNESS:  That's private.

2            MR. ZAID:  Disciplinary actions go to

3    credibility of the witness.

4            MS. DESHIELDS:  Disciplinary actions.

5            MR. ZAID:  Sure, we always ask, every

6    time I depose FBI agents and Secret Service

7    agents, find out if they've been disciplined.

8            MS. DESHIELDS:  No, I'm not asking about

9    that at all.  What I'm telling you is that I'm

10   objecting to the relevance of your inquiring in

11   connection with the case.

12           MR. ZAID:  Sure.  I understand.  Again,

13   I have no problems with your objections.

14           MS. DESHIELDS:  We really don't have to

15   get into all of this.

16           MR. ZAID:  It deals with motivational

17   issues.

18           MS. DESHIELDS:  No, I understand your

19   point.

20           MR. ZAID:  Oh, I know.  I guess I'm

21   trying and maybe I'm saying too much because I'm

Maria Diaz                                                          1/15/2004

Page 155

1    trying to at least make her understand, the

2    witness understand, why it is this scope, this

3    line of questioning is being asked because there

4    are questions that are still entitled to answers

5    regardless of whether there is an objection on

6    the table.

7            THE WITNESS:  I was told to write the

8    paper again on a different subject.

9    BY MR. ZAID:

10       Q.   Was there any letter of counseling or

11   letter of reprimand or anything other than what

12   you've just stated?

13           MS. DESHIELDS:  Objection.

14           THE WITNESS:  That I cannot talk about

15   because it was between my commander and me and

16   that's military.  I was told not to talk about

17   it.

18   BY MR. ZAID:

19       Q.   You were ordered not to talk about it or

20   you were told you didn't have to talk about it?

21       A.   I was ordered not to say anything about

Maria Diaz                                                                    1/15/2004

Page 156

1    it because it was commander.

2        Q.   Who ordered it?

3             MS. DESHIELDS:  Objection.

4             MR. ZAID:  I don't think there is

5    anything she can't talk about here so I need to

6    get this on the record.

7             THE WITNESS:  It was Col. Walsh.

8    BY MR. ZAID:

9        Q.   Do you believe that Col. Elders or Karl

10   Elders, since he was out of unit, I think, at

11   that time, was responsible for filing this

12   anonymous complaint or initiating investigation

13   against you?

14       A.   No.

15       Q.   Do you have any suspicions as to who was

16   responsible?

17            MS. DESHIELDS:  Objection.

18            THE WITNESS:  There was an investigation

19   done and in the course of the investigation, the

20   person who was, Col. Gelata let me know who it

21   was.

Maria Diaz                                                          1/15/2004

Page 157

1    BY MR. ZAID:

2        Q.    That they believed was responsible?

3        A.    Right.

4        Q.    Do you believe that the investigation of

5    the plagiarism issue was at all connected to the

6    sexual harassment allegations or conduct by Karl

7    Elders?

8        A.    No.

9        Q.    Did you at any time believe that they

10   were connected?

11       A.    No.

12       Q.    Did Mike Mentges tell you at any time

13   that he believed that they were connected?

14       A.    Not directly, no.

15       Q.    Okay.  When you say directly, did

16   someone tell you that that's what Mike Mentges

17   believed, a third party tell you?

18       A.    No.

19       Q.    Okay.  So when you say directly, in what

20   way did he indirectly --

21       A.    Like saying he did it, no.  That he

Maria Diaz                                                        1/15/2004

Page 158

1    said -- he didn't say anything to be honest with

2    you.  He did not talk about it.

3        Q.  Well, I get the sense just -- again,

4    this is what we do.  We parse things.  You said

5    he didn't directly tell you.  So in any way did

6    he indirectly give you the impression that he

7    believed that they were connected?

8        A.  No, he did not.  He just -- no, he did

9    not.

10       Q.  Are you aware of any discussion that Dee

11   Maurer had with Diane Kreinbrink regarding Karl

12   Elders and sexual harassment allegations?

13       A.  No, I'm not aware of any.

14       Q.  And when I ask you that, is it that you

15   are not personally aware and you did not

16   participate or you are not aware of having even

17   heard that there was such a conversation?

18       A.  I did not even hear that there was a

19   conversation.

20          MR. ZAID:  Okay.  We'll take a 45 minute

21   break for lunch.

Maria Diaz                                                          1/15/2004

Page 159

1          (Whereupon, at 1:15 p.m., a lunch recess

2     was taken.)

3     BY MR. ZAID:

4          Q.    We're back on the record at 2:05.  All

5     right.  Why don't we put a couple things we had

6     talked about before in a little bit more of a

7     context.

8               Now you had indicated that part of the

9     reason you had talked to Willem was because he

10    was a commander, right?

11         A.    Correct.

12         Q.    And because not just a commander but

13    also commander of the security forces, right?

14         A.    Correct.

15         Q.    Which would I be correct in saying that

16    to you gave him more of a significant position in

17    the position, authority position that he held as

18    being commander of security forces and you were

19    going to him talking about a problem that you

20    believed was related to work, is that a fair

21    characterization?

Page 160

1      A.    I was looking for guidance.

2      Q.    No, I understand that.  But in the sense

3   of looking for guidance as far as why Willem,

4   part if not all of the reason, was because of the

5   position that he held.  I'm sorry, the position

6   that he held, meaning commander of the security

7   forces.  I mean because guidance, I mean you

8   could have gone and talked to the janitor at the

9   base I suppose on guidance.  Anybody can get

10  guidance from someone.  Was it not, was there --

11     A.    No, that's incorrect, not anybody can

12  take guidance from a janitor.  He was, he was

13  security and I felt comfortable going up and

14  talking to him about this.

15     Q.    Because of the position that he held or

16  because of that he was Raul Willem?

17     A.    I already said this, yes.  I already

18  said that he is chief of security and that I was

19  looking for guidance.

20     Q.    Okay.  And you said as far as with Mike

21  Mentges that was because he also was a commander,

Maria Diaz                                                                                    1/15/2004

Page 161

1    correct?

2         A.    He was a commander, correct.

3         Q.    And that was the reason why you felt

4    comfortable in confiding in him with respect to

5    whatever it was that you told him?

6         A.    Correct.

7         Q.    Now what was Wilkinson's position at

8    that time, and that time frame that's 2002?

9    What, March, February, March, 2002, he was a

10   major at the time as I recall, correct?

11        A.    He was a major, yes, that is correct.

12        Q.    Do you know what position he held?

13        A.    No.

14        Q.    He wasn't a commander though, right?

15        A.    No.

16        Q.    And sometimes just from because it was

17   like a double negative, it's just so I'll make it

18   a little clear for the record, it's true he was

19   not a commander, that statement is correct he was

20   not a commander?

21        A.    He was a fellow officer.

Maria Diaz                                                    1/15/2004

Page 162

1      Q.    And do you believe that it would have

2    been appropriate for you to confide in Wilkinson

3    with respect to the allegations against Elders

4    that you had talked to Willem and Mentges about?

5      A.    I already told you about Maj. Wilkinson.

6      Q.    Right, you did not talk to him?

7      A.    Right, I don't know the line of

8    questioning.  I talked to two people only.

9      Q.    Right, I understand.  Do you believe it

10   would have been appropriate for you to have

11   confided in Maj. Wilkinson at that time?

12     A.    I didn't talk to him so I don't

13   understand what you're trying --

14     Q.    Okay.  That's fine.

15     A.    Can you rephrase?

16     Q.    Sure, I want to get it to a point where

17   you understand the question.  You are indicating

18   that one, if not all, and you can tell me which,

19   one of the reasons that you spoke to Willem was

20   because he was a commander and you felt then

21   comfortable seeking guidance from him about what

Maria Diaz                                                          1/15/2004

Page 163

1    to do about your perceived situation.  And that

2    was the same with Mentges, you felt comfortable

3    in talking to him because he was a commander

4    about your perceived situation with respect to

5    guidance as to what to do.

6          If you had chosen to do so, would it

7    have been appropriate for you to go confide in

8    Wilkinson and seek guidance from him regarding

9    your perceived problems with Elders?

10    A.   I answered your question and I don't see

11    where this is leading to.  I only talked to two

12    people.  There is, I don't know what level you're

13    trying to get me to.

14    Q.   I understand that, Doctor, and I will

15    try again to rephrase it to be as clear as

16    possible, but you don't have to understand the

17    reason for why I ask a question.

18    A.   Reason.

19    Q.   You just have to understand the

20    question.

21          MS. DESHIELDS:  You just have to

Maria Diaz                                                      1/15/2004

Page 164

1   understand the question.  If you don't understand

2   the question at all, then he has to constantly

3   rephrase it to get it to the point where you

4   understand it.

5   BY MR. ZAID:

6       Q.    Let me put it into a medical context,

7   right.  Let's say a colleague of yours is being

8   sued for medical malpractice and you are being

9   called as a witness because you are an expert in

10  these particular procedures and the doctor in

11  question who is being sued did a procedure a

12  certain way and the lawyer questioning you as the

13  expert would say well would it have been

14  appropriate for the doctor to have done the

15  procedure this way.  And your answer would be yes

16  or no or whatever.  Okay.  Would it have been

17  appropriate for the doctor to have done the

18  procedure this way?  You go yes, no, or

19  whatever.

20          So again, my question is you have

21  testified that you felt it was appropriate to

Maria Diaz                                                                    1/15/2004

Page 165

1    confide in Willem because he's the commander,

2    he's a commander; and two, particularly he's the

3    commander of security so it's appropriate to seek

4    guidance from him.

5         And then secondly you said you thought

6    it was appropriate to go to Mentges because he's

7    a commander which gives him a position of

8    authority and that then it was appropriate to

9    seek guidance from him.

10        My question is, back in February of

11   2002, would you have felt it was appropriate if

12   you had wanted to confide in Todd Wilkinson

13   regarding the same information you conveyed to

14   Mentges and Willem?

15   A.    And I'm answering you that I only do

16   this with the two people that I felt comfortable.

17   Q.    I know.

18   A.    And I, it's just --

19   Q.    Doctor, but that's not an answer to my

20   question.  I'm not asking you did you talk to

21   Wilkinson.  I know you said you did not talk to

Maria Diaz                                                          1/15/2004

Page 166

1    Wilkinson.

2         A.    So I did not talk to Wilkinson.

3         Q.    I know, that's not the question.  I'm

4    asking that had you decided you were going to

5    talk to Wilkinson at that time, do you feel it

6    would have been appropriate for you to do so?

7         A.    And I'm answering you the same way.

8         Q.    So basically since Wilkinson was not a

9    commander, correct, he was just a fellow officer

10   and a junior officer at that, right?

11        A.    Junior to me?

12        Q.    Junior to you, yes, right, he was a

13   major?

14        A.    He was a major, but I have been told

15   that in questions leading to pilots and

16   operations I have no say so whether I be a

17   lieutenant colonel or a full colonel.

18        Q.    That's okay, I'm not questioning why you

19   are a particular rank.  Wilkinson was a rank

20   lower than Karl Elders at the time, right?

21        A.    That one, yes.

Maria Diaz                                                          1/15/2004

Page 167

1      Q.    And Wilkinson did not hold any position

of authority or leadership that had anything to

do with Elders, would you agree with that?

4      A.    I don't recall him holding any position.

5      Q.    Maybe --

6      A.    Except, do you have --

7      Q.    I'm going to see if I have one of these

charts that I probably will have to ask you to

explain to me.

10     A.    Don't ask me to explain.

11     Q.    Let me just think how better I can try

and phrase this for you so we can both move on.

You are familiar with the declaration that

Allison Solomon filed as part of this case, are

you not, is that true?

16     A.    No, that is not true.

17     Q.    Have you never read the declaration?

18     A.    I've never read the declaration.

19     Q.    Okay.

20     A.    I didn't know she filed one.

21     Q.    Okay.

Maria Diaz                                                              1/15/2004

Page 168

1            MR. ZAID:  We'll mark this as 8, is that

2   what we're up to?

3            COURT REPORTER:  Eight.

4        (DIAZ Deposition Exhibit Number 8 was

5   marked for identification.)

6   BY MR. ZAID:

7     Q.   Take a look at that, Doctor, when you're

8   ready.

9            MS. DESHIELDS:  Are you going to mark

10  this as a deposition --

11           MR. ZAID:  It is, it's already marked 7

12  or 8, I'm sorry.

13  BY MR. ZAID:

14    Q.   Okay.  Now according to the chart, at

15  least as I read these charts, now, I'm sorry,

16  that has them as majors, right, not lieutenant

17  colonels?

18    A.   No, these are lieutenant colonels.

19  These are all lieutenant colonels because it's --

20    Q.   I can't use this chart because it's not

21  the time.

Maria Diaz                                                        1/15/2004

Page 169

1      A.    Should this be taken out then?

2      Q.    Let me -- maybe I can find it.  Do you

3   know when Mentges and Wilkinson were promoted?

4      A.    No.

5            MS. DESHIELDS:  So we're still going to

6   work off of this one?

7            MR. ZAID:  We'll strike it for now.

8            MS. DESHIELDS:  Right, right, right.

9            MR. ZAID:  I'm just pointing out to you

10   the confusion as to they're official documents

11   but they're -- somebody is not updating part of

12   it or speculating that the people are going to be

13   promoted, I don't know.  I don't know which one.

14   BY MR. ZAID:

15      Q.    If you want to look at it for

16   information purposes from a hierarchy standpoint,

17   is it your understanding either from looking at

18   it or from just what you remember, was Wilkinson

19   underneath in the order of command, chain of

20   command of Maj. Mentges?

21      A.    I thought, and here I'm probably

Page 170

1    ignorant, I thought he was under Col. Thomas.

2         Q.   Okay.

3         A.   But I'm not sure what he was doing.

4         Q.   All right.  Let's say, let me try and

5    see if we can come up with a, look at it from a

6    sort of a different angle.

7              Would you agree with me that one could

8    categorize that there are certain people on the

9    base that it would have been inappropriate for

10   you to have shared your concerns about Karl

11   Elders?

12        A.   The concerns of sexual harassment?

13        Q.   Right.

14        A.   Yes.

15        Q.   Okay.  And are you able to, without me

16   coming up with a list, are you able to give me an

17   example of a person or a position that you think

18   it would have been inappropriate for you to have

19   shared the information with?

20        A.   No, I cannot.

21        Q.   So, for example, clearly if you wanted

Maria Diaz                                                               1/15/2004

Page 171

1   to have gone to Col. Inglis that would have been

2   appropriate, would you say?

3        A.   I don't know -- yes, that would have

4   been appropriate, yes.

