<u>Elders v. Diaz</u>, Case No. MJG-02-3892 (D.Md)

# EXHIBIT "9""

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE DISTRICT OF MARYLAND/NORTHERN DIVISION

 3

 4  KARL ELDERS,

 5              Plaintiff      CIVIL NO.

 6   v.                       02-3892

 7

 8  MARIA DIAZ,                       May 4, 2005

 9              Defendant

10  _____/

11              TRANSCRIPT OF PROCEEDINGS

12          BEFORE THE HONORABLE MARVIN J. GARBIS,

13              UNITED STATES DISTRICT SENIOR JUDGE

14  APPEARANCES:

15  On behalf of the Plaintiff:

16  Mark Zaid, Esquire

17

18

19  On behalf of the Defendant:

20  Tarra DeShields, AUSA

21

22

23  Reported By:

24  Jacqueline Sovich, RPR, CM

25  Official Court Reporter
```

```
 1                    DIRECT EXAMINATION
 2  BY MR. ZAID:
 3  Q.  Good morning, Dr. Diaz.  My name, as you know, is Mark
 4  Zaid.  I'm representing the plaintiff in this case, Karl
 5  Elders.
 6           Let me ask you first, you've been a member of the
 7  Maryland Air National Guard now for 15 years; is that
 8  correct?
 9  A.  That is incorrect.  I believe it's 14, because I joined
10  late 1990.
11  Q.  Okay.  And in civilian life, you are a physician,
12  correct?
13  A.  I am a general surgeon.
14  Q.  And you are a tradition member of the Air National Guard?
15  A.  Correct.
16  Q.  And by tradition, that means you have certain
17  obligations, one drill weekend a month and minimum of two
18  weeks per year; is that correct?
19  A.  That is correct.
20  Q.  And the drill weekends, just in case we use acronyms, are
21  UTA or Unit Training Assemblies; is that correct?
22  A.  That is correct.
23  Q.  And could you describe to the Court what your
24  responsibilities are as a member of the Maryland Air National
25  Guard, please?
```

22

1  led up to that investigation, is it not true that what

2  prompted the investigation was the fact of statements

3  provided by Major Michael Mentges and Major Raul Wilhelm?

4  A.  That's correct.  I did not want to bring the allegations

5  forward.

6  Q.  And, in fact, isn't it true that you signed a sworn

7  statement adopting those statements in those two memorandums

8  as true except for the fact that Mr. Major Wilhelm had said

9  you were crying?

10  A.  That is correct.

11         MR. ZAID:  Your Honor, may I have a standing

12  permission to go to the witness?

13         THE COURT:  All right.  Fine.

14  BY MR. ZAID:

15  Q.  If you could, Dr. Diaz, review what we've had marked as

16  plaintiff's exhibit 2, and identify those?

17  A.  They are the two members I talked to, Raul Wilhelm and

18  Mike Mentges, both Lieutenant Colonels at this time.

19  Q.  It's true, that at the time these allegations and

20  investigations were going on, both of those men were majors;

21  were they not?

22  A.  They were both majors.

23  Q.  Now, if you look --

24         (Pause.)

25         MR. ZAID:  Your Honor, I'm just going to hand up to

1  chain of command above Colonel Inglis?

2  A.  I did not feel comfortable talking to anybody else.  I

3  talked to Major Wilhelm because of the fact that he was chief

4  of security police.  I asked for guidance.  I talked to

5  Colonel Mentges because it was -- I needed guidance.  I felt

6  comfortable talking to them.  I cannot just go -- I can't

7  approach the subject with just anybody.

8  Q.  And, as you said, you were simply seeking guidance from

9  both men, in fact, they told you need to officially report

10  this, did they not?

11  A.  That is correct.  But I was afraid.

12  Q.  And, in fact, when you spoke to Major Wilhelm, it was

13  because you just happened to be at the security office

14  administering vaccines, not that you had gone specifically to

15  talk to him; is that correct?

16  A.  That's correct.

17  Q.  And, in fact, he asked you just a question of whether

18  anything was wrong, and you volunteered the information to

19  him; is that correct?

20  A.  He knew something was wrong with me, that is correct.

21  Q.  And you volunteered information to him, correct?

22  A.  I did tell him, correct.

23  Q.  And, in fact, you told both of those men that they were

24  not to do anything with the information; is that correct?

25  A.  That's correct.

32

1  Q.  You weren't filing a complaint of sexual harassment

2  against Karl Elders, correct?

3  A.  That's correct.

4  Q.  You weren't filing an informal complaint against Karl

5  Elders, correct?

6  A.  Correct.

7  Q.  Or a formal complaint, correct?

8  A.  Correct.

9  Q.  And, in fact, you spoke to Major Mentges because you were

10  friends or buddies with him; is that not true?

11  A.  I wouldn't say friends or buddies.  I would say that I

12  felt comfortable enough to talk to him .

13  Q.  But you told Colonel Wirts you had spoken to Mentges

14  because he is your friend or buddy; is that not true?

15  A.  I can't remember Colonel Wirts's investigation.

16  Q.  When you spoke to Colonel Wirts, that was under oath;

17  correct?

18  A.  That's correct.

19  Q.  And, in fact, the sessions of the interview were

20  tape-recorded, correct?

21  A.  That's correct.

22  Q.  And transcripts were made, correct?

23  A.  Correct.

24  Q.  Bear with me, Your Honor, please.

25          (Pause.)

1  for rebuttal.

2        THE COURT:  Well, I would assume she would probably

3  testify in the defense case, too.  Sure.  That's fine.  You

4  can step down.

5        Do we have another witness, please?

6        MR. ZAID:  At this time we would call David

7  McGinnis, Your Honor.

8        THE COURT:  All right.  Fine.

9        THE CLERK:  Please raise your right hand.

10       (The Witness is sworn.)

11       THE CLERK:  Thank you.  Please be seated.  State

12  your name for the record.

13       THE WITNESS:  David L. McGinnis, M C G I N N I S.

14       THE CLERK:  Thank you.

15                    DIRECT EXAMINATION

16  BY MR. ZAID:

17  Q.  Mr. McGinnis, would you please go through your background

18  with respect to the military and your professional employment

