IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KARL L. ELDERS,                          *
                                         *
            Plaintiff                    *
                                         *
     v.                                  *    CIVIL ACTION NO. MJG-02-3892
                                         *
MARIA C. DIAZ,                           *
                                         *
            Defendant                    *

          *    *    *    *    ***    *    *    *    *

_____POST-HEARING MEMORANDUM
IN SUPPORT OF DEFENDANT MARIA C.
DIAZ'S MOTION REGARDING A DETERMINATION ON THE
MATTER OF SCOPE OF EMPLOYMENT AND STRIKING EXHIBITS
AND OPPOSING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

In accord with Local Rule 105.1 and the Court's directive that the parties submit, in writing, their respective positions relative to the matter of whether the Defendant, Lieutenant Colonel Maria C. Diaz, (hereinafter "Diaz"), acted within the scope of her employment when making certain statements about the Plaintiff, Karl Elders (hereinafter "Elders"), to members of the military, the Defendant, by her attorneys, Rod J. Rosenstein, United States Attorney for the District of Maryland, and undersigned counsel, submits the following memorandum.

I. INTRODUCTION

To summarize the procedural history of the case, Elders, formerly a Lieutenant Colonel in the Maryland Air National Guard ("MDANG") filed a defamation suit in the Circuit Court for Baltimore County, Maryland, maintaining specifically that Diaz,

also a Lieutenant Colonel in the MDANG, libeled and slandered him, (Count One), and invaded his privacy, (Count Two), when Diaz reported to other military personnel that Elders had sexually harassed her in the course of her military duties. *See* Original Complaint in *Elders v. Diaz*, Civ. No. MJG-02-3892 at 1-4, ¶¶ 1-24. The case was subsequently removed to federal court and a motion seeking to substitute the United States as the party-defendant was filed simultaneously with the Notice of Removal. *See* Notice of Removal and Motion for Substitution in *Elders v. Diaz*, Civ. No. MJG-02-3892. The United States, possessed of the United States Attorney's certification that Lt. Col. Diaz was acting within the scope of employment when she made the allegations at issue, moved to substitute itself as the sole party-defendant pursuant to Section 2679(d)(1) of Title 28 of the United States Code and moved to dismiss the Original Complaint, asserting that the suit was barred by: (1) the intramilitary immunity doctrine; (2) sovereign immunity because the United States is not subject to suit for the torts alleged by Elders; and (3) Elders had failed to exhaust his administrative remedies. *See* Substitution Motion of the United States and Certification and Motion to Dismiss, Or Alternatively, for Summary Judgment in *Elders v. Diaz*, Civ. No. MJG-02-3892.

Elders contested the removal and opposed the substitution of the United States as the sole party-defendant. *See* Elders's Opposition To Removal in *Elders v. Diaz*, Civ. No. MJG-02-3892. By letter

2

Order dated February 12, 2003, this Court directed Elders to file an Amended Complaint setting forth specifically the facts supportive of his argument that his claim was not one incident to military service and also that Diaz's allegations were not made within the scope of her employment as a National Guard officer. *See* 2/12/03 Letter of the Court in *Elders v. Diaz*, Civ. No. MJG-02-3892. Though afforded anew the opportunity to meet the pleading requirements of Rule 8(a)(2) of the Federal Rules of Civil Procedure, and heedless of the Court's directive, Elders failed to assert with particularity any facts supporting his defamation claim, content instead to rely upon vague and general allegations.

In his Amended Complaint, filed on March 3, 2003, Elders, alleged a single count of defamation. Amd. Compl. at ¶¶ 19-26. Without supplying specific dates, Elders alleged that Diaz made statements accusing him of sexual harassment to fellow MDANG officers, including Lt. Col. James M. Mentges and Lt. Col. Raul Q. Willem. Amd. Compl. at 2, ¶ 8. Elders attempted to remove the statements from the context of military service by alleging that they were not made within the course of *formal* sexual harassment complaints or investigations. Secondly, Elders alleged "upon information and belief" that Diaz made defamatory statements concerning him to her medical colleagues at Franklin Square Hospital "possibly including" some fifty named doctors. *Id*. at 3, ¶ 9. Elders did not identify when the allegedly defamatory

3

statements were made nor what was purportedly said.  Moreover, he supplied the Court, in paragraph 9 of the Amended Complaint, with a roster of names of Franklin Square Hospital employees that was nothing more than a list of every doctor in the General Surgery department of the hospital, an alphabetized list that could be obtained easily from the Franklin Square Internet website or telephone directory.  Finally, Elders alleged in his Amended Complaint that Diaz made unspecified defamatory statements on unspecified dates to her husband and an unnamed nanny.  Amd. Compl. at 4, ¶ 10.

On March 15, 2005, the Court scheduled an evidentiary hearing to resolve the factual dispute of whether Diaz was acting within the scope of her employment when the alleged tortious acts were committed.  *See* 3/15/05 Order in *Elders v. Diaz*, Civ. No. MJG-02-3892.  The evidentiary hearing was conducted on May 4, 2005.  *See* G.E.1, 5/4/05 Transcript of Evidentiary Hearing in *Elders v. Diaz*, Civ. No. MJG-02-3892.[1]  The Court thereafter directed the parties to file post-hearing briefs addressing the issue of whether the alleged torts occurred within the scope of Diaz's employment.

