1                    IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MARYLAND/NORTHERN DIVISION

3

4    KARL ELDERS,

5                    Plaintiff        CIVIL NO.

6        v.                           02-3892

7

8    MARIA DIAZ,                          May 4, 2005

9                    Defendant

10   _____/

11                    TRANSCRIPT OF PROCEEDINGS

12          BEFORE THE HONORABLE MARVIN J. GARBIS,

13             UNITED STATES DISTRICT SENIOR JUDGE

14   APPEARANCES:

15   On behalf of the Plaintiff:

16   Mark Zaid, Esquire

17

18

19   On behalf of the Defendant:

20   Tarra DeShields, AUSA

21

22

23   Reported By:

24   Jacqueline Sovich, RPR, CM

25   Official Court Reporter

```
 1                    DIRECT EXAMINATION

 2   BY MR. ZAID:

 3   Q.  Good morning, Dr. Diaz.  My name, as you know, is Mark

 4   Zaid.  I'm representing the plaintiff in this case, Karl

 5   Elders.

 6              Let me ask you first, you've been a member of the

 7   Maryland Air National Guard now for 15 years; is that

 8   correct?

 9   A.  That is incorrect.  I believe it's 14, because I joined

10   late 1990.

11   Q.  Okay.  And in civilian life, you are a physician,

12   correct?

13   A.  I am a general surgeon.

14   Q.  And you are a tradition member of the Air National Guard?

15   A.  Correct.

16   Q.  And by tradition, that means you have certain

17   obligations, one drill weekend a month and minimum of two

18   weeks per year; is that correct?

19   A.  That is correct.

20   Q.  And the drill weekends, just in case we use acronyms, are

21   UTA or Unit Training Assemblies; is that correct?

22   A.  That is correct.

23   Q.  And could you describe to the Court what your

24   responsibilities are as a member of the Maryland Air National

25   Guard, please?
```

1   A.   I have numerous responsibilities.   I'm not only the

2   squadron medical element, but I'm also a physician at the

3   clinic when they need a physician.

4            I'm assigned to the squadron, and in the squadron,

5   I take care of the people in that squadron.   Because of the

6   shortage of doctors, I also go to the clinic and work with

7   the clinic.

8            And I also I'm loaned to the A 10 side, which is

9   the there's a C 130 side and A 10 side.   I'm on loan to them

10  when they don't have a physician.   So I have multiple

11  responsibilities.

12           I also help with the deployment, I give the

13  vaccinations, do histories and physicals not only of the

14  pilots but of the members.

15  Q.   And from the time period in question that we're dealing

16  with, say the summer of 2002 to now, at all times you've been

17  a lieutenant colonel; is that correct?

18  A.   That is correct.

19  Q.   And your office was based at what are field air base; is

20  that correct?

21  A.   I don't understand what you man by "office.   "

22  Q.   Did you have an office with the guard?

23  A.   I don't have an office, per se, no.

24  Q.   So --

25  A.   You mean like a desk?   I don't have an office, period.

1  Q.  Were your primary responsibilities situated at Warfield

2  Air Base?

3  A.  They were situated at Warfield, yes.

4  Q.  Now, in 2002, allegations that you had made came to light

5  and were investigated by the Maryland Air National Guard,

6  allegations against the plaintiff, Karl Elders, correct?

7  A.  Correct.

8  Q.  And as I understand it, there were four primary

9  allegations.  The first allegation was, that in or around May

10  of 2000, Lieutenant Colonel Elders attempted, or did kiss you

11  while on an aircraft flight; is that correct?

12  A.  Correct.

13  Q.  And the second allegation was in or around the summer of

14  2001, Lieutenant Colonel Elders had offered you to travel

15  with him to Amsterdam on a free buddy pass where he would

16  show you a good time and you could go window shopping; is

17  that correct?

18  A.  That's correct.

19  Q.  And the third allegation was that in or around the summer

20  of 2001, Karl Elders tried to kiss you while you both were in

21  his office; is that correct?

22  A.  That's correct.

23  Q.  And the final allegation was that in December, 2001, on

24  or about December 21, Karl Elders grabbed your wrist and

25  twisted it; is that correct?

1    question would be more proper than calling the other side in

2    a case, so I'll overrule that one.

3    Q.  Can you read back the last question, please?

4            (The record was read as requested.)

5    A.  I go to dinner with my husband.

6    Q.  And you don't go to lunch with anyone but perhaps your

7    husband or family; is that correct?

8    A.  That is incorrect.  I don't eat lunch.

9    Q.  You never eat lunch?

10   A.  I don't eat lunch.

11   Q.  Okay.  And you don't go and have coffee with anyone; is

12   that true?

13   A.  That is true.

14   Q.  And you have no neighbors at your residence; is that

15   true?

16   A.  I have one neighbor who's never there.  They use it as a

17   summer cottage.

18   Q.  Now, prior to the Maryland Air National Guard

19   investigation commencing, you claimed to have told only two

20   people of the allegations that we discussed, and that was in

21   February of 2002; is that correct?

22   A.  That's correct.

23   Q.  And, in fact, as part of the sworn -- I'm sorry, the

24   investigation -- let me go over this first.  There was first

25   an investigation by Colonel John Inglis; correct?

1  A.  Correct.

2  Q.  And then there was a second investigation by Colonel

3  Arthur Wirts; is that correct?

4  A.  Correct.

5  Q.  Now, as part of the investigation conducted by Colonel

6  Inglis, you submitted sworn statements; did you not?

7  A.  That's correct.

8  Q.  And those statements were under penalty of perjury, were

9  they not?

10  A.  That's correct.

11         MR. ZAID:  Your Honor, this is part of the time

12  where the redacted documents start to come into play.

13         THE COURT:  Well, I think we have to find out

14  what's the relevance of this, since whatever she may have

15  said in those documents can't possible be the basis of a

16  lawsuit.

17         MS. DESHIELDS:  No, sir.  The documents themselves

18  are not.  As we have agreed throughout, the official

19  investigative statements are proper --

20         THE COURT:  Can I have the notebook?

21         MS. DESHIELDS:  -- are privileged.  The documents

22  are being used for impeachment purposes, Your Honor.

23         THE COURT:  Well, I haven't heard any substantive

24  testimony.  Right now she could testify she was the biggest

25  liar since Pinocchio, I wouldn't need anything.  There's no

1   led up to that investigation, is it not true that what

2   prompted the investigation was the fact of statements

3   provided by Major Michael Mentges and Major Raul Wilhelm?

4   A.  That's correct.  I did not want to bring the allegations

5   forward.

6   Q.  And, in fact, isn't it true that you signed a sworn

7   statement adopting those statements in those two memorandums

8   as true except for the fact that Mr. Major Wilhelm had said

9   you were crying?

10  A.  That is correct.

11          MR. ZAID:  Your Honor, may I have a standing

12  permission to go to the witness?

13          THE COURT:  All right.  Fine.

14  BY MR. ZAID:

15  Q.  If you could, Dr. Diaz, review what we've had marked as

16  plaintiff's exhibit 2, and identify those?

17  A.  They are the two members I talked to, Raul Wilhelm and

18  Mike Mentges, both Lieutenant Colonels at this time.

19  Q.  It's true, that at the time these allegations and

20  investigations were going on, both of those men were majors;

21  were they not?

22  A.  They were both majors.

23  Q.  Now, if you look --

24          (Pause.)

25          MR. ZAID:  Your Honor, I'm just going to hand up to

1  you the two documents.  I'm sorry.

2         (Pause.)

3  BY MR. ZAID:

4  Q.  Now, in fact, these two memorandums, one is a March 8,

5  2002 executed by James Mentges, and the other is March 7

6  statement executed by Raul Wilhelm, correct?

7  A.  Correct.

8  Q.  And, as you indicated, you had adopted these statements

9  as true except for that one reference to the crime.

10        Isn't it true you have admitted that you started

11  having discussions with Major Mentges in the fall of 2001

12  regarding these allegations?

13  A.  Not the allegations.  I was discussing with him the fact

14  that I was feeling a little uncomfortable.  But allegations,

15  no.

16  Q.  Well, in fact, isn't it true, if you look at the first or

17  the second paragraph of Major Mentges's document, he

18  discusses very specifically what you identified as the second

19  allegation investigated by Colonel Inglis, meaning the

20  alleged invitation to go to Amsterdam and have a good time?

21  A.  And at that time, when he said that, I was naive enough

22  not to realize that window shopping meant something else.

23  This discussion was twice.  Once was alone with me.  The

24  second time was with Major Falter.

25        But both times, I did not realize what the first

1    discussion, what it meant.  The second time I understood.

2    Q.  But, in fact, you claim that Colonel Elders invited just

3    yourself, a married woman, to accompany a married man, to

4    Amsterdam for whatever reason; correct?

5    A.  That's correct.

6    Q.  And, as you just said now, you've stated there were at

7    least two times in which you had conversations with

8    individuals regarding at least that allegation in or around

9    the fall of 2001?

10   A.  You're twisting that.

11   Q.  Did you not just indicate that you spoke to both Major

12   Falter and major Mentges?

13   A.  You're incorrect in that.  What I said was the first time

14   I spoke to Colonel Mentges.  The second time -- I mean, Major

15   Falter and Colonel Elders were together, and they spoke again

16   to me.  Two different instances.

17   Q.  I recognize that.

18   A.  Okay.

19   Q.  And, in fact, you were told at that time you had the

20   conversation what the window shopping meant; is that not

21   true?

22   A.  In a way.

23   Q.  And, in fact, if you look at the last paragraph of Major

24   Mentges's statement, which you adopted as your own in the

25   investigation, Major Mentges indicates that in fact several

1  times over the past three months, and as recently as the

2  first week of March, you were having discussions with him

3  regarding the allegations; is that not true?

4  A.  I still cannot see where you're talking.

5       MS. DESHIELDS:  Objection, Your Honor.  That

6  actually isn't what the statement actually says.