5        Q.   An airman who was on the base flying in

6   one of the C-130s, do you think it would have

7   been appropriate for you to share the information

8   with him?

9        A.   No.

10       Q.   Why is that?

11       A.   Because I don't know a lot -- I usually

12  only get connected to the airmen in the medical

13  situation.

14       Q.   Okay.  Is there a distinction to you as

15  to whether or not it would have been appropriate

16  to talk to any officer as part of the Maryland

17  Air National Guard about any of your concerns

18  regarding Col. Elders and the sexual harassment

19  allegations?

20       A.   And I'm going to answer it this way:  I

21  only went to security police, to the chief

Maria Diaz                                                          1/15/2004

Page 172

1    because he was the chief.  I did not go to Col.

2    Inglis and I did not go to Gen. Beasley.

3        Q.   If Maj. Willem hadn't been there that

4    day, do you think it would have been appropriate

5    for you to have talked to one of the other police

6    officers that were there?

7            MS. DESHIELDS:  Objection.

8            THE WITNESS:  If they had asked me if

9    something was wrong with me and -- I don't know

10   what I would have done because it's security.  I

11   don't know what I would have done.

12   BY MR. ZAID:

13       Q.   Okay.

14       A.   And that's an honest answer.

15       Q.   That's all I want.  If you couldn't have

16   found Maj. Mentges that day do you think it would

17   have been appropriate for you to talk to some

18   lieutenant in his chain of command who had asked

19   you how come you look --

20       A.   I don't talk to lieutenants.  I don't

21   usually talk to them.

Maria Diaz                                                                    1/15/2004

Page 173

1       Q.    You recognize though, do you not, that

2   there is a distinction between that there are

3   some people who would have been appropriate for

4   you to talk to and reveal concerns regarding a

5   high ranking officer and others who it would not

6   have been appropriate, is that fair to say?

7       A.    That is fair to say.

8       Q.    Okay.  Would it be fair to say that the

9   reason why you didn't talk to Maj. Wilkinson is

10  that there was no reason to talk to him because

11  he had no means by which to either provide you

12  guidance or do anything about the situation that

13  you felt you were experiencing?

14      A.    That's fair to say.

15      Q.    Have you ever heard Mentges or Willem

16  make any racial slurs?

17          MS. DESHIELDS:  Objection.  One, well,

18  relevance; and two, the question is a little

19  vague.

20          MR. ZAID:  Sure.

21  BY MR. ZAID:

Maria Diaz                                                      1/15/2004

Page 174

1        Q.    Have you ever heard Mentges or Willem

2   and this is not together, at any separate point,

3   have you ever heard Mentges or Willem make any

4   racial slurs about African Americans?

5            MS. DESHIELDS:  Objection.

6            THE WITNESS:  Well, Col. Mentges, no.

7   BY MR. ZAID:

8        Q.    But Willem you have, I take it?

9        A.    About Puerto Ricans.

10       Q.    Okay.

11       A.    I'm Puerto Rican.

12       Q.    I know.  I hope you didn't take that --

13       A.    I didn't take offense.

14       Q.    And that's fine.  I'm glad.  Anything

15   about African Americans, have you ever heard

16   anything?

17       A.    Not that I know.

18       Q.    Have you ever heard either of them make

19   any slurs specifically about Karl Elders?

20            MS. DESHIELDS:  Objection.

21            THE WITNESS:  I don't recall.

Maria Diaz                                                                1/15/2004

Page 175

1    BY MR. ZAID:

2        Q.    Now there came a point in time when in

3    fact Lt. Col. Elders had written a recommendation

4    for you about the state surgeon general position,

5    is that true?

6        A.    State air surgeon.

7        Q.    State air surgeon, that's true?

8        A.    That is correct.

9        Q.    And my understanding that was around

10   November of 2001?

11       A.    I have to look at the date.

12       Q.    Okay.  Whatever the date is it says in

13   the statement?

14       A.    It's on there.

15       Q.    Okay.  And at that point in time for

16   you, for your own impression, was that a point in

17   time where you felt already that you were afraid

18   of Col. Elders or did that develop after?

19            MS. DESHIELDS:  Objection.

20            THE WITNESS:  That was when he left a

21   message on my machine about having the OPRs and

Maria Diaz                                                    1/15/2004

Page 176

1    stuff.

2    BY MR. ZAID:

3        Q.    Same time frame?

4        A.    About the same time frame I was feeling

5    uncomfortable.

6        Q.    When you have said in some of your

7    statements that you were at times uncomfortable

8    and at times afraid, were you making distinction

9    between the two or are you saying, is that to you

10   the same emotion at the time but you just

11   conveyed the words differently?

12       A.    No.

13       Q.    Or is there a distinctive meaning for

14   each?

15       A.    There is a distinctive meaning.  I

16   became afraid after the Christmas incident.

17       Q.    Okay.  At the time when the letter of

18   recommendation was written, did you believe that

19   there was something that Karl Elders could do to

20   help you with that position besides a letter of

21   recommendation?

Page 177

1          MS. DESHIELDS:  Objection.

2          THE WITNESS:  Explain that again.

3    BY MR. ZAID:

4        Q.    Sure.  Was there something you believe

5    he might be able to help you with securing the

6    position besides submitting the letter of

7    recommendation?

8          MS. DESHIELDS:  Objection.

9          THE WITNESS:  I was under the impression

10   that he was friends with Gen. Tuxill.

11   BY MR. ZAID:

12       Q.    T-U-X-I-L-L.  And that that might help

13   secure the position?

14       A.    I don't know if that might help secure

15   the position, but that he knew how to write the

16   letter and how to, how to help me with the

17   recommendation.

18       Q.    Okay.  And so after the December 2001

19   incident with the party and when you became

20   afraid of Col. Elders, so would I be fair and say

21   or true and say the first time then you vocalized

Maria Diaz                                                              1/15/2004

Page 178

1    that was your conversations with Mentges and

2    Willem in the end of February?

3        A.    That is correct.

4        Q.    Okay.  Now when you went as I understand

5    it to Alaska on a trip in February.

6        A.    It was a deployment.

7        Q.    And Mentges was one of the individuals

8    who deployed with you, correct?

9        A.    That is correct.

10       Q.    And was it Thomas as well?

11       A.    Col. Thomas was there.

12       Q.    Okay.  During that period of time did

13   you ever talk about Karl Elders that you recall?

14       A.    No, we did not talk about Karl Elders.

15   We talked about being snowed in Alaska and broken

16   down and we were more attuned to that.

17       Q.    Do you recall at all whether you in fact

18   even had any interactions with Karl Elders after

19   the February UTA?

20       A.    I don't recall.

21            MS. DESHIELDS:  Of what year?

Page 179

1          MR. ZAID:  2002.

2          THE WITNESS:  2002.

3    BY MR. ZAID:

4       Q.   Okay.  Do you have any recollections as

5    to -- no strike that.  Don't worry about it.

6          Now do you recall that Col. Inglis was

7    going to leave his position as the commander in

8    or around February of 2002.

9          MS. DESHIELDS:  Objection.

10          THE WITNESS:  That's a jumble, I don't

11    recall.

12    BY MR. ZAID:

13       Q.   Do you have any recollection that the

14    command position was being advertised during

15    February, March of 2002?

16          MS. DESHIELDS:  Objection.

17          THE WITNESS:  I knew -- yes.  Yes, I'm

18    going to say yes.

19    BY MR. ZAID:

20       Q.   Did there come a time when you became

21    aware that Karl Elders had applied for the

Maria Diaz                                                     1/15/2004

Page 180

1    commander position?

2              MS. DESHIELDS:  Objection.

3              THE WITNESS:  I knew he wanted to

4    apply.  I didn't know he had applied.

5    BY MR. ZAID:

6       Q.    Did there come a time when Warren Thomas

7    told you that he was going to take over the

8    position as commander?

9              MS. DESHIELDS:  Objection.

10             THE WITNESS:  I don't recall that, no.

11   BY MR. ZAID:

12      Q.    Do you recall any conversations where

13   Warren Thomas told you that Karl Elders was

14   competing for him for the position of commander?

15      A.    They both said it.

16      Q.    Meaning, both said it to you or you

17   heard it from others?

18      A.    I, I knew that Col. Elders was going to

19   apply for that position and I knew Col. Thomas

20   was.  They both said it.

21      Q.    Okay.

Maria Diaz                                                          1/15/2004

Page 181

1      A.    Now I don't --

2      Q.    Were you angry or upset for the fact

3   that Col. Elders was applying for the commander

4   position?

5      A.    Absolutely not.

6      Q.    Did you have a preference that Col.

7   Thomas would become commander rather than Col.

8   Elders?

9      A.    Absolutely not.

10     Q.    Do you recall, as you can tell I'm not

11  going to be able to be specific, so maybe you can

12  recall, do you recall administering a flight

13  physical to Col. Elders during the fall 2001 to

14  early 2002 period?

15     A.    I don't recall.

16        MS. DESHIELDS:  Objection.

17  BY MR. ZAID:

18     Q.    Now is it not true that there are other

19  physicians with the Guard who could administer

20  the physical to Karl Elders?

21        MS. DESHIELDS:  Objection.

Maria Diaz                                                1/15/2004

1          THE WITNESS:  There's other flight

2     surgeons.

3     BY MR. ZAID:

4        Q.   So that if you had wanted you could have

5     asked one of the other flight physicians to

6     administer the physical to Elders, is that true?

7          MS. DESHIELDS:  Objection.

8          THE WITNESS:  That's incorrect because

9     drill weekends I usually am the only doctor up

10    there.  As a flight surgeon I have physician

11    assistants.  Col. Elders is a flier, he needs a

12    flight surgeon.  He could have come to the A10

13    drill, that is correct, but the C-130 drill, I'm

14    usually the only one.

15    BY MR. ZAID:

16       Q.   As a flight surgeon, squadron surgeon, I

17    presume there must be some sort of events of just

18    the medical personnel of the Guard, is there not?

19    Isn't there some, obviously even though you're

20    based out of the squadron, you are still also

21    designated within a medical squadron, right?

Maria Diaz                                                              1/15/2004

Page 183

1        A.    That's incorrect.  When I'm squadron,

2    I'm a squadron medical.  I am not, I'm paid by

3    squadron, I'm not paid by --

4        Q.    Is there no higher medical official who

5    has jurisdiction over you as a doctor versus just

6    the regular chain of command?

7        A.    The state air surgeon.

8        Q.    Is that the only leap that it goes?

9        A.    That I know of.

10       Q.    Now when you would say if I asked you

11   who is it that you report to?

12       A.    Col. Elders.

13       Q.    Okay.  But nobody from the medical side

14   that you would report to?

15       A.    No.

16       Q.    Okay.  Now do you remember scheduling

17   Karl Elders for an appointment with one of your

18   colleagues to care for his sore knee?

19             MS. DESHIELDS:  Objection.

20             THE WITNESS:  In private practice.  I

21   can't -- now I'm confused.

Maria Diaz                                                          1/15/2004

Page 184

1    BY MR. ZAID:

2        Q.   I think --

3        A.   That's private practice.

4        Q.   Right.  I think, my understanding is you

5    had referred a private physician to him.

6        A.   That is correct.

7        Q.   For his sore knee.

8        A.   Yes.

9        Q.   Is that something you do recall?

10       A.   Oh, I have a folder.

11       Q.   Okay.  And you did that during the time

12   that you say that you were afraid of him, did you

13   not?

14           MS. DESHIELDS:  Objection.

15           THE WITNESS:  I don't recall the time

16   frame.  But if he'd ask me, whether I was afraid

17   of him or not, he is a patient.  If he was having

18   trouble, I would refer him.  I'm a doctor.

19   BY MR. ZAID:

20       Q.   And as a doctor you never reveal patient

21   confidentiality, right?

Maria Diaz                                                          1/15/2004

Page 185

1      A.    You know, I thought that patient-doctor

2   confidentiality was the same as in the private

3   sector, in the military there is none and I did

4   not know that.

5      Q.    There is a distinction, that is true.

6      A.    I had no idea until the investigations.

7      Q.    My understanding of it though it's not

8   that you as the doctor, any doctor, not just

9   focussing on you, but you as the doctor in the

10  military, you don't have the discretion to just

11  go tell anyone, you can go tell a commander of a

12  potential problem you think the person is

13  suicidal, you think the person could be dangerous

14  to others.  Actually you can do that in private

15  practice.

16     A.    I was going to say that, yeah.

17     Q.    A lesser standard than what would apply

18  in the personal, in the private sector.  But

19  would you agree with me based on your

20  understanding from even after the investigation,

21  that something a patient would tell you during a

Maria Diaz                                                              1/15/2004

Page 186

1    treatment militarily, you don't have the

2    discretion as the doctor to just go tell anybody

3    within the squadron of that issue, that you'd

4    have to have a military reason to tell presumably

5    a command and a higher up?

6         A.    Military reason or be ordered.

7         Q.    Right, understood.

8         A.    Or the JAG, J-A-G.

9         Q.    Capitals, Judge Advocate General for the

10   record.  Do you deny visiting Lt. Col. Thomas'

11   office during the May 2002 drill and stating

12   something to the effect that you have taken,

13   meaning you, Lt. Col. Thomas have taken Karl

14   Elders' position, so why is Karl Elders still

15   here at the base?

16        A.    I deny that completely.

17        Q.    Okay.

18        A.    Absolutely not.

19        Q.    And at the time when you were talking to

20   Mike Mentges, you were aware, correct, that

21   Mentges and Elders had a let's say strained

Maria Diaz                                                          1/15/2004

Page 187

1    relationship?

2              MS. DESHIELDS:  Objection.

3              THE WITNESS:  I was aware.

4    BY MR. ZAID:

5        Q.   Now do you recall ever telling Elders

6    that he was being disloyal to Thomas?

7              MS. DESHIELDS:  Objection.

8              THE WITNESS:  Not to Thomas, and I did

9    not say disloyal.

10   BY MR. ZAID:

11       Q.   What do you recall?

12       A.   I recall saying that there was a lot of

13   tension and that we had to work together.

14       Q.   Do you ever recall telling Karl Elders

15   that he was being disloyal to his chain of

16   command?

17             MS. DESHIELDS:  Objection.

18             THE WITNESS:  I never said that he was

19   being disloyal.