19  for the court, please?

20  A.  I join the military in 1966, was commissioned in 1967.  I

21  served a total of 29 years both in the national -- in the

22  active and Army and in the National Guard, Army National

23  Guard in New York.

24       I served my first six years in active duty, then

25  moved over to the guard as a training officer.  I served in

52

1   the New York Guard as a technician for about eight years,

2   then reverted to active duty as a guardsman on federal active

3   duty and stayed in that service through 1995.

4           While I was in the State of New York, serving in

5   the state of New York, I had eight years of state

6   headquarters, working with directly with the Adjunct General

7   in the State of New York on a number of policy matters.

8   Although my portfolio is personnel and leadership, I was the

9   state leadership director and was responsible for training

10  officers and senior non commissioned officers in the New York

11  Army National Guard.

12          I then went to service with the Army as a guardsman

13  on active duty and served at Fort Drumm, New York as a

14  principal staff.  In that capacity, I rated the equal

15  opportunity officers among other special officers at the

16  garrison level, and was the appeal authority for the equal

17  opportunity officer.

18          I then moved on to Fort Sheridan, where I worked as

19  a personnel assistant of the commanding general there,

20  lieutenant general, and then moved to the National Guard

21  Bureau, where I assumed responsibility for the Army National

22  Guard forestructure and served as a principal staff member in

23  the director of the Army National Guard.

24          And I also had day-to-day, week-to-week contact

25  with the Chief of the National Guard Bureau.

53

1          In that the last part of that period, which would
2    have been most of 19 -- between February and September of
3    1993, I also functioned in many roles as deputy director of
4    the Army National Guard, because we didn't have a deputy
5    director for that period of time, and I still continued to do
6    my primary role.
7          I went to the Office of the Secretary Defense for
8    reserve affairs and assisted her, a presidential appointee,
9    with the management of National Guard and reserve programs.
10          I was still on active duty at that point.  I
11    retired in '95.  They asked me to sir come back to civilian
12    for about a year and a half, at which time I moved to, over
13    to the Senior Fellow of the National Guard Association of the
14    United States, which represents the states, first level
15    membership is the states of the republic, and the second
16    level are the officers of the National Guard.  And its role
17    is to represent the states on national guard matters before
18    the federal government.
19          In the year 2000, I retired and moved to
20    Williamsburg, Virginia, remained active in the association,
21    remained in close contact with many of the Adjunct Generals
22    throughout the country, helping them as best I could, dealt
23    with guard matters with the media, with nonprofit think
24    tanks.  And at the present time, also worked on committees at
25    the association including search committee to select the

54

1  current president of the association.  The National Guard

2  Association of the United States.

3           And I presently have a relationship with the Center

4  for Strategic International Studies as a senior associate

5  working on a project to determine or to provide some type of

6  analysis to the Department of the Defense and the congress on

7  what the guard and reserve should look like in the 21st

8  century.

9  Q.  Now min the roles that you played, particularly with the

10  National Guard Bureau, Mr. McGinnis, what involvement did you

11  have with developing National Guard Policies and regulations,

12  if any?

13  A.  Well, I was a proponent for my functional area, but I was

14  also consulted on every policy document that was created that

15  pertained to the Army National Guard, or to the National

16  Guard in general, and would have policy chop on that.

17           During the period I mentioned, when I was assisting

18  the director in accomplishing his functions, his senior

19  functions, I was much more involved in that process in a

20  general sense.

21  Q.  Now, the policies that the National Guard issues, are

22  they distinct for the army versus the air side?

23  A.  There are -- the National Guard Bureau is a unique

24  organization.  It's an interface between the Department of

25  the Defense, the Federal Executive, and the states.  And the

1  Chief of the Guard Bureau represents both the Secretary of

2  the Army and the Secretary of the Air Force in that context.

3         Where it comes to the common organization and

4  discipline of the National Guard, there are common

5  directives, which are issued by the Chief of the National

6  Guard Bureau.  Where it comes to the readiness and training

7  and organizations specific to the reserve of the Army and Air

8  Force, there are separate directives for the Army and the

9  air.

10         In the case of general areas, such as equal

11  opportunity, or the contracting, or a number of general areas

12  that apply equally, there's a common directive for each of

13  those functional areas.  And those directives are issued both

14  in the name of both secretaries, but they apply equally to

15  both the Army and the Air National Guard.

16  Q.  Now, you had indicated that were you associated with the

17  New York Army National Guard.  I'm not sure if you had

18  indicated what your retirement rank was.

19  A.  I retired as a Brigadier General on the state retired

20  list.

21  Q.  Now --

22  A.  My senior federal grade was on active duty was a Colonel.

23  Q.  What distinction, if any, would there be, or differences

24  between the fact that you were involved in the New York Guard