Elders, on July 13, 2005, instead filed a motion for summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure

---

[1]  All references to government exhibits will be denoted herein as "G.E." followed by the exhibit number and the corresponding page number as determined by the numbering system reflected therein or, if no page numbering system is used, then by the chronological order of the pages.

4

and attached to his motion exhibits that were not admitted during the evidentiary hearing conducted on May 4, 2005. *See* Elders's 7/13/05 Motion For Summary Judgment Regarding The Government's Certification On Scope Of Employment *Elders v. Diaz*, Civ. No. MJG-02-3892. Elders is procedurally in error in seeking summary judgment and attempting to have the Court consider evidence that was not admitted at the May 4, 2005 evidentiary hearing.

Summary judgment is only appropriate when there is no genuine dispute of material fact and the movant is thus entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The posture of the instant case is such where the Court must engage in a fact-bound inquiry. The Court must act as the fact finder to resolve the factual issue regarding scope of employment. At this stage of the process it is for the Court to determine the sufficiency of the evidence and resolve the contested scope-of-employment issue. *Borneman v. United States*, 213 F.3d 819, 827 (4th Cir. 2000). Moreover, the Court should not consider Exhibits 1, 7 and 8 attached to Elders's July 13, 2005 summary judgment motion. The exhibits were not admitted at the May 4, 2005 evidentiary hearing. Exhibits 7 and 8 are not authenticated. Accordingly, Exhibits 1, 7, and 8 should be struck.

Based upon the evidence adduced at the May 4, 2005 evidentiary hearing, the Court should determine that the United States's scope-

of-employment certification should stand.  Consequently, pursuant
to the Westfall Act, 28 U.S.C. § 2679(d)(2) (2005), the United
States must be substituted as the party-defendant in place of Diaz
and this suit should thus proceed as one under the Federal Tort
Claims Act ("FTCA").  28 U.S.C. §§ 1346(b), 2671-80 (2005).  *See
also* 28 U.S.C. § 2679(d)(4).  If the suit is treated as one filed
under the FTCA, the Court lacks subject matter jurisdiction to
entertain Elders's claim of defamation (libel and slander and
invasion of privacy) because these types of intentional torts are
not cognizable under the FTCA.  28 U.S.C. § 2680(h).  Even if the
contrary were true, Elders has not exhausted his administrative
remedy by first presenting his claim to the appropriate federal
agency for resolution and thus the Court has no jurisdiction to
adjudicate Elders's Complaint.  Additionally, given that Elders's
defamation claim arises out of or is incident to military service,
maintenance of the instant suit is barred by the doctrine of
intramilitary immunity.

## II.  <u>STATEMENT OF FACTS</u>

During the May 4, 2005 evidentiary hearing, Diaz, a general
surgeon, testified that she has been a member of the MDANG for
fourteen years.  G.E.1 at 14.  As a traditional member of MDANG
assigned to Warfield Air Base, Diaz is obligated to participate in
one drill weekend per month for a minimum of two weeks a year.  *Id*.
Diaz's MDANG responsibilities are numerous.  *Id*.  She stated that

she is the physician for the squadron and works in the clinic, helps with deployments and medical physicals. *Id*. at 15-16.

In 2002, the MDANG investigated allegations made by Diaz that Elders sexually harassed her. *Id*. at 16. One investigation of the allegations was conducted by Colonel John Inglis; a second investigation was conducted by Colonel Arthur Werts. *Id*. at 18-19. Colonel Inglis's investigation commenced after Diaz reported her allegations of sexual harassment to then Majors Michael Mentges and Raul Willem. *Id*. at 22-27.

Diaz testified that although both Mentges and Willem were officers lower in rank than both she and Elders and neither Mengtes nor Willem were in her chain of command, *id*. at 29-30, 105, and had no authority to do anything about the allegations, she spoke to them because she wanted guidance and was not, at that time, filing either an informal or formal complaint of sexual harassment. *Id*. at 31-32, 36. Diaz explained further that Elders was in her chain of command and she would otherwise have had to report her allegations of sexual harassment to him. *Id*. at 30. Diaz stated that she was administering vaccines and spoke to Willem in the security office. *Id*. at 31. Mentges testified that when Diaz spoke with him about Elders's conduct, the conversations occurred in the workplace, in his office, while both were on duty. *Id*. at 110. Though Diaz did not recollect discussing with then Major Todd Wilkinson the allegations of sexual harassment, *id*. at 37,

Wilkinson, who was in late 2001 and early 2002 lower in rank than Diaz, recollected that between December 2001 and February 2002, Diaz told him about Elders's conduct. *Id.* at 94-97. Wilkinson stated that the conversations with Diaz occurred at the base while he was on duty. *Id.* at 98.

Diaz, albeit aware that there existed an Equal Employment Opportunity ("EEO") process was unfamiliar with the EEO procedures. *Id.* at 42-43. Although both Mentges and Willem advised Diaz to report officially her allegations, she was afraid. *Id.* at 31. Mentges testified that Diaz told him that she was not comfortable reporting the allegations at that time. *Id.* at 106. Wilkinson maintained that he too encouraged Diaz to report her concerns through the chain of command. *Id.* at 99. He stated that military order and discipline is based on officers following the rules existing within the structure. *Id.* at 102. He testified further that although there was a process in place for voicing harassment allegations, an individual was not obligated to adhere to that process. *Id.* at 99-100.

David McGinnis, a former member of the Army National Guard in New York who was accepted as an expert respecting the development and promulgation of National Guard policies, stated that National Guard Bureau regulation ("NGR"), NGR-600-22, and Air National Guard Instruction ("ANGI") 36-3, established a mechanism pursuant to which informal and formal complaints of discrimination may be made.