7       THE COURT:  Miss Deshields, you're saying he's

8  inaccurately stating what is in that the document?

9       MS. DESHIELDS:  Correct.

10      THE COURT:  That should be easy to correct, so why

11  don't you read from the document whatever is in the document?

12      MR. ZAID:  Sure.

13  BY MR. ZAID:

14  Q.  Is it not true, Dr. Diaz, that in Major Mentges'

15  statement, he talks about in the last paragraph within the

16  last three months and as recently as this week you were

17  commenting to him several times that you're uncomfortable

18  around Lieutenant Colonel Elders?

19      THE COURT:  That doesn't seem a little bit

20  different from the last thing you said.

21  Q.  Is that not true?

22  A.  Well, what it says there is true, I was uncomfortable.

23  That was it.

24  Q.  And, in fact, you have admitted to telling Major Mentges

25  regarding the alleged incident in the -- fourth incident that

1  occurred in December of 2001, the wrist incident; is that not

2  true?

3       MS. DESHIELDS:  Objection, Your Honor.  Could we

4  get a time frame?

5       THE COURT:  Help me out.  When is the alleged

6  trying to kiss, when did that occur?

7       MR. ZAID:  May of 2000.

8       THE COURT:  And when the Amsterdam invitation?  Is

9  supposed -- when is the statement made?  Just find the

10  Amsterdam claim.

11       MR. ZAID:  The Amsterdam was the fall of 2001.

12       THE COURT:  Okay.  And what about the kiss in the

13  office business?

14       MR. ZAID:  That was the summer of 2001.

15       THE COURT:  All right.  Fine.  So the other way?

16       MR. ZAID:  I'm sorry, both were summer of 2001.

17  The Amsterdam and the kiss, alleged kiss.

18       THE COURT:  All right.  Fine.  Now, we've got the

19  time frame.

20       MR. ZAID:  And the wrist incident is December.

21       THE COURT:  December.

22       MR. ZAID:  Of 2001.

23  BY MR. ZAID:

24  Q.  And the question was that isn't it true, Dr. Diaz, you

25  told Major Mentges about the alleged battery contemporaneous

1   with the incident in December of 2001?

2   A.   It's not in this letter.

3   Q.   That's okay.  I didn't ask that, ma'am.

4   A.   I thought we were still doing the letter.

5   Q.   We'll still work off of it.  But isn't it true that you

6   told Major Mentges about the alleged battery incident in

7   December of 2001?

8   A.   That is correct.  And there's an addendum to that letter.

9   Q.   Which letter?

10  A.   There's two letters of Major Mentges.

11  Q.   Correct.

12  A.   I'm sure you have them.  But it was not in this letter.

13  Q.   Okay.  I'll find it.

14          (Pause.)

15  Q.   Now, if we look at Major Wilhelm's declaration, isn't it

16  true that you spoke to Major Wilhelm, in or around the third

17  week of February regarding the allegations?

18  A.   That's correct.

19  Q.   And, in fact, isn't it true that, at that time, at some

20  time, at that time or before, you had already informed your

21  husband of the allegations?

22  A.   I -- what I did was, I glossed over the details of the

23  allegations.  I did not want him to think that anything was

24  going on with me.  This is very embarrassing, and it was very

25  -- it's very difficult.

1  privileged.

2           MR. ZAID:  And I do not disagree at all with that,

3  you are, except in sworn deposition testimony she denied

4  talking to her husband about it, which is a large portion of

5  the defamation and goes to the scope of employment as set

6  forth in the Fourth Circuit.

7           THE COURT:  Only in the most remote sense.  You can

8  sit here and nitpick every possible statement where she

9  hasn't been truthful.  We're not advancing the ball of what

10  this hearing is about.  I'll sustain the objection on

11  privilege grounds, and I don't see where you're going.

12           MR. ZAID:  Understood.

13           THE COURT:  All right.

14  BY MR. ZAID:

15  Q.  Now, you reviewed those two memorandums contemporaneous

16  to their date on them when at the time your memory was fresh;

17  would that be accurate?

18  A.  That's correct.

19  Q.  And, in fact, both Mentges and Wilhelm were lower ranking

20  officers than yourself, correct?

21  A.  That's correct.

22  Q.  And they were lower ranking officers than Karl Elders,

23  correct?

24  A.  Correct.

25  Q.  And neither of those men were in your chain of command,

1  correct?

2  A.  Correct.

3  Q.  And, you were, of course, familiar with the chain of

4  command, correct?

5  A.  Incorrect.

6  Q.  You've been in the guard for almost 15 years, and your

7  testimony is you're not familiar with the chain of command?

8  A.  No, I was not familiar with the chain of command.  My

9  chain of command was Colonel Elders.  I understood that I

10  reported to him.  I would have had to report it to Colonel

11  Elders.  I did not feel comfortable going above that.

12  Q.  And, in fact, neither Mentges or Wilhelm were in Karl

13  Elders' chain of command, correct?

14  A.  I'm going to say correct.

15  Q.  Now, do you know at the time who was senior to Karl

16  Elders in the chain of command?

17  A.  Colonel Inglis.

18  Q.  And how would the chain of command have gone up from

19  Colonel Elders?

20  A.  I would have to have spoken to Colonel Inglis.

21  Q.  And you --

22  A.  I did not.

23  Q.  You knew Colonel Inglis at the time, correct?

24  A.  I knew him as the commander.

25  Q.  And did you not know that there were officers in that

1  chain of command above Colonel Inglis?

2  A.  I did not feel comfortable talking to anybody else.  I

3  talked to Major Wilhelm because of the fact that he was chief

4  of security police.  I asked for guidance.  I talked to

5  Colonel Mentges because it was -- I needed guidance.  I felt

6  comfortable talking to them.  I cannot just go -- I can't

7  approach the subject with just anybody.

8  Q.  And, as you said, you were simply seeking guidance from

9  both men, in fact, they told you need to officially report

10 this, did they not?

11 A.  That is correct.  But I was afraid.

12 Q.  And, in fact, when you spoke to Major Wilhelm, it was

13 because you just happened to be at the security office

14 administering vaccines, not that you had gone specifically to

15 talk to him; is that correct?

16 A.  That's correct.

17 Q.  And, in fact, he asked you just a question of whether

18 anything was wrong, and you volunteered the information to

19 him; is that correct?

20 A.  He knew something was wrong with me, that is correct.

21 Q.  And you volunteered information to him, correct?

22 A.  I did tell him, correct.

23 Q.  And, in fact, you told both of those men that they were

24 not to do anything with the information; is that correct?

25 A.  That's correct.

1  Q.  You weren't filing a complaint of sexual harassment

2  against Karl Elders, correct?

3  A.  That's correct.

4  Q.  You weren't filing an informal complaint against Karl

5  Elders, correct?

6  A.  Correct.

7  Q.  Or a formal complaint, correct?

8  A.  Correct.

9  Q.  And, in fact, you spoke to Major Mentges because you were

10  friends or buddies with him; is that not true?

11  A.  I wouldn't say friends or buddies.  I would say that I

12  felt comfortable enough to talk to him .

13  Q.  But you told Colonel Wirts you had spoken to Mentges

14  because he is your friend or buddy; is that not true?

15  A.  I can't remember Colonel Wirts's investigation.

16  Q.  When you spoke to Colonel Wirts, that was under oath;

17  correct?

18  A.  That's correct.

19  Q.  And, in fact, the sessions of the interview were

20  tape-recorded, correct?

21  A.  That's correct.

22  Q.  And transcripts were made, correct?

23  A.  Correct.

24  Q.  Bear with me, Your Honor, please.

25          (Pause.)

1          MR. ZAID:  Your Honor, in the unredacted materials

2    you have, you should have an investigation that reads

3    "Commander directed report of investigation prepared by

4    Colonel Arthur Wirts, dated June 7, 2002, pages 5 through 40

5    should be testimony that Dr. Diaz gave on April 18, 2002."

6          (Pause.)

7          THE COURT: 25 through 40?

8          MR. ZAID:  Yes, sir.

9          THE COURT:  Do you have any help, Miss Deshields,

10   as to which one of these things I'm looking at?

11         MS. DESHIELDS:  You should look in the second half

12   of the notebook there.  There's a section for the Inglis,

13   that should be the first part.  The second for the Wirts

14   report, that should be the second part.

15         (Pause.)

16         THE COURT:  About how far down is the report?

17         (Pause.)

18         THE COURT:  I see something that has testimony.

19   All right.

20         MS. DESHIELDS:  It actually starts about a third of

21   the way.

22         THE COURT:  I see what it is.  What is it that

23   you're asking.

24         MR. ZAID:  As I said, page 25 should be her

25   testimony.

1          THE COURT:  Yes.

2          MR. ZAID:  And I want to specifically refer to page

3     35, which, of course, are the names are redacted, where she

4     indicates in her testimony that she and Mentges were friends.

5          THE COURT:  Where on that page?  What are you

6     talking about, page starts with I?

7          MR. ZAID:  Yes.  If you look on the right-hand

8     side, 12 lines up, just at the end of that line,

9          THE COURT:  Well, maybe if I could see what you

10    have that's redacted, I'd know what you're talking about.  I

11    see the line.

12         (Pause.)

13         THE COURT:  Let me see it.

14         (Pause.)

15         THE COURT:  Well, okay.  They're referring to

16    something.  What's the difference if the guy's name is Joe or

17    Max or Karl?  what's the difference?

18         MR. ZAID:  It goes to the context of what the

19    nature of the discussion and why she was speaking to my

20    client.

21         THE COURT:  That's fine.  She can answer, I am just

22    making names up out of the blue.  So --

23         MR. ZAID:  I'm sorry.

24         THE COURT:  Call the guy Charlie.  I mean, use the

25    name Charlie.  What difference does it make?

1          MR. ZAID:  Also remember, so that you don't feel

2  you need to protect the privacy, Your Honor, I've had access

3  to these unredacted documents before.  I just never had a

4  copy.