20   BY MR. ZAID:

21       Q.   And besides what you had just answered

Page 188

```
 1   before -- strike that.  My recollection is and I

 2   gather you have a sense of at least the context

 3   of what this conversation might relate to or not?

 4        A.   No.

 5        Q.   Okay.

 6        A.   Absolutely not.

 7        Q.   In January 2002 I guess you had sort of

 8   a, all of you had some sort of leadership meeting

 9   to try and address some of the tension issues, I

10   guess, do you recall that?

11        A.   That is correct.

12        Q.   In recalling back to that leadership

13   meeting, does that refresh your recollection of

14   having a conversation with Karl Elders about his

15   attitude towards command and/or Warren Thomas?

16        A.   I did not say he was disloyal.

17        Q.   What did you say?

18        A.   I told you what I said, tension, and I

19   believe that's all I said.  I don't recall

20   anything else.  Now Col. Elders was in the room

21   with Col. Mentges and I thought that they were
```

Maria Diaz                                                          1/15/2004

Page 189

1    going to come to blows.  But I don't recall

2    saying anything else because this happened after

3    one of the facilitator meetings.

4        Q.   Do you recall telling or saying, I don't

5    know if it was just to Karl Elders, but saying to

6    Karl Elders or among other people, that Col.

7    Elders was undermining Lt. Col. Thomas'

8    authority?

9            MS. DESHIELDS:  Objection.

10           THE WITNESS:  I did not say that.  Can I

11   ask you something?

12   BY MR. ZAID:

13       Q.   Sure.

14       A.   How does this all relate to where you

15   are leading to?  We're supposed to be doing --

16   oh, I talked out of turn.

17       Q.   There is a rhyme and a reason to

18   everything, but that part of it I will

19   respectfully decline to answer.

20       A.   I'm sorry.

21       Q.   That's okay.  Do you have a recollection

Maria Diaz                                                    1/15/2004

Page 190

1    of after the session ended approaching Col.

2    Elders and telling him something to the effect

3    the full-time staff is too stupid to understand

4    what he is trying to accomplish?

5           MS. DESHIELDS:  Objection.

6           THE WITNESS:  I never said stupid.  I

7    said that there could have been, that he had good

8    ideas and that they could listen to him, but I

9    never said that the full-time staff was stupid.

10   BY MR. ZAID:

11       Q.   Do you recall telling Karl Elders that

12   in January of 2002 that Lt. Col. Thomas was going

13   to be the new CO?

14       A.   I never said that.

15          MS. DESHIELDS:  Objection.

16          THE WITNESS:  Absolutely not.

17   BY MR. ZAID:

18       Q.   Have you ever had Dee Maurer come visit

19   you at your house?

20       A.   I'm going to say 2003.

21       Q.   About do you remember when

Maria Diaz                                                    1/15/2004

Page 191

1    approximately?

2        A.   We had a summer party.

3        Q.   Okay.  Is that the private or personal

4    house?

5        A.   Yes.

6        Q.   Only one house, right?

7        A.   Only one house.

8        Q.   What was the nature of the party, summer

9    party?

10       A.   Celebrate her promotion.

11       Q.   She is lieutenant colonel now, too?

12       A.   Yes.

13       Q.   Who else was at the party?

14       A.   My husband's secretary, gees oh whiz, my

15   husband's secretary, Chief Williams.

16       Q.   Is that Frederick Williams?

17       A.   Yes, Chief Frederick Williams, Col.

18   Thomas, Col. Mentges, a couple of people gave

19   RSVPs.

20       Q.   How about Mentges or Thomas' spouses?

21       A.   Thomas' spouse was there, Mentges' was

Page 192

1    not, she had a soccer game.

2        Q.    Anyone else that you recall who was

3    there?

4        A.    I'm trying to remember who RSVP'd.

5        Q.    And I'm interrupting, but while you're

6    thinking I'll put a couple other direct

7    questions.  Besides your husband's secretary, I

8    understand your husband's a doctor, too?

9        A.    Uh-huh.

10           MS. DESHIELDS:  Well, I'm going to

11    object to that.  Let her answer the first

12    question and then you can --

13           MR. ZAID:  Okay.  That's fine.

14           THE WITNESS:  I don't recall anybody

15    else.

16    BY MR. ZAID:

17        Q.    Okay.  Other than your husband and your

18    husband's secretary, was there anybody else

19    outside of the Guard who attended the party?

20        A.    No.

21        Q.    Do you have any documents that would

Maria Diaz                                                        1/15/2004

Page 193

1    reflect who you invited to the party?

2        A.    No.

3        Q.    How about any documents that might

4    reflect who attended the party?

5        A.    No.

6        Q.    You would be surprised.

7        A.    Like signing in?

8        Q.    You never know.  You wrote thank-you

9    notes or something to everyone?

10       A.    No.

11       Q.    Why is it that you hosted a party for

12   Dee Maurer?

13           MS. DESHIELDS:  Objection.

14           THE WITNESS:  I hosted because it was a

15   promotion party for her.

16   BY MR. ZAID:

17       Q.    But I mean had you ever socialized with

18   her before?

19       A.    Never before.

20       Q.    I mean, that's, do you deal with Maurer

21   on any particular --

Maria Diaz                                                                1/15/2004

Page 194

```
 1      A.   No.

 2      Q.   Or is that part of your customary work

 3   you do at the Guard you deal with her?

 4      A.   No, you and Col. Elders brought up a

 5   friendship that developed after I was sued.

 6      Q.   Okay.

 7      A.   It was a very nice friendship.  So yes,

 8   it was after the lawsuit was placed.

 9      Q.   Okay.  How often do you speak to her?

10      A.   I mean, do I call her daily?  No.

11      Q.   Whatever it is.

12      A.   The only time I call her is when she has

13   a situation at the Guard.

14      Q.   So in with whether the filing of the

15   lawsuit or with the investigations, were you

16   talking to her often that the friendship

17   developed?

18      A.   No.

19      Q.   Were you meeting with her besides the

20   time that we talked --

21      A.   No, I never met with her until after the
```

Page 195

1    investigations were done and Col. Elders had the

2    lawsuit placed.  There was no need for me to talk

3    to her.

4        Q.   Well, so you filed the lawsuit in May of

5    2003, October, October of 2000?

6        A.   No.

7        Q.   October of 2000, that's wrong.  October

8    of 2000.  So between October 2002 and the summer

9    of 2003, how often would you say you spoke to Dee

10   Maurer?

11       A.   I can't recall how many times.

12       Q.   Would you say one, a dozen, two dozen?

13           MS. DESHIELDS:  Objection, asked and

14   answered.

15   BY MR. ZAID:

16       Q.   Do you have any sense of how many times?

17       A.   I can't recall.

18       Q.   And on the times though that you would

19   talk with her, part of the conversation may deal

20   with Karl Elders?

21       A.   Incorrect.

Maria Diaz                                                              1/15/2004

Page 196

1      Q.    And besides the one time that you had

2   talked about earlier, were there any

3   conversations that you ever had with Dee Maurer

4   about the litigation?

5      A.    The only conversation we had was that we

6   wanted a copy of the investigation and they

7   denied us that copy.  That was the only

8   conversations we had.

9      Q.    They shouldn't have.

10     A.    Well, they denied both of us.  All I

11  wanted was the excerpts of what I said and she

12  just wanted what she said and it was denied.

13     Q.    Under different circumstances I would

14  say I'd represent you.

15     A.    I don't want you to.

16     Q.    You had a legal entitlement to get your

17  copies, but that's another day.

18           So between and those times that you

19  spoke to her, what you are saying is you

20  developed a friendship strong enough that you

21  wanted to host a party for her and invite others

Maria Diaz                                                                                        1/15/2004

Page 197

1    from the base to join?

2        A.    I believe she deserved a promotion and

3    as such I did that.

4        Q.    Now at the party did anyone discuss the

5    lawsuit?

6        A.    Absolutely not.

7        Q.    Now do you remember talking to Dee

8    Maurer at the December 2001 Christmas party?

9        A.    I do recall talking to her, yes.

10       Q.    And I know I did ask this but forgive

11   me.  You guys were in uniform at the party or no,

12   do you remember?

13       A.    I don't even remember what I told you.

14   You've got me so confused.

15       Q.    I'm not trying to.

16       A.    I don't remember.

17       Q.    Not trying to.

18       A.    So I'm going to say I don't know.

19       Q.    That's fine.  Do you remember seeing Dee

20   Maurer give Karl Elders a big hug at the party?

21            MS. DESHIELDS:  Objection.

Page 198

1          THE WITNESS:  No, I don't recall seeing

2    that.

3    BY MR. ZAID:

4       Q.   Now from obviously how you're testifying

5    and from some of the documents that you executed,

6    the concerns that you had with Karl Elders were

7    troubling to say the least, correct?

8       A.   Yes.

9       Q.   At any time have you sought any outside

10   guidance, psychiatrists, psychologist, any type

11   of counselor?

12      A.   No.

13      Q.   To talk about it?

14      A.   No.

15      Q.   And I'd just like to have you answer it

16   after I ask.

17      A.   No.

18      Q.   And I take it at least as a result of

19   the litigation and the documents that were

20   submitted, part of the litigation you've read the

21   summary reports that Col. Inglis wrote and what

Page 199

1    Col. Werts wrote, would that be true?

2        A.    Yes.

3        Q.    And would you agree with me that Col.

4    Werts' investigation was more thorough than Col.

5    Inglis'?

6            MS. DESHIELDS:   Objection.

7            THE WITNESS:   No.

8    BY MR. ZAID:

9        Q.    Why is that?

10       A.    They were both the same.

11       Q.    And in what way do you believe they were

12   the same?

13       A.    You're asking me?   I have never been

14   through an investigation.  I don't know.  To me

15   they were both the same, the same questions were

16   asked.

17       Q.    When I say thorough in the sense

18   obviously Col. Werts interviewed a lot more

19   people, isn't that true, from what you know?   If

20   you don't know --

21       A.    I don't know.  I don't know who he

Maria Diaz                                                      1/15/2004

Page 200

1    interviewed.

2        Q.   Okay.

3            (DIAZ Deposition Exhibit Number 8 was

4    marked for identification.)

5    BY MR. ZAID:

6        Q.   If you could, Doctor, identify for me

7    what I've had marked as Exhibit 8.

8        A.   Orders.

9        Q.   And these are your orders for this

10   whatever period on the document, correct?

11       A.   Correct.

12       Q.   And in looking --

13       A.   I've never seen this before.  I don't

14   even know how the orders come out.

15       Q.   Okay.  Have you ever seen any of this

16   type of document before?

17       A.   No, I've never seen the type of this

18   document before.

19       Q.   Okay.  In looking at it are you able to

20   explain to me what is meant by what's in the bold

21   blocks, the A/T Deployed State, A/T Home Station,

Maria Diaz                                                                      1/15/2004

Page 201

1    S/T Deployed State, S/T Home Station?

2        A.    No, I don't know this.  I don't even

3    know what the A and T stands for.

4        Q.    Okay.  Do you know Mike Vichich,

5    V-I-C-H-I-C-H?

6        A.    He was a member of the unit.

7        Q.    At any time did you have any

8    conversations with Mike Vichich about your

9    situation, the allegations or Karl Elders?

10       A.    No.

11       Q.    Do you have any understanding as to how

12   Mike Vichich came to know about the allegations?

13       A.    No.

14           MR. ZAID:  Let's just mark that as an

15   exhibit, please.

16           (DIAZ Deposition Exhibit Number 9 was

17   marked for identification.)

18   BY MR. ZAID:

19       Q.    I've had marked as Exhibit 9 the

20   declaration submitted as part of the litigation

21   of David Gessouroun.  Do you recall having read

Page 202

1    this before?

2         A.    Only after I received it from --

3         Q.    Sure.

4              MR. ZAID:  Did I put in David Falter's

5    declaration?  Did we talk about that?

6    Ms. DeShields?

7              MS. DESHIELDS:  Yes, you did, exhibit,

8    deposition Exhibit 6.

9              MR. ZAID:  Can we pull that back as

10   well?

11             THE WITNESS:  Okay.

12   BY MR. ZAID:

13        Q.   If you would turn your attention to

14   paragraph six of David Gessouroun's declaration

15   and paragraph nine of David Falter's declaration.

16   Let me just first ask, this UTA drill and this, I

17   guess it was a roll call where you got up and you

18   spoke to everyone.  This is basically attended by

19   whoever is present for the squadron UTA, right?

20        A.   It was only limited to the people who

21   were part of the squadron.

Maria Diaz                                                    1/15/2004

Page 203

1      Q.    That's what I mean, whoever was there

2   for the squadron UTA was presumably present for

3   the roll call.  How many people would you

4   estimate were there?

5      A.    I don't know how many people were there.

6   I don't know.  Every weekend was different.  You

7   are asking me to --

8      Q.    Do you have any recollection of that

9   particular UTA squadron meeting as far as how

10  many people was present at the roll call?

11     A.    I don't recall how many people were

12  there.

13     Q.    Would you say there were dozens of

14  people?

15     A.    I don't recall.

16     Q.    Not at all?  Okay.  Even though you

17  addressed them all?

18     A.    There is people there.

19          MS. DESHIELDS:  Objection, she has asked

20  and answered.

21  BY MR. ZAID:

Maria Diaz                                                                    1/15/2004

Page 204

1      Q.    Okay.  Now both Dave Gessouroun says in

2   his sworn declaration, paragraph six, as does

3   Dave Falter in his sworn declaration in paragraph

4   nine, that you mentioned the issue about being

5   too touchy feely and that you specifically

6   pointed to Elders and asked him to watch over you

7   more closely and that's a statement you deny; is

8   that correct?

9      A.    I don't recall saying that.

10     Q.    Okay.  Now I'm going to get back to the

11  parsing, do you deny saying it or you just don't

12  recall saying it?

13           MS. DESHIELDS:  Objection.

14           THE WITNESS:  I'm going to deny saying

15  it.  That's public.

16  BY MR. ZAID:

17     Q.    Now do you have any reason to doubt what

18  Dave Gessouroun or Dave Falter might be saying?

19           MS. DESHIELDS:  Objection.

20           THE WITNESS:  Yes.

21  BY MR. ZAID:

Maria Diaz                                                          1/15/2004

Page 205

1      Q.    Why is that?

2            MS. DESHIELDS:   Objection.

3            THE WITNESS:   Why is that?

4   BY MR. ZAID:

5      Q.    Yes.

6      A.    Because they're both Col. Elders'

7   friends.

8      Q.    So you think perhaps they would have

9   reason to not be truthful in their declaration?

10     A.    I would say yes.

11     Q.    Okay.  Now bringing your -- I'm all set

12  with those if you want to put them away, yes.

13  Thank you.

14           Recalling back to that week in March of

15  2002 when the snowball effect happened and Willem

16  and Mentges did their statements and you were

17  questioned, do you recall having a conversation

18  with Maj. Maurer?