25  versus the Maryland Guard with respect to policies or

1  regulations?

2  A.  In terms of the requirement to adhere to National Guard

3  Bureau Directives?  None.

4         Now, the implementation of those directives, one of

5  the unique things about the National Guard SUV, a command

6  function, which is, in most cases, except when they're

7  actually on federal duty, in most cases, their annual

8  training, if they're not mobilized, and only annual training.

9  So the state commander has the ability to implement

10  directive, but the requirements to comply with the directive

11  are the same, and the procedures, any specific procedures in

12  there are the same.

13        MR. ZAID:  Your Honor, I'd move that Mr. McGinnis

14  be recognized as an expert witness with respect to the

15  development and promulgation of National Guard policies that

16  govern both the army and the air side and how those policies

17  are implemented through the National Guard system.

18        THE COURT:  All right.  Miss Deshields, it seems

19  that he has a background to speak.  I think that a portion of

20  what Mr. Zaid said is relevant.  Do you want to ask any

21  questions now or proceed with the testimony?

22        MS. DESHIELDS:  We can testimony proceed with the

23  testimony.

24        THE COURT: All right.  Fine.  I think we don't need

25  a lot on development here.  We're talking about what he's

1   saying the policies were at the relevant time?

2              MR. ZAID:  Yes, sir.

3              THE COURT:  All right.

4   BY MR. ZAID:

5   Q.  Now, Mr. McGinnis, with respect to this case, has there

6   come a time that you reviewed any documentation pertaining to

7   this case?

8   A.  I reviewed the motion.  I've reviewed your rebuttal to

9   the motion, and I reviewed the presentation by the chief of

10  the equal opportunity office of the National Guard bureau.

11  That's the extent of my review.

12  Q.  When you say motion, do you recall what motion that is

13  that you're referring to?

14  A.  Well, the motion for summary dismissal, based on the

15  issue of employment related to employment.

16  Q.  Now, do you know what, if any, regulations apply to the

17  Maryland -- the National Guard with respect to EEO

18  proceedings?

19  A.  Well, within the context of equal opportunity and

20  command, there's the Air Force, and in particular, the Air

21  National Guard.  There's the Air Force command policy and the

22  National Guard bureau equal opportunity regulation, which is

23  promulgated by the Chief of Equal Opportunity of the Guard

24  Bureau.  And I have looked at both of those documents, and

25  reviewed them.

58

1  Q.  And can you indicate which documents those are for the

2  record, please?

3  A.  I forget the number.  The specific, the specific code,

4  but it's the - -if you could refresh my memory, I just went

5  blank with it, 600 series reg.

6  Q.  I'll have it marked as -- I want to say 633, but I'm not

7  -- marked exhibit 7 this particular regulation, which I'll

8  wait for the witness.

9         Is that --

10 A.  Yes.

11 Q.  -- the regulation you're referring to?

12 A.  Yes.

13 Q.  Your Honor --

14 A.  I believe, without my glasses, I can tell.  I'm sorry,

15 622 and it's a double -- it's got two numbers, it's National

16 Guard regulation 622 and Air Guard Instructions 36-3, both of

17 which they have two numbers, because they apply to both the

18 components, the army and the air guard.

19         (Pause.)

20 Q.  Now, did you identify any other relevant National Guard

21 documents, policies and directives that would apply to EEO

22 proceedings?

23 A.  No.  This directive here is the bible.  Other than -- and

24 referenced in -- referenced in this, cited in this, is Air

25 Force command policy.  So I would say that those are the two

1  documents, the two directives that pertain.

2  Q.  And what is it that the directives require with respect

3  to the process of EEO complaints?

4  A.  This particular directive requires that there be two

5  processes, one formal, one informal.  The informal process is

6  intend more for junior personnel, who may have questions and

7  concerns, and allows them the opportunity to make an informal

8  complaint, or informal allegation, then put it in writing,

9  and then either escalate it to a formal complaint, and there

10  are certainly rules basically for the two complaints are the

11  same and have it adjudicated at the level of command that is

12  appropriate, which is normally the commander of the

13  organization, in which the event occurs, or if an allegation

14  occurs involving the commander of that organization, the

15  commander of the next immediate level is obligated to act on

16  it.

17         So the first step in the process is a complaint.

18  In the case of commissioned officers, and in the case of

19  officers who are in command positions being the alleged

20  offender, the way I read that regulation, an informal

21  complaint is not appropriate, and is excluded by the way I

22  read this regulation.

23         In other words, if you have a unit commander who

24  has allegedly done something, then there's only one recourse,

25  and that's a formal complaint to the next commander in the

1  chain of command.

2  Q.  So would you say that an option to simply talk to fellow

3  National Guard members about the allegations, would that be

4  something that falls within the policy?

5  A.  Not under my interpretation of this and the command

6  policy of the Air Force and the Army.  There are available to

7  certain individuals different channels.  Most individuals,

8  the majority, have the command channel, because that's all

9  they know.  They have no other related channel other than the

10  command channel.

11          As you get into certain senior positions,

12  especially among officers, you also have technical channels.

13  Technical channels are specialty channels, such as Judge