*Id.* at 59.  McGinnis went on to say that the informal complaint process is for "junior personnel" but commissioned officers and officers in command positions must lodge a formal complaint to the next person in the chain of command.  *Id.* at 59-60.  McGinnis added that Diaz's reports to then Majors Mentges and Willem did not constitute either informal or formal complaints, *id.* at 61-62, and were counter to the "good order and discipline" of the MDANG and were not authorized functions of the MDANG.  *Id.* at 63, 66. Charles Robinson, an EEO counselor for two and a half years and a MDANG member accepted as an expert in MDANG EEO policies, *id.* at 81-82, echoed McGinnis's sentiments.  *Id.* at 83-87.

McGinnis admitted that the MDANG promotes a workplace that is free of discriminatory behavior, including sexual harassment and that eradicating such discriminatory conduct is "essential to the good order and discipline" of the military.  *Id.* at 70, 75. McGinnis also conceded that although it is important that command policy be followed so that the discrimination complaint can be adjudicated in a timely and effective manner, *id.* at 73-74, the actual use of the discrimination complaint procedure is something that is merely desired.  *Id.* at 74.  Robinson also agreed that the policy statement in the preamble to the NGR-600-22 regulation makes clear that NGR-600-22 merely establishes a complaint mechanism for discrimination complaints and that individuals are simply encouraged to use the process.  *Id.* at 89-90.

McGinnis testified further that NGR-600-22 permits third parties to bring complaints of discrimination on behalf of third parties and he agreed that "third parties" is defined to encompass "any other individual." *Id.* at 75, 79-80. Robinson confirmed that while he believed Diaz used the incorrect "format" for voicing her complaints of sexual harassment, once those concerns were voiced an investigation conducted in accordance with NGB-600-22 ensued. Additional facts will be added, where necessary, in the Argument that follows.

### III.   **ARGUMENT**

### A. **The Scope-Of-Employment Certification And Its Effect**

In the instant case, the United States Attorney for the District of Maryland certified under Section 2679 of Title 28 of the United States Code that Diaz was acting within the scope of her federal employment when she made the allegations of sexual harassment to fellow MDANG, which allegations Elders claims constitute defamation. *See* Notice of Removal and Motion for Substitution in *Elders v. Diaz*, Civ. No. MJG-02-3892. In *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 434 (1995), the Supreme Court held that the scope-of-employment certification made under § 2679(d)(2) serves two functions. It conclusively establishes removal jurisdiction in the federal court, a consequence that is not judicially reviewable. *Id.* at 432. The certification also serves as the basis for the United States to be substituted as the

10

defendant, a consequence that is subject to judicial review.  *Id.* at 434; *Borneman v. United States*, 213 F.3d 819, 825 (4th Cir. 2000).

Elders asserts that the Court should reject the United States Attorney's scope-of-employment certification in the instant case because the certification contains a dearth of details and does not explain the bases for its conclusion.  Elders Memorandum In Support of Summary Judgment at 12.  In *Maron v. United States*, 126 F.3d 317, 323 (4th Cir. 1997), the Fourth Circuit Court of Appeals held that the burden of persuasion rests with the plaintiff to refute the certification and prove by a preponderance of the evidence that the defendant was not acting within the scope of employment when the alleged tort was committed.  Although the certification is not conclusive on the matter of scope of employment absent the provision of details and an explanation respecting the bases for its conclusion, it does satisfy the government's *prima facie* burden.  *Id.*

It is only if the plaintiff presents persuasive evidence refuting the certification that the burden then shifts to the United States to provide evidence and analysis to support its conclusion that the torts alleged occurred within the scope of employment.  *Id.*  To carry his burden, Elders must submit specific evidence that contravenes the certification decision.  *Gutierrez*, 111 F.3d at 1155.  Conclusory allegations and speculation will not

carry the day. *Id.* At all stages of the competing factual contest relative to the scope-of-employment issue, the district court must weigh the sufficiency of the evidence and resolve the factual issue. *Borneman*, 213 F.3d at 827. This is the posture of the instant case. In the instant case, and as explained more fully below, Elders has failed to adduce sufficient evidence to counter the certification and so it should stand.

**B. Diaz Was A Federal Employee When The Alleged Torts Occurred**

Although Elders maintains that the United States has no standing to seek substitution because Diaz was not a "federal" employee when she voiced her allegations about Elders, Elders Memorandum In Support of Summary Judgment at 13-17, the contention need not detain the Court long. Elders asserts that a MDANG member is generally a state employee who only becomes a federal employee while engaged in training or duty under sections 316, 502, 503, 504 and 505 of Title 32 of the United States Code. *Id.* at 13. Characterizing Diaz as a "weekend warrior," Elders argues that Diaz's military orders, which orders he attached as Exhibit 7 to his summary judgment motion, do not establish any federal service between November 2001 and February 2002, the time-period when Diaz made her allegations to certain fellow Guardsmen. *Id.* at 16.

It was Elders's burden to adduce competent, admissible evidence at the May 4, 2005 hearing but he did not do so. Elders cannot now adjure the Court to fill that gap and consider

unauthenticated documents that were not admitted into evidence during the scope-of-employment evidentiary hearing. Elders's Exhibits 7 and 8 were not made a part of the record developed during the evidentiary hearing and thus cannot properly and fairly be considered by the Court now and the exhibits should be stricken.