5          THE COURT:  So you know what the magic name is?

6          MR. ZAID:  I do.

7          THE COURT:  What's the big -- what are we doing

8  here?

9          First of all, I don't know what difference it makes

10  with what the guy's name is Charlie or Ajax.

11          MR. ZAID:  Because it goes to the context of the

12  nature of the conversations she's having a conversation with

13  the man because he was a friend of hers.

14          THE COURT:  Okay.  You can ask her did you have a

15  conversation with somebody.  I don't see any reason to use

16  the name.  You want to use the name, use the name.  If you

17  think you know it, what's the difference whether it's Charlie

18  or Ferdinand.

19          MR. ZAID:  Only because she had indicated they were

20  not friends, as I understood her testimony.

21          THE COURT:  And saying I saw a horse come by and

22  the horse stepped on Miss Deshields' foot, but I redacted the

23  name of the horse, nobody cares what the name of the horse

24  is, whether it's whether she stopped on her foot.

25          Who cares whether it's Charlie or whoever else?

1  Ask her whatever question you want.

2          MR. ZAID:  Understood.

3          (Pause.)

4  BY MR. ZAID:

5  Q.  Now, it's true, wait, no.  Dr. Diaz, neither Major

6  Mentges or Major Wilhelm had any authority to do anything

7  about the concerns or allegations you were raising to them,

8  is that true?

9  A.  That is true.  I went for guidance.

10  Q.  And, in fact, do you not admit that it would -- sorry.

11  Strike that.

12          And, of course, it would have been inappropriate to

13  just go around and talk to say anyone on the base regarding

14  these sexual harassment allegations, would you agree with

15  that?

16  A.  I don't understand that.  I only talked to these two

17  individuals, because I felt comfortable talking to them.

18  Q.  It's true, is it not, that it would have been

19  inappropriate to just talk to say anybody else on the base, a

20  janitor, for example, correct?

21  A.  I wouldn't speak to a janitor.  I have to have comfort.  I

22  needed a comfort level.

23  Q.  But would you agree -- you would agree with me, would you

24  not, that it would have been inappropriate for you to have

25  gone to certain people on the base and revealed these

1  allegations of sexual harassment?

2  A.  I already told you.

3        MS. DESHIELDS:  Objection.

4        THE COURT:  There's an objection.  I'll sustain the

5  objection.  A, there's no evidence she talked to anybody.  B,

6  her opinion of what's appropriate or inappropriate is just

7  meaningless here.

8        The issue's going to be whether I presume the

9  people spoken to on the base that we're focusing on are

10  Wilhelm and Mentges.  So, okay.  We'll hear evidence about

11  them and whether it was within the scope of employment or

12  not.

13  Q.  Now, isn't it true, Dr. Diaz, have you spoke to Major

14  Todd Wilkinson regarding some of or all of your allegations

15  of sexual harassment and battery against Karl Elders?

16  A.  I don't recall talking to him.  I talked to Wilhelm and

17  to Mentges.

18  Q.  Do you deny talking to Major Wilkinson prior to March,

19  2002, regarding some or all of the sexual harassment and

20  battery allegations?

21        MS. DESHIELDS:  Objection.

22        THE COURT:  Well, I don't know the significant of

23  it, so Miss Deshields, it sounds to me like it's a reasonable

24  question.  What's the objection?

25        MS. DESHIELDS:  She said she doesn't recall

1  specifically talking with Major Wilkinson about these

2  allegations.  So she's asked.

3            THE COURT:  Is Major Wilkinson Todd?

4            MS. DESHIELDS:  I'm sorry, Your Honor?

5            THE COURT:  Okay.  Fine.  In that case, what's your

6  question?

7  BY MR. ZAID:

8  Q.  Do you remember sitting for a deposition in this case,

9  Dr. Diaz?

10  A.  Correct.

11  Q.  And, in fact, that deposition was taken under oath,

12  correct?

13  A.  Correct.

14  Q.  And you were advised at the deposition that the testimony

15  in the deposition could be used in later proceedings; would

16  that be correct?

17  A.  Correct.

18  Q.  And did you not at that deposition deny ever talking to

19  Todd Wilkinson prior to March, 2002?

20  A.  I don't remember the deposition, to be honest with you.

21  Q.  Okay.

22  A.  I can't recall.

23            THE COURT:  Is it your contention that she did talk

24  to Wilkinson?

25            MR. ZAID:  Yes.  I'll refresh the witness's

1  recollection from her deposition testimony that she in fact

2  denied she ever spoke to him.

3          THE COURT:  Her denial proves that there was a

4  conversation, so where are we?

5          MR. ZAID:  Understood.

6          Your Honor, I've had marked as plaintiff's exhibit

7  3.  I'm sorry I don't have copies, but you both have them.

8  This is part of Colonel Inglis' investigation.

9          THE COURT:  Right.

10          MR. ZAID:  It's the statement of Major Todd

11  Wilkinson.  And I believe in this investigation they have an

12  index in the beginning, or table of contents.

13          THE COURT:  Yes.  All right.

14          MR. ZAID:  Just let me know when you're ready, Your

15  Honor.

16          (Pause.)

17          THE COURT:  Well, all right.  So --

18          MR. ZAID:  I was waiting for you to get to that.

19          THE COURT:  Is Wilkinson going to be a witness

20  here?

21          MR. ZAID:  Yes, sir.

22          THE COURT:  I guess I'll hear his testimony.

23  BY MR. ZAID:

24  Q.  Now, as you see in the statement they executed under

25  oath, Dr. Diaz, Major Wilkinson indicates that he -- you

1  spoke with him on more than one occasion starting in

2  December, 2001, as recently as March, 2002.

3         And you're saying it is your testimony here today

4  that you did not speak to him at all during those times

5  regarding these allegations?

6  A.  I talked to Major Wilhelm ton Major Mentges.

7  Q.  Now, this statement was executed March 10, 2002.  Do you

8  have any reason to believe why Major Wilkinson would have

9  trouble recollection conversations he says occurred as early

10 as several days before?

11        MS. DESHIELDS:  Objection.

12        THE COURT:  Sustained.  This is -- this not proper

13 questioning.  Wilkinson's going testify.  I presume he'll

14 testify like his statement, double cross-examination.

15        Miss Diaz will take some position on it.  I don't

16 think it's appropriate to get her up here to confront the

17 future evidence that we haven't heard yet.  It doesn't prove

18 anything.

19        Her denial of something doesn't prove the opposite

20 of the denial.  Wilkinson will testify.  This is really the

21 kind of stuff that you should cross-examine on if she

22 testifies.  I just don't know what we're doing here.

23 Q.  Okay.  I'll move on, Your Honor.

24        Now, Major Wilkinson was not in your command of

25 command, correct?

1   A.  Correct.

2   Q.  He was not in your chain of command of Karl Elders,

3   correct?

4   A.  Correct.

5   Q.  And he was a lower ranking officer than both of you,

6   correct?

7   A.  Correct.

8   Q.  And it would have been inappropriate for you to have told

9   him of your allegations?

10          MS. DESHIELDS:  Objection.

11  Q.  Would you agree with that?

12          THE COURT:  Sustained.  Her opinion is not of

13  evidentiary value.  I don't know what you mean by

14  appropriate.  I'm not being cutesy here.  The issue here is

15  we had something is within the scope of employment.  And her

16  opinion of whether something was inappropriate or not is not

17  helping me with regard to the scope of employment.

18  BY MR. ZAID:

19  Q.  Major Wilkinson had no authority to do anything regarding

20  the allegations that you had advanced regarding the sexual

21  harassment and battery; would that not be true?

22          MS. DESHIELDS:  Objection.  If you know?

23          THE COURT:  Well, I'll allow this question, but

24  there's no need to argue the case with this witness.  You're

25  going to have Wilkinson testify, and these are the points

1   you're going make.  I'd like this thing to have some level of

2   efficiency.  You can answer that question.

3           Did you perceive Wilkinson could have done

4   something?

5           THE WITNESS:  Did I perceive Dr. Wilkinson?

6           THE COURT:  I'm sorry.  I'm asking a question, you

7   say you didn't have a conversation, I guess you can't answer

8   what she thought about a conversation she said didn't occur.

9           MS. DESHIELDS:  Or what she says she has no

10  specific recollection, Your Honor, was her actual testimony.

11  BY MR. ZAID:

12  Q.  I'll rephrase.  Had Major Wilkinson been privy to the

13  allegations, did he have any authority to do anything about

14  them?

15          MS. DESHIELDS:  Objection.

16          THE COURT:  Sustained.  You can ask Wilkinson what

17  authority he had or what he might have done, if anything, you

18  can ask him.

19  BY MR. ZAID:

20  Q.  Okay.  Now, you understand, you're aware, were you not,

21  Dr. Diaz of the existence of EEO procedures; were you not?

22  A.  No, I was not.

23  Q.  Were you -- you were familiar, were you not, or

24  understood that you needed to file a complaint of harassment;

25  were you not?

1  A.  No, I was not.

2  Q.  Did you not testify to Colonel Wirts that in fact you

3  were familiar with the EEO process?

4  A.  I stated with Colonel Wirts that there was a process, but

5  I did not know it.

6  Q.  Now, did you not take some courses as part of your

7  responsibilities with the guard regarding EEO?

8  A.  No, I did not.

9        (Pause.)

10  Q.  Now, Dr. Diaz, were you found to have plagiarized a

11  document by the Maryland Air National Guard; were you not?

12        MS. DESHIELDS:  Objection.

13        THE COURT:  Sustained.

14        MR. ZAID:  It goes to credibility, Your Honor.

15        THE COURT:  We're not going set up credibility as

16  an open sesame to ask about everything.  I'll re-examine any

17  credibility issues after she testifies in her case.  But

18  right now you're putting on your affirmative case.  I'm going

19  tell you again, you're putting on your case to make your

20  prima facie case.  She can be the greatest liar since

21  Pinocchio.  It doesn't establish any element of your case.

22  So I'll sustain the objection for now.

23  Q.  Now, there came a time, did there not, doctor, that you

24  wrote then Governor Elect Ehrlich about these allegations; is

25  that true?