19     A.    I did not talk to Maj. Maurer until

20  after the investigation.

21     Q.    And in the normal course of business

Maria Diaz                                                    1/15/2004

Page 206

1    would there be any reason why you would be

2    interacting otherwise with Maj. Maurer?

3        A.    If she has problems in maintenance,

4    medical problems, yes, with her command.  I mean,

5    with her people.

6        Q.    Okay.  I don't need names, do you recall

7    any problems that were arising at around that

8    time?

9        A.    I don't recall.

10       Q.    Is it your understanding that Lt. Col.

11   Corrie Lunt was in your chain of command?

12       A.    I did not know that.

13       Q.    Is that something I guess that you might

14   have since learned?

15       A.    I know now.

16       Q.    And that was after?

17       A.    After the fact.

18       Q.    Okay.

19       A.    Whenever I had a problem I would go to

20   Col. Elders.

21       Q.    Is there any particular reason that you

Maria Diaz                                                    1/15/2004

Page 207

1    would have to have closed door meetings with Col.

2    Thomas or Mike Mentges?

3           MS. DESHIELDS:  Objection.

4           THE WITNESS:  The closed door meetings

5    were because they were having problems with the

6    tension.  And if it's medical it's only, I mean

7    would you like, it should be private.  If it's

8    something dealing with how -- their working

9    situation, it should be private and they were

10   having tensions.

11   BY MR. ZAID:

12      Q.   And when you speak of tensions, tensions

13   related to what was going on with the

14   investigation and Col. Elders and the whole mess

15   of the situation?

16      A.   I wouldn't say it was all Col. Elders.

17   I would say that Col. Mentges has a weight

18   problem and there was a lot of issue there.

19      Q.   But it was sure, everybody's got

20   problems?

21      A.   No.

Maria Diaz                                                          1/15/2004

Page 208

1      Q.   Part of the problem that you were

2  seeing, sorry, that they were expressing to you?

3      A.   That they specifically sat down and

4  talked about Karl Elders?  No.

5      Q.   So at any of the closed door meetings

6  did you have any conversations about what was

7  going on with the litigation or the

8  investigations about the sexual harassment

9  allegations?

10     A.   No, I don't recall other than what I

11  stated before with Col. Mentges.

12     Q.   Is there any, I think, let me -- sorry,

13  strike that.

14          You said earlier, I think, rightly so

15  you're not supposed to talk about in part, but

16  I'll join with you on this one, not supposed to

17  talk about the substance of the conversations you

18  had with Col. Hines of the Air Force Inspector

19  General's office, right?  Is there any reason why

20  Mike Mentges or Todd Wilkinson could have come to

21  have learned about testimony you provided to Col.

Maria Diaz                                                          1/15/2004

Page 209

1    Hines?

2              MS. DESHIELDS:  Objection.

3              THE WITNESS:  I don't know.

4    BY MR. ZAID:

5        Q.    But you never told either of them about

6    the testimony, correct?

7        A.    Col. Hines asked me this and I said no.

8        Q.    And at any time did you say to Lt. Col.

9    Thomas while in his office that he should finish

10   off Karl Elders by removing him from the unit

11   completely?

12       A.    No, I did not.

13       Q.    Now that particular statement apparently

14   was stated by Angela Lamb, that she has overheard

15   you saying that.  Is there any reason why you

16   believe Angela Lamb would not be truthful in what

17   she states she heard?

18             MS. DESHIELDS:  Objection.

19             THE WITNESS:  If I'm having closed door

20   sessions, how could she hear, that was the first

21   thing.  Secondly --

Maria Diaz                                                                    1/15/2004

Page 210

1    BY MR. ZAID:

2        Q.    I'm sorry, I think it was open.  Let me

3    just give you the, just because I don't want to

4    mischaracterize, let me tell you what was stated

5    so you can respond directly to it.  That she had

6    overheard through the open door of Lt. Col.

7    Thomas that you had said that to him.

8        A.    That's incorrect.

9        Q.    Now again, we were going off, I just

10   wanted to make sure I didn't give you the

11   impression she was saying something other than.

12       A.    And I'm going to finish what I was going

13   to say.

14       Q.    Yes, and I apologize for interrupting

15   you on that.

16       A.    Sgt. Lamb told me that Col. Elders

17   wanted to take her stripe away.  Why she would

18   say something like that after Col. Elders had

19   done that to her, I don't know.

20       Q.    Just because I don't know the time

21   context, when was that?

Maria Diaz                                                                    1/15/2004

Page 211

1      A.    That was, I'm going to say in the fall

2  of 2001.

3      Q.    Okay.

4      A.    She had told me that.

5            MR. ZAID:  Let me have this please

6  marked as Number 10 I guess is what we're up to.

7            COURT REPORTER:  Yes.

8            (DIAZ Deposition Exhibit Number 10 was

9  marked for identification.)

10 BY MR. ZAID:

11     Q.    Doctor, I've had marked Exhibit 10 a

12 sworn declaration of Ted Whitley, Whitley,

13 Whitley dated May 8th, 2003, that was submitted

14 as part of the lawsuit.  And is this a document

15 that you have seen before as part of the lawsuit?

16     A.    Only, yeah, as part of the lawsuit.

17     Q.    Sure.  And, you know, take your time in

18 reading it again if you'd like.  Is Ted Whitley

19 an individual whom you know?

20     A.    Ted Whitley I know.

21     Q.    Is it Whitley?

Maria Diaz                                                      1/15/2004

Page 212

```
1      A.    It's Whitley.

2      Q.    Whitley.

3      A.    Ted Whitley I know because Lt. Col. --

4  had asked me to evaluate him because he was

5  having problems with depression.  He was taking

6  medication, he was not being truthful to the

7  medical unit as to what he was doing.  And that

8  is the way I met Ted Whitley.

9          He was on antidepressants.  I

10 recommended he not be put back to working on the

11 A10's until his lawsuit or his civil service

12 lawsuit with Maj. Gen. Tuxill was completed.

13 That is how I knew him.  He would report to me,

14 only to me because he did not feel comfortable

15 with anybody else and I would write on his chart

16 that he was under the care of his private doctor

17 and he was still on his medicine.

18     Q.    Is he still in the Guard?

19     A.    I don't know.  I don't know.

20     Q.    Okay.  If you look he says in paragraph

21 three that you told him in or around November,
```

Maria Diaz                                                        1/15/2004

Page 213

1    December 2002 that you were being sexually

2    harassed by an officer within the 135th Airlift

3    Squadron.  Is that a statement that you would

4    agree with?

5        A.   That I did tell him because he asked me

6    what was wrong with me.  I was nervous.  My

7    demeanor had changed and he wanted to know why.

8    And I told him I had pressed sexual harassment

9    charges against an officer.

10       Q.   And so just to parse some of it out, now

11   he indicates that you volunteered that to him and

12   are you saying that he asked you?

13       A.   He asked me what was wrong with me.

14       Q.   Okay.

15       A.   That he had heard.

16       Q.   You want to finish?

17       A.   And that he had read.  Now hold it.  Not

18   that he had read, now I'm getting confused.  But

19   I know that he had heard, it was all over base

20   that he had heard that there was problems.

21       Q.   Do, let me think, is it your

Maria Diaz                                                    1/15/2004

Page 214

1    recollection that he, when asking you what was

2    wrong, had referred to something in general or

3    specific in the sense of oh I heard of something

4    going around, what's wrong?  Or was he just

5    asking what's wrong?

6        A.   He asked me what was wrong with me and

7    that he had heard that there was something going

8    on.  And he told me he had a good lawyer that

9    could represent me and that's where that

10   conversation came from.

11       Q.   Did you tell him that you were being

12   sexually harassed or did you indicate that you

13   had?

14       A.   Pressed sexual harassment charges

15   against an officer.

16       Q.   And when you say you had pressed them,

17   by that I take it you are meaning it became the

18   subject of an investigation?

19       A.   It became the subject of an

20   investigation.

21       Q.   Not that you had filed or pursued

Maria Diaz                                                          1/15/2004

Page 215

1    charges against anyone?

2         A.    I never pursued the charges.

3         Q.    And he also indicates and I take it that

4    you agree with this, that you told him that you

5    were being sued by the individual who you had

6    alleged had sexually harassed you?

7         A.    That is correct after it became public

8    knowledge, yes.

9         Q.    Did you, and I think we talked about

10   this a little bit earlier that I guess at least

11   with respect to and I don't remember the date of

12   the newspaper article, I guess it was probably

13   around the time the lawsuit was filed, that

14   people were coming to learn of what was going

15   on.  Did you often have people asking questions

16   about what was going on?

17        A.    And I would say I had sexual harassment

18   charges, I filed them, pressed them.

19        Q.    And did you indicate to any of these

20   people as to whether the charges were

21   substantiated or proven or unsubstantiated?

Maria Diaz                                                                  1/15/2004

Page 216

1       A.    Incorrect.

2       Q.    No, no, I'm asking which one you did.

3       A.    I did not.  I did not.  I just said this

4    is what was going on.  I wish I could say a

5    different word, but I pressed charges, sexual

6    harassment, that was all.

7       Q.    No comments on what the outcome was,

8    correct?

9       A.    No, no.

10      Q.    And he also indicated that in paragraph

11   five that sometime around January or February of

12   2003 Dr. Diaz also volunteered to me she had told

13   others of her allegations of sexual harassment.

14   Do you know what he's referring to?

15      A.    I don't know because I don't recall

16   talking to him in January.

17      Q.    Or February?

18      A.    Or February, I don't recall that.  I do

19   recall that December drill, though.  It was a

20   December drill.

21      Q.    Okay.  Understood.  And he was under an

Page 217

1    impression that you had talked to Congressional

2    staff or Congressional committee, do you know

3    what he is referring to about that?

4        A.    When I wanted a copy of my declaration

5    from the Col. Werts and Col. Inglis, I did send a

6    letter to one of the senators requesting that

7    they intervene and send me my copy.

8        Q.    Because the Guard was not?

9        A.    Was not forthcoming, yes.

10       Q.    Supplying you a copy.  Do you recall

11   which senator that was?

12            THE WITNESS:  Do I have to give him that

13   information?

14            MS. DESHIELDS:  You can give him the

15   name of the person to whom you contacted.  You

16   don't have to tell what the content --

17            MR. ZAID:  Unless I ask.

18            MS. DESHIELDS:  What the content

19   actually was.

20            MR. ZAID:  Do you think that's

21   privileged?

Maria Diaz                                                                1/15/2004

Page 218

1          MS. DESHIELDS:  The person has an

2     absolute right to communicate.

3          MR. ZAID:  I didn't say it was

4     necessarily actionable, as a matter of law that

5     it might be candidly, but it doesn't necessarily

6     mean that it's not relevant and couldn't lead to

7     admissible evidence.

8     BY MR. ZAID:

9        Q.   Which senator was it that you had

10    written to?

11         MS. DESHIELDS:  Yes, you can answer.

12         THE WITNESS:  Senator McCulsky.

13    BY MR. ZAID:

14       Q.   And was the nature of the letter simply

15    that you wanted access to the documents or were

16    you complaining or talking about the sexual

17    harassment allegations?

18       A.   No, it was mainly that I wanted copies.

19       Q.   Did she ever reply?

20       A.   She said I would get them.  I never got

21    them.  The first time I got them was when you --

Maria Diaz                                                                  1/15/2004

Page 219

1    with the lawsuit.

2        Q.    Other than that contact with Senator

3    McCulsky's office, is there any other member or

4    staff of a Congressional representative, Senate

5    or House that you spoke to regarding the sexual

6    harassment allegations?

7        A.    Senator Collins.

8        Q.    From Maine?

9        A.    Correct.

10       Q.    What was the nature of that contact?

11       A.    The nature of that content was the

12   investigations and how I was denied access at all

13   times.

14       Q.    And am I recalling she is on the Armed

15   Services Committee, is that why you wrote to her?

16       A.    That is correct, yes, because I was

17   denied access of anything.   I knew nothing that

18   was going on and I was feeling very frustrated.

19   I don't have a lawyer and I, maybe I'm blabbing.

20   I asked for help from Senator Collins.

21       Q.    Did Senator Collins' staff respond?

Maria Diaz                                                                    1/15/2004

Page 220

1      A.    Yes.

2      Q.    And anything come of that?

3      A.    I had a separate investigation done and

4   that's private, and it's not disclosed, against

5   General Tuxill.

6      Q.    And -- all right.  Sorry.

7      A.    General Tuxill and General Morgan.

8      Q.    Separate?

9      A.    So it's separate from this.

10      Q.    Yeah, in the sense of complaining about

11   that you didn't get access to the documents?

12      A.    I'm not going to tell you what it was

13   about because that's IG investigation and I'm not

14   allowed to say other than there was an

15   investigation done.

16      Q.    Okay.  Is it a Wing investigation or an

17   Air Force investigation?

18      A.    It was an Air Force investigation and I

19   am not allowed to talk about it.

20      Q.    Is it finished?

21      A.    I don't know.

Page 221

```
 1              MS. DESHIELDS:  Is what finished?

 2              MR. ZAID:  The investigation.

 3              THE WITNESS:  I don't know.  That's

 4    honest, I don't know.

 5    BY MR. ZAID:

 6         Q.   Don't interpret my pauses to mean that

 7    I'm doubting you or anything like that.  It's

 8    just my brain is thinking.  Who was the

 9    investigator for the Air Force?

10              MS. DESHIELDS:  Objection.

11              THE WITNESS:  Col. Hines.

12    BY MR. ZAID:

13         Q.   Does it pertain to the sexual harassment

14    aspects or the aftermath?

15         A.   I can't talk about it.

16         Q.   And that's per your understanding from

17    Col. Hines?

18         A.   Yes.

19         Q.   If you were informed by Col. Hines or

20    the Air Force that you were free to talk about

21    it, would you answer those questions?
```

Maria Diaz                                                          1/15/2004

Page 222

1      A.    It doesn't pertain.  Well, yes, I would

2  answer the questions if Col. Hines.

3      Q.    Other than Senator Collins and Senator

4  McCulsky, is there any other Congressional

5  contact that you had that ties in at all with the

6  harassment allegations?

7      A.    I never said they tied in with the

8  harassment allegations, be clear about that.

9      Q.    That's fine.  Any other Congressional

10 contact other than that that relates to why you

11 contacted the two of them?

12     A.    They were the only two that answered.

13     Q.    But there were other letters sent but

14 they blew you off for lack of a better term, did

15 not respond?