14  Advocate or Medical Corps or Intelligence, where you have a

15  technical channel to accomplish a certain function.  In those

16  cases, if you're in that channel, it opens up the

17  opportunities.

18          But, normally, by regulation, by both of those

19  directives, you have the EEO officer or member of the EEO

20  staff, or you have the commander of the appropriate

21  commander, or in case of individuals who are members of the

22  technical channel, your next higher individual in the

23  technical channel.

24          They're the three avenues of consultation that are

25  provided for in the two directives I mentioned.

1  Q.  Now, you were sitting here in the courtroom listening to

2  Dr. Diaz's testimony; were you not?

3  A.  Yes, sir.

4  Q.  And as you indicated, you read through some of the briefs

5  --

6  A.  Yes.

7  Q.  -- to get a factual sense of at least an allegation as

8  set forth by both sides?

9          Based on your interpretation, your expertise and

10 understanding the regulations, is the conduct of Dr. Diaz

11 talking to Majors Mentges and Wilhelm, would that constitute

12 an informal complaint within the National Guard regulations?

13 A.  No.  Not as defined, not in the process defined by -- the

14 informal complaint would have to go either to a member of the

15 EEO staff or to the commander, or a member of the chain of

16 command above them, who wasn't implicated, who was senior to

17 all individuals concerned.  It wouldn't necessarily to be a

18 commander, it could be a section supervisor.  But ideally it

19 would be the EEO staff or the commander.

20 Q.  And assuming, since Karl Elders was Dr. Diaz's commander,

21 and she indicated that, obviously, caused concern for her as

22 to how she complains to the commander about himself, is there

23 a mechanism by which that type of situation is dealt with

24 when the person is being harassed actually by their own

25 commander?

1   A.  Well, the regulation addresses that.  If the commander,

2   if the immediate commander is the individual who allegations

3   are against, then you're required to submit the report, at

4   least to his superior, which in this case, would be the group

5   commander, the air guard group commander.

6           If there's concerns with that, as the Judge

7   mentioned, you could go all the way to the governor in the

8   state if you were concerned about the politics of the issue

9   or relationships.  But it definitely has to be a formal

10  complaint in accordance with the guidance, in the directive.

11  It can't be an informal complaint because he's a commanding

12  officer.

13  Q.  Now, the conversations that she testified to having with

14  Major Mentges and Wilhelm, would any of those constitute a

15  formal complaint per the regulations?

16  A.  No.  Not into my interpretation of the regulation, no.

17  Q.  Now, would you say that her discussions with Major --

18  Majors Mentges and Wilhelm, and your opinion from your

19  experience with the National Guard bureau and with respect to

20  the regulation, they would have benefited the good order and

21  discipline and mission readiness of the National Guard?

22  A.  Could you can me that question again?

23  Q.  Sure.

24  A.  I'm sorry.

25  Q.  Based on your experience and the regulations, would you

1  say your conversations with Majors Mentges and Wilhelm

2  regarding her allegations, would they have benefited or

3  served the good order and discipline and mission readiness of

4  the National Guard?

5  A.  No.  It's my belief --

6          MS. DESHIELDS:  Objection.

7          THE COURT:  Yes.

8          MS. DESHIELDS:  Well, what Mr. Zaid is trying to

9  do, Your Honor, is to ask is -- what is your rank?

10         THE WITNESS:  General McGinnis.

11         MS. DESHIELDS:  General McGinnis, to opine whether

12  or not Lieutenant Diaz was acting within the scope of her

13  employment.

14         THE COURT:  I'm going to let it go to the weight,

15  rather than try to parse it out.  He can give his opinion, as

16  a commanding officer, as an experienced member of the guard,

17  there's -- you can argue this eternally.  He can give an

18  opinion.  Go ahead.

19         THE WITNESS:  Sir, I would -- it is my opinion, and

20  my judgment, that it is contrary to the good order and

21  discipline.  There are a couple of issues here that allow --

22  that cause me to come to that conclusion.

23             First of all, the person making the complaint is

24  not a regular person in the unit, a very special person.  The

25  flight surgeon is the second most important individual in the

64

1    squadron next to the squadron commander.  In fact, the only

2    person in the squadron and the only person in the State of

3    Maryland pertaining to the people and men of that squadron

4    who can say they can't fly is the flight surgeon.

5         That flight surgeon has a very special relationship

6    with the commanding officer of the squadron, commanding

7    officer with any air unit or army aviation unit.

8         I did supervise an army flight surgeon when I was

9    director of plans and training and had responsibility for the

10   airfield at Fort Drumm, New York.  So that the regulations to

11   those guys apply the same.  Those regulations to flight

12   surgeons, both in the Army and the air, are very, very close.

13        That's a unique responsibility.  And the individual

14   is recognized as being in that position by every member of

15   the unit.  The two people you want to keep, if you want to

16   keep flying happy, are the flight surgeon, the commander, if

17   you're a pilot.

18        So there's a special relationship there.  And when

19   anyone having that relationship and level of confidence with

20   the unit commander starts talking outside the chain of

21   command, there's a problem with that.  And I believe that the

22   command policy regulation of the Air Force, I know the Army