Members of the National Guard are federal employees when engaged in training or duty under Title 32 or Title 10 of the United States Code. 28 U.S.C. § 2671; *Singleton v. United States*, 277 F.3d 864 (6th Cir 2002)(affirming Westfall Act certification of Air National Guard officer sued for defamation in state court by fellow National Guard officer). When MDANG members are on duty they are in federal status. *Id.* Elders has not adduced admissible evidence to the contrary.

During the May 4, 2005 evidentiary hearing, ample evidence was elicited attesting to Diaz's federal employee status during the relevant time-period. Mentges testified that when Diaz spoke with him about Elders's conduct, the conversations occurred in the workplace, in his office, while both were on duty. *Id.* at 110. Though Diaz did not recall discussing with then Major Todd Wilkinson the allegations of sexual harassment, *id.* at 37, Wilkinson recollected that between December 2001 and February 2002 when Diaz told him about Elders's conduct, the conversations with Diaz occurred at the base while on duty. *Id.* at 94-98. Elders adduced no evidence during the hearing that Diaz was not on duty

and in federal status when she reported Elders's conduct to Major Willem or when she spoke with Wilkinson or Mentges.  The United States Attorney's certification decision must stand.

### C. **Diaz Was Acting Within The Scope Of Her Employment**

Elders has also failed to satisfy his burden relative to adducing persuasive evidence that Diaz was acting outside the scope of her employment when she confided her allegations about Elders's conduct to fellow Guardsmen who were subordinates to Elders and were not within either her or Elders's chain of military command. Elders Memorandum In Support of Summary Judgment at 27.  Elders contends that the NGR-600-22/ANGI 36-3 regulations establish a discrimination complaint system as an avenue of redress for sexual harassment allegations made by way of informal and formal complaints and provides that the chain of command will be the primary channel for resolving discrimination complaints.  *Id*. at 24.  He further asserts that because Diaz did not make either an informal or formal complaint within the chain of command, she acted outside the scope of her employment.  *Id*.  Invoking *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), Elders goes on to say that if a Title VII complainant cannot establish liability on the part of the employer where the employee failed to use or take advantage of the employer's discrimination complaint procedure, so too should an individual be considered as acting outside the scope of her

employment when failing to avail herself of the employer's existing protective mechanism.  Elders Memorandum In Support of Summary Judgment at 26.  The argument is nonsensical.

The holdings of *Ellerth* and *Faragher* speak to the issue of whether there is some basis for imputing liability upon the employer for the charged conduct to which the plaintiff claims he or she was subjected.  *Ellerth* and *Faragher* are premised upon the principal that it is fundamentally unfair to hold the employer liable for acts of the employee about which the employer had no notice.  The issue of scope-of-employment relates to whether an employee's act was a means or method of doing that which the employee was employed to do.  Whether Diaz utilized the complaint procedure established for lodging allegations of sexual harassment has nothing to do with whether she acted within the scope of her employment in voicing her allegations to fellow Guardsmen.

This is so because scope of employment is not defined specifically by the NGR-60-22/ANGI 36-3 regulations.  Scope of employment is defined by Maryland law, which case law this Court must apply.  *Maron*, 126 F.3d at 323-24.  Under Maryland law, the general test for determining whether an employee's alleged tortious acts were within the scope of his or her employment is whether the acts were in furtherance of the employer's business and were authorized by the employer.  *Sawyer v. Humphries*, 322 Md. 247, 255, 587 A.2d 467, 470 (1991).  Quoting *Hopkins C. Co. v. Read Drug & C.*

*Co.*, 124 Md. 210, 92 A.2d 478 (1914), the *Sawyer* court explained that the term "authorized" does not refer to authority expressly conferred but rather to whether the act was incident to the performance of the duties entrusted to the employee by the employer, even if opposition to the employer's express and positive orders.  322 Md. at 255, 587 A.2d at 470-71.

The *Sawyer* court further observed that in making the scope of employment determination, various considerations are pertinent. Elaborating, the court explained that:

> [t]o be within the scope of employment the conduct must be of the kind the servant is employed to perform and must occur during a period not unreasonably disconnected from the authorized period of employment in a locality not unreasonably distant from the authorized area, and actuated at least in part by a purpose to serve the master.

*Id.* Additionally, a factor to consider is whether the employee's conduct was "expectable" or "foreseeable."  *Id.*  The *Sawyer* court also quoted approvingly from the *Restatement of Agency*, saying that in determining whether the conduct, although not authorized, is so similar to or incidental to the conduct authorized to be within the scope of employment, one can consider: (a) whether or not the act is one commonly done by such servants; (b) the time, place and purpose of the act; (c) previous relations between the master and the servant; (d) the extent to which the master's business is apportioned between different servants; (e) whether the act is outside the enterprise of the master or, if within the enterprise,

has not been entrusted to any servant; (f) whether the master has any reason to expect that such an act will be done; (g) the similarity in quality of the act done to the act authorized; (h) whether the instrumentality by which the harm is done has been furnished by the master; (i) the extent of departure from the normal method of accomplishing an authorized result; and (j) whether the act committed is criminal. 322 Md. at 256, 587 A.2d at 471 (quoting *Restatement of Agency* § 229 (1933)).