1   documents, the two directives that pertain.

2   Q.  And what is it that the directives require with respect

3   to the process of EEO complaints?

4   A.  This particular directive requires that there be two

5   processes, one formal, one informal.  The informal process is

6   intend more for junior personnel, who may have questions and

7   concerns, and allows them the opportunity to make an informal

8   complaint, or informal allegation, then put it in writing,

9   and then either escalate it to a formal complaint, and there

10  are certainly rules basically for the two complaints are the

11  same and have it adjudicated at the level of command that is

12  appropriate, which is normally the commander of the

13  organization, in which the event occurs, or if an allegation

14  occurs involving the commander of that organization, the

15  commander of the next immediate level is obligated to act on

16  it.

17          So the first step in the process is a complaint.

18  In the case of commissioned officers, and in the case of

19  officers who are in command positions being the alleged

20  offender, the way I read that regulation, an informal

21  complaint is not appropriate, and is excluded by the way I

22  read this regulation.

23          In other words, if you have a unit commander who

24  has allegedly done something, then there's only one recourse,

25  and that's a formal complaint to the next commander in the

1   chain of command.

2   Q.  So would you say that an option to simply talk to fellow

3   National Guard members about the allegations, would that be

4   something that falls within the policy?

5   A.  Not under my interpretation of this and the command

6   policy of the Air Force and the Army.  There are available to

7   certain individuals different channels.  Most individuals,

8   the majority, have the command channel, because that's all

9   they know.  They have no other related channel other than the

10  command channel.

11          As you get into certain senior positions,

12  especially among officers, you also have technical channels.

13  Technical channels are specialty channels, such as Judge

14  Advocate or Medical Corps or Intelligence, where you have a

15  technical channel to accomplish a certain function.  In those

16  cases, if you're in that channel, it opens up the

17  opportunities.

18          But, normally, by regulation, by both of those

19  directives, you have the EEO officer or member of the EEO

20  staff, or you have the commander of the appropriate

21  commander, or in case of individuals who are members of the

22  technical channel, your next higher individual in the

23  technical channel.

24          They're the three avenues of consultation that are

25  provided for in the two directives I mentioned.

1  Q.  Now, you were sitting here in the courtroom listening to

2  Dr. Diaz's testimony; were you not?

3  A.  Yes, sir.

4  Q.  And as you indicated, you read through some of the briefs

5  --

6  A.  Yes.

7  Q.  -- to get a factual sense of at least an allegation as

8  set forth by both sides?

9        Based on your interpretation, your expertise and

10  understanding the regulations, is the conduct of Dr. Diaz

11  talking to Majors Mentges and Wilhelm, would that constitute

12  an informal complaint within the National Guard regulations?

13  A.  No.  Not as defined, not in the process defined by -- the

14  informal complaint would have to go either to a member of the

15  EEO staff or to the commander, or a member of the chain of

16  command above them, who wasn't implicated, who was senior to

17  all individuals concerned.  It wouldn't necessarily to be a

18  commander, it could be a section supervisor.  But ideally it

19  would be the EEO staff or the commander.

20  Q.  And assuming, since Karl Elders was Dr. Diaz's commander,

21  and she indicated that, obviously, caused concern for her as

22  to how she complains to the commander about himself, is there

23  a mechanism by which that type of situation is dealt with

24  when the person is being harassed actually by their own

25  commander?

1  A.  Well, the regulation addresses that.  If the commander,

2  if the immediate commander is the individual who allegations

3  are against, then you're required to submit the report, at

4  least to his superior, which in this case, would be the group

5  commander, the air guard group commander.

6         If there's concerns with that, as the Judge

7  mentioned, you could go all the way to the governor in the

8  state if you were concerned about the politics of the issue

9  or relationships.  But it definitely has to be a formal

10  complaint in accordance with the guidance, in the directive.

11  It can't be an informal complaint because he's a commanding

12  officer.

13  Q.  Now, the conversations that she testified to having with

14  Major Mentges and Wilhelm, would any of those constitute a

15  formal complaint per the regulations?

16  A.  No.  Not into my interpretation of the regulation, no.

17  Q.  Now, would you say that her discussions with Major --

18  Majors Mentges and Wilhelm, and your opinion from your

19  experience with the National Guard bureau and with respect to

20  the regulation, they would have benefited the good order and

21  discipline and mission readiness of the National Guard?

22  A.  Could you can me that question again?

23  Q.  Sure.

24  A.  I'm sorry.

25  Q.  Based on your experience and the regulations, would you

1  say your conversations with Majors Mentges and Wilhelm

2  regarding her allegations, would they have benefited or

3  served the good order and discipline and mission readiness of

4  the National Guard?

5  A.   No.   It's my belief --

6             MS. DESHIELDS:  Objection.

7             THE COURT:  Yes.

8             MS. DESHIELDS:  Well, what Mr. Zaid is trying to

9  do, Your Honor, is to ask is -- what is your rank?

10            THE WITNESS:  General McGinnis.

11            MS. DESHIELDS:  General McGinnis, to opine whether

12  or not Lieutenant Diaz was acting within the scope of her

13  employment.

14            THE COURT:  I'm going to let it go to the weight,

15  rather than try to parse it out.  He can give his opinion, as

16  a commanding officer, as an experienced member of the guard,

17  there's -- you can argue this eternally.  He can give an

18  opinion.  Go ahead.

19            THE WITNESS:  Sir, I would -- it is my opinion, and

20  my judgment, that it is contrary to the good order and

21  discipline.  There are a couple of issues here that allow --

22  that cause me to come to that conclusion.

23            First of all, the person making the complaint is

24  not a regular person in the unit, a very special person.  The

25  flight surgeon is the second most important individual in the

1  squadron next to the squadron commander.  In fact, the only

2  person in the squadron and the only person in the State of

3  Maryland pertaining to the people and men of that squadron

4  who can say they can't fly is the flight surgeon.

5       That flight surgeon has a very special relationship

6  with the commanding officer of the squadron, commanding

7  officer with any air unit or army aviation unit.

8       I did supervise an army flight surgeon when I was

9  director of plans and training and had responsibility for the

10  airfield at Fort Drumm, New York.  So that the regulations to

11  those guys apply the same.  Those regulations to flight

12  surgeons, both in the Army and the air, are very, very close.

13       That's a unique responsibility.  And the individual

14  is recognized as being in that position by every member of

15  the unit.  The two people you want to keep, if you want to

16  keep flying happy, are the flight surgeon, the commander, if

17  you're a pilot.

18       So there's a special relationship there.  And when

19  anyone having that relationship and level of confidence with

20  the unit commander starts talking outside the chain of

21  command, there's a problem with that.  And I believe that the

22  command policy regulation of the Air Force, I know the Army

23  one and the Air Force I believe, did, too, does not look

24  favorably upon that.

25  Q.  In your opinion, what, if any, impact occurs when senior

1  officers complain to junior officers regarding their

2  commanders?

3           MS. DESHIELDS:  Objection.

4           THE COURT:  I'll overrule it.  You may answer it.

5           THE WITNESS:  Sir?

6           THE COURT:  You can answer it.

7           THE WITNESS:  Okay.  It creates dissension within

8  the ranks all the way up.  It's whether, you know, one thing

9  about the guard, you've got to be very careful of doing

10  anything political because of the governor.  But that goes

11  all the way up from the commander in chief on down.

12           Individuals talking about seniors to subordinates

13  is, TO put it in a common context, it's a sin.  And it can

14  lead to -- it can lead to action.  It can lead to

15  administrative or non judicial or judicial punishment,

16  depending on what it's said, when it's said, and in what

17  context it's said.

18  Q.  Now, in your opinion, is the -- would that be an

19  authorized function of a member of the guard, an officer, to

20  talk to lower ranking officers regarding the discontent or

21  allegations they have regarding a senior level officer?

22           MS. DESHIELDS:  Objection.

23           THE COURT:  Overrule.  You can answer.

24  A.  There are three, as I mentioned before, in this case,

25  specifically, based on my review, there are three channels

1   that would constituted legitimate avenues to discuss, just to

2   discuss the complaint let alone render it.

3           The one is the EEO I mentioned.  The second is the

4   next higher flight surgeon, which would be either the group

5   level flight surgeon, not having one would have been at least

6   up to the state surgeon who might not necessarily be a flight

7   surgeon, but he's in the technical channel of this

8   individual, and any one of the commanders above the commander

9   in question, who the commander who the allegations are being

10  made against.

11          Those are the only three legitimate channels that

12  the command policy, in my opinion, recognizes as legitimate

13  channels for this type of information to flow.

14          And it would be -- it would not be out of the

15  question for the surgeon at the next higher level to take it

16  to the commander.  That would be perfectly fine.  But not

17  somebody, some subordinate to take it to the commander.  It

18  would be appropriate for anyone in these channels.

19          The EEO, in fact, if you make complaint to the EEO,

20  according to the regulation, is like making it to the

21  commander, if you go to him, make a complaint, it's

22  equivalent to making a complaint to his commander.

23          The surgeon, I would say probably isn't.  It's not

24  codified in regulation.  But it is an appropriate channel for

25  the individual to approach this issue with.

1    wide.  A would be distribution down to the lowest unit level.

2    B would be at the 0506 command or higher.  So the

3    distribution is pretty wide concerning it's a directive

4    coming from the federal government.

5            MR. ZAID:  I have no further questions, Your Honor.

6            THE COURT:  All right.  Miss Deshields, I'm looking

7    at the clock.  Do you have much, or if you're very brief, we

8    can finish the witness.  If not, we'll wait until two.

9            MS. DESHIELDS:  I could probably be done in about

10   five minutes.