16     A.    I also sent -- yeah.

17     Q.    Was it essentially the same letters that

18 you just retitled address-wise?

19     A.    I don't remember.  I'd have to look.

20     Q.    Did you ever initiate a Wing

21 investigation with Lt. Col. Hinsel regarding

Page 223

1    anything relating to the sexual harassment?

2        A.    I don't even know who Hinsel is.

3        Q.    Okay.  Were you aware during the January

4    to March 2002 time frame regarding the issue of

5    Lt. Col. Thomas and the missing night vision

6    goggles?

7            MS. DESHIELDS:  Objection.

8            THE WITNESS:  I knew nothing about that,

9    no.

10   BY MR. ZAID:

11       Q.    Okay.  Now do you know Marc Wolfgang and

12   Tim Robbins?

13       A.    Yes, I do, they're members of the unit.

14       Q.    Have you ever had any conversations with

15   them concerning Karl Elders within the time frame

16   of within the spring of 2002 time frame, winter

17   2002, spring of 2002?

18       A.    The only conversation I remember is with

19   Col. Robbins, and it wasn't even a conversation.

20   They did not realize I was sitting or maybe they

21   did, that I was sitting in a cubicle and Maj.

Maria Diaz                                                              1/15/2004

Page 224

1    Falter and Col. Robbins were laughing and jesting

2    about the report in the Daily Record and how much

3    money Col. Elders was going to get out of me,

4    which was $2.4 million.

5           I got very upset, it was a gut

6    reaction.  In retrospect I should not have done

7    anything and walked away.  But that was the only

8    time I talked to him.

9       Q.   That was after, as you said, after the

10   article, so that was like November of '02?

11      A.   Everybody had that article in that place

12   and they were all sharing it.

13      Q.   We didn't have anything to do with that

14   part of it.

15      A.   Made it public.

16      Q.   Actually just so you know, the newspaper

17   found, grabbed the document in the sense looked

18   it up at the court.  Just so you know we did not

19   publicize it to the press just for whatever that

20   means.

21          Do you have any reason to know why

Maria Diaz                                                    1/15/2004

Page 225

1    before any of the investigation started at all in

2    March of '02 why Marc Wolfgang would tell Tim

3    Robbins and David Falter that you hated Karl

4    Elders?

5        A.   No, I don't talk to Wolfgang.

6             MR. ZAID:   Could I have this please

7    marked as 11.

8             (DIAZ Deposition Exhibit Number 11 was

9    marked for identification.)

10   BY MR. ZAID:

11       Q.   I've had marked Exhibit 11, it's an

12   internet list just taken from Franklin Square

13   Hospital, I guess, of doctors who have privileges

14   I suppose with the hospital where you're.  It's a

15   three-page, four-page list.  This has also been

16   an exhibit as in one of the pleadings so you

17   might have seen it before.  It's just an

18   alphabetical list.

19           Now I take it obviously that these are

20   just doctors who have privileges so you don't

21   know all of them, is that true?

Maria Diaz                                                    1/15/2004

Page 226

1       A.    That is correct.

2       Q.    Now of those on the list, are any of

3    them individuals who you work with I'm going to

4    say regularly?

5       A.    My cases are solo cases.  I work with

6    cancer patients, we do ports.

7       Q.    I don't know what a port is.

8       A.    If there is a problem -- a subcutaneous

9    infusion port is a device that they put in a

10   patient.

11      Q.    Oh, okay.

12      A.    For chemotherapy.  If they need help and

13   they have an emergency, yes, there would be a

14   chance for me to work with them.  It would only

15   be as an assistant and then I would leave.

16      Q.    Do you have an office at the hospital or

17   there's just one available for the doctors who

18   have privileges there?

19      A.    There are no offices.  I'm in solo

20   practice.

21      Q.    And I guess just so my, remember from my

Maria Diaz                                                           1/15/2004

Page 227

1    EMT days.

2        A.    You were an EMT?

3        Q.    Emergency medical technician, I did that

4    for six years.  It was a great, great job.  As a

5    privilege, so obviously you schedule time if you

6    need to have a patient meet you at the hospital,

7    treatments or surgery, something like that?

8        A.    There is really no room, but if it's an

9    emergency I can find a room in either an

10   emergency room or in the surgical suite.

11       Q.    And are any of these doctors, would you

12   consider any of them your friends?  I'm

13   separating being friendly with or are any of

14   these people your friends at any given time

15   you've socialized with them outside of the

16   hospital setting?

17       A.    No.

18       Q.    And again just so it's consistent in the

19   record, I realize you did answer that, but you

20   did say, correct, that at no time did you discuss

21   Col. Elders or the sexual harassment allegations

Page 228

1    with any of the doctors at the hospital?

2        A.    That is correct.

3        Q.    Are you familiar with the document

4    NGR600-22/ANGI36-3 which refers to military

5    discrimination complaints?

6        A.    No, I'm not.

7        Q.    Off the top of your head does that

8    number ring any bells to you?

9        A.    No, it does not.

10       Q.    I'm not going to mark them as exhibits

11   because I don't think we're going to go anywhere

12   with them, it's the same, Counsel, if you want,

13   it's right here, too, it's the same document

14   here, same numbers, if you will confirm for me on

15   the record I'm showing you the same National

16   Guard document.

17       A.    Okay.

18       Q.    The distinction is they're dated at

19   different times, so this one is 30 March 2001,

20   this one is 26 April 2002, so they have a title

21   change.

Maria Diaz                                                      1/15/2004

Page 229

1       A.   Okay.  That's the only change?

2       Q.   Yes, as far as I know.  Now let's see,

3  this one was the one, the one I'm referring to is

4  30 March 2001 is the one that was in place when

5  everything was going on.  Have you ever seen that

6  document before?

7       A.   Only -- no.  Is this the one that was

8  placed?  There was this big thick document and I

9  did not read it, so I don't know.

10      Q.   I don't think I had an exhibit, I think

11  we just referred to it.  But before the

12  litigation?

13      A.   No, nothing.

14      Q.   You had never seen this document before?

15      A.   I had not seen it.

16      Q.   Okay.  Now do you remember, and this you

17  had a conversation with Col. Werts about it in

18  one of your sessions, a telephone message that

19  you left Col. Elders in or around February 7,

20  2002?

21      A.   I did leave him a message thanking him

Page 230

1    for the desk.

2              (DIAZ Deposition Exhibit Number 12 was

3    marked for identification.)

4    BY MR. ZAID:

5        Q.    I guess we can make it part of the

6    record, I only have my one copy.  I'm handing you

7    what is page 49 from the Memorandum of Law in

8    Support of Plaintiff's Opposition to Motion of

9    Defendant Maria Diaz to Dismiss that was filed on

10   May 19, 2003, which purports to contain a

11   transcript of the telephone message that you left

12   on Col. Elders' voice mail.  And if you would

13   read that and then let me know if that's what, if

14   that is in fact the message that you left?

15       A.    No, this is not the message that I left.

16   I did say I was going to Alaska.  I did say thank

17   you for the desk.  I don't recall saying I've

18   irritated you.

19       Q.    Okay.

20       A.    Okay.

21       Q.    Tell me if this is, if you recognize

Maria Diaz                                                          1/15/2004

Page 231

1    this as your voice.  I'm going to play a tape

2    recording that purports to be the message in

3    question which I will ask the court reporter to

4    take down as it is discussed or played and then

5    once it concludes the question will be whether or

6    not that is actually your message?

7        A.   Before you do that, can I go to the

8    bathroom?

9        Q.   Absolutely.  Off the record.

10           (A brief recess was taken.)

11   BY MR. ZAID:

12       Q.   I don't know, I don't recall the

13   specific quality, I think obviously we'll be able

14   to tell, if there is an issue we can talk about

15   it, but you might want to follow along using this

16   as a guide to get a sense.  If it is in fact you,

17   maybe you can obviously understand yourself

18   better than somebody who is not you.

19           REPORTER'S NOTE:  THE FOLLOWING IS A

20   TRANSCRIPTION OF A TAPED VOICE MESSAGE:

21           Hi, Carl, this is (unintelligible).

Maria Diaz                                                          1/15/2004

Page 232

1    It's a little late and I'm just checking

2    (unintelligible).  I wanted to thank you for

3    getting me the desk.  I haven't thanked you and

4    that's really kind and (unintelligible).  Thank

5    you.  I'm just grateful.  But I talked

6    (unintelligible).

7              THE WITNESS:  That is not my voice.

8    BY MR. ZAID:

9        Q.   That is not your voice?

10       A.   That is not my voice.  I did call.  I

11   did call but that is not my voice.

12       Q.   Okay.  I'm just going to play the rest

13   of the tape for the record.

14       A.   For the record, okay.

15             REPORTER'S NOTE:  CONTINUATION OF

16   TRANSCRIPTION OF REQUESTED TAPE.

17             I'm sorry if I've been not so good, but

18   you're, you're, you've proven yourself very well

19   and (unintelligible) you're going to get ahead.

20   Just so tomorrow I'm leaving for Alaska and I

21   just thought I'd let you know that.

Maria Diaz                                                                1/15/2004

Page 233

1          I wanted to thank you and to apologize

2     if I irritated you.  I think I'm going to

3     continue to irritate you.  I have that way.  I

4     don't know why, but it's just creepy.  Take care

5     and thanks again and thank you for the nice

6     note.

7          And you are a, you're a typical

8     renaissance man, the one who shows just enough to

9     let me realize that you are (unintelligible).  So

10    take it easy.  I'm going to Alaska.  I'm going to

11    have fun because I need a break from surgery,

12    etc.

13          I've got a good group. I've got

14    (unintelligible), Col. Thomas.  We're going to

15    have a good time.  When I come back I hope to

16    thank you again in person.  So take it easy and

17    thank you again.  Thanks again.  See you later.

18    Bye, bye.

19    BY MR. ZAID:

20      Q.   So for the record after hearing the

21    entire tape, do you still state that that is not

Maria Diaz                                                          1/15/2004

Page 234

1    you?

2         A.    That does not sound like my voice at

3    all.

4         Q.    Okay.  Is that your message?

5         A.    No.  I did call.  For the record let it

6    be stated I did call.

7         Q.    And for the record you did leave on

8    February 7th, 2002, for the Alaska trip, right?

9         A.    Yes.  Well, I need to look at --

10        Q.    At least in looking at --

11        A.    I don't remember days.

12        Q.    I don't know which exhibit number it is

13   per se, but the document said orders.  Assuming

14   of course that that's a valid, authentic --

15        A.    Order.

16        Q.    -- document?

17        A.    Yes.

18        Q.    Which I am told it is, but I did not

19   obtain it myself so I'm not going to tell you

20   that it is.  But assuming that it is, it does say

21   that you were put into a deployed state on

Maria Diaz                                                          1/15/2004

Page 235

1   February 7th and at least that comports with what

2   your recollection of when you did leave for

3   Alaska, is that at least what I'm getting from

4   you?

5       A.   I'm going to tell you if I left February

6   7th, I left a message the night before.

7       Q.   Right, that's our contention.   The

8   switch between days to night, 12 a.m., 12:30

9   a.m., 1 a.m.

10      A.   I left it the night before, that's the

11  first thing.   Secondly, when I get there if I'm

12  leaving on a deployment, I'm invariably late so

13  I'm running around trying to get things ready to

14  get on the airplane.   So you need to give me

15  dates, I just don't remember dates.

16      Q.   And on the flight, though, was Mike,

17  there was a Mike, right, on the trip to Alaska?

18      A.   There was a Maj. Mentges, yes.

19      Q.   Was there somebody who went by the name

20  of Dougie?

21      A.   That's Master Sgt. Neilson.

Page 236

1    Q.    And there was a Col. Thomas on the

2    flight?

3    A.    Yes, there was a Col. Thomas on the

4    flight.

5    Q.    Now would you agree with me at least

6    that the tone and substance of whoever's message

7    that is would certainly be inconsistent with

8    anything that you have been publicly telling

9    people?

10    A.    That is -- yes.

11    Q.    Okay.  And when you were in Alaska is

12    that classified you are on duty the entire time,

13    active duty, do you know?

14    A.    I don't know.

15    Q.    And so since you are denying that this

16    is you in the message, would I be correct in

17    assuming you would deny that Karl Elders is a

18    good person as of February 2002?

19         MS. DESHIELDS:  Objection.

20         THE WITNESS:  Can you rephrase that

21    question?

Maria Diaz                                                           1/15/2004

Page 237

1    BY MR. ZAID:

2        Q.    Sure.    I guess let me put it this way.

3    Looking at what the transcript is that was typed

4    up and would you agree, I don't know if you were

5    following it, would you at least agree that that

6    seems to be an accurate transcription of this

7    message?

8            MS. DESHIELDS:    Objection.

9            THE WITNESS:    I cannot say it's

10   accurate.

11   BY MR. ZAID:

12       Q.    Did you follow along as you were

13   listening?

14       A.    I didn't, I was more intent on listening

15   than on reading, trying to see, but.

16       Q.    Okay.    In reading this transcription,

17   what within this paragraph would you take issue

18   with?

19           MS. DESHIELDS:    Objection.

20   BY MR. ZAID:

21       Q.    What within there don't you agree with?

Maria Diaz                                                          1/15/2004

Page 238

1      A.    I told you.

2      Q.    I'm not saying you said it.

3      A.    No, no, no, no, I told you that I did

4   call him and I did thank him for my desk.

5            (Telephone interruption)

6            MR. ZAID:  Off the record, please.

7            (A brief recess was taken.)

8   BY MR. ZAID:

9      Q.    Let me ask you.  All right, I know, so

10  let me get it straight.  One, you say you don't

11  recognize that voice as your own, correct?

12     A.    Correct.

13     Q.    And two, from your recollection of the

14  message that you did leave you don't believe that

15  it comports with the message you just heard?

16     A.    I told you the message I left.

17     Q.    Understood.  Do you recognize the voice

18  at all as somebody that you might know?

19     A.    (Shaking head).

20     Q.    I'm sorry, to verbalize for the court

21  reporter.