23   one and the Air Force I believe, did, too, does not look

24   favorably upon that.

25   Q.  In your opinion, what, if any, impact occurs when senior

1  officers complain to junior officers regarding their

2  commanders?

3          MS. DESHIELDS:  Objection.

4          THE COURT:  I'll overrule it.  You may answer it.

5          THE WITNESS:  Sir?

6          THE COURT:  You can answer it.

7          THE WITNESS:  Okay.  It creates dissension within

8  the ranks all the way up.  It's whether, you know, one thing

9  about the guard, you've got to be very careful of doing

10 anything political because of the governor.  But that goes

11 all the way up from the commander in chief on down.

12         Individuals talking about seniors to subordinates

13 is, TO put it in a common context, it's a sin.  And it can

14 lead to -- it can lead to action.  It can lead to

15 administrative or non judicial or judicial punishment,

16 depending on what it's said, when it's said, and in what

17 context it's said.

18 Q.  Now, in your opinion, is the -- would that be an

19 authorized function of a member of the guard, an officer, to

20 talk to lower ranking officers regarding the discontent or

21 allegations they have regarding a senior level officer?

22         MS. DESHIELDS:  Objection.

23         THE COURT:  Overrule.  You can answer.

24 A.  There are three, as I mentioned before, in this case,

25 specifically, based on my review, there are three channels

66

1    that would constituted legitimate avenues to discuss, just to

2    discuss the complaint let alone render it.

3              The one is the EEO I mentioned.  The second is the

4    next higher flight surgeon, which would be either the group

5    level flight surgeon, not having one would have been at least

6    up to the state surgeon who might not necessarily be a flight

7    surgeon, but he's in the technical channel of this

8    individual, and any one of the commanders above the commander

9    in question, who the commander who the allegations are being

10   made against.

11             Those are the only three legitimate channels that

12   the command policy, in my opinion, recognizes as legitimate

13   channels for this type of information to flow.

14             And it would be -- it would not be out of the

15   question for the surgeon at the next higher level to take it

16   to the commander.  That would be perfectly fine.  But not

17   somebody, some subordinate to take it to the commander.  It

18   would be appropriate for anyone in these channels.

19             The EEO, in fact, if you make complaint to the EEO,

20   according to the regulation, is like making it to the

21   commander, if you go to him, make a complaint, it's

22   equivalent to making a complaint to his commander.

23             The surgeon, I would say probably isn't.  It's not

24   codified in regulation.  But it is an appropriate channel for

25   the individual to approach this issue with.

67

1  Q.  Now, from your understanding of how the National Guard

2  Bureau operates, could there be any other policies or

3  regulations that govern conduct, other than what's set forth

4  in the policy document that you've identified?

5  A.  There's one document and that would be -- that would be

6  the Maryland State Military Code.  And, again, I'm not that

7  familiar with it, but the Uniformed Code of Military Justice

8  and the New York State Military code would apply here, or

9  could be applied here, if the allegation was made properly

10  and in the proper context.

11        MS. DESHIELDS:  Objection.  I would move to strike

12  that, if you're not familiar with it.

13        THE COURT:  I just would take that into account.

14  A.  He asked me if there could be.

15  Q.  I'm not following up on that part of it, Your Honor.

16        Now, would, Mr. McGinnis, the dissemination of

17  information that was known to be lies or falsehoods about a

18  superior officer be an authorized function of a member of the

19  National Guard unit?

20        MS. DESHIELDS:  Objection, Your Honor.

21        THE COURT:  I'll sustain it.  First of all, it's

22  self-evident, that nobody's authorized to lie.  Truck drivers

23  aren't authorized to run into school buses.  That's not

24  getting us anywhere on the scope of employment.  Let's move

25  along.

68

1  Q.  Sure.  Understood.

2          In general, are you familiar with the familiar

3  scope of employment?

4  A.  Yes.

5  Q.  And or --

6  A.  I'm familiar with how it applies in the military context

7  versus a civilian context.

8  Q.  Generally, you're familiar with what "line of duty"

9  means?

10 A.  Yes.  Very well, I've investigated line of duty many

11 times.

12 Q.  Now, based on the documents that you reviewed, and

13 testimony that you've heard today, do you have an opinion as

14 to whether or not Maria Diaz was acting in an authorized

15 function of the Maryland Air National Guard?

16 A.  I think I answered it when my --

17          MS. DESHIELDS:  Objection.

18          THE COURT:  Acting in an authorized manner?

19          MR. ZAID:  An authorized function.

20          THE COURT:  All right.  You can answer.

21 A.  I think I answered it with my last question.  There are

22 three channels, in my opinion, that were open to be taken in

23 this case.  And, from what I've read, none have been used.

24 At least by the individual who's making the complaint.  So I

25 would say no.

69

1   Q.  And, in general, given that this is the military, in your

2   opinion, is there a gray area that exists with whether or not

3   she was or wasn't acting as an authorized function of the

4   National Guard?

5              MS. DESHIELDS:  Objection.

6              THE COURT:  I'm not sure what, are you asking him

7   whether there's a bright line?

8              MR. ZAID:  Yes, sir.

9              THE COURT:  Well, fine, you can answer.

10  A.  There is always a judgmental line.  There is always a

11  judgmental line.  But it gets larger and grayer as you lack