The *Sawyer* court noted that in applying the test for scope of employment, there are few if any absolutes. *Id.* It is important, in deciding whether the act is within the scope of employment, to view the allegedly tortious act in context, and not in a vacuum. *Maron*, 126 F.3d at 325. In light of the above, it is clear that when Diaz expressed her allegations of sexual harassment to certain of her fellow Guardsmen she was acting within the scope of her employment.

Both McGinnis and Mentges testified that the MDANG does not tolerate sexual harassment and seeks to eradicate the discriminatory treatment of all of it members and employees. G.E.1 at 70-71, 110. McGinnis also testified that the promotion of the non-discriminatory treatment of MDANG members is essential to the good order and discipline of the military. *Id.* at 75. That the airing of complaints of sexual harassment within the MDANG is "expectable" or "foreseeable" and indeed "authorized" is evident

17

from the fact of the existence of the discrimination complaint system adumbrated in NGR 600-22/ANGI 36-3.  The complaint system outlined in NGR-600-22/ANGI 36-3 serves to establish that the non-discriminatory treatment of MDANG members and employees is incident to the duties entrusted to MDANG members and employees.  Indeed, the policy section of NGR-600-22/ANGI 36-3 declares that the "fair, equitable, and non-discriminatory treatment of all members and employees of the [National Guard] improves morale and productivity, fosters cohesion and readiness, and increases combat effectiveness of the Guard."  Subsection (b) of Section 1-7 of NGR-600-22/ANGI 36-3 goes on to state that

> [a]ll [National Guard] personnel are entitled to serve in an environment free from sexual harassment.  Sexual harassment is a form of gender discrimination and will not be tolerated.  Allegations of sexual harassment will be given prompt attention and resolved as expeditiously as possible.

Moreover, McGinnis testified that Section 2-5 of NGR-600-22/ANGI 36-3 specifically permits third parties, including "any individual," to lodge complaints of discrimation on behalf of another individual.[2]  G.E.1 at 75, 80.  When Diaz spoke to then

---

[2]  Section 2-5 of NGR-6-00-22/ANGI 36-3 provides that when the National Guard Bureau "receives allegations of discrimination from a complainant or a third party on behalf of a complainant and such allegations do not constitute a formal complaint filed under the provisions of Paragraph 2-2, such allegations will be processed as specified in this paragraph.  Third parties referred to above may include inspectors general or other members of the Defense Department who refer allegations of discrimination to NGB; members of State or local governments; members of Congress or the executive branch; organizations writing on behalf of the complainant; or *any*

Majors Mentges and Willem about Elders's conduct, she was furthering the National Guard's policy prohibiting sexual harassment. Whether she followed the reporting procedure outlined in NGR-600-22/ANGI 36-3 to the letter is of no moment. This is so because allegedly tortious conduct may be within the scope of employment where such conduct is incidental to the employer's business or interest even though in opposition to the employer's express orders. *Sawyer*, 322 Md. at 255, 587 A.2d at 471.

Diaz, by reporting her allegations to fellow Guardsmen, whatever their rank, engaged in conduct so similar to or incidental to the conduct authorized by NGR-600-22/ANGI 36-3 and her employer that she was acting within the scope of her employment. The conversations with Mentges and Wilkinson occurred while all were on duty and on base and so were not unreasonably disconnected from the authorized period of employment in a locality not unreasonably distant from the authorized area. G.E.1 at 94-98, 110. Elders adduced no evidence during the hearing that Diaz was not on duty and in federal status when she reported Elders's conduct to Major Willem or when she spoke with Wilkinson or Mentges.

Although Elders vociferates that Diaz was not acting within the scope of her employment when she confided her allegations about Elders to Mentges because she and Mentges are friends and Diaz was

---

*other individual* writing on behalf of the complainant." NGR-600-22/ANGI 36-3, § 2-5 (emphasis added).

19

thus acting pursuant to "personal" reasons, Elders Memorandum In Support of Summary Judgment at 27, it is clear that even if personal motivation played a part, however slight, in the conduct alleged to be tortious, such is insufficient to find that Diaz was not acting within the scope of her employment.  *Maron*, 126 F.3d at 325.  Furthermore, with respect to the issue of the employee's motivation, *Sawyer* has concluded that conduct actuated at least in part by a purpose to serve the employer can be within the scope of employment.  322 Md. at 255, 587 A.2d at 471.

Though Elders points to two letters that Diaz wrote to Senator Barbara Mikulski and then Governor-elect Robert Erhlich on December 2, 2002 and December 18, 2002, respectively, as proof that Diaz acted outside the scope of her employment, Elders Memorandum In Support of Summary Judgment at 28, those communications were privileged and therefore are not defamatory.[3]  A member of the Armed Forces may petition or present any grievance to any member of Congress.[4]  10 U.S.C. § 1034 (2005).  More importantly, in the letter to Senator Mikulski, Diaz does nothing more than state that

---

[3]  Section 2-5 of NGR 600-22/ANGI 36-3 expressly permits third parties like members of State or local governments and members of Congress to raise allegations of discrimination on behalf of a complainant.  The regulation thus authorizes the communications giving rise to the allegations.

[4]  The letter written by Diaz on December 18, 2002 was addressed to Governor-Elect Robert Erhlich.  One does not become governor until officially given the oath of that office.  Md. Code Ann., State Govt., § 16-101(a) (2005).

she was told that MDANG may not defend her in the lawsuit instituted by Karl Elders. There is nothing defamatory about the reference to Elders in that communication. Under Maryland law, defamation is a reputational tort. *Chinwuba v. Larsen*, 142 Md. App. 327, 359, 790 A.2d 83, 101 (2002). The essential element of the tort is injury to reputation through the communication of false information. *Id.* Diaz's written communication to Senator Mikulski was truthful. Elders had indeed instituted a lawsuit.