11           THE COURT:  Why don't you do that, so we don't have

12   to carry a witness over.

13                       CROSS-EXAMINATION

14   BY MS. DESHIELDS:

15   Q.  Thanks.  I want to be referring to General McGinnis; is

16   that correct?

17   A.  Generally, since I became a civilian in the Department of

18   Defense, I prefer "Mr." because rank becomes a problem when

19   you're dealing with a lot of military people, and you've got

20   civilian responsibilities.

21   Q.  I will demote, but you don't disagree national Guard

22   seeks to promote a workplace that's free of discriminatory

23   acts or behavior, do you?

24   A.  Absolutely.

25   Q.  And that includes sexual harassment as well?

1  A.  Absolutely.  Absolutely.  Been a proponent of it.

2  Q.  You know, of course, that the National Guard seeks to

3  encourage, at least sets forth in the policy statements of NG

4  600-22 the airing or reporting of perceived discriminatory

5  behavior; is that correct?

6  A.  That's correct.

7  Q.  And the goal of promoting a workplace that is free of

8  discriminatory behavior does not somehow become less of an

9  objective on the part of the Air National Guard or the Army

10  National Guard, does it, because the wrong or different

11  channel was pursued by an individual?

12  A.  The first part of the question is not normally.  But then

13  we're not dealing with a normal situation here, because we're

14  dealing were with between two senior people.  The breadth of

15  the intent of the regulation is to protect the whole

16  population.

17          We're talking about two people here whose job is to

18  protect the population.  The flight surgeon is responsible

19  for the physical and mental health of everybody in that

20  squadron.  And I would argue if I was the commander, and I

21  have been, so I will argue the chaplain and surgeon are

22  important to mental health in my organization and the

23  discipline of my organization.  So it's not -- I don't

24  believe you can -- the general intent applies here, that

25  would be my judgment.  Because of the specific individuals

1  involved and their responsibilities and their relationship to

2  one another.

3  Q.   That's your opinion?

4  A.   That's my opinion.   That's my opinion of how the chain of

5  command should work, which I've been doing it for 29 years.

6  Q.   But you are not saying, of course, that the seriousness

7  and the desire on the part of the Air National Guard to

8  eradicate discrimination, to have a workplace that's free of

9  discriminatory behavior, turns on whether or not a person

10  pursues a particular channel of communication, you know,

11  that's set up as a mechanism for airing such complaints; is

12  that what you're saying?

13  A.   What I'm saying is compliance with the procedures is

14  essential to getting the job that you are -- you are

15  mentioning done.

16         We have to get it into the process as quickly as

17  possible at the correct level so that we can avoid exactly

18  what we're trying to avoid here.   We can avoid outside

19  influences and unnecessary command influence to bury the

20  allegation.   That's what we're trying to do.

21         But in this particular case, the logical process

22  was exactly that channel, because you didn't have to be

23  informal on this.   I mean, you've got two senior people.   I

24  spent a lot of time with a good friend of mine.   Claudia --

25  General Claudia Kennedy was a friend of mine in the Pentagon,

1   and here she went through this as a senior staff officer, but

2   she went right in the chain of command.  She didn't talk to

3   me about it, she didn't talk the anybody else, went right to

4   the general and brought the situation up because she was in

5   that position.

6          My argument is if she's a flight surgeon of the

7   squadron, she should be able to kick the group commander's

8   door down any time she wants to.  That would be the process

9   that I would expect from a person of that -- in that

10  position.

11  Q.  But apart from the process that you would expect, or that

12  you would like to see followed, my question to you, was that

13  you're seeming to suggest by your testimony that the Air

14  National Guard's desire to have a workplace free of

15  discrimination is selective?

16  A.  No, it's not selective.  What I'm testifying is, that

17  there's a command policy, and there's an objective the stated

18  in the regulation.  And everything you said is absolutely

19  true.  But it's important that the command policy be followed

20  so the organization can function.  And --

21  Q.  There is --

22  A.  It is not -- we are not equal.

23  Q.  I'm sorry?

24  A.  We are not all equal in terms of the Private and Major

25  and Colonel.  We're not equal in terms of the people who work

1   in the National Guard and people who work in the field.

2   There are different expectations of people in the military.

3   That's what I'm saying.  There's expectations within Army

4   command policy, and that's all I'm saying.

5          I'm not saying the bureau isn't trying to do

6   something or not trying to make it easy.  I'm saying the

7   military organizations of the United States run in a certain

8   way so that we can get things done.

9          And regardless of what the allegation is and what

10   area it's in, that's irrelevant in any case with senior

11   people.  It needs to get into the chain of command to be

12   adjudicated in a timely manner and effectively.

13   Q.  But what's not irrelevant is the Air National Guard seeks

14   to have a workplace that's free of discriminatory --

15   A.  Totally relevant.  I'm not arguing with that statement at

16   all.

17   Q.  Okay.

18   A.  I just want you to understand what I'm saying, which is

19   process-related.

20   Q.  I understand that your testimony is that there is an

21   expectation, and there is --

22   A.  That is my testimony.

23   Q.  And there is an expectation that a mechanism is in place,

24   we would hope that people would use it, is that what your

25   testimony is?

1  A.  That's what my testimony is.

2  Q.  Okay.  But you do agree with me there is an overriding

3  concern on the part of the Air National Guard to try to have

4  a workplace that's free of discriminatory behavior?

5  A.  Absolutely.  It's essential to the good order of

6  discipline.

7  Q.  So you've reviewed NGB 600-22?

8  A.  Yes.

9  Q.  You're well familiar with it?

10  A.  Yes.

11  Q.  You also recognize that that regulation permits third

12  parties -- and third parties is defined to encompass any

13  other individual -- to bring a complaint of discrimination on

14  behalf of another person; isn't that right?

15  A.  Yes.  It does, in general sense.  And --

16  Q.  Do you want to look at it?

17  A.  I just want -- if you don't mind I'd like to refer, in a

18  general sense it does, it encourages that, and it has to, and

19  it should.

20  Q.  Why don't you look at Section 2-5?

21  A.  Okay.

22  Q.  Which would be page 18 of your --

23  A.  2-5.  Okay.  Allegations and discrimination received by

24  the bureau, National Guard Bureau.

25  Q.  When NGG receives allegations of complaint for a third

1  party on behalf of the complainant, and such allegations do

2  not constitute a formal complaint filed under the provision

3  of paragraph 2-2, such allegations will be processed as

4  specified in this paragraph, I am just quoting here in

5  pertinent part, may include "any other individual writing on

6  behalf of the complaint," that was my question to you.

7  A.   Well, it said may include Inspector Generals or other

8  members of the Department of Defense, members and local state

9  government, members of Congress, and any other individual on

10 behalf of the complainant, that's correct.   That's correct.

11 Q.   Okay.

12 A.   But --

13 Q.   That was my question.

14 A.   Okay.  But if I   --

15 Q.   That was my question.

16 A.   I know that's your question.   That's what it says, yes,

17 it does.

18          MS. DESHIELDS:  Okay.  Okay.

19          That's all I have.  Thank you, Your Honor.

20          THE COURT:  All right.  Anything else?

21          MR. ZAID:  Just very quickly.

22          THE COURT:  Go ahead.

23                  REDIRECT EXAMINATION

24 BY MR. ZAID:

25 Q.   To follow up on that, Your Honor.

1          You wanted to respond further to what Miss

2   Deshields said.  Did you have further comment as to what this

3   particular paragraph was referring to?

4   A.  I was looking for a reference here pertaining

5   specifically to commanders.  And I think -- well, I guess you

6   can bring it up later on.

7          THE COURT:  It could be --

8   A.  It's a master record, but there is a reference in there

9   that indicates that commanders are treated just a little bit

10  differently when allegations are being made against them, so

11  I would suggest that you take a look at that.

12  Q.  Now, Mr. McGinnis --

13         THE COURT:  How about 2-6, wouldn't that be where

14  it is?

15         (Pause.)

16         THE WITNESS:  Your Honor, I saw it, it was back,

17  it's back farther, and it caught my surprise, because it was

18  --

19         THE COURT:  Well, 2-6 refers to allegations against

20  general officers?

21         THE WITNESS:  Yes, sir, that's I that's it.

22         THE COURT: Okay.

23         THE WITNESS:  And commanders and potential and

24  Colonels.

25  Q.  Mr. McGinnis -- I'm sorry, Your Honor.

1          THE COURT:  Go ahead.  All right.

2   Q.  Do circumstances ever occur where third parties witness

3   potential discrimination against individuals within the

4   guard?

5          MS. DESHIELDS:  Objection.

6          THE COURT:  Well, that's of course I'm sure that

7   happens.  What's the next question?

8   Q.  In your opinion, do you have an opinion as to whether

9   that's the type of circumstance that might be referred to in

10  2-5 as far as a third party raising the complaints?

11  A.  The third party, I believe, in the intent of that

12  directive, is someone who the individual went to, and said

13  somebody in the -- some authority, congressman, senator,

14  friends, friend who may be in a position of authority to do

15  something, I think, is someone who the person believes is in

16  a position do something, who can help them.

17          But, as you see, from the context of the paragraph,

18  it talks about a wide range of officials.  So my belief is

19  that it's people in official positions who have either an

20  obligation, have an obligation to react, and the Inspector

21  General would obviously have a obligation to react, a member

22  of Congress would want to react, a state legislator would

23  want to react.  That's what the intent is.  I don't believe

24  the intent is a common person to activate the system.

25  Q.  And just a final question, based on your understanding of

1   the regulations and policies, in your experience, from the

2   guard, do you have an opinion as to whether or not this

3   paragraph authorizes a senior officer to discuss sensitive

4   allegations as if we're talking about, with respect to what

5   we're talking about today, to lower ranking officers?

6   A.   I think I addressed there question earlier.   Army --

7            MS. DESHIELDS:   Objection.

8   A.   -- Command Policy.

9            MS. DESHIELDS:   Objection.

10           THE COURT:   Overruled.   The question was whether

11  this authorizes it.   He can answer it doesn't authorize it.