Maria Diaz                                                    1/15/2004

Page 239

```
1      A.   Oh, I'm sorry.  No, no.

2      Q.   I mean, do you know of any other woman

3   who knew that Karl Elders had gotten you a desk?

4           MS. DESHIELDS:  Objection.

5           THE WITNESS:  I don't know.  Oh, the

6   person that I shared the desk with.

7   BY MR. ZAID:

8      Q.   Okay, who was that?

9      A.   Sgt. King.

10     Q.   But it doesn't sound like her, does it?

11     A.   I have --

12     Q.   I have no idea what her voice sounds

13  like so.

14     A.   I don't know how her voice sounds

15  exactly.

16     Q.   I'm just going to show you this document

17  to start and just ask you if in fact it's a

18  document you have ever seen before or recognized

19  the form of in the sense that -- let me look.  At

20  least there is two pages in the second, I don't

21  know which is it.  The first or second page says
```

Maria Diaz                                                    1/15/2004

Page 240

1    NGB form 41 and the other says AFTO 781.  You

2    deal with apparently flight missions.  Is this a

3    document format -- don't even worry about --

4    first, what's on it?

5        A.   I see this one mainly.

6        Q.   What is that document?

7        A.   They have put down like who's FTPs,

8    well, flying, and who's on, but I see this one.

9        Q.   Sort of like a duty roster for the

10   flight?  Might not be a technical term.

11       A.   The load master.  I don't know what the

12   technical term is, but the load master usually

13   has this.  This one I've seen, but I think I

14   mainly know this one.

15       Q.   Okay.  There is four spots that have

16   highlights, pinkish highlight.  I don't know,

17   even know what that one is over there, but there

18   is one that I guess is highlighted and the number

19   three.  Do you have any idea what that column

20   refers to?

21       A.   No, I don't know that.

Maria Diaz                                                          1/15/2004

Page 241

```
 1      Q.   Okay.  And looking at the NGB form, this

 2   highlights the letter A and G, I'm sorry to reach

 3   over for a second, the column of remarks, do you

 4   have any idea what that connotates to whatever

 5   the name of the person is on the plane?

 6      A.   No, I don't know.

 7      Q.   Okay.  And when you say that you don't

 8   know, is this something that you never have known

 9   or you knew and you just don't remember?

10      A.   No, I've never known what this A and G

11   is and I don't know any of this.

12      Q.   Okay.  That's fine.

13      A.   Okay.

14           MS. DESHIELDS:  You are not marking

15   those two documents?

16           MR. ZAID:  I can if you want.  I don't

17   have any objections.  I have no substantive

18   questions, it just was to see did she know what

19   those designations meant.

20   BY MR. ZAID:

21      Q.   Okay.  Now so you left for Alaska and I
```

Maria Diaz                                                              1/15/2004

Page 242

1    understand you were there for approximately two

2    weeks, does that sound about right?

3        A.    No, it was not two weeks.

4        Q.    What do you recall?

5        A.    It was supposed to be a three day trip,

6    it ended up we ended up staying over.  The plane

7    broke and we had weather problems.

8        Q.    Do you recall about how long you ended

9    up being there?

10       A.    I know I had to cancel a surgery on

11   Tuesday because I was still down there.  I got

12   back to base -- I don't recall.  But I know I

13   cancelled a surgery because it was unexpected.  I

14   did get back, I did not stay two weeks.

15       Q.    Again referring to, forgive me, I just

16   don't know the exhibit number offhand, but again

17   the document that reflected orders indicates that

18   there were total of days used up eleven with

19   respect to A/T deployed state.  So that number

20   eleven you are saying doesn't reflect what you

21   recall being the time that you spent?

Maria Diaz                                                    1/15/2004

Page 243

1      A.    You said I went two weeks in Alaska and

2    I said no, I did not spend two weeks in Alaska.

3      Q.    Was whatever the, is it deployment?

4      A.    It's a deployment.

5      Q.    How long did the deployment last?

6      A.    I don't recall.  All I know it was

7    supposed to be a three-day deployment and the

8    plane broke and we got snowed in.  I got, we got

9    back and that's all I know.

10     Q.    But you are saying it wasn't

11   approximately a two week deployment wherever you

12   were?  I don't know if you went elsewheres

13   besides Alaska.

14          MS. DESHIELDS:  Objection, asked and

15   answered.

16          THE WITNESS:  I answered.

17   BY MR. ZAID:

18     Q.    Well, the question I didn't get answered

19   was the fact that it says you took eleven days of

20   active duty on the trip you are saying is

21   inaccurate?  I mean please feel free.

Maria Diaz                                                          1/15/2004

Page 244

```
1      A.   I don't know.  I don't have any referral

2   to refer to.  How do I know this is a true

3   document?  I don't know.

4      Q.   If you look at --

5      A.   And you're talking about two years ago.

6   I don't recall how many days I stayed there.

7      Q.   Then again, Doctor, look I'm not going

8   to badger you if you say an answer I don't

9   recall.  What the disconnect is, is I'm not

10  getting an answer.  I'm getting a non-answer to

11  the question.  I don't recall, that's an answer.

12  If you don't recall, you don't recall.  That's

13  going to be the end of that particular line of

14  questions.  So you don't recall then how long the

15  deployment was, is that what you want the

16  testimony to reflect?

17     A.   I don't recall.

18     Q.   You had testified earlier and the

19  written documentation reflects you had this

20  alleged incident with the Christmas party the end

21  of December and you had indicated earlier that
```

Page 245

1    that's when you switched or transformed from

2    being uncomfortable to being more afraid of Col.

3    Elders, am I correct so far?

4         A.    That is correct.

5         Q.    Now between that period, that time of

6    January 2002 and the time you went to talk to

7    Mentges and Willem, is there anything that

8    happened in between those times that prompted you

9    to go talk to them or was it just from, well was

10   there anything that specifically prompted you to

11   talk to either gentlemen that happened during

12   that December, end of December to sometime

13   February time frame?  Was there a trigger, was

14   there a triggering event that prompted the

15   conversation?

16        A.    The trigger was the Christmas party as I

17   told you.  I had already started feeling

18   uncomfortable.  I just didn't know how to

19   verbalize it.

20        Q.    Bear with me as I jump around, so I'm

21   just going to make sure I cross off everything.

Maria Diaz                                                                          1/15/2004

Page 246

1          And you had testified earlier that you

2    always attended the UTA drills and there was a

3    UTA drill that you had in March of 2002, so is it

4    your recollection that you hadn't attended that?

5         A.   I would say I attended it.

6         Q.   Do you have any recollection of whether

7    you had a conversation with anyone at that UTA

8    drill regarding Col. Elders?

9         A.   I don't recall any conversations.

10         Q.   Now let me ask you, going back to the

11    tape, were you aware that there was a purported

12    tape recording of that, well let me ask you this,

13    let me strike it so I don't say something that

14    you don't agree with.  Were you aware that there

15    purported to be a tape recording of a phone

16    message from you?

17         A.   I found out when papers showed up.  I

18    did not know.

19         Q.   And did you understand that there --

20         A.   Let me clarify that.

21         Q.   Sure, go right ahead.

Maria Diaz                                                          1/15/2004

Page 247

1      A.    I was asked about the Alaska trip during

2   the investigations, let me clarify that.  Now I

3   understand, but I did not know that there was a

4   tape.

5      Q.    Okay.  And that's where I was sort of

6   getting to.  Did, from the, the litigation and

7   assuming, I presumed you skimmed through.

8            (Telephone interruption)

9            MR. ZAID:  Off the record.

10           (A brief recess was taken.)

11  BY MR. ZAID:

12     Q.    The reason, for those who were not in

13  the room there, the reason why that break was

14  taken was we were on the telephone with Col.

15  Hines, Steven Scott Hines of the U.S. Air Force,

16  Office of Inspector General who's as I said a

17  colonel and investigation officer and is the

18  investigation officer who actually as you

19  indicated on your earlier testimony, you had met

20  with for an investigation and had also indicated

21  that he was the investigating officer on the

Maria Diaz                                                    1/15/2004

Page 248

1    complaint that you had filed against Gen. Tuxill

2    and Gen. Morgan.

3            And the purpose of the discussion was to

4    find out what prohibitions actually apply to

5    individuals who are witnesses or complainants

6    with the Air Force Office of Special

7    Investigations.  And I had Ms. DeShields as well

8    talk to Col. Hines to satisfy for herself what it

9    was that I was conveying so I'm not misconveying

10   any of the conversation.

11           And there's supposed to be a letter

12   being faxed over here that conveys what I'm about

13   to say.  I don't know if it will arrive in time

14   because we are actually nearing the end of the

15   deposition and I wanted to conclude this.

16           The gist of it was that there is no

17   prohibition actually even on those during the

18   investigative process to talk although it is,

19   they do in fact sort of order you not to, but

20   it's sort of a, sort of not a true order.  It's

21   kind of an order at your own risk to obey or not,

Maria Diaz                                                                1/15/2004

Page 249

1    but it's more to maintain the investigative

2    sanctity so that there is not an, I just had the

3    word that I wanted to use, but something that

4    would impact the investigation.  And that when

5    there is an investigation that is concluded, then

6    there is certainly absolutely no prohibition

7    whatsoever on anyone who participated in the

8    investigation to discuss what the events were.

9            So I wanted to do that because I

10   understand you did have hesitations and I

11   understand those because I deal with a lot of

12   people who deal with the IG's office and it is

13   sometimes unclear as to what you are allowed to

14   say and not say.

15       A.   So you can talk, for my information, you

16   can after an investigation is concluded?

17       Q.   Sure, it's not particular to you, this

18   is Air Force Inspector General policy that

19   technically you can talk during the

20   investigation, but they frown upon that.

21           But certainly after an investigation is

Maria Diaz                                                        1/15/2004

Page 250

1    concluded there is no prohibition whatsoever on

2    anyone to discuss what the investigation was

3    about, what they were told, what they asked, what

4    they know about it at all.

5            I do that in the sense because I want to

6    understand better about the complaint that you

7    filed against Gen. Morgan and Gen. Tuxill that

8    was investigated to see if in fact there is any

9    way that there is a connection or relevance to

10   this investigation or to the case that we're

11   talking about.

12           MR. ZAID:  Let me ask first to

13   Ms. Deshields, did I say anything inaccurate as

14   far as how your conversation with Col. Hines

15   went?

16           MS. DESHIELDS:  Well, you weren't

17   actually privy to the conversation.

18           MR. ZAID:  Well, right.  Right.

19           MS. DESHIELDS:  With Col. Hines, but in

20   as far as having Col. Hines just affirm that

21   there was no prohibition on you speaking about

Maria Diaz                                                          1/15/2004

Page 251

1    whatever the nature of the investigations were

2    after they have been concluded, then yes, you are

3    accurate.

4            MR. ZAID:  Let me just jump out of

5    context and let's, since I'm not putting the tape

6    in as an exhibit, I will put that page in that

7    again from our perspective purports to be the

8    transcription.  The government has a copy of the

9    tape, right?  I did send it to you, did I not?

10           MS. DESHIELDS:  You made it a part.

11           MR. ZAID:  It got kicked back to me from

12   the court, I didn't know if you know that,

13   because apparently they don't like bulky

14   exhibits.  You learn something new every day.

15           MS. DESHIELDS:  They don't want an

16   exhibit like that.

17   BY MR. ZAID:

18      Q.   So now, Doctor, do you understand from

19   what both Ms. Deshields and I have said is the

20   Air Force position with respect to policies on

21   investigations and discussions?

Maria Diaz                                                                    1/15/2004

Page 252

1       A.   I understand that.

2       Q.   Okay.  Now would you please tell me what

3    the complaint was against Gen. Tuxill and Gen.

4    Morgan that you filed?

5       A.   I cannot.  I am still in the Air

6    National Guard and I'm still a member.

7       Q.   I understand that.

8       A.   Of the Maryland Air National Guard, I

9    cannot.

10      Q.   Why do you believe you cannot?

11      A.   I am still a member of the Maryland Air

12   National Guard.

13      Q.   Okay.  I mean are not Gen. Tuxill and

14   Gen. Morgan aware of the investigation, they

15   would have been interviewed as part of it or was

16   it a complaint against somebody else?

17      A.   I fear of retaliation.

18      Q.   Okay.

19      A.   I'm not going to talk about it.  It has

20   nothing to do with this investigation.

21      Q.   All right.  Give me what you can so I

Maria Diaz                                                              1/15/2004

Page 253

1    can be satisfied that it doesn't in some form of

2    what the scope was of the allegation.

3        A.   I am not going to talk about it.

4        Q.   We've got a problem there because I

5    don't want to, I'm not attempting certainly to

6    get you in a position where you can be retaliated

7    against and I understand that, but I need to be

8    satisfied in some way that, of what the

9    nonrelevance or relevance can be with respect to

10   this.  Now I think -- well let me --

11   retaliate -- it's a protected conversation in

12   this sense that it's under a court proceeding.

13       A.   I am not going to talk about it.

14       Q.   Because otherwise I'm forced to then go

15   to the court to compel you to discuss it.  Now we

16   can -- let me go off the record for one second

17   and talk to my client.

18            (Discussion off the record.)

19   BY MR. ZAID:

20       Q.   Obviously without telling me anything of

21   your conversations, have you changed your

Page 254

1    position at all about discussing the contents of

2    the investigation?

3            MS. DESHIELDS:  Why don't you ask a

4    specific question about it.

5    BY MR. ZAID:

6       Q.    Okay.  And believe me if there is no

7    relevance to it, we have no interest in doing

8    anything with the information.  Can you please

9    tell me what the nature of the allegation was

10   that you filed with the Inspector General's

11   office?

12      A.    Retaliation.

13      Q.    And who did you believe was retaliating

14   against you?

15      A.    Gen. Morgan and Gen. Tuxill.

16      Q.    Why is it that you believe that?    Hang

17   on before you answer.  Let me say, now did the

18   reason for why you believe there was retaliation

19   have anything to do whatsoever with either Karl

20   Elders, the harassment allegations or the

21   investigations?

Maria Diaz                                                    1/15/2004

Page 255

1      A.   It had nothing to do with Col. Elders,

2  it had nothing to do with the investigations of

3  Karl Elders.  And what was the other one?

4      Q.   The sexual harassment allegations.

5      A.   I did not make it for the sexual

6  harassment.

7      Q.   And was your concern, not concern, was

8  your complaint of retaliation that Gen. Morgan,

9  Gen. Tuxill themselves were or were there or did

10  you believe that you were being retaliated

11  against by other officers?

12          MS. DESHIELDS:  Objection.

13          THE WITNESS:  It was Gen. Morgan and

14  Gen. Tuxill.

15  BY MR. ZAID:

16      Q.   And when did you file the allegation or

17  the complaint approximately?

18      A.   The same time I refiled the sexual

19  harassment charges of Col. Elders.

20      Q.   Okay.  When you mean refiled what do you

21  mean?

Page 256

1       A.    I was told by, I don't know her rank --

2    McFall?

3       Q.    Carrie?

4       A.    I don't know her first name.

5       Q.    Yeah.

6       A.    I don't know what, but she --

7       Q.    Something sergeant.  Isn't she a

8    sergeant?