12  formal procedures.

13              In this case, we have formal procedures for

14  accomplishing this.  So there's -- but it's a judgmental

15  call.

16  Q.  Now, what is the availability, for example, the policy

17  document that we're talking about here --

18  A.  Uh-huh.

19  Q.  -- NGR 600-22, in your -- to your knowledge, what is the

20  availability of that document to members of the National

21  Guard?

22  A.  It's readily accessible in PDF form on a web page on the

23  web.  It's available on all units.  Its distribution, if you

24  look at the distribution, that will tell you, distribution is

25  B and F.  I don't have the code there, but that's pretty

1  wide.  A would be distribution down to the lowest unit level.

2  B would be at the 0506 command or higher.  So the

3  distribution is pretty wide concerning it's a directive

4  coming from the federal government.

5          MR. ZAID:  I have no further questions, Your Honor.

6          THE COURT:  All right.  Miss Deshields, I'm looking

7  at the clock.  Do you have much, or if you're very brief, we

8  can finish the witness.  If not, we'll wait until two.

9          MS. DESHIELDS:  I could probably be done in about

10 five minutes.

11         THE COURT:  Why don't you do that, so we don't have

12 to carry a witness over.

13                  CROSS-EXAMINATION

14 BY MS. DESHIELDS:

15 Q.  Thanks.  I want to be referring to General McGinnis; is

16 that correct?

17 A.  Generally, since I became a civilian in the Department of

18 Defense, I prefer "Mr." because rank becomes a problem when

19 you're dealing with a lot of military people, and you've got

20 civilian responsibilities.

21 Q.  I will demote, but you don't disagree national Guard

22 seeks to promote a workplace that's free of discriminatory

23 acts or behavior, do you?

24 A.  Absolutely.

25 Q.  And that includes sexual harassment as well?

71

1  A.  Absolutely.  Absolutely.  Been a proponent of it.

2  Q.  You know, of course, that the National Guard seeks to

3  encourage, at least sets forth in the policy statements of NG

4  600-22 the airing or reporting of perceived discriminatory

5  behavior; is that correct?

6  A.  That's correct.

7  Q.  And the goal of promoting a workplace that is free of

8  discriminatory behavior does not somehow become less of an

9  objective on the part of the Air National Guard or the Army

10  National Guard, does it, because the wrong or different

11  channel was pursued by an individual?

12  A.  The first part of the question is not normally.  But then

13  we're not dealing with a normal situation here, because we're

14  dealing were with between two senior people.  The breadth of

15  the intent of the regulation is to protect the whole

16  population.

17       We're talking about two people here whose job is to

18  protect the population.  The flight surgeon is responsible

19  for the physical and mental health of everybody in that

20  squadron.  And I would argue if I was the commander, and I

21  have been, so I will argue the chaplain and surgeon are

22  important to mental health in my organization and the

23  discipline of my organization.  So it's not -- I don't

24  believe you can -- the general intent applies here, that

25  would be my judgment.  Because of the specific individuals

72

1  involved and their responsibilities and their relationship to

2  one another.

3  Q.  That's your opinion?

4  A.  That's my opinion.  That's my opinion of how the chain of

5  command should work, which I've been doing it for 29 years.

6  Q.  But you are not saying, of course, that the seriousness

7  and the desire on the part of the Air National Guard to

8  eradicate discrimination, to have a workplace that's free of

9  discriminatory behavior, turns on whether or not a person

10  pursues a particular channel of communication, you know,

11  that's set up as a mechanism for airing such complaints; is

12  that what you're saying?

13  A.  What I'm saying is compliance with the procedures is

14  essential to getting the job that you are -- you are

15  mentioning done.

16      We have to get it into the process as quickly as

17  possible at the correct level so that we can avoid exactly

18  what we're trying to avoid here.  We can avoid outside

19  influences and unnecessary command influence to bury the

20  allegation.  That's what we're trying to do.

21      But in this particular case, the logical process

22  was exactly that channel, because you didn't have to be

23  informal on this.  I mean, you've got two senior people.  I

24  spent a lot of time with a good friend of mine.  Claudia --

25  General Claudia Kennedy was a friend of mine in the Pentagon,

1  and here she went through this as a senior staff officer, but

2  she went right in the chain of command.  She didn't talk to

3  me about it, she didn't talk the anybody else, went right to

4  the general and brought the situation up because she was in

5  that position.

6          My argument is if she's a flight surgeon of the

7  squadron, she should be able to kick the group commander's

8  door down any time she wants to.  That would be the process

9  that I would expect from a person of that -- in that

10 position.

11 Q.  But apart from the process that you would expect, or that

12 you would like to see followed, my question to you, was that

13 you're seeming to suggest by your testimony that the Air

14 National Guard's desire to have a workplace free of

15 discrimination is selective?

16 A.  No, it's not selective.  What I'm testifying is, that

17 there's a command policy, and there's an objective the stated

18 in the regulation.  And everything you said is absolutely

19 true.  But it's important that the command policy be followed

20 so the organization can function.  And --

21 Q.  There is --

22 A.  It is not -- we are not equal.

23 Q.  I'm sorry?

24 A.  We are not all equal in terms of the Private and Major

25 and Colonel.  We're not equal in terms of the people who work