In the letter to then Governor-Elect Erhlich, Diaz wrote that she had "pressed sexual harassment charges" against Elders and that he was temporarily removed from his command and an investigation ensued and Elders was subsequently promoted to a new position. *See* Elders's Exhibit 5. There was nothing false about the above information. To be sure, Elders asserts that whether the communications were actually defamatory and privileged is not relevant because the issue before the Court is scope of employment. Elders Memorandum In Support of Summary Judgment at 28, n.29. The truthful and privileged nature of the communications *is* relevant because Elders is claiming that the communications constituted a tort, which inquiry also implicates the scope-of-employment issue.

The evidence adduced at the May 4, 2005 hearing establishes that Diaz was acting within the scope of her federal employment when she made her allegations about Elders to certain of her fellow Guardsmen. Given the evidence, the scope-of-employment

21

certification must be accepted and the United States should be substituted as the sole party-defendant in the case.

**D. <u>The Amended Complaint Is Non-Cognizable Under The FTCA</u>**

If the Court finds that Diaz was acting within the scope of her employment when she spoke with fellow Guardsmen and voiced her allegations of sexual harassment, then the United States must be substituted as the defendant in the case and the case must be dismissed, a point Elders concedes. *See* Elders Memorandum In Support of Summary Judgment at 9, n.5. Under the doctrine of sovereign immunity, the United States may not be sued without its consent. *United States v. Sherwood*, 312 U.S. 584, 586 (1941). Courts strictly construe limited waivers of sovereign immunity in favor of the sovereign. *Doe v. Chao*, 306 F.3d 170, 179 (4th Cir. 2002). Absent such a waiver, the court lacks subject matter jurisdiction over claims against the government. *United States v. Mitchell*, 463 U.S. 206, 212 (1983).

Though the FTCA constitutes a limited waiver of sovereign immunity, the FTCA exempts intentional torts of the sort at issue here from its immunity waiver. Subsection(h) of Section 2680 of the FTCA expressly provides that:

> The provisions of this chapter and section 1346(b) of this title shall not apply to—
>
> (h) Any claim arising out of assault, battery, false imprisonment . . . *libel, slander* . . . .

28 U.S.C. § 2680(h) (2005)(emphasis added). Count I of Elders's

Amended Complaint alleges defamation (libel and slander). *See* Amd. Compl. at ¶¶ 19-26. Under Maryland law, the gravamen of this tort is injury to reputation through the communication of false information.

A defamation action under Maryland law requires proof that: (1) the defendant made a defamatory statement to a third person; (2) the statement was false; (3) the defendant was legally at fault for making the statement; and (4) the plaintiff suffered harm. *Chinwuba v. Larsen*, 142 Md. App. 327, 358 n.8, 790 A.2d 83, 101 (2002), *aff'd in part, rev'd in part*, 377 Md. 92, 832 A.2d 193 (2003). A "defamatory" statement is one which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with that person. *Gohari v. Darvish*, 363 Md. 42, 54, 767 A.2d 321, 327 (2000). However pled, when a claim involves the type of damage described above, it is not cognizable under Section 2680(h)'s exception for claims having their genesis in libel or slander. *Talbert v. United States*, 932 F.2d 1064, 1066-67 (4th Cir. 1991). In short, the suit is jurisdictionally barred and this Court must dismiss the Amended Complaint.

### E. Elders Has Not Exhausted His Administrative Remedy Thus Divesting The Court Of Subject Matter Jurisdiction

Even if the Amended Complaint is cognizable under the FTCA, this Court still has no authority to adjudicate the matter. Unless an administrative claim is first presented to the appropriate

federal agency and subsequently denied, no civil action may be instituted in federal court.  This is the command of the FTCA, which, in pertinent part, provides in language that brooks no misunderstanding:

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, *unless the claimant shall have first presented the claim to the appropriate federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.*

28 U.S.C. § 2675(a) (2005)(emphasis added).

Section 2401(b) of Title 28 of the United States Code reinforces when a tort claim against the Government may be filed in court, enjoining that

> [a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

By their terms, these statutory provisions evince Congress' intent that satisfaction of the available administrative remedy conferred by the FTCA is a condition precedent to invocation of the judicial process.  The failure to follow the requirements of the FTCA leaves a plaintiff without a forum in which suit may be entertained.  This is so because the statutory command of Section 2675(a) is jurisdictional.  The Supreme Court so held in *McNeil v. United*

24

*States*, 508 U.S. 106 (1993).

There, four months after filing an FTCA action in federal court seeking damages derived from allegedly injurious human experimentation, McNeil submitted a similarly-based claim to the Department of Health and Human Services. *Id*. at 107. One month after its submission, the claim was denied by the federal agency. *Id*. at 108. Upon being served with McNeil's complaint, the United States moved successfully to dismiss the action, the district court concluding that the suit was filed prematurely, a ruling affirmed by the Seventh Circuit Court of Appeals. *Id*. at 109.