12           THE WITNESS:   My interpretation of the command

13  policies of both services is that it precludes it.

14           MR. ZAID:   That's all I have.

15           THE COURT:   All right.   Anything?

16           MS. DESHIELDS:   Your Honor, I just had one

17  follow-up, very, very brief.

18                     RECROSS-EXAMINATION

19  BY MS. DESHIELDS:

20  Q.   With respect to your belief that Section, 2.5, you say

21  talks about people, or authorizes individuals to bring a

22  complaint on behalf of another individual, and you say that

23  that section is limited to people who can actually do

24  something about it, people in authority, I want to parse

25  that.

1         Why don't you follow me, take a look at Section

2    2.5.?

3    A.  Okay.

4             (Pause.)

5    Q.  If you look at the second full sense, it said "Third

6    parties referred to above may include Inspectors General or

7    other members of the Defense Department, who refer

8    allegations of discrimination to NGB, members of state or

9    local governments, members of congress or the executive

10   branch, organizations writing on behalf of the complainant,

11   or any other individual writing on behalf of the

12   complainant;" is that not what it says?

13   A.  That's exactly what it says.  That's exactly what it

14   says.

15   Q.  Thank you.

16            THE COURT:  Okay.  Thank you.  See you folks at

17   five after two.

18            (Luncheon recess.)

19            THE COURT:  All right.  Mr. Zaid?

20            MR. ZAID:  Yes, sir.  Next witness we'd call is

21   Charles Robinson.

22            THE CLERK:  Please raise your right hand.

23            (The Witness is sworn.)

24            THE CLERK:  Thank you.  Please be seated.  Could

25   you state and spell your last name for the record?

1          THE WITNESS:  My name Charles Robinson.

2          THE CLERK:  Keep your voice up and speak directly

3   into the microphone.  Thank you.

4                    DIRECT EXAMINATION

5   BY MR. ZAID:

6   Q.  Good afternoon, Mr. Robinson.  Would you please state for

7   the Court your background within the military, and if you

8   could just go through, please, state your background with

9   them?

10  A.  I was in the Maryland National guard for 35 years, 27 of

11  years was in the operation of support flight.  The last seven

12  years I served as operating superintendent, and also chief of

13  airfield management.

14         MS. DESHIELDS:  Chief of what?

15  A.  Chief of air field management.

16         MS. DESHIELDS:  Thank you.

17  A.  And then also the last two and a half years, I spent as

18  the EEO counselor.

19  Q.  And with respect to the EEO counselor, what were your

20  responsibilities in that position?

21  A.  My responsibilities was to understand the regulations,

22  and also to keep my commander advised by anything I thought

23  it was inappropriate or anything they need to know about the

24  EEO.

25  Q.  And what kind of training did you take, if any, with

1  respect to that position?

2  A.  I took EEO training with the USDA in Washington, D.C.  I

3  took mediation training.  I took conflict resolution, and

4  also how to write reports.

5  Q.  And as part of that position, were you required to know

6  what regulations existed with respect to the National Guard

7  or the Maryland National Guard --

8  A.  Yes, I was.

9  Q.  -- on EEO matters?

10  A.  Yes.

11  Q.  And you said -- what was the period of time that you

12  served in that?

13  A.  I served from January 2000 to September 2002.

14  Q.  And what is your current occupation?

15  A.  My current occupation at this time is a pastor and also

16  counselor.

17          MR. ZAID:  Your Honor, I'd move that Mr. Robinson

18  is an expert witness with respect to the policies of EEO,

19  having served as the EEO officer for two years with the

20  Maryland Air National Guard, he needed to know exactly what

21  policies existed.

22          THE COURT:  All right.  Guard EEO policies and

23  practices.  Okay.

24  BY MR. ZAID:

25  Q.  And Mr. Robinson, were you in the courtroom earlier today

1  for Mr. McGinnis's testimony?

2  A.  Yes, I was.

3  Q.  Now, I don't want to just have you repeat much of

4  anything of what Mr. McGinnis covered, but what was your

5  understanding, if any, as to what regulations govern the EEO

6  policies of the Maryland Air National Guard?

7  A.  The policies as far as?

8  Q.  With respect to the filing complaints and how complaints

9  are dealt with?

10  A.  Mr. McGinnis covered all that.  Basically, the policy is

11  that, when there's a case, you're supposed to report it to

12  either the -- use the chain of command, you have the social

13  actions office, and you also have the EEO, counselor or EEO

14  manager.

15  Q.  In addition to the policy that Mr. McGinnis was referring

16  to, the NGR 600-22, which is exhibit 7, are there any other

17  policies that you're aware of that are applicable to the EEO

18  process with the Maryland Air National Guard?

19  A.  Yes.  There are two policies letters that we have.  One

20  was February 1995, and the other policy letter was 9 November

21  1987, and both were produced by General Frederick.

22  Q.  And what, if anything, do those policies say?

23  A.  They back up 600-22 and AGI 36-3, I believe it is.

24  Q.  Now, there was some discussion with respect to Section

25  2-5 of the National Guard regulation that pertained to, as

1  the section states, of allegations of discrimination received

2  by the NGW.  You don't have that in front of you.  Can you

3  just hand him, please, it's already up there, exhibit 7.

4         Thank you.

5         And that's on page 18.

6         Now, from your understanding of how the EEO process

7  works in these regulations and the Maryland Air National

8  Guard regulations, what is it that that paragraph purports to

9  state?

10 A.  From my understanding this regulation, this paragraph

11 talks about the fact that a complaint can be made, and a

12 third party can make on behalf the complainant.  And that in

13 this situation, my understanding, based on what I've heard so

14 far, is the fact that the two parties that was told of the

15 allegations had a responsibility to report the allegations.

16 Q.  And the by two parties, about whom do you refer?

17 A.  Major Mentges and Major Wilhelm.

18 Q.  Now, your understanding of the regulations, does that

19 paragraph address Maria Diaz's discussions with Majors

20 Mentges and Wilhelm?

21 A.  Based on the regulations she had a -- she had several

22 options how to report that allegation based on the training

23 that we received in the Maryland Air National Guard, all the

24 supervisors and commanders, and that procedure is the fact if

25 there's an allegation, that they use a chain of command, and

1  they use -- they have the EEO counselor and EEO major or

2  social action officer to report the allegation to, not to

3  other parties.   Because it does not -- it does not help the

4  morale of the unit.   That's based on General Frederick's

5  policy letter.

6  Q.  Now, the 1995 policy letter that you referenced, are you

7  aware as to what the distribution of that letter was?

8  A.  The distribution of this letter, this policy was supposed

9  to be all leaders, supervisors, and commanders.

10  Q.  Would that have included, a far as you're aware,

11  Lieutenant Colonel Diaz?

12  A.  Yes.

13  Q.  And is how many EEO officers were there while you were

14  serving?

15  A.  Three.

16  Q.  As the EEO officer?

17  A.  Three, including myself.

18  Q.  And that was what, at the wing level?

19  A.  At the wing level, yes.   There were two NCO's, and one

20  officer.

21  Q.  And were there any other EEO officers within the Maryland

22  National Guard?

23  A.  Not in the Maryland Air National Guard, but the Maryland

24  National Guard, yes, you have.   EEO manager, which is

25  downtown.

1  Q.  And by downtown, what do you mean?

2  A.  The headquarters for the Maryland Guard.

3  Q.  And as you indicated, you were the one of the EEO

4  counselors from January of 2000 to September 2002, during

5  that time period, did Maria Diaz ever come to you with any

6  allegations against Karl Elders?

7  A.  No.

8  Q.  Are you personally aware of her having gone to your

9  colleagues?

10  A.  No.

11          (Pause.)

12  Q.  Now, you had indicated about how this impacts morale with

13  respect to the policies.  What is your opinion, having dealt

14  with the EEO procedures, as to the reasons for why the

15  regulation in question was crafted -- crafted in the manner

16  that it is?

17  A.  Repeat that again, please.

18  Q.  Sure.  You were talking about morale is impacted with

19  respect to chain of command, and based on your experiences

20  with the Maryland Air National Guard, in your 27 years, and

21  as the EEO officer, do you have an opinion as to why the

22  regulation is written in the way it might be with respect to

23  how an individual should report an allegation of sexual

24  harassment or discrimination?

25  A.  It's --

1          MS. DESHIELDS:  Objection.

2          THE COURT:  It's a bench trial.  Overruled.  You

3    can answer it.

4    A.  I believe the purpose of it is --

5          THE COURT:  Miss Deshields, I don't expect a lot of

6    cross on the point.  All right.

7          Go ahead, please.  Answer.

8    A.  Yes, sir.  I believe the reason why is you want to keep

9    morale on an upbeat because of the readiness of the Mission

10   of the guard.  And the reason also is because of the fact

11   that if you have people doing anything and everything they

12   want to do, you're always going to cause a lot of chaos.  But

13   in the military, there is structure, and you keep things in

14   order.

15   Q.  Now, do you have any opinion as to what the impacts would

16   be of a senior officer telling lower ranking officers about

17   problems that a person might be having with their commander?

18         MS. DESHIELDS:  Objection.

19         THE COURT:  Overruled.

20   A.  I believe that one of the problems would be the fact that

21   it would cause the commander ineffective ability to run his

22   command, because everyone would be undermining what's taking

23   place because of the fact they feel that there's issues.

24   Q.  Now, just so, you know -- you know the parties in

25   question, I presume?

1  A.  Yes.

2  Q.  And did you ever work with either of them?

3  A.  I work with Colonel Elders, he was the OCF commander, but

4  in my position I was required to work for all three of the

5  commanders, and also have dealing with the flight surgeon,

6  because also overseeing the operation resource management

7  system, and that primary focus is to make sure the air crew

8  members were up to par to fly medically and also for training

9  purposes.