9       A.    I don't know her first name.

10      Q.    At state headquarters?

11      A.    At state headquarters.

12      Q.    She's the EEO officer, right?

13      A.    She's EEO.

14      Q.    Okay.

15      A.    They had told me --

16      Q.    It's Carrie McFall.

17      A.    This was after the investigations they

18   had told me.

19      Q.    After both?

20      A.    Yes.

21      Q.    Okay.

Maria Diaz                                                              1/15/2004

Page 257

```
1      A.    That I had not filed correctly.

2      Q.    Okay.

3      A.    That I had to refile.

4      Q.    Okay.

5      A.    That they showed me the process to file,

6  so there were two different filings.

7      Q.    And then two different filings, are you

8  equating the Inglis Werts investigation as the

9  first filing?

10     A.    No.

11     Q.    No, okay, completely separate.  Okay.

12 So --

13     A.    No, the sexual harassment and Gen.

14 Tuxill.

15     Q.    Oh, okay.  Let me, all right, let me --

16     A.    Two investigations.

17     Q.    -- let me just -- so I understand.

18     A.    It has nothing to do with Col. Elders.

19 I think that that's all you need to know, right?

20     Q.    Well --

21     A.    It has nothing to do with Col. Elders
```

Maria Diaz                                                          1/15/2004

Page 258

1    and that's where it should stop.

2         Q.    It's possible but you never

3    underestimate how things are linked.  Did you

4    believe that you were being sexually harassed by

5    someone other than Col. Elders?

6         A.    Incorrect, it had nothing to do with

7    sexual harassment.

8         Q.    Okay.  Okay.

9         A.    That's what I'm trying to tell you.

10        Q.    I understand.  Now, so after Col. Werts

11   had completed his investigation and the findings

12   were made known to you, are you saying that you

13   attempted to file an actual formal complaint?

14        A.    Incorrect.  At that time I had not filed

15   anything.  At that time I went, it was spring, it

16   was after the investigation of Col. Werts, I sent

17   the letter.

18        Q.    Right, I think that's what I said.

19        A.    To the senator, Senator Mcculsky.

20        Q.    Okay.

21        A.    This is totally separate.  This is

Maria Diaz                                                    1/15/2004

Page 259

1    private between Gen. Tuxill, Gen. Morgan and

2    myself.

3        Q.    Okay.  You tried to get access to the

4    reports, the Inglis and the Werts reports?

5        A.    You asked me a question and the question

6    was, was it after the Col. Werts investigation

7    and I said no.  I told you that the only thing I

8    had done after the investigation, after

9    everything was completed was tried to get a copy.

10       Q.    Okay.

11       A.    Of what I had said.

12       Q.    Okay.  So sometime between when Inglis

13   started his investigation and Werts'

14   investigation?

15       A.    You're not listening to me.

16       Q.    Well, I'm trying to actually work with

17   you to keep things minimally and obviously I'm

18   getting confused.  It would frankly be a lot

19   easier if you specifically said exactly what it

20   is, but I'm trying to be cognizant and balance

21   this with you.

Page 260

1      A.   I already told you it was retaliation

2   but it has nothing to do with Col. Elders.  What

3   more do you want?

4      Q.   I can ask you specifically what it is

5   and you can say all day you don't want to and

6   I'll get a judge to compel you to do so, but I'm

7   trying not to do that and I'm trying to work with

8   you so that we minimize anything that's out

9   there.  But I need to be able to feel satisfied

10  that I understand what the situation is.  I'm

11  not, and maybe I'm just being thick headed that I

12  don't understand.

13     A.   You just said -- maybe I'm not

14  understanding.  You just said that you wanted to

15  make sure it had nothing to do with Col. Elders.

16  It has nothing to do with Col. Elders, that is

17  what your question was.

18     Q.   Okay.

19     A.   I answered your question.

20     Q.   I said three things and you said it has

21  nothing to do with Col. Elders, had nothing to do

Page 261

1    with the investigation, but the way I interpreted

2    it I didn't get a warm and fuzzy negative on that

3    it didn't have anything to do with sexual

4    harassment.

5         A.   I already said it.

6         Q.   Now, well give me the specific time

7    frame as to when you filed the complaint.  I mean

8    why would you go, is going to McFall as the EEO

9    officer, does she handle reprisal complaints,

10   too?

11        A.   Yes.

12        Q.   So something happened that you believe

13   with respect to Gen. Morgan and Gen. Tuxill that

14   led you to go file the complaint with McFall?

15        A.   I answered your questions.

16        Q.   I don't think you did, Doctor, and the

17   problem is if you argue with me back and forth

18   I'll just ask you directly and wait for a

19   response as to exactly what was the nature of the

20   retaliation complaint that you filed against Gen.

21   Morgan and Gen. Tuxill.  I mean if that's the way

Maria Diaz                                                          1/15/2004

Page 262

1    you want to do it that's fine, what was the

2    nature of the complaint you filed against you?

3         A.   I told you it was retaliation.

4         Q.   What was the retaliation you believed

5    occurred?

6         A.   I'm going to have to say I'm not going

7    to speak anymore.  If you want to get the judge,

8    that's fine, but you asked me a question, I

9    answered it in faith.  It was retaliation.  You

10   asked me if it had anything to do with Col.

11   Elders, I said no.  You asked me about sexual

12   harassment, I said no.  What I have in my

13   privacy, whatever I have with any other Guard

14   member stays put.  No more.  Retaliation and

15   that's it, exactly what I've been telling you all

16   along with Col. Elders.  All I have said when

17   people have asked me, sexual harassment, that's

18   it.  No specifics.  And I'm going to say that to

19   you right now.

20        Q.   Now did your concerns of retaliation

21   exist before the Inglis investigation?

Maria Diaz                                                          1/15/2004

Page 263

 1      A.   A little, yes.

 2      Q.   Did they predate your discussions with

 3   Mentges and Willem?

 4      A.   I never discussed any of this with

 5   anybody.

 6      Q.   Your discussions about Karl Elders with

 7   them, the ones that we have been talking about

 8   all day?

 9      A.   I have not talked to anybody about what

10   happened or what I felt.

11      Q.   No, no, no, you're misunderstanding.

12   Did the concerns of retaliation or the

13   experiences of retaliation that you believe

14   existed, did they predate your conversations of

15   late February 2002 with Mentges and Willem?

16      A.   Did it happen before?

17      Q.   Exactly, predate?

18      A.   Predate, before?  Yes.

19      Q.   And is it your understanding the

20   investigation of whatever the nature of it was is

21   closed?

Maria Diaz                                                                    1/15/2004

Page 264

1      A.    You just told me Col. Hines said it was

2    closed.

3      Q.    No, no, I don't want to misquote what

4    the colonel said.

5      A.    It's not closed and I'm speaking?

6      Q.    No, no, I said that there is no

7    prohibition during the course of the

8    investigation or when the investigation is

9    closed.  I did not say that Col. Hines said to me

10   that it was closed.  I mean, if you would like to

11   call Col. Hines you can find out if it was

12   closed.  I'll be happy to take a break.

13     A.    No.

14     Q.    It may in fact be closed.

15     A.    I don't know.

16     Q.    If the situation between, the situation

17   as you perceived it between yourself and Col.

18   Elders which became this snowball effect of

19   Inglis' investigation, Werts' investigation,

20   etc., if none of that had ever happened, if your

21   allegations of sexual harassment against Karl

Maria Diaz                                                              1/15/2004

Page 265

1    Elders had never happened, you guys are best

2    buddies, never had a problem, would the concerns

3    that you raised in your complaint of retaliation

4    still have existed?

5          MS. DESHIELDS:  Objection.

6          THE WITNESS:  Yes.

7    BY MR. ZAID:

8     Q.   Okay.

9     A.   Is that?

10    Q.   That's all I'm asking about.  If you

11   will just some, we're coming to the close.  Don't

12   go into great detail, just give me where you went

13   to college and to medical school.

14    A.   I went to Mary Washington College.  For

15   my -- I have a BS in chemistry.  You want dates?

16    Q.   Don't worry about it.

17    A.   Please.

18    Q.   I learned female deponents, I typically

19   don't ask dates.

20    A.   I went to medical school at UCEM,

21   accredited medical school in Puerto Rico.

Maria Diaz                                                              1/15/2004

Page 266

1    Q.    And not in great detail, from your

2    graduation of medical school, your career

3    progression, what has it been?  You became a

4    doctor, you went to work in such and such a place

5    for a year, 1980 to 1985, something essentially

6    like that.

7    A.    I was a physician.  I came and did my

8    residency in general surgery which is five years,

9    finished in 1985.

10   Q.    Where was the residency done?

11   A.    Franklin Square Hospital.

12   Q.    Okay.  And so 1985, the conclusion of

13   your residency, what did you do then?

14   A.    I stayed at Franklin Square Hospital and

15   established a practice and it's limited to

16   oncology.

17   Q.    Okay.  And before you joined the

18   Maryland Air National Guard had you served in the

19   military at all?

20   A.    No.

21   Q.    I think you said you joined in 1990?

Maria Diaz                                                                    1/15/2004

Page 267

1        A.    I believe it was 1990.  Desert Storm,

2    they had trouble.  I applied in 1990, they have

3    to go through security clearance.

4        Q.    And you come in as a captain?

5        A.    I was a captain.

6        Q.    And do you recall by year as far as when

7    you got promoted to major and when you got

8    promoted to lieutenant colonel?

9        A.    I don't recall by year.  I was a

10   captain, I should have become a major within the

11   year but they forgot to promote me.  And I had to

12   go what they call ROPA.  Colonel Elders, you know

13   this.

14       Q.    R-O-P-M-A?

15       A.    I had to do that and then I became after

16   four years being a major, I believe it was four

17   years I became a lieutenant colonel.

18       Q.    So what would that take us to, something

19   like '96 or so, '97?

20       A.    I don't remember dates.

21       Q.    Okay.  And the position that you hold

Page 268

1    now, are you still squadron surgeon?

2        A.    Squadron medical.

3        Q.    Medical?

4        A.    SME.

5        Q.    So the position that you hold now any

6    different from in 2002?

7        A.    No, no difference.

8        Q.    Same position?

9        A.    It's the same position.

10        Q.    Okay.  And when are you, when you reach

11    that promotable line, whatever the proper

12    terminology, when are you eligible to become

13    colonel?

14        A.    I don't know.  I would think I can now,

15    but I'm not sure.

16        Q.    And at the moment now your immediate,

17    your chain of command is what, Lt. Col. Hans?

18        A.    Yes.

19        Q.    And then Col. Walsh?

20        A.    Col. Hans, the way I perceive it Col.

21    Hans, Col. Thomas, Col. Walsh.

Maria Diaz                                                                    1/15/2004

Page 269

1          MR. ZAID:  Okay.  What I'd like to do is

2     take like a five minute break, just collect my

3     thoughts, just double-check the documents, see if

4     there is anything left that I have, and otherwise

5     conclude for the day.

6          (A brief recess was taken.)

7     BY MR. ZAID:

8       Q.   I just have a couple follow-up questions

9     to close this out.  Just so again I understand,

10    I'm not asking you about the retaliation claim,

11    did you try to file a formal complaint against

12    Elders at any time?

13      A.   No, because I did not know how to do it.

14      Q.   And so after the, after the Inglis

15    investigation concluded and whether Werts had

16    started or not, did at any time, did you once you

17    found out what the process was, did you try to

18    initiate the formal process against Elders?

19      A.   McFall told me to put the paper work in.

20      Q.   Okay.  And again this is where I still

21    had a disconnect.  Okay.  So at what point in

Maria Diaz                                                          1/15/2004

Page 270

1    time with respect to Elders, I'm not talking

2    about retaliation.

3        A.    I have to look at the date.  I don't

4    remember, but she told me to refile.

5        Q.    And was that before Werts started his

6    investigation or after?

7        A.    I don't recall.

8        Q.    Okay.  Do you have, did you in fact

9    submit a formal complaint?

10       A.    I thought I had.

11       Q.    Do you have a copy of that complaint?

12       A.    Not with me.

13       Q.    But I mean within your control somewhere

14   you have a copy of the complaint?

15       A.    The one who has a copy of that complaint

16   is McFall and colonel -- I don't know this, if I

17   recall.  Colonel, I know McFall -- I don't know

18   if Col. Simon does.  I better not say her name.

19   Strike that.  Just McFall.

20       Q.    To your knowledge was there any other,

21   was there any action taken on the formal

Maria Diaz                                                    1/15/2004

Page 271

1    complaint you believed you filed?

2        A.   I haven't heard anything.

3        Q.   So as far as you know they didn't do

4    anything?

5        A.   I don't know.

6        Q.   And other than the Inglis Werts

7    investigations, do you know of any other action

8    ever taken involving the sexual harassment

9    allegations?

10       A.   No.

11       Q.   Did you ever have any conversations with

12   McFall to ask, you know, what's going on, are you

13   guys going to do anything about my complaint?

14       A.   I, I did call and left it on an

15   answering machine.  I never got called back, and

16   I let it drop because it was the same thing as

17   when I asked them for a copy of the

18   investigation.

19       Q.   And did anyone within the Maryland

20   National Guard give you any response whatsoever

21   as to what if anything was going to be done based

Maria Diaz                                                                1/15/2004

Page 272

1   on what you believed to be the formal complaint

2   being filed with McFall?

3           MS. DESHIELDS:  Objection.

4           THE WITNESS:  No one has talked to me.

5   BY MR. ZAID:

6       Q.   And just to be clear now, so the

7   retaliation complaint against the generals has

8   nothing to do with respect that the Guard in your

9   opinion, if this is accurate, failed to

10  investigate the formal complaint that you filed

11  against Elders?

12      A.   I already told you it was retaliation

13  with Gen. Tuxill and Gen. Morgan.  I gave you an

14  answer.

15      Q.   I understand, but see from a deposition

16  standpoint it doesn't answer this direct

17  question, it leaves me with doubts.  That's why,

18  that's why, and I think I know your answer and

19  I'm assuming the answer is something is okay with

20  you, but that's why I need for you to verbalize

21  it to me, you know, unless there is something

Maria Diaz                                                                    1/15/2004

Page 273

1    there that should concern me.

2        A.   I told you already.

3        Q.   All right, but then that's not a

4    problem.  See, the problem is if you think it's

5    still the same answer all you just need to do

6    is --

7        A.   It's the same answer.

8        Q.   And not give me this run around.  And so

9    I want to make it clear for this, yes or no, the

10   retaliation complaint you are saying has nothing

11   to do with the fact that the Guard took no action

12   to your knowledge on the formal complaint you

13   filed with McFall against Elders?