74

1   in the National Guard and people who work in the field.

2   There are different expectations of people in the military.

3   That's what I'm saying.  There's expectations within Army

4   command policy, and that's all I'm saying.

5           I'm not saying the bureau isn't trying to do

6   something or not trying to make it easy.  I'm saying the

7   military organizations of the United States run in a certain

8   way so that we can get things done.

9           And regardless of what the allegation is and what

10  area it's in, that's irrelevant in any case with senior

11  people.  It needs to get into the chain of command to be

12  adjudicated in a timely manner and effectively.

13  Q.  But what's not irrelevant is the Air National Guard seeks

14  to have a workplace that's free of discriminatory --

15  A.  Totally relevant.  I'm not arguing with that statement at

16  all.

17  Q.  Okay.

18  A.  I just want you to understand what I'm saying, which is

19  process-related.

20  Q.  I understand that your testimony is that there is an

21  expectation, and there is --

22  A.  That is my testimony.

23  Q.  And there is an expectation that a mechanism is in place,

24  we would hope that people would use it, is that what your

25  testimony is?

1          THE WITNESS:  My name Charles Robinson.

2          THE CLERK:  Keep your voice up and speak directly

3    into the microphone.  Thank you.

4                    DIRECT EXAMINATION

5    BY MR. ZAID:

6    Q.  Good afternoon, Mr. Robinson.  Would you please state for

7    the Court your background within the military, and if you

8    could just go through, please, state your background with

9    them?

10   A.  I was in the Maryland National guard for 35 years, 27 of

11   years was in the operation of support flight.  The last seven

12   years I served as operating superintendent, and also chief of

13   airfield management.

14          MS. DESHIELDS:  Chief of what?

15   A.  Chief of air field management.

16          MS. DESHIELDS:  Thank you.

17   A.  And then also the last two and a half years, I spent as

18   the EEO counselor.

19   Q.  And with respect to the EEO counselor, what were your

20   responsibilities in that position?

21   A.  My responsibilities was to understand the regulations,

22   and also to keep my commander advised by anything I thought

23   it was inappropriate or anything they need to know about the

24   EEO.

25   Q.  And what kind of training did you take, if any, with

83

 1  for Mr. McGinnis's testimony?

 2  A.  Yes, I was.

 3  Q.  Now, I don't want to just have you repeat much of

 4  anything of what Mr. McGinnis covered, but what was your

 5  understanding, if any, as to what regulations govern the EEO

 6  policies of the Maryland Air National Guard?

 7  A.  The policies as far as?

 8  Q.  With respect to the filing complaints and how complaints

 9  are dealt with?

10  A.  Mr. McGinnis covered all that.  Basically, the policy is

11  that, when there's a case, you're supposed to report it to

12  either the -- use the chain of command, you have the social

13  actions office, and you also have the EEO, counselor or EEO

14  manager.

15  Q.  In addition to the policy that Mr. McGinnis was referring

16  to, the NGR 600-22, which is exhibit 7, are there any other

17  policies that you're aware of that are applicable to the EEO

18  process with the Maryland Air National Guard?

19  A.  Yes.  There are two policies letters that we have.  One

20  was February 1995, and the other policy letter was 9 November

21  1987, and both were produced by General Frederick.

22  Q.  And what, if anything, do those policies say?

23  A.  They back up 600-22 and AGI 36-3, I believe it is.

24  Q.  Now, there was some discussion with respect to Section

25  2-5 of the National Guard regulation that pertained to, as

1   A.   Yes.

2   Q.   And did you ever work with either of them?

3   A.   I work with Colonel Elders, he was the OCF commander, but

4   in my position I was required to work for all three of the

5   commanders, and also have dealing with the flight surgeon,

6   because also overseeing the operation resource management

7   system, and that primary focus is to make sure the air crew

8   members were up to par to fly medically and also for training

9   purposes.

10  Q.   And, again, just to complete it, and having listened to

11  Mr. McGinnis's testimony, was there anything that he said

12  that you disagreed with?

13  A.   No.

14  Q.   And are you being compensated in any way for your

15  testimony today?

16  A.   No.

17          MR. ZAID:   I have no further questions, Your Honor.

18          THE COURT:   All right.   Fine.

19          MS. DESHIELDS:   Just a few, Your Honor.

20                     CROSS-EXAMINATION

21  BY MS. DESHIELDS:

22  Q.   Mr. Robinson, in this particular case, when Majors, then

23  Majors Wilhelm and Mentges, were told by Lieutenant Colonel

24  Diaz of your concerns respecting the conduct of Mr. Elders,

25  they then reported that conduct; did they not?

1            MS. DESHIELDS:  Okay.  Thank you, Your Honor.  No

2   further questions.

3            THE COURT:  All right.

4            MR. ZAID:  Nothing further.

5            THE COURT:  Okay.  Thank you.  You're excused.  You

6   can stay if you want, you can leave if you want.  It's up to

7   you.

8            MR. ZAID:  Todd Wilkinson, Your Honor.

9            THE COURT:  All right.

10           (Pause.)

11           THE CLERK:  Please come forward, sir, to be sworn.

12   Please raise your right hand.

13           (The Witness is sworn.)

14           THE CLERK:  Thank you.  Please be seated.  Would

15   you please state your name for the record.

16           THE WITNESS:  Lieutenant Colonel Todd Wilkinson.  W

17   I L K I N S O N.

18           THE CLERK:  Thank you.

19                    DIRECT EXAMINATION

20   BY MR. ZAID:

21   Q.  Good afternoon, Lieutenant Colonel.  My name is Mark

22   Zaid.  As you might know, I'm Karl Elders' attorney.