In taking up the question of whether McNeil could properly file suit in federal court without first having completed the procedural steps adumbrated in § 2675(a), the Supreme Court held that McNeil had filed his complaint too early. Informed by that portion of the text of § 2675(a) proscribing the filing of a suit in the absence of presentment and denial of a claim at the administrative level, and noting that it could not rewrite the language of the statute, the High Court observed that "Congress intended to require complete exhaustion of Executive remedies before invocation of the judicial process." 508 U.S. at 112. The Court went on to hold that dismissal of McNeil's complaint was proper and fully in accord with § 2675(a)'s exhaustion requirement. *Id*.

No different result should obtain here. Elders has adduced no

evidence that he presented an administrative claim to the appropriate federal agency with respect to his tort-related claims. As discussed earlier in subsection D of the Argument section of this Memorandum, the principle that the United States, as sovereign, has the right to define the conditions under which it will be sued is entrenched. Courts are not free to extend or narrow the waiver of sovereign immunity beyond what Congress intended. *Houston v. U.S. Postal Service*, 823 F.2d 896, 898 (4th Cir. 1987), *cert. denied*, 485 U.S. 1006 (1988). The language of § 2675(a) manifests Congress's intent that FTCA cases begin with the express or implicit denial of an administrative claim before subject matter jurisdiction over the claim vests in federal court. Allowing maintenance of Elders's premature suit would contravene the plain language of § 2675(a) and disserve the goals underlying the FTCA exhaustion requirement—the efficient settlement of claims and reduced congestion of court dockets.

### F. Intramilitary Immunity Bars Elders's Claim

Elders has known since at least December 16, 2002, when Diaz filed her initial motion to dismiss, that evidence of defamatory statements to people outside of the National Guard would be necessary in order to overcome the defenses of intramilitary immunity and Westfall Act immunity. The facts clearly establish that Elders's claim is barred by application of the doctrine of intramilitary immunity because it arises from military service.

*Feres v. United States*, 340 U.S. 135, 146 (1950); *United States v. Stanley*, 483 U.S. 669, 679-84 (1987). In *Stanley*, the Supreme Court applied the "arising from or incident to military service" test first articulated in *Feres* to bar suits against military personnel in their individual capacities. *Stanley*, 483 U.S. at 682-83. Therefore, it makes no difference, for purposes of intramilitary immunity, whether the United States or Lt. Col. Diaz is the party-defendant. **The identical standard controls.** *Id.* Accordingly, even if the United States is not substituted as the defendant in this case, the Court may dismiss it under the intramilitary immunity doctrine.

At least two circuits have squarely held that sexual harassment claims by members of the Armed Forces are barred by the intramilitary immunity doctrine. *Mackey v. United States*, 226 F.3d 773 (6th Cir. 2000); *Smith v. United States*, 196 F.3d 774 (7th Cir. 1999). It would be absurd to suggest that the victim of sexual harassment is barred from suit while the alleged military harasser is free to hail his victim into court in a defamation action. If the alleged sexual harassment took place in the context of military service, all lawsuits arising from the matter are necessarily barred by intramilitary immunity.

The Court of Appeals teaches that the arising-from-or-incident-to-military-service test for intramilitary immunity "'encompass[es], at a minimum, *all* injuries suffered by military

27

personnel that are even remotely related to the individual's **status** as a member of the military.'" *Stewart v. United States*, 90 F.3d 102, 105 (4th Cir. 1996), *quoting Major v. United States*, 835 F.2d 641, 644 (6th Cir. 1987)(emphasis in original). The Court of Appeals instructs that when a Court evaluates an assertion of intramilitary immunity, "the proper question is whether the plaintiff's claims 'are the **type** of claims that, if generally permitted, would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness.'" *Stewart*, 90 F.3d at 106 (*quoting United States v. Shearer*, 473 U.S. 52, 59 (1985)(emphasis in original)). *See also Minns*, 155 F.3d at 450. If a lawsuit has the potential to require members of the Armed Forces "'to testify in court as to each other's decisions and actions,'" it is barred by intramilitary immunity. *Stewart,* 90 F.3d at 106 (*quoting Stencel*, 431 U.S. at 673). *See also Ricks v. Nickels*, 295 F.3d 1124, 1129 (10th Cir. 2002). The Supreme Court has continually stressed that "the prospect of compelled depositions and trial testimony by military officers concerning the details of their military commands . . . would disrupt the military regime," and cannot be permitted. *Stanley*, 483 U.S. at 682-83. *See generally, Orloff v. Willoughby*, 345 U.S. 83, 94 (1953)(holding that "[o]rderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters").

28

Whether involving regular or reserve components of the military, lawsuits arising incident to military service are uniformly barred. *See, e.g.,* *Jones v. New York State Division of Military and Naval Affairs*, 166 F.3d 45, 51 (2nd Cir. 1999)(collecting cases). *See also Bowen v. Oistead*, 125 F.3d 800, 804-05 (9th Cir. 1997), *cert. denied*, 524 U.S. 938 (1998); *Uhl v. Swanstrom*, 79 F.3d 751, 755-56 (8th Cir. 1996); *Wright v. Park*, 5 F.3d 586, 591 (1st Cir. 1993)(all cases applying intramilitary immunity to bar suits incident to service of any component of military). In a well-reasoned recent opinion applying the doctrine to the National Guard, the Court of Appeals for the Second Circuit stressed that "intramilitary immunity is designed to protect a defendant from the obligation to participate in the litigation, and not merely from an adverse result." *Dibble v. Fenimore*, 339 F.3d 120, 124 (2003).