10  Q.  And, again, just to complete it, and having listened to

11  Mr. McGinnis's testimony, was there anything that he said

12  that you disagreed with?

13  A.  No.

14  Q.  And are you being compensated in any way for your

15  testimony today?

16  A.  No.

17             MR. ZAID:  I have no further questions, Your Honor.

18             THE COURT:  All right.  Fine.

19             MS. DESHIELDS:  Just a few, Your Honor.

20                          CROSS-EXAMINATION

21  BY MS. DESHIELDS:

22  Q.  Mr. Robinson, in this particular case, when Majors, then

23  Majors Wilhelm and Mentges, were told by Lieutenant Colonel

24  Diaz of your concerns respecting the conduct of Mr. Elders,

25  they then reported that conduct; did they not?

1  A.  From my understanding, yes.

2  Q.  I believe they may have reported it to the brigadier

3  general?

4  A.  Beasley, that's my understanding.

5  Q.  And then Brigadier General Beasley then appointed Colonel

6  Inglis to conduct an investigation; is that right?

7  A.  That's my understanding.

8  Q.  And then there was a second investigation that was then

9  undertaken Colonel Wirts; is that correct?

10  A.  That's correct.

11  Q.  And, actually, you participated in the Colonel Wirts'

12  investigation, because you were interviewed; were you not?

13  A.  Yes.

14  Q.  Okay.  So the complaint was investigated.  There was an

15  IO so to speak, an investigating officer who conducted an

16  inquiry, correct?

17  A.  That's correct.

18  Q.  Okay.  And the NGR 600-22 is a reg that basically

19  establishes an administrative process, or the a means of

20  processing complaints of discrimination; is that correct?

21  A.  Yes.

22  Q.  Okay.  And in the policy statement for NGR 600-22, it

23  says that members are encouraged to report or to utilize this

24  particular process when they have such complaints; is that

25  right?

1  A.  What process are you talking about?

2  Q.  Complaints of discrimination?

3  A.  Yes, uh-huh.

4  Q.  That they're encouraged to use this particular process?

5  A.  That's correct.

6  Q.  That's the exact terminology, the chain of command will

7  be the primary channel for resolving discrimination

8  complaints, but individuals will be encouraged to use command

9  channels for redress of grievances, and that's the

10  terminology that's used?

11  A.  That's correct.

12  Q.  "Encourage to use"?

13  A.  That's correct.

14  Q.  And, in this particular case, the investigative process

15  that's also set forth in chapter three of this particular

16  reg, that was followed in this case, wasn't it, once

17  Lieutenant Colonel Diaz aired her concerns, so to speak?

18  A.  Her format was incorrect.  The format was to use the

19  chain of command, and she used colleagues.

20  Q.  But the investigation then ensued; is that right?

21  A.  Yes.

22  Q.  And that investigation was conducted in accordance with

23  the processing or, you know, the processing that's spelled

24  out in the NGR 600-22; is that right?

25  A.  Yes.

1          MS. DESHIELDS:  Okay.  Thank you, Your Honor.  No

2  further questions.

3          THE COURT:  All right.

4          MR. ZAID:  Nothing further.

5          THE COURT:  Okay.  Thank you.  You're excused.  You

6  can stay if you want, you can leave if you want.  It's up to

7  you.

8          MR. ZAID:  Todd Wilkinson, Your Honor.

9          THE COURT:  All right.

10         (Pause.)

11         THE CLERK:  Please come forward, sir, to be sworn.

12  Please raise your right hand.

13         (The Witness is sworn.)

14         THE CLERK:  Thank you.  Please be seated.  Would

15  you please state your name for the record.

16         THE WITNESS:  Lieutenant Colonel Todd Wilkinson.  W

17  I L K I N S O N.

18         THE CLERK:  Thank you.

19                  DIRECT EXAMINATION

20  BY MR. ZAID:

21  Q.  Good afternoon, Lieutenant Colonel.  My name is Mark

22  Zaid.  As you might know, I'm Karl Elders' attorney.

23         The period in question we're talking about, 2001,

24  2002, primarily, at that time you were a major, correct?

25  A.  Correct.

1  Q.  Now, I know that the signature on that copy is redacted,

2  but do you recognize that as the document that you sign?

3  A.  Yes, sir.

4  Q.  Now, what was it -- do you know how it was that Colonel

5  Inglis came to you to talk about these allegations?

6  A.  He called me on the phone and asked if I could come talk

7  to him.

8  Q.  Had he indicated to you what it was that led him to call

9  you?

10  A.  Not that I recall.

11  Q.  Now, you indicate in this document, dated March 10th,

12  2002, that Maria Diaz was talking to you during the month of

13  December, early January, about that he wanted to sleep with

14  her, and that that is why he was going to take her to Europe.

15         Do you recall how many conversations you might have

16  had with Dr. Diaz about that allegation?

17  A.  How many?

18  Q.  Yes, sir.

19  A.  I don't recall a quantity.  There was confusion on my

20  part in that, when Colonel Elders was going to take her to

21  Europe, I originally thought it was for a guard trip, because

22  our flights service flies with the crews.  And then during

23  this conversation, that got cleared up, the conversation I'm

24  referencing here.

25         So --

1  Q.  Meaning that -- by that you mean --

2  A.  I recall only one based on what I've stated in this

3  statement.

4  Q.  Now, Colonel Inglis, would it be accurate to state that

5  this conversation was concerning allegations, Dr. Diaz's

6  allegation that is Colonel Elders was making sexual advances

7  toward her?

8  A.  I'm sorry.  I don't understand your question.

9  Q.  Colonel Inglis references your statement for the

10  proposition that Lieutenant Colonel Elders was making

11  repeated sexual advances towards her.

12         Would you agree with me that that is consistent

13  with Lieutenant Colonel Diaz telling you that Karl Elders

14  wanted to sleep with her?

15  A.  I might have some concern on the repeated, but your

16  terminology you used that she -- that it was repeated

17  advances, I don't know of that, or recall that.  But based on

18  this, I would say, yes, that he made an advance to her.

19  Q.  And you also indicate -- do you recall how many

20  conversations you might have had with her, with respect to

21  the allegation that Elders had twisted or grabbed Dr. Diaz's

22  arm?

23  A.  Quantity, no.  But I did have knowledge at least one time

24  that was shared with me.

25  Q.  And when you had this meeting with her around mid

1  February, when she indicated that she was going confront

2  Lieutenant Elders and tell him how unprofessional she thought

3  he was, do you recall whether she articulated what she meant

4  by the unprofessionalism of Colonel Elders?

5  A.  No.  I don't recall the details at the time.

6  Q.  At the time you were having the conversation, though, you

7  believed that what she was referring to was the same

8  information she had been telling you back in December and

9  January, would that be correct?

10  A.  Yes.

11  Q.  And, in fact, you suggested to her that she should report

12  this conduct up through the chain of command, would that be

13  correct?

14  A.  Correct.

15  Q.  And that is because that is -- it was in your opinion the

16  proper way that such allegations should be raised, would that

17  be correct?

18  A.  Yes, twofold.  One, my position, Colonel Elders's boss at

19  the time was Colonel Thomas, who was my boss.  So if Colonel

20  Thomas is not reachable, quite a few people would talk to me.

21  I handled a lot of the administrative, a lot of personnel

22  type issues.  So, yes.  That would be the advice, if you're

23  being wronged, that you don't need to accept that, you report

24  it.  You'd do something with that.

25  Q.  Now, at the time this was going on, you were not in

1  lieutenant Colonel Elders' chain of command, correct?

2  A.  Correct.

3  Q.  You were lower ranking than him at that time, still are?

4  A.  Correct.

5  Q.  You were lower ranking, correct?

6  A.  Correct.

7  Q.  And, in fact, you were lower ranking than Lieutenant

8  Colonel Diaz at the time, correct?

9  A.  Correct.

10  Q.  And at the time that you made this statement to Colonel

11  Inglis, would I be correct to state that the events were

12  fresh in your memory?

13  A.  Yes, sir.

14  Q.  And do you have any reason with respect to why Dr. Diaz

15  would deny speaking to you at these times you state in your

16  statement that you had conversations with her?

17          MS. DESHIELDS:  Objection.

18          THE COURT:  Sustained.

19          MR. ZAID:  No further questions, Your Honor.

20          THE COURT:  All right.  Fine.

21                  CROSS-EXAMINATION

22  BY MS. DESHIELDS:

23  Q.  Just a few, Your Honor.

24          With regard to the conversations that you

25  memorialize in your March 10, 2002 written statement that you

1    then submitted to Colonel Inglis, where did those

2    conversations occur?

3    A.  At the -- at the base, in operations.

4    Q.  Were you on duty at the time?

5    A.  Yes, ma'am.

6    Q.  Okay.  Were you in your military capacity?

7    A.  Yes, ma'am.

8    Q.  Okay.  You referenced somebody by the name of Lieutenant

9    Colonel Thomas.  Where does he stand in the chain of command?

10   A.  Lieutenant Colonel Thomas is the -- was the DCO, which

11   is, we don't have -- because we're a composite wing, we have

12   a wing commander and then a group commander, who was Colonel

13   Inglis.

14              Under that, you have a deputy commander for

15   maintenance and a commander for operations.  The DCO for

16   operations was Colonel Thomas and then you have the squadron

17   commander, who Colonel Elders was in that position.  Colonel

18   Mentges is the OSF underneath that.

19   Q.  You indicated that you served in some capacity for

20   Lieutenant Colonel Thomas; is that correct?

21   A.  Yes, ma'am.  With the -- this J model, the airplane that

22   we have at the base new, we were the first unit with it, so

23   there was a great deal of training, et cetera, going on.

24   Colonel Thomas not only was the head of the operations in

25   handling personnel issues, et cetera, but his job was also,

1    he's a flight evaluator, flight instructor.  So along with

2    learning how to fly that airplane, he would perform teaching

3    to the other and students, et cetera.