14       A.   I gave you the answer already.

15            MS. DESHIELDS:  Just answer yes or no.

16            MR. ZAID:  That's all I'm looking for.

17            MS. DESHIELDS:  Yes or no?

18            THE WITNESS:  No.

19   BY MR. ZAID:

20       Q.   That's all we're looking for, that's how

21   easy that is.  My recollection of what you

Page 274

1    testified to earlier was that you didn't tell

2    your husband, you didn't have a discussion with

3    your husband, without talking about what you

4    said, but you didn't have an initial discussion

5    with your husband until after the investigations

6    started, is that accurate?

7        A.    That is accurate.

8        Q.    Okay.  Looking and referring you to

9    Exhibit 2, which is marked as Exhibit 2 already

10   which is the March 7th statement of Raul Willem,

11   he indicates in paragraph five, last sentence

12   that as of March 7 before any investigation

13   started, that according to him you had advised

14   your husband of the problem she is having.  Is he

15   incorrect?

16       A.    He is incorrect there, problems with the

17   facilitator meetings, because he was asking why I

18   was over there at the Guard late at night.

19       Q.    So you believe that he is

20   misunderstanding which problems you are talking

21   about?

Maria Diaz                                                    1/15/2004

Page 275

```
 1      A.    Yes.

 2      Q.    Okay.  In the aftermath of the Werts

 3   investigation, did anybody come to you to debrief

 4   you as to what happened?

 5      A.    No.

 6      Q.    Did anyone ever have a confidential

 7   session with you to discuss with you how to take

 8   care of these types of situations or complaints?

 9           MS. DESHIELDS:  Objection.

10           THE WITNESS:  No.

11   BY MR. ZAID:

12      Q.    Did anyone ever come to you and talk

13   about how you should be assured that no reprisals

14   will happen against you?

15           MS. DESHIELDS:  Objection.

16           THE WITNESS:  No.

17           MR. ZAID:  You did say -- the reason why

18   I asked is because that's what Col. Werts

19   recommended that they do.  I had not seen this

20   before, the recommendations, and on that is the

21   government, given that they have made the
```

Maria Diaz                                                                          1/15/2004

Page 276

1    documents available for this deposition, is the

2    government willing to provide unredacted copies

3    of the two investigative reports.

4         MS. DESHIELDS:  Not at this time.  I'll

5    have to check to make sure that's actually

6    possible, okay?

7         MR. ZAID:  I did not anticipate I was

8    going to have access to the unredacted documents.

9         MS. DESHIELDS:  It's not court's order.

10         MR. ZAID:  I think and maybe you guys

11   misunderstood or maybe I misunderstood, it was my

12   understanding that what was to happen was that

13   you were to have the unredacted reports here to

14   ensure that, that Dr. Diaz, if I said who did you

15   talk to and she said only two people and the

16   document said three people, that was my

17   understanding because otherwise I would have said

18   to the judge obviously let me have the documents

19   beforehand because I can't properly prepare.

20   I've been preparing off of documents that are

21   completely redacted, which I can't tell.

Maria Diaz                                                      1/15/2004

Page 277

1              MS. DESHIELDS:  Are we still on the

2     record?

3              MR. ZAID:  I'm still talking.  I can't

4     tell what is within the context of those

5     documents, it makes it very difficult.  And I

6     will say there were some redactions where the

7     unredacted text was contained, frankly some of

8     the stuff I thought was helpful, some of the

9     stuff actually was innocuous but it looked

10    suspicious.  Meaning if I have it unredacted,

11    wow, I wonder what that word is but it turns out

12    it wasn't.  Off the record.

13             (A brief recess was taken.)

14             MR. ZAID:  That message there was a

15    message from Col. Hines saying to expect the fax

16    tomorrow.  If the government wishes, once I

17    receive the fax if you want to put it into the

18    deposition record, that's fine by me.  You know

19    maybe to be complete that might make sense.

20             So in the issue I'm sure counsel can

21    understand from our perspective, the distinction

Maria Diaz                                                                                          1/15/2004

Page 278

1    or significance between having the actual

2    documents.

3            I have had in other cases where Privacy

4    Act information is provided as part of the

5    litigation, including FBI 302 reports.  Sometimes

6    there are restrictions put on the use of those

7    documents, sometimes not depending on the

8    confidentiality provisions.

9            In this case I don't think

10   confidentiality, that anyone asked for

11   confidentiality so that that wasn't an issue.

12   But I would ask for the government to provide me

13   with unredacted copies so I could have them in my

14   procession so I can check to see in fact if there

15   is some line of questioning that I would have

16   requested otherwise or talked about otherwise,

17   because it puts me at a disadvantage to work off

18   of the redacted copies and I best as my ability

19   tried and did to some extent, used the unredacted

20   documents as much as possible.

21           There is just too much information to me

Maria Diaz                                                          1/15/2004

Page 279

1    for me to have gone and compared the redacted

2    versions with the unredacted versions to see if

3    there is something that is missing.  Maybe it was

4    a misunderstanding that both of us had or one of

5    us had about the judge's order and I'm not

6    certainly laying blame on that in any way.

7              But I guess the issue was I'll wait for

8    the government to properly respond to that

9    request and to that extent I'll say at least for

10   the record that I consider the deposition

11   potentially still open until I can verify and go

12   through the complete unredacted record.

13            MS. DESHIELDS:  You will have to take

14   that up with the court.

15            MR. ZAID:  Of course, of course, I

16   understand that.  With that we have no further

17   questions and turn the witness over to you if you

18   have any questions.

19            MS. DESHIELDS:  I do have a few.

20                        EXAMINATION

21   BY MS. DESHIELDS:

Maria Diaz                                                    1/15/2004

Page 280

1      Q.    Lt. Col. Diaz, you were asked whether

2  you filed a formal complaint?

3      A.    Yes.

4      Q.    There were two formal investigations of

5  your allegations regarding Col. Elders that were

6  conducted by Col. Inglis and Werts; is that

7  correct?

8      A.    That is correct.

9      Q.    Were both Col. Willem and Mentges at the

10 time that you reported lieutenant colonel's

11 conduct to them, were they both full-time

12 guardsmen?

13     A.    They were both full-time.

14     Q.    Was Col. Mentges at that time a senior

15 member of the Guard?

16     A.    Yes.

17     Q.    When you reported your allegations

18 relative to lieutenant or to Col. Elders' conduct

19 to both Col. Mentges and Willem, did those

20 discussions occur on base?

21     A.    Those discussions, yes.

Maria Diaz                                                    1/15/2004

Page 281

1    Q.    Were Col. Willem and Mentges in uniform?

2    A.    Yes.

3    Q.    Did you know who at the Guard was

4    responsible for handling EEO-related matters in

5    the year 2001-2002?

6    A.    No.

7    Q.    Did you know when you spoke to Cols.

8    Willem and Mentges in early 2002 about the

9    allegations relative to Lt. Col. Elders, I'm

10   sorry, Col. Elders, whether sexual harassment was

11   prohibited at the Guard?

12   A.    I knew it was prohibited.  I went to

13   them for guidance.

14   Q.    Did you think that the conduct upon

15   which your allegations against Col. Elders rested

16   affected the good order of the military unit,

17   your squadron, the 135th Squadron?

18   A.    It affected, yes.

19   Q.    Was your ability to continue to work

20   within that squad, did it play a factor at all in

21   why you vocalized your allegations relative to

Maria Diaz                                                          1/15/2004

1    Col. Elders' conduct to Cols. Willem and Mentges?

2        A.    Yes.

3        Q.    Now you indicated that your sister lives

4    in Puerto Rico presently, correct?

5        A.    Correct.

6        Q.    When you spoke to her about the fact

7    that you pressed allegations of sexual harassment

8    against a member of the Guard, was she still then

9    living in Puerto Rico?

10       A.    She was still in Puerto Rico.

11       Q.    What language was that conversation

12   conducted in?

13       A.    Spanish.

14       Q.    Did you ever identify the guardsman

15   against whom you had pressed sexual harassment

16   charges to your sister?

17       A.    No.

18       Q.    Does your sister know Col. Elders at

19   all?

20       A.    No.

21       Q.    Does she have any contacts with anyone

Maria Diaz                                                                      1/15/2004

Page 283

1    in Maryland?

2        A.    No, other than myself and my children

3    and my husband.

4        Q.    And you also expressed that you had a

5    conversation with your aunt in which you also

6    told her that you had pressed sexual harassment

7    charges against someone in the Guard; is that

8    correct?

9        A.    That is correct.

10       Q.    Why did you tell your aunt?

11       A.    My aunt is now my mother since my mother

12   passed away, and that's why I told her.

13       Q.    Why did you tell your sister?

14       A.    My sister in my confidante.  She is not

15   only my sister, she is my friend.

16       Q.    The conversation with your aunt, in what

17   language did that occur?

18       A.    Spanish.

19       Q.    Where does your aunt reside?

20       A.    Puerto Rico.

21       Q.    Did she reside in Puerto Rico when you

Maria Diaz                                                                1/15/2004

Page 284

1    had the conversation with her about pressing

2    sexual harassment charges with somebody in the

3    Guard?

4        A.   Yes.

5        Q.   Did you ever mention Col. Elders' name

6    in connection with the sexual harassment charges?

7        A.   I did not mention his name.

8        Q.   Does she know Col. Elders?

9        A.   No.

10       Q.   Did she have any contacts with anyone in

11   Maryland?

12       A.   Only family.

13       Q.   Only family contacts?

14       A.   Only family contacts.  She has never

15   visited the State of Maryland.

16       Q.   You were also asked about a conversation

17   with an individual by the name of Mike Vichich,

18   do you recall that, Mr. Zaid asking you?

19       A.   Yes, I do recall him asking me.

20       Q.   He asked you whether you knew or did you

21   have any idea of how Vichich learned of the

Maria Diaz                                                          1/15/2004

Page 285

1    allegations relative to Col. Elders' conduct,

2    correct?  Do you recall that question?

3         A.    Yes.

4         Q.    Do you recall when it was that the

5    article in the Daily Record appeared?

6         A.    It was right after I received the

7    lawsuit.  I received the lawsuit in my office

8    October 2nd, and I first saw it at the Guard in

9    my mailbox.

10        Q.    Did members of the Guard know about that

11   newspaper article?

12        A.    They, when I looked at the other

13   mailboxes, all of the mailboxes had the paper in

14   there.  So I would imagine that they knew and

15   obviously Maj. Falter and Col. Robbins didn't

16   help by making it a laughing matter and

17   projecting it in a loud voice and in an open

18   area.

19        Q.    I have no further questions.

20             MR. ZAID:  Just a few follow-up.

21                       EXAMINATION

Maria Diaz                                                      1/15/2004

Page 286

1    BY MR. ZAID:

2        Q.    You indicated that Mentges you

3    considered to be a senior member of the Guard, by

4    what do you mean senior member?

5        A.    He was in a command position.

6        Q.    The command position that we were

7    talking about earlier?

8        A.    Correct.

9        Q.    And do you believe that as a lieutenant

10   colonel which is a very senior officer, of

11   course, it's your responsibility to know who the

12   EEO officer would be?

13       A.    I think it's important.

14       Q.    Do you believe that it, to you in your

15   personal opinion, do you believe that it would be

16   outside of someone's employment responsibilities

17   to intentionally disseminate false information

18   about someone?

19            MS. DESHIELDS:  Objection.

20            THE WITNESS:  I believe that that's

21   correct.

Page 287

1    BY MR. ZAID:

2         Q.    Okay.  And it's true, is it not, that

3    Vichich left the Maryland Air National Guard

4    before any of these allegations came about?

5         A.    I don't know when Vichich left.

6         Q.    Okay.

7         A.    Okay.

8              MR. ZAID:  I have no other questions

9    either.  We'll leave, for technical purposes, for

10   me to send the court reporter the Hines document

11   when I receive it and any other issues then will

12   just be raised, of course, with the court.

13             MS. DESHIELDS:  Now, Lt. Col. Diaz, we

14   did discuss whether you would prefer to waive or

15   whether you would prefer to read and sign.

16             THE WITNESS:  I would like to read and

17   sign.

18             (Reading and signing not waived.)

19             (Whereupon, the deposition concluded at

20   5:40 p.m.)

21

Maria Diaz                                                              1/15/2004

Page 288

```
1    UNITED STATES OF AMERICA )

2    STATE OF MARYLAND         )

3            I, DONNA M. HALL, the reporter before

4    whom the foregoing deposition was taken, do

5    hereby certify that the witness whose testimony

6    appears in the foregoing deposition was sworn by

7    me; that said deposition is a true record of the

8    testimony given by said witness.

9            I further certify that I am neither

10   counsel for, related to, nor employed by any of

11   the parties to the action in which this

12   deposition was taken; and further that I am not a

13   relative or employee of any attorney or counsel

14   employed by the parties hereto, or financially or

15   otherwise interested in the outcome of this

16   action.

17                  _____

18                  Donna M. Hall, Notary Public

19

20

21   My Commission expires January 1, 2005
```

Maria Diaz                                                                    1/15/2004

Page 289

```
 1                    I N D E X

 2            DEPOSITION OF MARIA DIAZ

 3                 January 15, 2004

 4

 5   Examination by:                    Page

 6   Mr. Zaid                           3, 286

 7   Ms. DeShields                      279

 8

 9

10   Exhibit    Description             Page

11   1          Report                  23

12   2          Declaration             36

13   3          3/8 Memorandum by Mentges  77

14   4          Portions of Report      89

15   5          Document                103

16   6          Declaration of D. Falter  108

17   7          Declaration of M. Diaz  118

18   8          Charts                  168

19   8          Orders                  200

20   9          Declaration of D.

21             Gessouroun               201
```

Maria Diaz                                                                1/15/2004

Page 290

```
 1    Exhibits (Continued)

 2

 3

 4    Exhibit    Description          Page

 5    10         Declaration of T. Whitley   211

 6    11         Internet list       225

 7    12         Excerpt (voice mail)   230

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21
```

Maria Diaz                                                          1/15/2004

Page 291

1              CERTIFICATE OF DEPONENT

2

3

4          I hereby certify that I have read and

5     examined the foregoing transcript, and the same is

6     a true and accurate record of the testimony given

7     by me.

8

9          Any additions or corrections that I feel

10    are necessary, I will attach on a separate sheet

11    of paper to the original transcript.

12

13

14

15

16

17                        _____

18                              Maria Diaz

19

20

21