23           The period in question we're talking about, 2001,

24   2002, primarily, at that time you were a major, correct?

25   A.  Correct.

1  February, when she indicated that she was going confront

2  Lieutenant Elders and tell him how unprofessional she thought

3  he was, do you recall whether she articulated what she meant

4  by the unprofessionalism of Colonel Elders?

5  A.  No.  I don't recall the details at the time.

6  Q.  At the time you were having the conversation, though, you

7  believed that what she was referring to was the same

8  information she had been telling you back in December and

9  January, would that be correct?

10  A.  Yes.

11  Q.  And, in fact, you suggested to her that she should report

12  this conduct up through the chain of command, would that be

13  correct?

14  A.  Correct.

15  Q.  And that is because that is -- it was in your opinion the

16  proper way that such allegations should be raised, would that

17  be correct?

18  A.  Yes, twofold.  One, my position, Colonel Elders's boss at

19  the time was Colonel Thomas, who was my boss.  So if Colonel

20  Thomas is not reachable, quite a few people would talk to me.

21  I handled a lot of the administrative, a lot of personnel

22  type issues.  So, yes.  That would be the advice, if you're

23  being wronged, that you don't need to accept that, you report

24  it.  You'd do something with that.

25  Q.  Now, at the time this was going on, you were not in

1  lieutenant Colonel Elders' chain of command, correct?

2  A.  Correct.

3  Q.  You were lower ranking than him at that time, still are?

4  A.  Correct.

5  Q.  You were lower ranking, correct?

6  A.  Correct.

7  Q.  And, in fact, you were lower ranking than Lieutenant

8  Colonel Diaz at the time, correct?

9  A.  Correct.

10  Q.  And at the time that you made this statement to Colonel

11  Inglis, would I be correct to state that the events were

12  fresh in your memory?

13  A.  Yes, sir.

14  Q.  And do you have any reason with respect to why Dr. Diaz

15  would deny speaking to you at these times you state in your

16  statement that you had conversations with her?

17        MS. DESHIELDS:  Objection.

18        THE COURT:  Sustained.

19        MR. ZAID:  No further questions, Your Honor.

20        THE COURT:  All right.  Fine.

21              CROSS-EXAMINATION

22  BY MS. DESHIELDS:

23  Q.  Just a few, Your Honor.

24        With regard to the conversations that you

25  memorialize in your March 10, 2002 written statement that you

1  had a problem, he wouldn't complain to the janitor?

2  A.  Correct.

3  Q.  And would you agree with me in saying that the military

4  order and discipline is based on the officers in particular

5  following the rules that exist within the structure?

6  A.  Yes.

7              MR. ZAID:  I have no further questions, Your Honor.

8              THE COURT:  Anything else, Miss Deshields.

9              MS. DESHIELDS:  No, Your Honor.

10             THE COURT:  All right.  Thank you.  I assume you're

11 free to stay or free to leave, if you wish.  All right.

12             MR. ZAID:  Next witness, Your Honor, is Michael

13 Mentges.

14             MS. DESHIELDS:  Your Honor, if I could just

15 interrupt for a moment, could Lieutenant Colonel Wilkinson be

16 released?  He does have a flight.

17             THE COURT:  I said he's free to leave or free to

18 stay.

19             THE CLERK:  Please come forward, sir.  Please raise

20 your right hand.

21             (The Witness is sworn.)

22             THE CLERK:  Thank you.  Please be seated.  Would

23 you please state your name your name for the record.

24             THE WITNESS:  Last name is Mentges, M E N T G E S.

25             THE CLERK:  Thank.  Please keep your voice up and

 1  speak loudly and directly into the microphone.

 2            DIRECT EXAMINATION

 3  BY MR. ZAID:

 4  Q.  I want to pronounce your name correct.

 5  A.  Mentges.

 6  Q.  Mentges.  Okay.  Thank you.

 7            Now, I understand you're now Lieutenant Colonel,

 8  correct?

 9  A.  Yes, sir.

10  Q.  Okay.  At the time these events were going on from 2000,

11  2002, though, you were a major, correct?

12  A.  That's correct.

13  Q.  Now, Lieutenant Colonel Mentges, there came a time when

14  you participated in an investigation with -- conducted by

15  Colonel Inglis regarding allegations made by Maria Diaz to

16  Karl Elders, correct?

17  A.  Yes.

18  Q.  And you provided a sworn statement to Colonel Inglis

19  during that time; did you not?

20  A.  I provided a memorandum for the record.

21  Q.  And you provided more than one, correct?

22  A.  That's correct.

23  Q.  And that memorandum was truthfully stated by yourself as

24  you understood facts to be?

25  A.  Yes.

105

 1  Q.  Now, were you aware at the time Major Wilhelm had

 2  provided a memorandum of record?

 3  A.  I have no knowledge of that.

 4  Q.  And you provided the contents of this statement because

 5  you had in fact been talking to Lieutenant Colonel Diaz for

 6  the months prior regarding the allegations she ultimately

 7  made against Lieutenant Colonel Elders, correct?

 8  A.  As I stated in the memo, those are the conversations that

 9  and Colonel Diaz had with me.

10  Q.  And part of your conversations would have, or were, with

11  respect to unwelcomed sexual advances, as she says Colonel

12  Elders had made toward her, correct?

13  A.  Yes, as I've stated in this memo.

14  Q.  And those conversations were occurring as early as the

15  fall of 2001; correct?

16  A.  I would say that's a fairly accurate time frame.

17  Q.  And you were not in Lieutenant Colonel Diaz's chain of

18  command at that time, correct?

19  A.  No, I was not.

20  Q.  And you neither were in the chain of command for

21  Lieutenant Colonel Elders, correct?

22  A.  That's correct.

23  Q.  And did you consider yourself a friend of Lieutenant

24  Colonel Diaz?

25  A.  I would say within the guard community, yes.