At every phase of the pretrial litigation of this case, Elders has proven that his claim against Diaz arises incident to his military service. During the May 4, 2005 Westfall Act "scope" hearing, Elders's called as witnesses members of the MDANG and former members of the military to testify in court as to each other's decisions and actions, thus requiring a judicial assessment of military regulations and policies. G.E.1. Litigation of the *type* of claim asserted by Elders necessarily involved the judicial branch in sensitive military affairs at the expense of military

discipline and effectiveness.  *See Stewart*, 90 F.3d at 106, *quoting Shearer*, 473 U.S. at 59.  Accordingly, it is barred by intramilitary immunity.  Like judicial immunity, Speech and Debate Clause immunity, and qualified immunity, intramilitary immunity is an immunity from the disruptive burdens of litigation, including discovery, not simply a defense to liability.  *See, e.g., Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)(holding that qualified immunity is meant to give government officials a right to avoid the burden of such pretrial matters as discovery).

Elders has utterly failed to produce any admissible evidence that Diaz made unprivileged statements to persons outside of the military.  Indeed, the May 4, 2005 testimony of Diaz and others established that the harassment-related allegations at issue were made exclusively to military personnel.  It must be remembered that under Maryland law, a "defamatory statement is one that tends to expose a person to ***public scorn***, hatred, contempt or ridicule, thereby discouraging ***others in the community*** from having a good opinion of, or from associating or dealing with, that person."  *Batson v. Shiflett*, 325 Md. 684, 72-23 (1992)(emphasis added).  Defamation arises from false *public* statements that seriously affect one's reputation in the community at large.  *Id.*

Here, all statements made by Lt. Col. Diaz to fellow National Guard members reporting Lt. Col. Elder's sexual harassment are absolutely privileged.  The Court of Appeals, in *Mangold v.*

*Analytic Services Incorporated*, 77 F.3d 1442, 1447 (4th Cir. 1996), a case strikingly similar to the one at bar, held that all statements made during official military investigations are absolutely privileged.  In *Mangold*, an Air Force Lt. Col. reported his superior officer, Col. Mangold, to Air Force authorities for improperly pressuring a contractor to hire a family friend.  *Id.* at 1445.  Prior to formally reporting Col. Mangold's misconduct, the Lt. Col. discussed the Col.'s misconduct with fellow Air Force officers.  *Id.*

As a result of the Lt. Col.'s complaint, the Air Force conducted an internal investigation and Col. Mangold was removed from his position.  *Id.*  Colonel Mangold then filed suit in Virginia state court against the Lt. Col., the contractor, and its executives alleging that they had defamed him by fabricating the charges of misconduct.  *Id.*  Pursuant to the Westfall Act, 28 U.S.C. 2679(d)(2), the Attorney General certified that the Lt. Col. was acting within the scope of his federal employment when he made the allegedly defamatory statements, removed the case to federal court, and substituted the United States for the Lt. Col. as the party-defendant.  *Id.*

Relying on the Supreme Court's opinions in *Barr* and *Westfall, supra*, the Fourth Circuit recognized that under federal common law, government employees participating as witnesses in official investigations are shielded by absolute immunity.  *Mangold*, 77 F.3d

31

at 1447. The Court reasoned that "if government employees cooperating in such investigations are left exposed to lawsuits filed by those under investigation, they might be reluctant to cooperate, even if they are eyewitnesses to improper conduct." *Id.* The *Mangold* court then extended this absolute immunity to civilians cooperating with official investigations. *Id.* at 1448-49.

Applying *Mangold* to the instant case, it is apparent that all statements made by Lt. Col. Diaz during the two official Air National Guard investigations are absolutely privileged. *Id.* at 1447. Furthermore, Diaz's informal reports to fellow National Guard members should also be protected by absolute privilege. Official National Guard policy encourages National Guard soldiers and airmen to make informal complaints reporting sexual harassment prior to filing formal complaints. *See* Diaz 6/13/03 Reply to Elders's Opposition to Diaz's 4/10/03 Motion for Summary Judgment Exhibit 1, Page Declaration at 3-4, ¶¶ 12-14, incorporated herein by reference. Such informal complaints advance the critical National Guard imperative of preventing, identifying, and eliminating sexual harassment. *Id.* at 4, ¶ 15. All statements made by Lt. Col. Diaz accusing Lt. Col. Elders of sexual harassment are privileged under the law of defamation. The undisputed facts show that this lawsuit arises from military service. The Amended Complaint should be dismissed on the ground of intramilitary immunity.

32

## IV. __CONCLUSION__

Based upon the foregoing, the Defendant, Lieutenant Colonel Maria C. Diaz, requests that Elders's Amended Complaint be dismissed.

Respectfully submitted,

ROD J. ROSENSTEIN
United States Attorney

By: _____/s/_____
TARRA DeSHIELDS
Assistant United States Attorney
General Bar No. 07749

Office of the United States Attorney
36 South Charles Street
Fourth Floor
Baltimore, Maryland 21201
(410) 209-4800

Counsel for Defendant Diaz and the
United States

## __CERTIFICATE OF SERVICE__

I HEREBY CERTIFY that on this 29th day of August, 2005, a copy of the foregoing Post-Evidentiary Hearing Memorandum of Defendant Maria C. Diaz Respecting The Determination Regarding Scope of Employment And Striking Exhibits was filed electronically, and so served upon, Mark S. Zaid, Krieger & Zaid, PLLC, 1747 Pennsylvania Avenue, N.W., Suite 300, Washington, D.C. 20006.

_____/s/_____
TARRA DeSHIELDS
Assistant United States Attorney