4              So there were meetings that I would attend, and

5    basically whatever he had delegated to me.  I'm a navigator.

6    This airplane doesn't use a navigator, so my role became a

7    staff role.  And so once a week there's a 1300 meeting, it's

8    a staff meeting, and I would go there, facilitate information

9    up to the commanders who were there and bring it back in a

10   brief.

11   Q.  And you say that you encouraged or recommended that

12   Lieutenant Colonel Diaz report her concerns through the chain

13   of command, is your testimony correct, that's what you

14   testified to on direct?

15   A.  Yes.  She should, take it to you know, Colonel Thomas or

16   another commander, and then follow the process to get it

17   solved.

18   Q.  Because there is a process in place for pursuing such,

19   but you don't necessarily have to follow that, do you?  Is

20   that your understanding?

21   A.  That's true.  I mean, it's certainly up to the

22   individual, but, yes.  I mean, certainly letting the

23   commanders know, I would have told, and I'm sure, you know, I

24   don't say it in this statement, but I reported it to Colonel

25   Thomas, and, you know, I would have talked to him, shared

1  with him, hey, this is going on, it's going to come your way,

2  I'll keep you in the loop.

3  Q.  But it's a person's option as to how they choose to air

4  that particular complaint?

5  A.  That's correct, to my knowledge, yes, ma'am.

6           MS. DESHIELDS:  No further questions, Your Honor.

7           REDIRECT EXAMINATION

8  BY MR. ZAID:

9  Q.  For one thing, you had no authority to resolve that, any

10  allegation or issue between Lieutenant Colonel Diaz and

11  Lieutenant Colonel Elders, correct?

12  A.  What do you mean by resolve?  By punish him or her, or --

13  Q.  Or you had no authority to take any action with respect

14  to any problems between two Lieutenant Colonels that were

15  above you, right?

16  A.  No.  I was not in a command position.

17  Q.  And you had no authority, for example, to initiate any

18  investigation, correct?

19  A.  Not that I know of.

20  Q.  And now, you indicated, in response to a question from

21  the government about that this sort of informal process that

22  people could go talk to other people, are you aware of any

23  policy within the guard that specifically states that

24  individuals can discuss sexual harassment allegations with

25  fellow guard members?

1  A.  No.

2  Q.  Now --

3          MS. DESHIELDS:  Have you finished your answer?

4  A.  Well, not really.

5  Q.  Are you aware, yes or no?

6          THE COURT:  Do you want to explain, or something?

7          THE WITNESS:  Yes.  Well, the question, yes.  I

8  mean, you can go up through the chain of command.  I wouldn't

9  think you'd run through the building telling everyone.  You

10  know, so I'm not directing her to giving advice that, you

11  know, and going to talk to somebody it would be, you know,

12  somebody of authority.  That is what I meant.

13  Q.  Okay.  Because, as you recognized, there must, for

14  military discipline and order, be some sort of limitations as

15  to who a senior officer can go with respect to complaints

16  against another senior officer, would you say that's

17  accurate?

18  A.  I don't know all the rules, but --

19  Q.  As a general rule?

20  A.  Yes.

21  Q.  And you couldn't, for example, if you had a problem with

22  a senior officer higher ranking than you, just go complain to

23  the base janitor; would that be fair to say?

24          MS. DESHIELDS:  Objection.

25          THE COURT:  Overruled.  You can answer it.  If he

1  had a problem, he wouldn't complain to the janitor?

2  A.  Correct.

3  Q.  And would you agree with me in saying that the military

4  order and discipline is based on the officers in particular

5  following the rules that exist within the structure?

6  A.  Yes.

7          MR. ZAID:  I have no further questions, Your Honor.

8          THE COURT:  Anything else, Miss Deshields.

9          MS. DESHIELDS:  No, Your Honor.

10         THE COURT:  All right.  Thank you.  I assume you're

11  free to stay or free to leave, if you wish.  All right.

12         MR. ZAID:  Next witness, Your Honor, is Michael

13  Mentges.

14         MS. DESHIELDS:  Your Honor, if I could just

15  interrupt for a moment, could Lieutenant Colonel Wilkinson be

16  released?  He does have a flight.

17         THE COURT:  I said he's free to leave or free to

18  stay.

19         THE CLERK:  Please come forward, sir.  Please raise

20  your right hand.

21         (The Witness is sworn.)

22         THE CLERK:  Thank you.  Please be seated.  Would

23  you please state your name your name for the record.

24         THE WITNESS:  Last name is Mentges, M E N T G E S.

25         THE CLERK:  Thank.  Please keep your voice up and

1    speak loudly and directly into the microphone.

2                    DIRECT EXAMINATION

3    BY MR. ZAID:

4    Q.  I want to pronounce your name correct.

5    A.  Mentges.

6    Q.  Mentges.  Okay.  Thank you.

7            Now, I understand you're now Lieutenant Colonel,

8    correct?

9    A.  Yes, sir.

10   Q.  Okay.  At the time these events were going on from 2000,

11   2002, though, you were a major, correct?

12   A.  That's correct.

13   Q.  Now, Lieutenant Colonel Mentges, there came a time when

14   you participated in an investigation with -- conducted by

15   Colonel Inglis regarding allegations made by Maria Diaz to

16   Karl Elders, correct?

17   A.  Yes.

18   Q.  And you provided a sworn statement to Colonel Inglis

19   during that time; did you not?

20   A.  I provided a memorandum for the record.

21   Q.  And you provided more than one, correct?

22   A.  That's correct.

23   Q.  And that memorandum was truthfully stated by yourself as

24   you understood facts to be?

25   A.  Yes.

1  Q.  Would that be correct?

2  A.  Yes.

3  Q.  And there came a time, did there not, when you

4  participated an investigation conducted by Colonel Wirts?

5  A.  Yes.

6  Q.  And during that time, you testified under oath as well,

7  correct?

8  A.  I testified under oath with Colonel Wirts, yes, that's

9  correct.

10  Q.  Now, what was it that led you to write, and, actually,

11  I'm -- I'm not sure which exhibit number it was, but you

12  actually have it, I'll put that before him.

13          (Pause.)

14  Q.  Referring to plaintiff's exhibit 2, if you could take a

15  look at it and let us know if you recognize that document?

16  A.  Yes, I do.

17  Q.  The March, that's the March 8th, 2002 memorandum of

18  record.

19          And that is your signature, sir, down at the

20  bottom?

21  A.  Yes, it is.

22  Q.  Now, what was it that led you to write that document?

23  A.  General Beasley came to me and asked me if I had any

24  knowledge of any concerns between Colonel Elders or Colonel

25  Diaz.

1  Q.  Now, were you aware at the time Major Wilhelm had

2  provided a memorandum of record?

3  A.  I have no knowledge of that.

4  Q.  And you provided the contents of this statement because

5  you had in fact been talking to Lieutenant Colonel Diaz for

6  the months prior regarding the allegations she ultimately

7  made against Lieutenant Colonel Elders, correct?

8  A.  As I stated in the memo, those are the conversations that

9  and Colonel Diaz had with me.

10  Q.  And part of your conversations would have, or were, with

11  respect to unwelcomed sexual advances, as she says Colonel

12  Elders had made toward her, correct?

13  A.  Yes, as I've stated in this memo.

14  Q.  And those conversations were occurring as early as the

15  fall of 2001; correct?

16  A.  I would say that's a fairly accurate time frame.

17  Q.  And you were not in Lieutenant Colonel Diaz's chain of

18  command at that time, correct?

19  A.  No, I was not.

20  Q.  And you neither were in the chain of command for

21  Lieutenant Colonel Elders, correct?

22  A.  That's correct.

23  Q.  And did you consider yourself a friend of Lieutenant

24  Colonel Diaz?

25  A.  I would say within the guard community, yes.

1  Q.  Did you ever socialize outside the guard community?

2  A.  Very infrequently.

3  Q.  Did you have any impression as to when she was discussing

4  these conversations with you that it was because you were her

5  friend or buddy?

6  A.  I don't know.  She came to me and confided this in me,

7  and I listened.

8  Q.  And, in fact, you did more than listen, though, you did

9  recommend to her that she report these allegations of her

10  chain of command, correct?

11  A.  I don't know if I said it in that terminology or not, up

12  the chain of command or not.  But I asked her if she was

13  going to report it, or whatnot, and she said she was not

14  comfortable reporting it at that time, and that she could

15  probably handle what was occurring at that time.

16  Q.  Now, if you look at your statement at the first

17  paragraph, the one that begins within the fall of 2001, given

18  that you wrote this in March -- let me first ask, actually,

19  you wrote it at the time when the events were fairly fresh

20  within your recollection, would that be true?

21  A.  No.  I wrote it in March when General Beasley came to me

22  and asked me if I had any knowledge of any of these sort of

23  events.

24  Q.  Now, by that I mean, well, let me rephrase.

25          You were writing about events that had taken place

1  Elders had invited her to Amsterdam, and that she thought

2  that he wanted to sleep with her, where did those

3  conversations occur?

4  A.  It occurred at the workplace in my office.

5  Q.  Were you on duty?

6  A.  Yes.

7  Q.  Do you know whether Lieutenant Colonel Diaz was on duty?

8  A.  I would say yes, she was.

9  Q.  And are you aware of whether the Maryland Air National

10  Guard has a policy prohibiting discrimination in the

11  workplace?

12  A.  Yes, they do.

13  Q.  And do they condone sexual harassment?

14  A.  No, they don't.

15  Q.  And when such complaints are made, however they are made,

16  should they be reported by whomever those allegations are

17  made to?

18  A.  I would believe they should, since there's a zero

19  tolerance policy.

20          MS. DESHIELDS:  No further questions, Your Honor.

21          THE COURT:  All right.  Any other questions?  Okay.

22          MR. ZAID:  No, sir.

23          THE COURT:  Lieutenant Colonel Wilkinson, you can

24  leave if you want.  You can stay if you want.

25          MS. DESHIELDS:  Mentges.